LAW OFFICE
**THOMAS McKEE TARPLEY**
A Professional Corporation
Bank of Hawaii Building
134 Soledad Avenue, Suite 402
Hagatna, Guam 96910
Telephone: (671) 472-1539
Facsimile: (671) 472-4526
Electronic mail: tarpley@guam.net

**FORREST BOOTH** (Cal. Bar No. 74166) (admitted pro hac vice)
**RYAN C. DONLON** (Cal. Bar No. 229292) (admitted pro hac vice)
**SEVERSON & WERSON**
A Professional Corporation
One Embarcadero Center, Suite 2600
San Francisco, CA 94111
Telephone: (415) 398-3344
Facsimile: (415) 956-0439

Attorneys for Defendant, Counter-Complainant,
Cross-Complainant, and Third-Party Complainant
S.J. GARGRAVE SYNDICATE 2724

FILED
DISTRICT COURT OF GUAM
FEB 20 2007
MARY L.M. MORAN
CLERK OF COURT

8ZP846W

# IN THE DISTRICT COURT OF GUAM

## TERRITORY OF GUAM

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>INCHCAPE SHIPPING SERVICES GUAM, LLC,<br><br>Plaintiff in Intervention,<br><br>vs.<br><br>MARWAN SHIPPING & TRADING CO., FIVE SEAS SHIPPING CO., LLC, and S.J. GARGRAVE SYNDICATE 2724, *in personam*,<br><br>Defendants.<br><br>AND CROSS-CLAIMS, COUNTERCLAIM, AND CLAIM IN INTERVENTION | Civil Case No.: 06-00011<br><br>**MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF S.J. GARGRAVE SYNDICATE 2724'S MOTION TO DISMISS CROSSCLAIM OF MARWAN SHIPPING CO., LLC, OR ALTERNATIVELY TO STAY THE CROSSCLAIM**<br>**[ORAL ARGUMENT NOT REQUESTED]**<br><br>Accompanying Documents: Notice of Motion and Motion, Affidavit of Myles A. Sunley, Table of Foreign Authorities, Proposed Order<br><br>Complaint Date: April 19, 2006<br>Trial Date: None Set |

## I. INTRODUCTION

S.J. GARGRAVE SYNDICATE 2724 ("Gargrave") submits the following recitation of facts, points, and authorities in support of its motion to dismiss or stay the Crossclaim of MARWAN SHIPPING & TRADING CO., LLC ("Marwan") and FIVE SEAS SHIPPING & TRADING CO., LLC ("Five Seas"). By their Crossclaim, Marwan and Five Seas seek damages for, inter alia, Gargrave's alleged breach of a contract of insurance and bad faith arising from such breach. Gargrave respectfully moves the Court to dismiss the Crossclaim, or alternatively stay it, because the insurance contract upon which Marwan and Five Seas base their claims contains an enforceable forum selection clause and arbitration clause requiring that any dispute arising therefrom shall be arbitrated in London, to the exclusion of this litigation.

## II. STATEMENT OF FACTS

The genesis of this action is the grounding of the M.V. AJMAN 2, a North Korean-flagged vessel ex Mexico, in Apra Harbor, Guam. (*See* Verified Complaint of the United States ("Complaint"), ¶ 21; Crossclaim of Marwan and Five Seas ("Crossclaim"), ¶ 9.)[1] Marwan "was the general agent" of the M.V. AJMAN 2 and Five Seas her "manager." (Crossclaim, ¶¶ 2, 3.) Both are limited liability companies located in Sharjah, an Arabian emirate. (Crossclaim, Caption, ¶¶ 2, 3, Ex. 2.) Gargrave was her pollution insurer and COFR[2] guarantor/surety. (Crossclaim, ¶¶ 6, 8.) How Gargrave, a Lloyds of London-based insurance syndicate, came to assume financial responsibility for, and separately to insure Marwan for pollution liability arising from, M.V. AJMAN 2, a North Korean-flagged vessel steaming across the Pacific from Mexico to Asia, owned and operated by United Arab Emiritian entities, directly informs the below analysis regarding choice of law and habitability. It warrants elaboration.

---

[1] Selected portions of the United States' Complaint and Marwan/Five Seas Crossclaim are set forth herein as background facts and assumed true for purposes of this motion only. Reliance on those allegations should not and cannot be construed as admissions by Gargrave, or constitute any kind of waiver or form the basis of a judicial estoppel as to those factual allegations.

[2] "COFR" is acronymical for "certificate of financial responsibility." (33 U.S.C. § 2701, et seq.; 33 CFR § 138.65.)

- 1 -

M.V. AJMAN 2 began her fateful journey in Loreto, Mexico, apparently destined for China or elsewhere in Asia. (Affidavit of Myles A. Sunley ("Sunley Aff."), ¶¶ 4 and 5, Ex. A and B.) She sailed under the flag of the Democratic People's Republic of Korea, i.e., North Korea. (Sunley Aff., ¶¶ 4-6, Ex's A-C). Her journey was interrupted by a typhoon from which she sought sanctuary in Apra Harbor. (Crossclaim, ¶ 5.) Before she could enter Apra Harbor, however, the U.S. Coast Guard required that Marwan/Five Seas secure a COFR pursuant to the Oil Pollution Act of 1990. (Crossclaim, ¶ 5; 33 U.S.C. § 2701 et seq.)

In order to obtain the financial guarantee necessary to obtain a COFR, Five Seas employed the services of Environmental Protection Group, LLC ("EPG"). (Sunley Aff., ¶¶ 4 and 5, Ex. A and B.) EPG is a coverholder with an open cover agreement with Gargrave, meaning that EPG is authorized under certain circumstances to bind Gargrave to financial guarantees that EPG assumes. (Sunley Aff., ¶ 3.) EPG issued a financial guarantee for M.V. AJMAN 2 in aid of Five Seas' COFR Application, which Five Seas references in its Crossclaim as "Exhibit 2." (Crossclaim, ¶ 8; Sunley Aff., ¶ 4, Ex. A.) The method of financial responsibility that Gargrave thereby incurred was a financial guarantee.

Marwan also procured pollution insurance through another intermediary, Ropner Insurance Services Ltd ("Ropner"). (Crossclaim, ¶ 6; Sunley Aff., ¶¶ 6 and 7, Ex's C and D.) Ropner is a Lloyds-licensed insurance broker. (Sunley Aff., ¶ 6.) Ropner was approached by Navigators Management (UK) Ltd. ("Navigators"), which insured M.V. AJMAN 2's hull. (Sunley Aff., ¶ 6, Ex. C.) Navigators' coverage apparently did not include pollution insurance, and Navigators instructed Ropner to arrange a declaration covering pollution risks, which it did as represented by the Cover Note Marwan incorporates as "Exhibit 1" to its Crossclaim. (Crossclaim, ¶ 6; Sunley Aff., 6 and 7, Ex's C and D.)

In the face of a typhoon, M.V. AJMAN 2 entered Apra Harbor, eventually dropping, and dragging, her anchor, then running aground. (Crossclaim, ¶ 9.) The United States allegedly incurred costs in refloating her, then complained against Marwan and Five Seas. (Complaint, ¶¶ 4, 6-17, 21; Crossclaim, ¶ 10.) The United States also sued Gargrave directly as a "guarantor"

because it "provided evidence of financial responsibility and certain guarantees to the said vessel pursuant to statute and regulations." (Complaint, ¶ 19; 33 USC §§ 2701(13) and 2716(f)(1).)

### III. PROCEDURAL HISTORY

On July 12, 2006, after the United States commenced its action against Marwan, Five Seas, and Gargrave, Gargrave crossclaimed against Marwan and Five Seas. Gargrave did *not* crossclaim to enforce any rights, or obtain a declaration of its duties, arising from any insurance. Rather, Gargrave's crossclaims arose exclusively from the guarantee/surety it gave pursuant to the COFR. (See Gargrave's Crossclaim, ¶¶ 6, 10, 13, 23.) Similarly, the United States sued Gargrave on the basis of the guarantee/surety bond Gargrave issued in order that Five Seas could obtain the COFR, and not on the basis of Gargrave's insurance relationship with Marwan. (Complaint, ¶¶ 18, 19.) The first instance that the issue of rights and duties arising from the insurance came up in this case was when Marwan and Five Seas crossclaimed against Gargrave.

### IV. POINTS & AUTHORITIES

Gargrave now seeks to enforce the provision of its insurance contract that any disputes arising therefrom shall be arbitrated in London. Therefore, it moves the Court to dismiss or stay Marwan and Five Seas' Crossclaim. The motion to dismiss is made pursuant to rules 12(b)(1) and (3) of the Federal Rules of Civil Procedure. A forum selection clause, such as the one contained in the Cover Note, renders a crossclaim dismissible because the Court lacks jurisdiction and the matter is brought in an improper venue. (*Argueta v. Banco Mexicano, S.A.*, 87 F.3d 320, 324 (9th Cir. 1996) ("*Argueta*").) Also, the parties' arbitration clause means that the court must dismiss or stay the Crossclaim. (9 U.S.C. § 3.)

As a prefatory matter, Gargrave moves the Court to recognize that English law applies to this Crossclaim since the contract upon which Marwan and Five Seas are suing contains an enforceable choice of law provision.

**A.  English Law Governs The Contract.**

The Cover Note provides, unequivocally and in pertinent part, "CHOICE OF LAW & JURISDICTION: This insurance shall be governed by and construed in accordance with the laws of England and the exclusive jurisdiction of the English courts." (Sunley Aff., ¶ 7, Ex. D, p. 4.)

Courts generally defer to the autonomy of contracting parties to select the law applicable to their contract. (*See* Restatement of Law (Second) of Conflict of Laws § 187 (1971).) The same rule applies to a contractual election to arbitrate, as well as selection of the seat of arbitration. (*Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior University*, 489 U.S. 468, 476-477 (1989).) An effective contractual choice of law clause even supplants the forum's law in adjudicating the validity of the contract and its separate terms. (17A Am.Jur.2d (Contracts), § 261.) Therefore, the only arguable need herein to apply the forum's law (in a conflict of law analysis) would be to validate the contractual selection of English law. But, as demonstrated *infra*, no conflict of law analysis is necessary even for that discreet issue because any conceivably applicable law yields the same result: that the choice of law provision is plain, unambiguous, and binding. (See *Heikkila v. Sphere Drake Ins. Underwriting Management, Ltd.*, 1997 AMC 2975, 1997 WL 995625, 2-4 (D. Guam 1997) ("*Heikkila*") (dismissing action in favor of arbitration after conflict of law analysis, finding English law applicable.)

First, each body of law, England (Contracts (Applicable Law) Act 1990, Title II, Art. 3(1) (Freedom of Choice)[3]; *Vitafood Products v. Unus Shipping Co.* [1939] AC 277 (Privy Council)); federal law/admiralty (*The Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 12-13 (1972) ("*The Bremen*")); and Guam (*Heikkila*, 1997 WL 995625, 2-7) recognizes the parties' fundamental right to chose the law that will govern their transaction, and applies that law.

Second, juridical deference to the parties' choice of law is particularly compelling in the context of international commerce. In enacting its statutory recognition of choice of law provisions, the Crown expressed her "anxi[ety] to continue in the field of private international law the work of unification which has already been done ... in particular in the field of jurisdiction and enforcement of judgments," and that she "wished to establish uniform rules concerning the law applicable to contractual obligations." (England Contracts (Applicable Law) Act 1990, Preamble.) Under American federal law and admiralty, "courts should enforce choice-of-law and choice-of-forum clauses in cases of 'freely negotiated private international agreements."

---

[3] "A contract shall be governed by the law chosen by the parties."

- 4 -

(*Batchelder v. Kawamoto*, 147 F.3d 915, 918 (9th Cir. 1998); quoting *The Bremen*, 407 U.S. at 12-13.) "[C]hoice-of-law and choice-of-forum provisions in international commercial contracts are '*an almost indispensable precondition* to achievement of the orderliness and predictability essential to any international business transaction,' and should be enforced absent strong reasons to set them aside." (*Batchelder*, 147 F.3d at 918 (italics added; internal citation omitted); quoting *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 516-520).) Choice of law and forum provisions in a marine insurance contract must be upheld absent "a strong showing" that the enforcement of such a provision would be unreasonable or unjust. (*Lien Ho Hsing Steel Enterprise Co., Ltd. v. Weihtag*, 739 F.2d 1455, 1458 (9th Cir. 1984) ("*Lien Ho*"); citing *The Bremen*, 407 U.S. at 15.)

Rather than being unreasonable or unjust, the present case exemplifies why internationally contracting parties would opt for the predictability attendant on choosing the rules to apply to their transaction. It also explains the favor with which courts view choice of law clauses. On the facts at bar, a limited liability company organized in the United Arab Emirates allegedly purchased insurance through a London broker with a Lloyd's of London underwriter covering a North Korean-flagged vessel embarking on a transoceanic voyage originating in Mexico and bound for Asia. Fully one half of the populated continents of the world are represented on these facts. It is little wonder that the parties sought to remove the uncertainty of which law would apply to a dispute arising from their agreement, and where such a dispute should be resolved. There is no offense to law or public policy. Quite the contrary, courts and legislatures enthusiastically embrace the concept.

More, the words by which the parties affected their mutual understanding are clear. "CHOICE OF LAW & JURISDICTION: This insurance shall be governed by and construed in accordance with the laws of England and the exclusive jurisdiction of the English courts." (Sunley Aff., ¶ 7, Ex. D, p. 4.) The parties chose English law to govern their contract. Where the text of a commercial contract is unambiguous and the commercial context offers no alternative meaning, the plain meaning controls. That canon is universal, be it English law (*Reliance Marine*

*Ins. Co. v. Duder* [1913] 1 KB 265, 273 (Court of Appeal)[4]; admiralty law[5] (*Indemnity Ins. Co. of N. America v. Cal. Stevedore & Ballast Co.*, 307 F.2d 513, 516-518 (9th Cir. 1962) ("[w]here there is no ambiguity[,] [t]here is nothing to construe"); general Ninth Circuit law (*Trident Center v. Connecticut General Life Ins. Co.*, 847 F.2d 564, 568-570 (9th Cir. 1988)); or Guamanian law (*Morta v. Korea Ins. Corp.*, 840 F.2d 1452, 1459-1460 (9th Cir. 1988); 18 Guam Code, §§ 87104 and 87105.)

The plainness of the choice of law clause, the uniformity of law relating to interpreting contracts, and the universality of enforcing choice of law clauses do not tolerate any further analysis. (*Wilburn Boat Co. v. Fireman's Fund Ins. Co.*, 348 U.S. 310, 1955 AMC 467 (1955).) The parties chose English law to govern the contract of insurance.

**B.     This Court Is An Improper Venue Due To The Forum Selection Clause And This Court Therefore Must Dismiss The Action.**

Marwan and Gargrave agreed, under their "CHOICE OF LAW & JURISDICTION" clause, that the "insurance shall be governed by ... the exclusive jurisdiction of the English Courts." (Sunley Aff., ¶ 7, Ex. D, p. 4.) Where contracting parties agree upon a forum in which to adjudicate their disputes, a motion to dismiss lies where one party sues elsewhere on the basis that the venue is improper (Fed.R.Civ.P., rule 12(b)(3); *Argueta,* 87 F.3d at 324) or on the basis that the district lacks subject matter jurisdiction. (Fed.R.Civ.P., rule 12(b)(1); *AVC Nederland B.V. v. Atrium Invest. Partnership,* 740 F.2d 148, 152-153 (2nd Cir. 1984.) Either way the result is the same. The Court must dismiss the Crossclaim.

---

[4] "It is, [Lord Justice Kennedy of the Court of Appeal] conceive[d], a fundamental principal of [English] law that, where you have a contract which has a plain natural meaning ... it is not permissible to alter its effect according to the intention of one of the two contracting parties, or to adduce evidence in order to shew such an intention. If A and B enter into a written contract it is immaterial to consider what either of them intended to effect. The only question is, What have they said by their contract?"

[5] In the absence of a clear conflict, American admiralty law imports its English antecedent. (*Queen Ins. Co. of America v. Globe & Rutgers Fire Ins. Co.*, 263 U.S. 487, 493 (1924) (commenting on the "special reasons for keeping in harmony with the marine insurance laws of England, the great field of this business").)

The choice of law provision, discussed above, means that the forum selection clause should be interpreted in accordance with English law. Again, English courts afford contracting parties broad latitude in choosing their forum- so broad, in fact, that they will exercise exclusive jurisdiction over a claim that had nothing to do with England, save that the parties chose it as their forum. (*Unterwester Reederei G.M.B.H. v. Zapata Off-Shore Co. (The "Chaparral")*, [1968] 2 Lloyd's Rep. 158 ("*The Chaparral*").) Conveniently, in *The Chaparral*, the English Court of Appeal provided a reported decision on the very dispute that went to the United States Supreme Court in *The Bremen* (the "BREMEN" being defendant's tug that towed the "CHAPARRAL," plaintiff's oil rig). "The law on the subject," thought Lord Justice Willmer, "is not open to doubt... It is always open to parties to stipulate (as they did in the case) that a particular Court shall have jurisdiction over any dispute arising out of their contract." (*The Chaparral*, 2 Lloyd's Rep at 162; see also *Akai Pty Ltd v. People's Ins. Co. Ltd*, [1998] 1 Lloyd's Rep 90, 104-105.) Reciprocally, as a matter of international comity and deference to the freedom of contract, English courts will enforce choices of foreign forums to the same extent as they will the choice of an English one. (*Hamed El Chiatry & Co. v. The Thomas Cook Group, Ltd (The "Nile Rhapsody")* [1994] 1 Lloyd's Rep 382, 388-389.)

The same result obtains under United States law. In arriving at the same conclusion and citing Lord Justice Willmer, the Supreme Court consciously adopted a position that "is substantially that followed in other common-law countries including England." (*The Bremen*, 407 U.S. at 11, fn. 12 (citing English cases).) Like choice of law clauses, choice of forum clauses "are prima facie valid and should not be set aside unless the party challenging enforcement of such a provision can show it is "'unreasonable' under the circumstances." (*Argueta*, 87 F.3d at 325; quoting *The Bremen*, 407 U.S. at 10.) "The Supreme Court has construed this exception narrowly" and it is the challenging party's "heavy burden" to show it. (*Argueta*, 87 F.2d at 325.) A forum selection clause is only unreasonable if (1) its incorporation into the contract was the result of fraud, undue influence, or overweening bargaining power; (2) the selected forum is so "gravely difficult and inconvenient" that the complaining party will "for all practical purposes be deprived of its day in court;" or (3) enforcement of the clause would contravene public policy of

- 7 -

the forum in which the suit is brought. (*The Bremen*, 407 U.S. at 12-15.) Since it is Marwan's burden to demonstrate the unreasonableness of the forum selection clause, there is no reason to discuss these factors now, save to rely on the prima facie enforceability of the forum selection clause and *The Bremen*'s own observation that "[p]lainly, the courts of England meet the standards of neutrality and long experience in admiralty litigation." (*Id.*, at p. 12.) The Crossclaim must be dismissed. (Fed.R.Civ.P. 12(b)(3).)

### C. The Laws of England and U.S. Admiralty Law Require The Court To Dismiss or Stay Judicial Proceedings When the Parties Have Agreed To Arbitration.

Marwan and Gargrave also agreed that "[t]he seat of arbitration *shall be* London" (Sunley Aff., ¶ 7, Ex. D, p. 4.) (italics added).) Therefore, if either party sues to enforce any obligation or seek a declaration of any right under the insurance agreement, it must be by means of arbitration in London.

Federal maritime law, which would otherwise preempt The Guam International Arbitration Chapter[6] in this instance (9 U.S.C. §§ 1, 2; *Southland Corp. v. Keating* (1984) 465 1, 12), recognizes the right of parties engaged in an international and/or maritime transactions to opt out of the Federal Arbitration Act[7] and arbitrate under the laws and at a place of their choosing. (*Volt*, 489 U.S. at 476.) Such freedom includes the right to arbitrate under the laws and in a place outside the United States. (*Republic of Nicaragua v. Standard Fruit Co.*, 937 F.2d 469, 478 ("*Standard Fruit*"); see also *Vimar Seguros y Reaseguros v. Sky Refer*, 515 U.S. 528, 534-535 (1995) (provisions requiring arbitration in foreign country or under foreign law may increase a shipper's costs, but that does not "lessen liability" within meaning of Carriage of Goods by Sea Act, and therefore does not invalidate arbitration clause); and *Triton Lines, Inc. v. Steamship Mutual Underwriting Ass'n*, 707 F.Supp. 277, 278 (S.D. Texas 1989) (dispute over maritime contract stayed pending arbitration conducted under English law.) This determination requires

---

[6] 7 Guam Code, § 42101 et seq.

[7] The Federal Arbitration Act applies to contracts of marine insurance. (9 U.S.C. §§ 1 and 2; *Triton*, 707 F.Supp. at 278.)

- 8 -

but "an expeditious and summary hearing, with only restricted inquiry into factual issues." *Moses H. Cone Mem. Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 22 (1976) ("*Moses H.*".)

The Arbitration Act 1996 of England ("Arbitration Act") complements the American rule that another body of law may be chosen to govern the arbitration, asserting itself "where the seat of the arbitration is in England." (Arbitration Act, § 2.) "'Seat of arbitration' means the juridical seat of the arbitration designated (a) by the parties to the arbitration agreement." (Arbitration Act, § 3(a).) The contracting parties here stated that "[t]he seat of arbitration shall be London," thus mirroring the statutory invocation of the Act. (Sunley Aff., ¶ 7, Ex. D, p. 4; Arbitration Act, §§ 2(1) and 3.)

The English Arbitration Act reflects the internationally recognized public policy favoring arbitration. "[T]he parties should be free to agree how their disputes are resolved, subject only to such safeguards as are necessary in the public interest." (Arbitration Act 1996, § 1(b).) "[C]ourts should not intervene" with that freedom of contract, except to enforce an arbitration agreement or award. (Arbitration Act, § 1(c); cf. *Moses H.*, 460 U.S. at 24.) Courts, be they English or American, favor arbitration so strongly that "the clear weight of authority holds that the most minimal indication of the parties' intent to arbitrate must be given full effect, *especially in international disputes*." (*Standard Fruit*, 937 F.2d at 478 (italics added); citing *Bauhinia Corp. v. China Nat'l Machinery and Equip Co.*, 819 F.2d 247 (9th Cir. 1987) (arbitration ordered where contract contained two incomplete and contradictory arbitration clauses); *Mediterranean Enterprises, Inc. v. Ssangyong Corp.*, 708 F.2d 1458, 1462-1463 (9th Cir. 1983) (broadly construing scope of Korean arbitration clause).)

While the arbitration clause here is itself not burdened by any ambiguity, it is instructive to note that English courts do not quibble with "technical interpretations," and shun "undue emphasis on niceties of language," particularly in the context of commercial arrangements. (*Sirius Int'l Ins. Co. v. FAI Gen. Ins. Ltd.* [2005] 1 Lloyd's Rep. 461, 465-466 (House of Lords).) Thus, in *Mangistaumunaigaz Oil Prod. Ass'n v. United World Trade Inc.* [1995] 1 Lloyd's Rep. 617 ("*Mangistaumunaigaz*"), the Queen's Bench Division (Commercial Court) interpreted an

Case 1:06-cv-00011    Document 103    Filed 02/20/2007    Page 10 of 14 AND P&A OF POINTS & AUTHORITIES
Civil Case No.: 06-00011

arbitration contract in a commodity sales contract which read "Arbitration, if any, by I.C.C.[8] rules in London," to bind the parties to arbitration. (See also *Arab African Energy Corp. Ltd v. Olieprodukten Nederland BV* [1983] 2 Lloyd's Rep. 419 (Queen's Bench) (interpreting similar clause).) A dispute arose after the plaintiff ("M.O.P."), a state-owned enterprise of the Republic of Kazakhstan, allegedly failed to pay defendant ("United World"), a Colorado corporation, for the third and fourth of four oil shipments. (*Mangistaumunaigaz*, 1 Lloyd's Rep at 618.) M.O.P. initiated proceedings before the I.C.C., to which United World objected. (*Id.* at 619.) M.O.P. sought declaratory judgment from the Queen's Bench that the provision constituted a valid, effective, and binding agreement to arbitrate. (*Id* at 619-620.) United World argued that the words "if any" are "inconsistent with an unconditional contractual undertaking to arbitrate future disputes." (*Id* at 620.) The Queen's Bench sided with M.O.P., finding the language "Arbitration, if any, by I.C.C. rules in London," to be a valid and binding arbitration clause. (*Id* at 621.) Read as whole, in the context of international commerce between two sophisticated parties, a contrary finding, according to the court, would "strain common sense" and "breach the overall rule of construction which is to give effect to the presumed intention of the parties." (*Ibid.*)

In any case, the arbitration provision before this Court does not contain such surplusage as "if any." It straightforwardly provides that "[t]he seat of arbitration shall be London." As the court and all parties recognized in *Mangistaumunaigaz* (including United World's counsel, who resisted arbitration), "but for the words 'if any,' the intention of the parties would have been plain. In English law, an agreement to arbitrate need be in no particular form; on the contrary, an arbitration agreement may be in a most summary form, tersely expressed." (*Id.* at 5.) With such words as "Arbitration ... by I.C.C. rules in London," or comparatively, "[t]he seat of arbitration shall be London," "the parties *make quite clear that they are choosing arbitration* as the appropriate form of dispute resolution rather than resort to the Courts. (*Ibid.* (italics added).)

---

[8] "I.C.C." refers to the International Chamber of Commerce, which provides arbitration services for international commercial disputes. (*See* http://www.iccwbo.org/court/.)

The question that the parties opted for arbitration is beyond dispute. The only issue is the remedy to which Gargrave is entitled. The Arbitration Act expressly mandates that judicial actions must, upon one party's motion, be stayed when England is the seat of arbitration:

> 9. Stay of legal proceedings.
>
> (1) A party to an arbitration agreement against whom legal proceedings are brought (whether by way of claim or counterclaim) in respect of a matter which under the agreement is to be referred to arbitration may (upon notice to the other parties to the proceedings) apply to the court in which the proceedings have been brought to stay the proceedings so far as they concern that matter.
>
> …
>
> (4) On an application under this section the court *shall* grant a stay unless satisfied that the arbitration agreement is null, void, inoperative, or incapable of being performed.
>
> (5) If the court refuses to stay the legal proceedings, any provision that an award is a condition precedent to the bringing of legal proceedings in respect of any matter is of no effect in relation to those proceedings.

(Arbitration Act, § 9 (italics added).) Indeed, the court's power to stay judicial proceedings, and the arbitrant's corresponding right to such a stay, is "mandatory," and will "have effect notwithstanding any agreement to the contrary." (Arbitration Act, § 4(1), Schedule 1.) American maritime law similarly provides for litigation to be stayed pending contractual arbitration. (9 U.S.C. § 3.) However, the court's affirmative power to stay the proceedings does not foreclose its power to dismiss the Crossclaim. (*Choice Hotels Int'l Inc. v. BSR Tropicana Resort, Inc.*, 252 F.3d 707, 709-710 (4th Cir. 2001) ("*Choice Hotels*"); citing *Alford v. Dean Witter Reynolds, Inc.*, 975 F.2d 1161, 1164.) "[D]ismissal is a proper remedy when all the issues presented in a lawsuit are arbitrable." (*Choice Hotels*, 252 F3d at 709-710.) And "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." (*Moses H.*, 460 U.S. at 24-25.)

Coupled with the strong Anglo-American preference for arbitration, the reasons for dismissing or staying the Marwan's and Five Seas' Crossclaim are overwhelming. As a matter of judicial economy, it makes most sense to simply dismiss the Crossclaim, as the Court is empowered to do. In any event, the Court should grant Gargrave's motion.

## V. CONCLUSION

Gargrave respectfully submits that the Crossclaim of Marwan and Five Seas must be dismissed, or at least stayed pending arbitration in London. The choice of forum clause conferring exclusive jurisdiction to the English courts makes it particularly appropriate for this Court to dismiss the Crossclaim pursuant to rule 12(b)(1) and (3) of the Federal Rules of Civil Procedure. Even absent the forum selection clause, however, the arbitration clause means, pursuant to U.S. law and English law, that the Court should stay the Crossclaim, if not dismiss it outright.

DATED: February 20th, 2007

THOMAS M. TARPLEY, JR.
A Professional Corporation

By: _____
Thomas M. Tarpley, Jr.

Attorneys for S.J. GARGRAVE SYNDICATE 2724

# CERTIFICATE OF SERVICE

I, Thomas M. Tarpley, Jr., hereby certify pursuant to Rule 5(d) Fed. R. Civ. P. that on February **20**, 2007, I caused to be served a true and correct copy of the **MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF S.J. GARGRAVE SYNDICATE 2724'S MOTION TO DISMISS CROSSCLAIM OF MARWAN SHIPPING & TRADING CO., LLC, AND FIVE SEAS SHIPPING CO., LLC, OR ALTERNATIVELY TO STAY THE CROSSCLAIM [ORAL ARGUMENT NOT REQUESTED]**, to the following:

R. Michael Underhill, Esq.
Attorney in Charge
c/o Mike W. Schwab, Esq.
OFFICE OF THE UNITED STATES ATTORNEY
108 Hernan Cortez Avenue, Suite 500
Hagatna, Guam 96910
*Attorneys for Plaintiff and Counterdefendant United States of America*

John E.D. Powell, Esq.
c/o Lawrence J. Teker, Esq.
TEKER TORRES & TEKER, P.C.
Suite 2-A, 130 Aspinall Avenue
Hagatna 96910-5018, Guam
*Attorneys for Defendants and Cross-Defendants Marwan Shipping & Trading Co. and Five Seas Shipping Co., LLC*

David P. Ledger, Esq.
Elyze J. McDonald, Esq.
CARLSMITH BALL LLP
Bank of Hawaii Building
Suite 401
134 West Soledad Avenue
Hagatna, Guam 96910
*Attorneys for Intervenor Inchcape Shipping Services Guam LLC*

Dated this **20** day of February, 2007.

_____
THOMAS McKEE TARPLEY,
Attorney for Defendant
S.J. GARGRAVE SYNDICATE 2724, in *personam*

-13-