# Exhibit 3



Westlaw.UK

[1998] 1 Lloyd's Rep. 90                                                                     Page 1

1997 WL 1103548 (QBD (Comm Ct)), [1997] C.L.C. 1508, [1999] I.L.Pr. 24, [1998] 1 Lloyd's Rep. 90
**(Cite as: [1998] 1 Lloyd's Rep. 90)**

*90 Akai Pty. Ltd. v. People's Insurance Co. Ltd.

Queen's Bench Division (Commercial Court)

QBD (Comm Ct)
July 31, 1997

Before Mr. Justice Thomas

Insurance (Comprehensive Credit) - Jurisdiction - Stay of action - Anti-suit injunction - Time bar - Claim by insured under policy - Actions brought in Australia and England - Whether insurers submitted to jurisdiction of Australian Courts - Whether English action should be stayed - Applications for anti-suit and anti-enforcement injunctions - Whether defendants entitled to summary judgment on time bar issue.

On June 1, 1991 Akai Pty. Ltd. (Akai) a company incorporated in New South Wales as the subsidiary of a large multi-national Japanese company entered into a comprehensive credit insurance policy with the insurers People's Insurance Co. Ltd. of Singapore (PIC). The policy provided inter alia:

Clause VI 8: *Action Against the Company*

No action arising out of this policy may be brought against the company unless such action is commenced within twelve (12) months following the event of the loss.

Clause VI 9: *Governing Law*

This policy shall be governed by the laws of England. Any dispute arising from this policy shall be referred to the Courts of England.

On Jan. 14, 1992 one of Akai's largest debtors Norman Ross Homeworks Pty. Ltd. (Norman Ross) went into receivership and the New South Wales Court appointed a liquidator on Feb. 10, 1992.

On Apr. 23, 1992 Akai claimed under the policy but on Dec. 30, 1992 PIC declined to pay alleging breaches of the terms of the policy.

On Mar. 5, 1993 Akai commenced proceedings in Australia and on the same day commenced proceedings in England by writ.

On June 11, 1993 there was a directions hearing before the New South Wales Court which resulted

in an order by consent that PIC should file their motion for a stay. On June 21, 1993 PIC issued a notice of motion seeking a stay of the proceedings in New South Wales until the proceedings in England had been determined.

Meanwhile on June 15, 1993 PIC had filed a notice of appearance with the New South Wales Court.

On Dec. 7, 1993 the New South Wales Court stayed the proceedings. An appeal was dismissed on Apr. 28, 1995 and Akai appealed to the High Court of Australia.

On Dec. 23, 1996 the High Court of Australia by a majority allowed the appeal and refused a stay on the ground that s. 8 of the Insurance Contracts Act, 1984 provided that if the proper law of a contract of insurance would be the law of an Australian state but for an express provision to the contrary, then notwithstanding that provision, the proper law of the contract would be the law of that state. The High Court held that cl. VI 9 was rendered void and there was no basis for a stay (see [1997] 141 A.L.R. 389).

On Mar. 5, 1997 PIC applied to the High Court in Singapore, where any judgment obtained by Akai in Australia would be enforced, for an anti-suit injunction. This was granted ex parte on Mar. 6, 1997.

PIC counterclaimed in the English proceedings. They sought summary judgment against Akai on the basis that the claim was time barred as no action had been brought within a year of the event of loss.

Akai applied to have the anti-suit injunction discharged and applied to this Court to strike out or stay the counterclaim.

On June 13, 1997 the Singapore Court discharged the injunction but granted a stay pending an appeal and on the same day PIC gave notice that they would apply for an anti-suit injunction.

The issues for decision were: (1) whether PIC submitted to the jurisdiction of the New South Wales Court with the consequence that this Court should recognize the decision of the High Court of Australia as finally deciding that the English law and jurisdiction clause in the policy was void and unenforceable; (2) whether the Court should, as a matter of comity give effect to the Australian law

[1998] 1 Lloyd's Rep. 90                                                                Page 2

1997 WL 1103548 (QBD (Comm Ct)), [1997] C.L.C. 1508, [1999] I.L.Pr. 24, [1998] 1 Lloyd's Rep. 90
**(Cite as: [1998] 1 Lloyd's Rep. 90)**

and public policy by staying the action; (3) whether the agreements made between the parties for extension of time to serve the defence preclude PIC from continuing the proceedings in this Court; (4) whether the Court should exercise its discretion to stay these proceedings; or grant an anti-suit injunction in respect of the New South Wales proceedings or an anti-enforcement injunction against any judgment obtained in those proceedings; (5) if these proceedings were not stayed whether PIC were entitled to judgment on their counterclaim for a declaration that the claim was time barred.

Held, by Q.B. (Com. Ct.) (THOMAS, J.), that

(1) it was quite clear from all the evidence that PIC never submitted to the jurisdiction of the Courts of New South Wales; all they sought to do was obtain a stay; they might have taken the technical step of filing a notice of appearance but that had to be seen in the context that there had been a hearing a few days earlier where PIC had made it clear they would apply for a stay and the Judge had directed them to file a motion to stay; there was no evidence in the proceedings between 1993 and the decision of the High Court in December, 1996 that they did anything other than seek a stay; the filing of the notice of appearance was not inconsistent with the challenge to the jurisdiction and the application for a stay *(see* p. 97, cols. 1 and 2);

(2) the attendance of PIC's solicitors at hearings in 1997 were consistent with the continued challenge to the jurisdiction; the solicitor's action had to be viewed in the context of the decision of the High Court of Australia that it had jurisdiction over Akai and that he *91 did nothing to suggest that the Court should proceed to consider the merits *(see* p. 98, cols. 1 and 2);

(3) PIC did not submit to the jurisdiction of the Courts of New South Wales and the judgment of the High Court of Australia was not one that was recognized as giving rise to a decision binding on PIC that the proper law and the jurisdiction clause in the policy was void and unenforceable *(see* p. 98, col. 2);

(4) it was clear that the parties to the insurance policy bargained for English law; the Courts should therefore give effect to that intention, unless it would be contrary to English public policy to give effect to the enforcement of the jurisdiction clause which was otherwise valid *(see* p. 100, col. 1);

(5) although the insurance policy had a very close connection with Australia, that was not a decisive factor in considering the particular questions of public policy; in contracts of this kind between commercial enterprises there was no equivalent restriction in English law or Community law on the parties' choice of law; this Court should

give effect to the bargain of the parties and their freely negotiated choice of law and jurisdiction; it should not as a matter of comity give effect to the decision of the High Court that overrode that bargain and that choice *(see* p. 100, cols. 1 and 2);

-Re Missouri Steamship Co., (1889) 42 Ch.D. 321 and Vita Food Products Inc. v. Unus Shipping Co. Ltd., (1938) 63 Ll.L.Rep. 21 considered.

(6) there was no agreed term (express or implied) that formed part of the agreements to extend time or any collateral agreement to the same effect on which Akai could rely so as to prevent the continuation of those proceedings *(see* p. 103, cols. 1 and 2; p. 104, col. 1);

(7) the English proceedings ought not to be stayed *(see* p. 105, col. 2; p. 106, cols. 1 and 2; p. 107, col. 1);

(8) if PIC had applied to the English Court in March, 1997 instead of the Singapore Court they would have been entitled to an anti-suit injunction; the right course would be to compensate Akai by an indemnity against all the expenses to which they had been wrongly put in Singapore and grant the relief to PIC; PIC would be granted an injunction restraining further continuance of the proceedings in New South Wales but was required to discontinue their claim for an injunction in Singapore *(see* p. 108, col. 1);

(9) it would not be right to grant an anti-enforcement injunction; there was no suggestion that Akai would breach the injunction granted in respect of the continuation of the proceedings in Australia; and there were powerful arguments that it was more consistent with comity to leave it to the Courts of Singapore to decide what course they should take in the light of their own law *(see* p. 108, col. 2);

(10) on the evidence the Court could not decide what the state of the knowledge of the parties was and it would be assumed for present purposes that Akai did not know PIC would rely on the defence of time bar until it was raised in March, 1997 *(see* p. 110, col. 1);

(11) there were grave difficulties in establishing waiver; and PIC did not have to make an election as to whether they would rely on the time bar defence so that no circumstances arose from which a waiver could have been founded on the evidence; it could not be determined whether the circumstances giving rise to an estoppel had been made out; the essential element relating to Akai's state of knowledge could not be determined and PIC was not entitled to summary judgment on the time bar issue; the issue on the time bar should be tried as a preliminary issue *(see* p. 110, col. 2; p. 111, col. 2).

The following cases were referred to in the judgment:

Case 1:06-cv-00011      Document 104-2      Filed 02/20/2007      Page 3 of 25

A/s D/s Svendborg v. Wansa, [1996] 2 Lloyd's Rep. 559;

Abidin Daver, The (H.L.) [1984] 1 Lloyd's Rep. 339; [1984] A.C. 398;

Adams v. Cape Industries Ltd., [1990] Ch. 433;

Airbus Industrie GIE v. Patel, (C.A.) [1997] 2 Lloyd's Rep. 8;

Amchem Products Inc. v. Workers Compensation Board, [1993] 102 D.L.R. (4th) 96;

Angelic Grace, The [1995] 1 Lloyd's Rep. 87;

Atlantic Emperor, The (No. 2) (C.A.) [1992] 1 Lloyd's Rep. 624;

Atlantic Star, The [1973] 2 Lloyd's Rep. 197; [1974] A.C. 436;

Attock Cement Co. Ltd. v. Romanian Bank for Foreign Trade, (C.A.) [1989] 1 Lloyds Rep. 572; [1989] 1 W.L.R. 1147;

Attorney-General v. Arthur Andersen & Co., [1989] E.C.C. 224;

August Leonhardt, The [1985] 2 Lloyd's Rep. 28;

Camilla Cotton Oil Co. v. Granadex S.A., (H.L.) [1976] 2 Lloyd's Rep. 10;

Citi-March Ltd. v. Neptune Orient Lines Ltd., [1997] 1 Lloyd's Rep. 72; [1996] 1 W.L.R. 1367;

Chaparral, The [1968] 2 Lloyd's Rep. 158;

Detker v. v/O Sovfracht Dec. 16, 1987 unreported;

Du Pont de Nemours & Co. v. Agnew, (C.A.) [1987] 2 Lloyd's Rep. 585;

Eastern Trader, The [1996] 2 Lloyd's Rep. 585;

El Amria, The (C.A.) [1981] 2 Lloyd's Rep. 119;

Ellerman Lines Ltd. v. Reed, [1928] K.B. 144;

Family Housing Association v. Hyde, [1993] 1 W.L.R. 354;

Fehmarn, The (C.A.) [1957] 2 Lloyd's Rep. 551; [1958] 1 W.L.R. 159;

First National Bank of Boston v. Union Bank of

Switzerland, (C.A.) [1990] 1 Lloyd's Rep. 32;

Golden Anne, The [1984] 2 Lloyd's Rep. 489; *92

Harris v. Taylor, [1915] 2 K.B. 580;

Henry v. Geoprosco International Ltd., (C.A.) [1975] 2 Lloyd's Rep. 148; [1976] Q.B. 726;

Hiscox v. Outhwaite, (C.A.) [1991] 2 Lloyd's Rep. 1; [1992] 1 A.C. 562;

Hollandia, The (sub. nom. The Morviken) (H.L.) [1983] 1 Lloyd's Rep. 1; [1983] 1 A.C. 565;

Ion, The [1980] 2 Lloyd's Rep. 245;

Kanchenjunga, The (H.L.) [1990] 1 Lloyd's Rep. 391;

Lisboa, The [1980] 2 Lloyd's Rep. 546;

Man (E. D. & F.) (Sugar) Ltd. v. Haryanto, (C.A.) [1991] 1 Lloyd's Rep. 429;

Marazura Navegacion S.A. v. Oceanus Mutual Underwriting (Bermuda) Ltd., [1977] 1 Lloyd's Rep. 283;

Metal Scrap Trade Co. v. Kate Shipping Co. Ltd. (the Gladys), (H.L.) [1990] 1 Lloyd's Rep. 297; [1990] 1 W.L.R. 115;

New Hampshire Insurance Co, v. Phillips Electronics North America Corporation, (C.A.)May 16, 1997, unreported;

Re Missouri Steamship Co., (1889) 42 Ch.D. 321;

Rein v. Stein, (1892) 66 L.T. 469;

Siebe Gorman & Co. Ltd. v. Pneupac Ltd., [1982] 1 W.L.R. 185;

Sohio Supply Co. v. Gatoil (USA) Inc., (C.A.) [1989] 1 Lloyd's Rep. 588;

Stolt Loyalty, The [1993] 1 Lloyd's Rep. 281;

Toepfer International G.M.B.H. v. Molino Boschi Srl, [1996] 1 Lloyd's Rep. 510;

Tracomin S.A. v. Sudan Oil Seeds Co. Ltd., [1983] 2 Lloyd's Rep. 384; [1983] 1 W.L.R. 1026;

Ultisol Transport Contractors Ltd. v. Bouygues Offshore S.A., [1996] 2 Lloyd's Rep. 140;

Vita Food Products Inc. v. Unus Shipping Co.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[1998] 1 Lloyd's Rep. 90

1997 WL 1103548 (QBD (Comm Ct)), [1997] C.L.C. 1508, [1999] I.L.Pr. 24, [1998] 1 Lloyd's Rep. 90
**(Cite as: [1998] 1 Lloyd's Rep. 90)**

Page 4

Ltd., (P.C.) (1938) 63 Ll.L.Rep. 21; [1939] A.C. 277;

Volvox Hollandia, The [1988] 2 Lloyd's Rep. 361;

Williams & Glyn's Bank Plc. v. Astro Dinamico Compania Naviera S.A., (H.L.) [1984] 1 Lloyd's Rep. 453; [1984] 1 W.L.R. 438;

Woodhouse A.C. Israel Cocoa Ltd. S.A. v. Nigerian Marketing Co. Ltd., (H.L.) [1972] 1 Lloyd's Rep. 439; [1972] A.C. 741.

There were three applications relating to a dispute under a policy of insurance issued by the defendants People's Insurance Co. Ltd. of Singapore to the plaintiff Akai Pty. Ltd., Australian subsidiary of a multi-national company, the defendants seeking summary judgment against the insured on the basis of a time bar defence under the policy; the plaintiffs applying for the defendants' counterclaim to be struck out or stayed and the defendants' applying for an anti-suit injunction.

**Representation**

Mr. Stephen Morris and Miss Sara Masters (instructed by Messrs. Stephenson Harwood) for the plaintiffs; Mr. Lawrence Collins, Q.C. and Mr. Terence Mehigan Solicitor Advocates (instructed by Messrs. Herbert Smith) for the defendants.

The further facts are stated in the judgment of Mr. Justice Thomas.

**JUDGMENT**

Mr. Justice THOMAS:

*Introduction*

There are before the Court three applications relating to a dispute under a policy of insurance issued by a Singapore insurer to an Australian subsidiary of a multi-national company. A specifically negotiated clause provided for English law and jurisdiction.

Proceedings were begun by the insured in this Court and in Australia. The insurers applied to stay the proceedings in Australia. They failed. The High Court of Australia decided that the Australian Insurance Contracts Act, 1984 applied to the policy and that the clause providing for English law and jurisdiction was void under that Act. Shortly after that decision was given, the insurers counterclaimed in these proceedings. They made the first of the applications which are before the Court seeking summary judgment against the

insured on the basis of a time bar defence under the policy. This is most unlikely to be available to them under the Australian Insurance Contracts Act which will be applied by the Courts in Australia. The insured responded by the second application; this was for leave to discontinue and to have the defence and counterclaim struck out or stayed. The insurers had obtained ex parte from the Singapore Courts an anti-suit injunction against the continuation of the proceedings in Australia; shortly before the hearing of this application, that injunction was discharged. The insurers seek such an injunction by the third application before this Court.

The applications involve issues of recognition and comity in addition to the exercise of the discretion to stay proceedings and grant injunctions; I am greatly indebted to Mr. Stephen Morris and Mr. Lawrence Collins, Q.C. for the clarity of their submissions and the depth of their research.

It is convenient first to set the facts out in a little more detail.

*\*93 The policy*

On June 1, 1991, the insured, Akai Pty. Ltd. (Akai) a company incorporated in New South Wales as the subsidiary of a large multi-national Japanese company, entered into a comprehensive credit insurance policy with the insurers, People's Insurance Co. Ltd. of Singapore (PIC). PIC did not carry on business in Australia and the insurance was negotiated by Australian brokers directly with PIC's managers in Singapore. The policy contained two short provisions which are central to the dispute between the parties.

Clause VI 8:

*Action Against the Company*

No action arising out of this policy may be brought against the company unless such action is commenced within twelve (12) months following the event of the loss.

Clause VI 9:

*Governing Law*

This policy shall be governed by the laws of England. Any dispute arising from this policy shall be referred to the Courts of England.

It is clear from the evidence before me the law and jurisdiction clause was the result of negotiation between the parties. PIC had wanted Singapore law

and Singapore jurisdiction. Akai had wanted Australian law. The parties compromised on English law and the Courts of England. Akai did so after taking legal advice.

### The loss

On Jan. 14, 1992, during the currency of the policy, one of Akai's largest debtors, Norman Ross Homeworks Pty. Ltd. (Norman Ross), a retailer, went into receivership. The Supreme Court of New South Wales appointed a liquidator on Feb. 10, 1992. Akai made a claim under the policy on Apr. 23, 1992. Extensive correspondence between Akai's brokers and PIC followed. On Dec. 30, 1992, PIC declined to pay the claim in a letter alleging four specific breaches of the terms of the policy. No time bar under cl. VI 8 had then arisen. The amount of the claim is in excess of Australian $1 m.

### The proceedings against PIC

On Mar. 5, 1993, Akai commenced proceedings in Australia before the Commercial Division of the New South Wales Supreme Court. On the same day, they commenced proceedings in this Court by writ. The reason they issued the writ in this Court is material to the time bar issue, but it is more convenient to deal with that later.

Under the Australian Insurance Contract Acts, 1984, a contract governed by the law of an Australian state is subject to a provision (s. 54) which restricts the insurer's right to decline to pay a claim in the event of a breach of a policy term. Under that provision, if the act or omission of the assured relied on by the insurer is of a type which could reasonably be regarded as being capable of causing or contributing to a loss covered by the insurance, the insurer may not refuse to pay the claim unless the insurer can prove it did cause the loss. If the act or omission relied on by the insurer is not of that type, but in fact caused prejudice to the insurer, the insurer can reduce his liability by the amount that fairly represents the prejudice he has suffered. That is not English law.

Given the breaches which PIC had identified in their letter of Dec. 30, 1992, there was a considerable advantage to Akai if their claim could be brought before the Courts of New South Wales and if those Courts would apply the provisions of the Act. There is a further point. It is now common ground that the claim was in fact time barred under cl. VI 8 of the policy before the proceedings were issued in March, 1993 if English law applied to the policy; there was therefore an overwhelming advantage to them in maintaining the Australian

proceedings. It is not clear on the evidence before me whether Akai appreciated this at the time.

### The Australian proceedings

The writ issued in this Court was therefore not served (though Akai told PIC in July, 1993 that it had been issued and PIC obtained a copy of the writ by August, 1993).

On May 5, 1993, the originating process in the New South Wales action was served on PIC. On June 11, 1993, there was a directions hearing before the New South Wales Court. It will be necessary later to refer to that hearing in a little more detail; it resulted in an order by consent that PIC should file their motion for a stay by June 23, 1993. On June 21, 1993, PIC issued a notice of motion seeking a stay of the proceedings in New South Wales until the proceedings brought in England had been determined.

However PIC had taken one further step in New South Wales which Akai have relied on in this application as amounting to a submission by PIC to the jurisdiction of New South Wales. On June 15, 1993, PIC had filed a notice of appearance with the New South Wales Court. I will deal with this in more detail when considering the issue of submission.

On Dec. 7, 1993, O'Keefe, C.J. Comm. D. gave judgment in the Supreme Court of New South Wales on the application for a stay in favour of PIC and stayed the proceedings until final determination of the proceedings in this Court. Akai applied for leave to appeal to the Court of Appeal of New *94 South Wales; leave was granted, but on Apr. 28, 1995 the appeal was dismissed by a majority. Akai then obtained leave to appeal to the High Court of Australia.

### The decision of the High Court of Australia

On Dec. 23, 1996, the High Court of Australia, by a majority, allowed the appeal and refused a stay of the proceedings in New South Wales. The High Court based its decision upon the Insurance Contracts Act, 1984.

Section 8 of that Act provided that if the proper law of a contract of insurance would be the law of an Australian state but for an express provision to the contrary included in the contract, then, not withstanding that provision, the proper law of the contract was to be the law of that state. The Act forbade contracting out; s. 52 rendered any provision void if it had the effect of modifying the operation of the provisions of the Act to the

[1998] 1 Lloyd's Rep. 90

Page 6

1997 WL 1103548 (QBD (Comm Ct)), [1997] C.L.C. 1508, [1999] I.L.Pr. 24, [1998] 1 Lloyd's Rep. 90
(Cite as: [1998] 1 Lloyd's Rep. 90)

prejudice of the insured.

The Court held (at p. 384 of [1997] 141 A.L.R.):

Taken together, ss 52 and 8 manifest a legislative intent not only that there should be no power to contract out of the provisions of the Act, but also that the regime established by the Act should be respected as regards contracts the proper law of which is, or but for selections of another law would be, that of a State or Territory. This defeats evasion of the legislative regime by the choice of some other body of law as the governing law of the contract. "In the language of conflict-of-laws specialists, the policy of [this statute] has been made a part of [Australian] ordre public interne and ordre public international".

. . .

It is the statute "which demands application in an [Australian] Court irrespective of the identity of the lex causae".

The High Court then considered that both parts of cl. VI 9 of the policy - the choice of law and the choice of jurisdiction - were "express provisions to the contrary" within the scope of s. 8. As the Act applied to New South Wales, it must therefore be applied by a New South Wales Court. The effect of s. 8 was that the law of New South Wales applied to the policy. This was because that was the system of law with which the contract, viewed objectively, had its closest and most real connection, if the parties' express choice of law and jurisdiction were disregarded as "provisions to the contrary".

The High Court, having concluded that the Courts of New South Wales should apply the provisions of the Act, refused the stay sought by PIC for two reasons. First the policy of Australian law and the Australian constitution militated against a stay. The majority said (at p. 395):

The present application is to be dealt with on the footing that an English Court would not apply the Act as part of the lex causae. The grant of a stay would involve the State Court so exercising its discretion as to stay its process in favour of an action in a Court where the statute would not be enforced. This stay would be granted on the basis that in so doing a contractual obligation would be implemented. But the policy of the Act, evinced by s 8, is against the use of private engagements to circumvent its remedial provisions. To grant a stay in the present case would be to prefer the private engagement to the binding effect upon the State Court of the law of the parliament. This indicates a strong reason against the exercise of the discretion in favour of a stay. The policy of the law and of the Constitution militates against a stay.

Secondly the English jurisdiction clause was rendered void by s. 52 of the Act; this was because Akai would be prejudiced within the meaning of s.

52 of the Act if a stay were granted, as the Courts in England would not apply s. 54 of the Act. As the clause was void, there was no basis for a stay.

*The events of 1997*

After the High Court of Australia had given its judgment, Akai applied on Feb. 17, 1997 to the New South Wales Court for a directions hearing on Mar. 7, 1997:

On Mar. 5 and 6, 1997, PIC took action on two fronts - in Singapore and in England. They applied on Mar. 5, 1997 to the High Court in Singapore, where any judgment obtained by Akai in Australia would have to be enforced, for an anti-suit injunction. This was granted ex parte on Mar. 6, 1997. It had the effect of postponing the hearing in New South Wales; if Akai had progressed the action in New South Wales, they would have been in breach of an order of the Court where they would ultimately seek to enforce any judgment that they obtained in New South Wales.

To explain the action that PIC took in England, it is necessary to set out briefly what had happened to the proceedings begun in this Court by Akai in the intervening four year period. The validity of the writ issued by Akai on Mar. 5, 1993 had been extended by Mr. Justice Curtis on Aug. 19, 1993; at the same time Mr. Justice Curtis granted Akai leave to serve the writ out of the jurisdiction, upon an undertaking by Akai not to serve it unless the Court in New South Wales . . .

. . .adjudged that it did not have a jurisdiction over the issues between [Akai] and [PIC].

**\*95** Following the decision of O'Keefe, C.J. Comm. D., the writ was served on Dec. 22, 1993. Points of claim were served on Aug. 5, 1994. In correspondence which it will later be necessary to examine in more detail, the parties agreed on three occasions that time for service of the points of defence be extended pending the outcome of the proceedings in Australia.

On Mar. 5, 1997, PIC's English solicitors issued a summons for summary judgment on their counterclaim. The following day, they served that summons together with the points of defence and counterclaim. PIC's solicitors made it clear in the letter accompanying the summons that PIC did not intend to participate in the New South Wales proceedings. In their points of defence and counterclaim, PIC relied on the defences that they had originally raised in December, 1992 and the defence based on cl. VI 8 of the policy - the claim was time barred as no action had been brought within a year of the event of loss; in the

[1998] 1 Lloyd's Rep. 90            Page 7

1997 WL 1103548 (QBD (Comm Ct)), [1997] C.L.C. 1508, [1999] I.L.Pr. 24, [1998] 1 Lloyd's Rep. 90
**(Cite as: [1998] 1 Lloyd's Rep. 90)**

counterclaim they sought a declaration of non-liability. They sought summary judgment solely in reliance on the time bar defence. Their purpose is clear; they seek a judgment of the Court which PIC contends is the contractual forum and intend to apply to have that judgment recognized in Singapore; they will "set up" such a judgment against any judgment obtained in New South Wales by Akai.

Akai responded to these moves by applying in Singapore to have the anti-suit injunction discharged and issuing in this Court an application to strike out or stay the counterclaim. After an inter partes hearing in Singapore, Mr. Judicial Commissioner Choo Han Teck discharged the injunction on June 13, 1997, but granted a stay of his order pending an appeal. That same day, PIC's English solicitors gave notice that they would apply to this Court for an anti-suit injunction and they have subsequently submitted an amended counterclaim for such injunctive relief.

*The issues on the application*

At a directions hearing on May 15, 1997, it was agreed that this Court should consider Akai's application first; if that application failed, then this Court should consider the application for summary judgment, though if there were disputed issues of fact, these should be determined at a later hearing. As I understand it, it was believed at that time that any disputed issues of fact might relate to the date at which the one year period for the purposes of the contractual time bar started to run. After that hearing, PIC made the further application for the anti-suit injunction. I therefore propose to consider the issues in the following order.

1. Did PIC submit to the jurisdiction of the Courts of New South Wales with the consequence that this Court should recognize the decision of the High Court of Australia as finally deciding that the English law and jurisdiction clause in the policy is void and unenforceable?

2. Should the Court, as a matter of comity, give effect to Australian law and public policy by staying this action?

3. Do the agreements made between the parties' solicitors for an extension of time to serve the defence preclude PIC from continuing the proceedings in this Court?

If Akai is correct on any of these issues, it would follow that these proceedings should be stayed as of right. If they are not, then the fourth issue arises. Akai seek to achieve the same result through the

exercise by the Court of its discretion. PIC seek through their application for an anti-suit injunction to prevent the continuation of the New South Wales proceedings.

4. Should this Court exercise its discretion to stay these proceedings? Or rather should it grant an anti-suit injunction in respect of the New South Wales proceedings or an anti-enforcement injunction against any judgment obtained in those proceedings?

5. If these proceedings are not stayed are PIC entitled to judgment on their counterclaim for a declaration that the claim is time barred?

*1. Did PIC submit to the jurisdiction of the Courts of New South Wales with the consequence that this Court should recognize the decision of the High Court of Australia as finally deciding that the English law and jurisdiction clause in the policy is void and unenforceable?*

It was Akai's first contention that PIC had submitted to the jurisdiction of the Courts of New South Wales. The decision of the High Court should therefore be recognized as finally deciding as between the parties that the English law and jurisdiction clause was void and unenforceable. It was not therefore permissible to re-litigate the point in England as there was an issue estoppel.

If Akai are correct on the issue of submission, then the proceedings in this Court should not continue, but the dispute between the parties must be resolved in New South Wales.

Akai rely on two matters: (i) the filing of a notice of appearance in June, 1993 and (ii) the attendance of PIC's solicitors at hearings in New South Wales in 1997 after the decision of the High Court in December, 1996.

*(i) Was the filing of the notice of appearance in June, 1993 a submission?*

Sections 32 and 33 of the Civil Jurisdiction and Judgments Act, 1982 are the starting point. Section *96 32 sets out the relevant principles applicable to the recognition of overseas judgments obtained in breach of an agreement for the settlement of disputes in the following terms:

(1) Subject to the following provisions of this section, a judgment given by a court of an overseas country in any proceedings shall not be recognised or enforced in the United Kingdom if - (a) the bringing of those proceedings in that court was contrary to an agreement under which the dispute in question was to be settled otherwise than

[1998] 1 Lloyd's Rep. 90

Page 8

1997 WL 1103548 (QBD (Comm Ct)), [1997] C.L.C. 1508, [1999] I.L.Pr. 24, [1998] 1 Lloyd's Rep. 90
(Cite as: [1998] 1 Lloyd's Rep. 90)

by proceedings in courts of that country; and (b) the proceedings were not brought in that court by, or with the agreement of, the person against whom the judgment was given; and (c) that person did not counterclaim in the proceedings or otherwise submit to the jurisdiction of that court. . . .

(3) In determining whether a judgment given by a court of an overseas country should be recognised or enforced in the United Kingdom, a court in the United Kingdom shall not be bound by any decision of the overseas court relating to any of the matters mentioned in sub-section (1) or (2).

It is common ground that, as a matter of the law of New South Wales, the action of PIC in filing a notice of appearance on June 15, 1993 was a submission to that jurisdiction. PIC did not have to file that notice of appearance in order to apply for a stay. If they had merely applied for a stay, then the filing of that application would not have been a submission under the law of New South Wales. The effect of filing a notice of appearance under the law of New South Wales was that if PIC failed to obtain a stay, the Court would treat that notice of appearance as a submission.

Akai contended that PIC could not in these circumstances rely on s. 32 to prevent recognition of the judgment as they had submitted to the jurisdiction of the New South Wales Court; they could not therefore satisfy the condition specified in s. 32(1)(c) for non-recognition under that section.

It is convenient next to refer to s. 33 of the Civil Jurisdiction and Judgments Act which sets out certain steps that are not to be treated as a submission to the jurisdiction of an overseas Court:

(1) for the purposes of determining whether a judgment given by a court of an overseas country should be recognised or enforced in England and Wales or Northern Ireland, the person against whom the judgment was given shall not be regarded as having submitted to the jurisdiction of the court by reason only of the fact that he appeared (conditionally or otherwise) in the proceedings for all or any one or more of the following purposes, namely,. . .(b) to ask the court to dismiss or stay the proceedings on the ground that the dispute in question should be submitted to arbitration or to the determination of the courts of another country.

Akai contended that, although PIC did ask the New South Wales Court to stay the proceedings on the ground that they should be submitted to the determination of the Courts of England within par. (b) of s. 33(1), they did not "appear" for that purpose, as the notice of appearance was not necessary for the purposes of obtaining a stay. PIC

could not therefore rely on s. 33.

"Submission" is not defined in s. 33; nor is the word "submit" defined in s. 32(1)(c), though it appears in the context of "counterclaim or otherwise submit "; there are however two considerations to which I must have regard. First, it is clear that s. 33 was intended to reverse the principle set out in the decisions in Harris v. Taylor, [1915] 2 K.B. 580 and Henry v. Geoprosco International Ltd., [1975] 2 Lloyd's Rep. 148; [1976] Q.B. 726 so that an implication of submission could not be drawn from the fact that the defendant appeared in foreign proceedings in circumstances obviously inconsistent with a submission to that jurisdiction. Second, in the Atlantic Emperor (No. 2), [1992] 1 Lloyd's Rep. 624, the Court of Appeal made it clear that s. 33 must not be construed too narrowly; it should, the Court said, be construed in a broad sense. This must also apply to the construction of s. 32 as these two sections interrelate.

In Adams v. Cape Industries Ltd., [1990] Ch. 433 at p. 459 Mr. Justice Scott referred to the guidance to be derived from the decision of the House of Lords in Williams & Glyn's Bank Plc. v. Astro Dinamico Compania Naviera S.A., [1984] 1 Lloyd's Rep. 453; [1984] 1 W.L.R. 438 on the approach the Court should adopt in considering whether steps taken can amount to a submission to the jurisdiction. The House of Lords had to consider whether, where there was a challenge to the jurisdiction, an application for a stay of the action could be made before the issue of jurisdiction was determined. In deciding that a Court could determine the stay application on the assumption it had jurisdiction, Lord Fraser of Tullybelton approved (at p. 457, col. 1; p. 444) the observation of Mr. Justice Cave in Rein v. Stein, (1892) 66 L.T. 469 at p. 471:

It seems to me that in order to establish a waiver, you must show that the party alleged to have waived his objection has taken some step which is only necessary or only useful if the objection has been actually waived, or if the objection has never been entertained at all.

Adopting this observation, the question for the Court, in determining whether the steps taken by a *97 party in an overseas Court amounts to a submission for the purposes of s. 32 or s. 33, is whether the step was only necessary or useful if the party was not objecting to the jurisdiction. A step that is not consistent with or relevant to the challenge to the jurisdiction or obtaining a stay will usually be a submission to that jurisdiction.

The Court must consider the matter objectively; it must have regard to the general framework of its

Case 1:06-cv-00011    Document 104-2    Filed 02/20/2007    Page 9 of 25

[1998] 1 Lloyd's Rep. 90

Page 9

1997 WL 1103548 (QBD (Comm Ct)), [1997] C.L.C. 1508, [1999] I.L.Pr. 24, [1998] 1 Lloyd's Rep. 90
**(Cite as: [1998] 1 Lloyd's Rep. 90)**

own procedural rules, but also to the domestic law of the Court where the steps were taken. This is because the significance of those steps can only be understood by reference to that law. If a step taken by a person in a foreign jurisdiction, such as making a counterclaim, might well be regarded by English law as amounting to a submission to the jurisdiction, but would not be regarded by that foreign Court as a submission to its jurisdiction, an English Court will take into account the position under foreign law. In Adams v. Cape Industries Ltd, Mr Justice Scott held (at p. 461):

If the steps would not have been regarded by the domestic law of the foreign court as a submission to the jurisdiction, they ought not, in my view, to be so regarded here, notwithstanding that if they had been steps taken in an English court they might have constituted a submission. The implication of procedural steps taken in foreign proceedings must, in my view, be assessed in the context of the foreign proceedings.

This was followed by Mr. Justice Rix in The Eastern Trader, [1996] 2 Lloyd's Rep. 585 (see pp. 599-601). In The Atlantic Emperor (No 2), [1992] 1 Lloyd's Rep. 624 regard was paid to the way the domestic law of the foreign Court viewed the steps taken. In such cases the effect of the law of the foreign Court may well be decisive; there would be some illogicality in an English Court finding a person had submitted to the jurisdiction of the foreign Court in circumstances in which that Court would find he had not submitted.

However the converse is not necessarily the case. Section 32(3) makes it clear that the English Court is not bound by the decision of the foreign Court that a person had submitted; it must follow that an English Court is not bound by the characterization of a step as a submission merely because the law of the foreign Court would regard it as a submission.

Adopting this approach, I must consider objectively, taking into account the procedures of the foreign Court and the principles of English procedural law, whether the actions of PIC amounted to a submission to the Courts of New South Wales and what the purpose of their appearance was. It is, in my view, quite clear from all the evidence that they never submitted to the jurisdiction of that Court; all they sought to do was to obtain a stay. They may have taken the technical step of filing a notice of appearance, but that must be seen in the context that there had been a hearing a few days earlier where PIC had made it clear they would apply for a stay and the Judge had directed they file a motion to stay which they did a few days later. Apart from that one technical step there is no evidence at all in the proceedings between 1993

and the decision of the High Court in December, 1996 that they did anything other than seek a stay. All their actions, save for that one step, were solely referable to obtaining a stay. In those circumstances, I do not consider that the filing of the notice of appearance was only necessary or useful if they were not objecting to the jurisdiction; viewed objectively it was not inconsistent with the challenge to the jurisdiction and the application for a stay.

The question can also be viewed more broadly. To hold that the filing of the notice of appearance amounted to a submission to the jurisdiction of the Courts of New South Wales would in effect be to revive the principle decided in Henry v. Geoprosco International Ltd. as summarized by Lord Justice Roskill at p. 161 of [1975] 2 Lloyd's Rep.; p. 748 of [1976] Q.B.:

But we do think that the authorities compel this Court to say that if such a protest takes the form of or is coupled with what in England would be conditional appearance and an application to set aside an order for service out of the jurisdiction and that application then fails, the entry of that conditional appearance (which then becomes unconditional) is a voluntary submission to the jurisdiction of the foreign Court. The defendant need not appear there, conditionally or unconditionally. He can stay away. But as the cases say, he may prefer to take his chance upon a decision in his favour. If he does so, he must also accept the consequences of a decision against him.

We appreciate that on this view the dividing line between what is and what is not a voluntary submission and what is and what is not an appearance solely to protest against the jurisdiction is narrow and may often be difficult to draw satisfactorily. But, as we think, it must depend in each case upon what it was that the defendant did or refrained from doing in relation to the jurisdiction of the foreign Court.

The purpose of s. 33 was to reverse the principle so decided. A broad test is to be applied as to the purpose of the steps taken in the foreign Court and submission is not be inferred from the fact that the **\*98** defendant appeared in foreign proceedings in circumstances obviously and objectively inconsistent with a submission to that jurisdiction.

*(ii) Was the attendance of PIC's solicitor at hearings in 1997 a submission?*

Akai contended that even if the notice of appearance was not a submission, what PIC did after the decision of the High Court of Australia amounted to a submission. It is therefore necessary to set out in a little more detail what happened. At the directions hearing that was fixed for Mar. 7,

[1998] 1 Lloyd's Rep. 90
1997 WL 1103548 (QBD (Comm Ct)), [1997] C.L.C. 1508, [1999] I.L.Pr. 24, [1998] 1 Lloyd's Rep. 90
(Cite as: [1998] 1 Lloyd's Rep. 90)

Page 10

1997, Akai sought an adjournment because of the anti-suit injunction granted in Singapore. The solicitor for PIC attended and told the Court that they did not oppose the application for an adjournment. At the adjourned hearing on Apr. 4, 1997, the solicitor again appeared; when Akai sought a further adjournment at that hearing, PIC's solicitor said that they neither consented to nor opposed the application. That solicitor attended further hearings on May 16, 1997 and June 20, 1997. His attendance on June 20, 1997 was after Akai had relied, in argument before this Court, on his attendance as constituting a submission to the Courts of New South Wales.

It is the evidence of PIC's Australian solicitor that he attended these hearings as they were ordered by the Court. If he had not done so it would have been at the very least a discourtesy to the Court. Akai, however, contended that there could be only one explanation of the attendance of the solicitor; it was to keep open PIC's position to contest the merits if the action proceeded.

It is clear from the decision of the Court of Appeal in The Atlantic Emperor (No. 2) (at p. 633 of the report) that if a party who has merely challenged the jurisdiction of a Court later takes steps that amount to a submission of the merits to the jurisdiction of that Court (without reserving the position on jurisdiction), then that submission will be a submission to the whole of the proceedings; that party cannot thereafter maintain his challenge to the jurisdiction. If therefore the actions of PIC's solicitor amounted to a submission, then the judgment of the High Court of Australia would be recognized by this Court as having determined the issues on the law and jurisdiction clause in Akai's favour.

Adopting the approach to the issue of submission which I have set out earlier, the question for the Court is whether viewed objectively the actions of PIC's solicitor were only necessary or useful if he was not continuing to object to the jurisdiction; viewed objectively was it inconsistent with the continued challenge to the jurisdiction?

In my judgment, his actions were consistent with the continued challenge to the jurisdiction. The actions of that solicitor must be considered in the context of PIC's actions as a whole. They had obtained an anti-suit injunction in Singapore against the continuation of the proceedings in Australia; their English solicitors had made it clear by letter on Mar. 6, 1997 that PIC were not going to take any further part in the Australian proceedings and that they wished to proceed with this action in this Court. In those circumstances, it

is difficult to see how, viewed objectively, this action can have been a submission to the jurisdiction of New South Wales Court. The solicitor's action must be viewed in the context of that Court's decision that it had jurisdiction over Akai and that he did nothing to suggest that the Court should proceed to consider the merits.

I therefore conclude that PIC did not submit to the jurisdiction of the Courts of New South Wales and therefore the judgment of the High Court of Australia is not one that is recognized as giving rise to a decision binding on PIC that the proper law and jurisdiction clause in the policy is void and unenforceable.

*2. Should the Court, as a matter of comity, give effect to Australian law and public policy by staying this action?*

Akai submit that even if the judgment of the High Court is not capable of recognition because PIC did not submit, then nonetheless as a matter of comity this Court should give effect to that decision of the highest Court of Australia.

In considering this issue, the applicable principles are those of the common law; the Rome Convention, as enacted by the Contracts (Applicable Law) Act, 1990, does not apply as art. 1.2(d) of the Convention states that the Convention does not apply to agreements on the choice of Court. At common law, the validity of a jurisdiction clause is generally to be determined by its proper law; there are exceptions to that principle, but the only exception upon which Akai rely is public policy.

By the terms of the insurance policy, English law is the proper law. Akai accept that prima facie by English law that jurisdiction clause is valid and enforceable. They contend, however, that where the foreign law is of such a character that it would be against the comity of nations for a Court in England and Wales to give effect to a contract made in contravention of it, then those Courts will not enforce that contract even it if is otherwise valid by English law.

Akai relied first on the fact that, in giving effect to the Australian Insurance Contracts Act, 1984, Kirby, P. (in his dissenting judgment in the Court of Appeal of New South Wales) and the High Court were applying the same principles as were followed by the House of Lords in relation to the Carriage of Goods by Sea Act, 1971 *99 in The Hollandia (Sub. nom. the Morviken), [1983] 1 Lloyd's Rep. 1; [1983] 1 A.C. 565. They submitted that as the foreign Court had reached a decision in

[1998] 1 Lloyd's Rep. 90

1997 WL 1103548 (QBD (Comm Ct)), [1997] C.L.C. 1508, [1999] I.L.Pr. 24, [1998] 1 Lloyd's Rep. 90
(Cite as: [1998] 1 Lloyd's Rep. 90)

Page 11

the same way as an English Court would have reached its decision, then that was a powerful factor in favour of giving effect to its decision as a matter of comity.

There are two separate aspects of the approach of the High Court that must be considered. In the first place they decided that the provisions of the Australian statute rendered the choice of law provision void; the fact that they reached this decision by legal reasoning derived from The Hollandia does not mean that the decision to that effect is to be particularly respected any more than if the statute itself had made that clear or if the Court had reached that decision by a process of reasoning different to that in The Hollandia. That part of the decision was merely declaratory of the law of New South Wales. I do not consider the approach or the method of reasoning of the High Court as a material consideration to this issue.

Nor is it relevant in the particular circumstances of this case that the High Court considered whether it should give effect to the jurisdiction clause by reference to principles similar to those applicable in this Court (cf. Airbus Industrie GIE v. Patel, [1997] 2 Lloyd's Rep. 8). In many cases it may be relevant that the overseas Court takes into account in adjudicating on jurisdiction considerations similar to those that form part of English law: see the judgment of the Supreme Court of Canada in Amchem Products Inc. v. Workers Compensation Board, [1993] 102 D.L.R. (4th) 96 at p. 120. In such a case the exercise of jurisdiction by the overseas Court may be respected on the grounds of comity. However in this case, the basis of the High Court's decision was not the exercise of a discretion on principles familiar to this Court, but the application of Australian public policy set out in an Australian statute regulating insurance contracts (see pp. 394-395 of the majority judgment).

The real question for this Court is whether it should give effect to that public policy as set out in the Australian statute as determined by the High Court of Australia. Akai contended that this Court should. PIC had chosen to go and do business in Australia; as the contract had everything to do with Australia and nothing to do with England, the public policy of Australia should be enforced. There are indeed on the facts of this case powerful factors connecting the contract with Australia clearly enumerated in the judgment of Kirby, P. in the Court of Appeal of New South Wales.

The principles upon which a Court should act have been set out in the two leading cases concerning clauses exempting the shipowner from liability for negligence. In Re Missouri Steamship

Co., (1889) 42 Ch.D. 321, goods were shipped under a bill of lading governed by English law from the United States; under the law of the United States, this form of exemption was contrary to public policy. A claim was brought by the cargo-owner against the shipowners in England. Lord Halsbury laid down the applicable principle at p. 336:

It seems to me that it is impossible to approach this question without recognising the fact that there may be stipulations which one country may enforce and which another country may not enforce, and that in order to determine whether they are enforceable or not you must have regard to the law of the contract, by which I mean the law which the contract itself imports is to be the law governing the contract. I put aside, as [Counsel for the cargo-owner] candidly put aside, questions in which the positive law of the country forbids contracts to be made. Where a contract is void on the ground of immorality, or is contrary to such positive law as would prohibit the making of such a contract at all, then the contract would be void all over the world, and no civilised country would be called on to enforce it.

It was held that the proper law of the contract was English law; consequently effect would be given to that law and not to the law of the United States. Lord Halsbury concluded:

It is enough for me to say that whatever be the American law, assuming always that it is outside the category to which I have referred, the law which the parties have elected as the law of their contract makes this stipulation valid.

In Vita Food Products Inc. v. Unus Shipping Co. Ltd., (1938) 63 Ll.L.Rep. 21; [1939] A.C. 277, goods were shipped from Newfoundland under a bill of lading governed by English law; Newfoundland had enacted the Hague Rules and the exemption clause was void under Newfoundland law. In holding that the Courts of Nova Scotia in which the claim was brought should give effect to the exemption clause, Lord Wright delivering the opinion of the Privy Council said at p. 30, col. 2; p. 296:

But whatever view a Newfoundland Court might take, whether they would hold that the contracts contained in the bills of lading must be taken to have incorporated the Hague Rules or whether they would hold them to have been illegal, the result would be the same in the present case, where the action was brought not in a Newfoundland but in a Nova Scotian Court. It may be that, if suit were brought on these bills of lading in a Newfoundland Court, and the Court held they were illegal, the Court would refuse to give effect to them, on the basis that a Court is *100 bound to obey the laws of its own Legislature or its own common law, as indeed the United States Supreme Court did in

[1998] 1 Lloyd's Rep. 90

1997 WL 1103548 (QBD (Comm Ct)), [1997] C.L.C. 1508, [1999] I.L.Pr. 24, [1998] 1 Lloyd's Rep. 90
(Cite as: [1998] 1 Lloyd's Rep. 90)

Page 12

Liverpool and Great Western Steam Co. v. Phoenix Insurance Co. But it does not follow that any other Court could properly act in the same way. If it has before it a contract good by its own law or by the proper law of the contract, it will in proper cases give effect to the contract and ignore the foreign law.

Lord Wright, after referring to the passage in the judgment of Lord Halsbury in Re Missouri Steamship Co. set out above, then said at p. 31, col. 1; p. 297:

In this passage Lord Halsbury would seem to be referring to matters of foreign law of such a character that it would be against the comity of nations for an English Court to give effect to the transaction just as an English Court may refuse in proper cases to enforce performance of an English contract in a foreign country where the performance has been expressly prohibited by the public law of that country. The exact scope of Lord Halsbury's proviso has not been defined. There may also be questions in some cases as to the effect of non-performance of conditions which by the foreign law of the place where a contract was entered into are essential to its formation, though even in that case the validity of the contract may depend on its proper law. But whatever the precise ambit of that saving expression, it is clear that it does not apply to such a statutory enactment as s. 3 [which rendered the exemption clause void], even if disobedience to it were regarded as rendering the bill of lading in some sense illegal.

Lord Wright went on to say that the fundamental principle of English conflict of laws was that intention was the general test of what law to apply; a Court should ascertain what was the bargain of the parties and give effect to that bargain unless debarred by a provision of foreign law that bound the Court. In general legislative provisions of the type being considered did not have extra-territorial effect and did not debar the Court from giving effect to the bargain of the parties.

It is clear that the parties to the insurance policy bargained for English law. This Court should therefore give effect to that intention, unless it would be contrary to English public policy (which includes international public policy) to give effect to the enforcement of the jurisdiction clause which is otherwise valid.

Although the insurance policy has a very close connection with Australia, that is not a decisive factor in considering the particular question of public policy before the Court. Although art. 7(1) of the Rome Convention permits effect to be given to the mandatory law of another country "with which the situation has a close connection", the United Kingdom made a reservation to this article.

As enacted by the Contracts (Applicable Law) Act, this article does not have the force of law in the United Kingdom (s. 2(2)).

This is not to say that in an appropriate case the Court will not take into account in relation to an insurance contract the public policy of a jurisdiction with which the insurance has a close connection: see Du Pont de Nemours & Co. v. Agnew, [1987] 2 Lloyd's Rep. 585 at p. 594, where Lord Justice Bingham observed that it was an open question as to the extent to which, as a matter of comity, an English Court would give effect to Illinois law on the irrecoverability of punitive damages under a policy of insurance.

In this case, however, the Court is concerned with the enforceability of the parties' freely chosen choice of law and jurisdiction in a credit insurance policy. In contracts of this kind between commercial enterprises, there is no equivalent restriction in English law or Community law on the parties' choice of law. Nor, in my judgment, are the provisions of Australian law which operated to restrict the parties' choice of law and jurisdiction within the type of stipulation referred to by Lord Halsbury in Re Missouri Steamship Co. It cannot be said that they are of a character that is anywhere near the ambit of the type of stipulation to which he referred.

In my judgment therefore this Court should give effect to the bargain of the parties and their freely negotiated choice of law and jurisdiction. It should not, as a matter of comity, give effect to the decision of the High Court that overrode that bargain and that choice.

*3. Do the agreements made between the parties' solicitors for an extension of time to serve the defence preclude PIC from continuing the proceedings in this Court?*

Akai next contended that, even if PIC could continue with these proceedings because the decision of the High Court was not binding on the parties either because it did not have to be recognized or given effect to as a matter of comity, nonetheless the English solicitors had made agreements that precluded PIC from continuing with these proceedings. They rely upon what happened when arrangements were made on three separate occasions for extensions of time for the service of the defence; they contend that there was a term or an implied term or an estoppel to the effect that in the event that the New South Wales proceedings were not stayed, the English action would not continue.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**\*101** It is first necessary to refer in some detail to what happened when the extensions of time or standstills (as Akai described them) were agreed.

As I have already set out in outlining the events giving rise to the present application (p. 95), the writ in these proceedings was served on Dec. 22, 1993 after Akai had failed to obtain a stay at first instance in Australia. Akai's Australian solicitors made it clear to PIC's Australian solicitors in December, 1993 that the English proceedings had been issued out of abundance of caution and they did not wish to take any further steps until their appeal in New South Wales had been determined.

### (i) The first extension of time agreed in September, 1994

In July, 1994, it is Akai's evidence that they became concerned that the delay in obtaining a hearing date for their appeal in New South Wales might adversely affect the English proceedings; they say that they therefore decided to seek an expedited hearing of their appeal and at the same time serve points of claim in the English proceedings. These were served on Aug. 5, 1994. After agreements to extend time for service of the defence for the usual short periods, PIC's solicitors wrote on Sept. 13, 1994:

We have been told by our clients that the appeal in the proceedings in New South Wales has been fixed on 11th November 1994. Our clients consider that it would be sensible and, in the interests of both parties, not to incur costs unnecessarily in the proceedings in London when a final determination of the jurisdiction issue in the New South Wales proceedings will be made in November. In the circumstances, our clients suggest that the parties agree to take no further steps in the proceedings in London pending the resolution of the appeal in New South Wales on the basis that neither parties' rights are prejudiced by the temporary suspension of the proceedings in London.

Akai's solicitors responded by saying they would agree if PIC provided a summary of their defence in the form of a draft. PIC's solicitors replied to this suggestion on Sept. 21, 1994:

The purpose of the extension of time for service of Points of Defence is to save costs pending resolution of the appeal in New South Wales. That objective clearly will be defeated by the cost of preparing a draft defence. We enclose, by way of service, a Time Summons returnable this Friday. ...
The summons sought either a general extension of time (save that if the appeal to the Court of Appeal was unsuccessful, PIC were to serve their defence within three weeks of the decision) or an extension of time until Nov. 25, 1994 (which was a few days after the proposed date for the hearing of the appeal

in the New South Wales Court of Appeal). Akai's solicitors agreed to the second alternative and an order was made by consent on Sept. 23, 1994 extending the time for service of the defence until Nov. 25, 1994.

### (ii) The second extension of time agreed in November, 1994

During the course of the hearing of the appeal in New South Wales (which took place between Nov. 11 and 14, 1994), Counsel for Akai told the Court that no further steps need be taken by PIC in the English proceedings until after the determination of that appeal. It was anticipated that judgment would not be given until February, 1995. PIC's English and Australian solicitors therefore both sought confirmation on Nov. 22, 1994 that the time for service of the defence in England would be extended. In doing so, PIC's Australian solicitors also sought confirmation that:

. . .any abeyance of the English proceedings pending the outcome of the Australian appeal shall be without prejudice to either party's rights in connection with the English proceedings; and that neither party will seek to use the fact of this delay against the other should the English proceedings subsequently resume.

The request by PIC's English solicitors was made on Nov. 22, 1994 in these terms:

It remains in neither of our clients' interests to incur costs in the English proceedings prior to the resolution of your clients' appeal in Australia. In view of this, we suggest that the time for service of our client's defence be extended until 28 February 1995. We would propose to regulate this extension by order of the Court . . .

. . .We wish to make it clear that the purpose behind this request is to avoid the costs of simultaneous litigation in two jurisdictions. The resulting delay should not derogate from or otherwise affect either party's rights in respect of the issues raised by this litigation and our clients wish expressly to reserve such rights . . .

Akai's Australian and English solicitors consented to an extension of time to serve the defence until two weeks after judgment in the New South Wales appeal. Both gave the confirmation sought that the abeyance of the English proceedings was without prejudice to either party's rights in the English proceedings and that neither party would seek to use the delay against the other should the English proceedings resume. No order was made.

### \*102 (iii) The third extension of time agreed in July, 1995

After judgment was given on Apr. 28, 1995 by the Court of Appeal, there was correspondence

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

between the Australian solicitors granting a further extension of time while Akai decided whether they would seek special leave to appeal to the High Court of Australia; after Akai had decided to seek special leave to appeal, PIC's Australian solicitors sought confirmation on May 23, 1995 that an extension of time for service of a defence in the English proceedings would be granted until two weeks after the High Court refused special leave or gave judgment on the appeal. Akai's Australian solicitors granted a general extension while they sought instructions.

After obtaining instructions, Akai's Australian and English solicitors wrote on June 19 and 20, 1995 requesting service of a defence in the English proceedings within 14 days and proposing thereafter a "further standstill " agreement until special leave was refused or judgment given by the High Court. That proposal was rejected by PIC. In a letter sent on June 26, 1995, PIC's Australian solicitors stated:

If your client insists on continuing with the English proceedings, our client will strenuously oppose any further continuation of the matter in Australia . . .

If your client maintains the application for special leave, no doubt you can explain to the High Court why your client is pursuing precisely the same proceedings in two different jurisdictions.

On June 29, 1995, after a conversation with Akai's Australian solicitors, they explained their position further:

You have told us that your client is interested in the nature of our client's defence in the English proceedings only for the purpose of determining whether to join third parties as defendants to those proceedings.

We would firstly point out that the issue of joining further defendants to the English proceedings is irrelevant to the special leave application. Your client's enquiry into this matter again suggests that your client is seeking to pursue the same proceedings in two jurisdictions.

Further, in order for your client to finally identify all the defences it may raise in connection with the English proceedings, it will be necessary to undertake a detailed investigation and analysis of the facts. It is not appropriate for our client to undertake that task at this stage, or to incur the expense of doing so, while your client is continuing to pursue the Australian proceedings.

Nevertheless, without limiting our client's ability to raise other matters by way of defence, our client can confirm that the defence set out in paragraph 4 of Mr. Peken's affidavit sworn 21 December 1993 include the defences that our client will consider raising in defence to your client's claim in the English proceedings.

We also refer you to the letters from GTI to CIA dated 30 December 1992 and 15 January 1993 which give particulars of the bases on which our client has disclaimed liability.

On June 30, 1995, PIC's English solicitors issued and served a time summons returnable on July 7, 1995 seeking primarily a general extension of time to serve the defence, save that in the event that the New South Wales action was discontinued or finally determined, the defence was to be served on four weeks' notice from Akai.

On July 5, 1995, after it had been learnt that the High Court of Australia would hear the application for special leave on Dec. 15, 1995, Akai's English solicitors wrote to PIC's English solicitors agreeing in substance to the primary relief sought in PIC's time summons with a variation in the wording. The letter concluded:

Finally it should be expressly agreed that abeyance of the English action pending the outcome of the application and/or appeal to the High Court of Australia shall be without prejudice to either party's rights in connection with the English action and that neither party will seek to use the fact of this delay against the other should the English action resume.

On July 6, 1995, PIC's English solicitors confirmed that they accepted this and recapitulated the terms agreed. No hearing of the time summons took place on July 7, 1995 and no order was made.

*(iv) Akai's evidence as to their understanding of the arrangements*

It is the evidence of the partner of Akai's English solicitors that at the time each of the agreements was made it was his understanding that there was no question of these proceedings continuing if the Australian Courts decided to exercise jurisdiction over Akai's claim; this was Akai's position and PIC's attitude, conduct and correspondence indicated that it would not wish the English proceedings to continue in such circumstances; the sole purpose of the agreements was to preserve the position of both parties in the English proceedings in the event (but only in the event) that the Australian Court declined to exercise jurisdiction.

*(v) Was there an agreement to the effect for which Akai contend?*

On this evidence, Akai contended first that there was a representation by PIC in words and conduct *103 that in the event that the New South Wales action was not stayed, the English action would not continue; that PIC made that representation for the purpose of inducing Akai to enter into the

[1998] 1 Lloyd's Rep. 90

1997 WL 1103548 (QBD (Comm Ct)), [1997] C.L.C. 1508, [1999] I.L.Pr. 24, [1998] 1 Lloyd's Rep. 90
**(Cite as: [1998] 1 Lloyd's Rep. 90)**

Page 15

agreements and did induce them. It was therefore a term of the agreements or a collateral warranty to those agreements.

In support of this, they relied principally on the assertion by PIC's English solicitors (particularly in the letters of Sept. 13, 1994 when the first extension was sought and of Nov. 22, 1994 when the second extension was sought) that the extensions of time to serve the defence were required to avoid (1) unnecessary costs and (2) simultaneous proceedings in two jurisdictions. Akai submitted that it was the necessary implication that these costs and simultaneous litigation could only be avoided if, in the event of the Australian Courts exercising jurisdiction, the English proceedings were not to continue.

In approaching this type of discussion and correspondence between lawyers which leads to a consent order, it is important to bear in mind the need to draw the distinction made in Siebe Gorman & Co. Ltd. v. Pneupac Ltd., [1982] 1 W.L.R. 185 between a consent order based on a "real contract" between the parties and a consent order where one party does not object and in that sense assents to the order made. In my judgment, the correspondence that led to each extension of time for service of the defence gave rise to a real agreement between very experienced solicitors that followed careful consideration and negotiation. The parties themselves took that view; when PIC's solicitors wrote on Mar. 6, 1997 to serve their summons, the letter began -

We refer to our letter of 5 July 1995 which records the agreement concerning the abeyance of the proceedings in England. . ..

Even though there was a real agreement on each occasion, there plainly was no express term that in the event that the New South Wales action was not stayed, the English action would not continue. There was no express representation to this effect. Nor in my judgment can such a representation be implied. It is not realistic to read into such exchanges which are the common place of this type of litigation anything more than a statement as to the position at the time each agreement was made and the need to avoid the costs and simultaneous litigation at that time. It was not necessary to imply anything about the future, in the event that Akai succeeded in their argument that the action proceed in Australia. While it was obvious that Akai, having sued in breach of the jurisdiction clause, would continue with those proceedings if they succeeded on the jurisdiction issue, PIC gave no indication of their position for the future. At the time all three agreements were made PIC had succeeded in Australia; there was nothing for PIC, as an insurer, to gain by seeking to have the action

progressed against them in England at that time and incurring costs and defending the claim in both jurisdictions at once. They did not need to say any more than was said. I do not read into what PIC's solicitors said anything more than they did not want at that time to incur costs or litigate at that time in both jurisdictions. If they lost in Australia, PIC's position would be different and neither expressly nor by implication did they make any representation as to their position in such an eventuality. Nor, for the same reasons, can I discern any basis of necessity that would lead, on the usual tests, to the implication of a term that PIC were to be precluded from taking action in England in those circumstances.

Akai submitted that they would not have agreed to the extensions of time had such a term not formed part of the agreement. I do not accept that submission. I infer that Akai were, for tactical reasons, anxious to obtain a defence in the English proceedings, as they wanted a formal statement of the defences PIC would be taking; however, I also infer that they appreciated that they could not force the position. If they had forced the service of a defence instead of agreeing to the extensions of time, they would have been faced with explaining to the Australian Courts why they were pursuing the claim in two Courts at the same time (cf. for example, the question posed in the letter of June 26, 1995 from PIC's Australian solicitors set out at p. 102 above). Nor do I consider that it is realistic to infer that they would have discontinued the English proceedings at a time when they had failed before the two New South Wales Courts to obtain jurisdiction in Australia.

Furthermore it is important that the extensions of time were made on the basis that they were made without prejudice to either party's rights in connection with the English proceedings; though the language differed on each occasion when this was agreed, there was no difference in the substance as to the agreement in this respect. It is difficult to see how the alleged implied term could exist consistently with this express term.

*(vii) Are PIC estopped from continuing the English proceedings?*

Akai submitted in the alternative that even if there was no term (express or implied) to the effect for which contended, PIC were precluded from continuing the English action (and in particular seeking to raise the counterclaim). They relied first on an estoppel by convention and contended that it was the common understanding which formed the basis of the extensions of time that the English *104 action would not continue if the Australian

Page 16

[1998] 1 Lloyd's Rep. 90
1997 WL 1103548 (QBD (Comm Ct)), [1997] C.L.C. 1508, [1999] I.L.Pr. 24, [1998] 1 Lloyd's Rep. 90
(Cite as: [1998] 1 Lloyd's Rep. 90)

Courts exercised jurisdiction. For the reasons I have given, I have concluded that there was no such common understanding or promise.

Akai contended in the alternative that if PIC had always intended, in the event that the Courts of Australia determined that they would exercise jurisdiction, to continue with the English action, then PIC were under a duty to speak; PIC must have appreciated that Akai was under the impression that this would not be the case. They relied on The August Leonhardt, [1985] 2 Lloyd's Rep. 28 and The Stolt Loyalty, [1993] 2 Lloyd's Rep. 281.

In my judgment there was no express or implied representation on the part of PIC's solicitors for the reasons I have given. In any event any such representation would have had to have been clear or unequivocal or one that was reasonably understood as clear or unequivocal (see Woodhouse A.C. Israel Cocoa Ltd. S.A. v. Nigerian Marketing Co. Ltd., [1972] 1 Lloyd's Rep. 439; [1972] A.C. 741). It would, in any event, absent a duty to say something, have been difficult to spell out such a representation from the exchanges of correspondence.

Nor do I consider that there was any duty on the part of PIC's solicitors to say anything about their future intentions about action in this jurisdiction. In exchanges between experienced solicitors during the course of litigation, there is no general duty upon one party to point out mistakes or misapprehensions of another party or his legal advisers: each situation must depend on the circumstances (see the judgment of Mr. Justice Clarke in The Stolt Loyalty at p. 290). In the circumstances of this case, while I entirely accept the evidence of Akai's solicitor that he thought that there was no question of the English proceedings continuing if Akai succeeded in Australia on the jurisdiction issue, PIC's solicitors did not know or appreciate he had this understanding. There is no question here of PIC deliberately allowing Akai to agree to the extensions of time and continuing their attempts to obtain jurisdiction in Australia on a misapprehension of PIC's position. They fully and fairly stated their position by reference to the existing position, but neither said nor were asked to say anything about their position if Akai established Australian jurisdiction.

*Conclusion*

I have therefore reached the conclusion on the third issue that there is no agreed term (express or implied) that forms part of the agreements to extend time (or any collateral agreement to the same effect) and no estoppel on which Akai can rely so as to prevent the continuation of these proceedings.

*4. Should this Court exercise its discretion to stay these proceedings? Or should it grant an anti-suit injunction in respect of the New South Wales proceedings or an anti-enforcement injunction against any judgment obtained in those proceedings?*

In the three issues I have so far considered, Akai have sought as of right to prevent the continuation of these proceedings. They next contend that even if they are not entitled as of right to prevent the continuation of these proceedings, I should exercise my discretion and stay these proceedings. PIC have responded not merely by arguing that these proceedings should continue, but by seeking to prevent Akai continuing the Australian proceedings by an anti-suit injunction and obtaining any benefit from those proceedings by an anti-enforcement injunction.

*(i) The principles applicable to the grant of a stay and an anti-suit injunction*

To a considerable extent the principles to be applied in an application in the context of a jurisdiction clause in a contract between the parties are the same whether a Court is considering an application for a stay or an application for an anti-suit injunction; the principles generally differ only where the different nature of the relief sought renders a particular principle inapplicable to the form of relief. The principles that are relevant to my decision in this application are the following:

(1) It is the policy of the Courts to hold parties to the bargain in respect of their choice of forum by use of a jurisdiction clause, unless there is good reason to the contrary: see The Chaparral, [1968] 2 Lloyd's Rep. 158.

(2) The same principles apply whether the contractual forum is England or another country: see the judgment of Lord Justice Diplock in The Chaparral at p. 164. Mr. Lawrence Collins, Q.C. (who appeared for PIC) argued that Lord Justice Diplock was wrong as a matter of historical analysis of the cases. He may be correct in his analysis of the history (see in particular The Fehmarn, [1957] 2 Lloyd's Rep. 551 at p. 555; [1958] 1 W.L.R. 159 at p. 164 and The Atlantic Star, [1973] 2 Lloyd's Rep. 197. However, given the developments of this area of the law, I prefer to follow what Lord Justice Diplock said in The Chaparral; [1974] A.C. 436, though he may have anticipated the developments he was later to make in this area of the law. Looking at the question as a matter of principle today, it must be right to

[1998] 1 Lloyd's Rep. 90                                                    Page 17

1997 WL 1103548 (QBD (Comm Ct)), [1997] C.L.C. 1508, [1999] I.L.Pr. 24, [1998] 1 Lloyd's Rep. 90
**(Cite as: [1998] 1 Lloyd's Rep. 90)**

approach all jurisdiction clauses whether English or overseas, on the same basis.

(3) Where a plaintiff sues in England in clear breach of a foreign jurisdiction clause, the Court is not bound to grant a stay but has a discretion **\*105** whether or not to do so; the discretion should be exercised by granting a stay unless a strong cause for not doing so was shown: see The El Amria, [1981] 2 Lloyd's Rep. 119 at p. 123.

(4) Where a plaintiff seeks an injunction to restrain foreign proceedings where there is a clear breach of a jurisdiction clause, an injunction should not be granted as a matter of course, but usually should be granted unless good reason was shown why it should not: see The Angelic Grace, [1995] 1 Lloyd's Rep. 87 at p. 96.

(5) Where proceedings are brought in breach of a jurisdiction clause, the test for the grant of an anti-suit injunction is the same test as that which applies where a stay of English proceedings is sought: see Ultisol Transport Contractors Ltd. v. Bouygues Offshore S.A., [1996] 2 Lloyd's Rep. 140 at p. 149.

(6) The Court must on all such applications take into account all the circumstances of the case.

(7) If the party applying for a stay or an injunction has already litigated the issue of jurisdiction in another state and failed, this will be a significant factor counting against him if that Court has applied principles relating to jurisdiction similar to those applied by this Court: see The Angelic Grace, Amchem Products Inc. v. Workers Compensation Board (sup.). Where the foreign Court is not bound to apply such principles or has not applied such principles, the fact the issue of jurisdiction has been litigated in another state will not generally be significant (see Airbus Industrie GIE v. Patel, [1997] 2 Lloyd's Rep. 8.)

(8) In the case of a stay, the particular matters to be taken into account are those set out in the judgment of Lord Justice Brandon in The El Amria, [1981] 2 Lloyd's Rep. 119:

(a) In what country the evidence on the issues of fact is situated, or more readily available, and the effect of that on the relative convenience and expense of trial as between the English and foreign Courts. (b) Whether the law of the foreign Court applies and, if so, whether it differs from English law in any material respects. (c) With what country either party is connected, and how closely. (d) Whether the defendants genuinely desire trial in the foreign country, or are only seeking procedural advantages. (e) Whether the plaintiffs would be prejudiced by having to sue in the foreign Court because they would: (i) be deprived of security for their claim; (ii) be unable to enforce any judgment obtained; (iii) be faced with a time bar not applicable in England; or (iv) for political, racial, religious or other reasons be unlikely to get a fair trial.

(9) Where the parties have chosen a neutral forum connected with neither party, factors relating to the convenience of the parties or the location of witnesses (such as those set out in (a) and (c) above) are of little relevance: see Attock Cement Co. Ltd. v. Romanian Bank for Foreign Trade, [1989] 1 Lloyd's Rep. 572 at p. 582, col. 1 where Lord Justice Staughton said:

For my part, I think we ought to look with favour on the choice of our own jurisdiction, when it appears to have been made in order to find a Court which is neutral rather than one that is convenient.

Indeed many international contracts are expressly made subject to the jurisdiction of this Court as a neutral forum in much the same way as arbitration at a neutral seat is chosen. In such cases, it would only be for exceptional reasons that this Court would not exercise the jurisdiction that the parties have chosen.

(10) In considering whether to grant an injunction, the Court will also take account of: (a) whether the plaintiff seeking an injunction had applied promptly and before foreign proceedings were too far advanced: see The Angelic Grace. The longer the delay that occurs before the application is made, the more likely a Court is to refuse it; (b) any voluntary submission to the jurisdiction of the foreign Court, particularly where proceedings have progressed for any period of time: see A/s D/s Svendborg v. Wansa, [1996] 2 Lloyd's Rep. 559 at p. 570; (c) the undesirability of a second set of proceedings where the matter is already being litigated elsewhere, except where there are powerful reasons for so doing: see The Abidin Daver, [1984] 1 Lloyd's Rep. 339 at pp. 344 and 351; [1984] A.C. 398 at pp. 411 and 423.

No special considerations arising by virtue of the fact that the other proceedings are in another member state of the European Union are applicable in this matter as this dispute has no connection with other member states.

*(ii) Should a stay be granted?*

In this case I do not consider that the English proceedings should be stayed.

First the parties had freely bargained for this jurisdiction and that bargain should be upheld unless there are strong reasons for not doing so. The parties had also bargained for English law. The proceedings in Australia will deprive PIC of the results of that bargain by imposing a set of statutory provisions which make the contract much less favourable to PIC than English law provides.

[1998] 1 Lloyd's Rep. 90

Page 18

1997 WL 1103548 (QBD (Comm Ct)), [1997] C.L.C. 1508, [1999] I.L.Pr. 24, [1998] 1 Lloyd's Rep. 90
(Cite as: [1998] 1 Lloyd's Rep. 90)

Second, it cannot be properly suggested that PIC are forum shopping. They seek only to have the **\*106** dispute decided in the chosen jurisdiction according to the chosen proper law.

Third, although clearly most of the relevant witnesses and documentation are in Australia and if not there, in Singapore (for which Australia is more convenient), I do not consider this a factor of any significance in this case where the parties have deliberately chosen England as the neutral venue for litigation.

Fourth, the technical, though voluntary, submission of PIC to the jurisdiction of the New South Wales Courts under the law of New South Wales should not, in my judgment, count against them. I have set out in considering the issue on recognition the reasons why I considered that their actions did not amount to a submission that would entitle or require this Court to recognize the judgment of the New South Wales Court. It would not in any event be right, having reached that result, to bring about the same result through the grant of a stay as would have been achieved by recognition.

In contrast with this, it is clear that Akai's submission to the jurisdiction of this Court was not technical; they freely agreed English jurisdiction in the contract and the issue of the writ must have amounted to a further voluntary submission: see Metal Scrap Trade Co. v. Kate Shipping Co. Ltd. (the Gladys), [1990] 1 Lloyd's Rep. 297 at p. 299; [1990] 1 W.L.R. 115 at p. 117. It would require good reasons for a Court to stay proceedings voluntarily brought before it pursuant to a jurisdiction agreement at the suit of the party which itself instituted those proceedings, even though Akai had made it clear that they had done so on a "protective basis" and had also made it clear (as the plaintiff had done in Attorney-General v. Arthur Andersen & Co., [1989] E.C.C. 224) that they did not intend to proceed if they were successful in Australia.

Fifth, quite apart from the issue of technical submission to the jurisdiction of the New South Wales Court, there is the factor that the issue of jurisdiction has been litigated in the Courts of Australia which apply similar jurisdictional principles to those applied by this Court. Although often this is a decisive factor, in this case, for the reasons given when considering the issue of comity, the High Court did not apply those principles in deciding to refuse a stay; the stay was refused because of the mandatory requirements of Australian legislation affecting the substantive

rights of the parties. I therefore do not consider that the fact that PIC litigated the issue of jurisdiction in an overseas jurisdiction and lost should in the very unusual circumstances of this case count against them.

Sixth in the particular circumstances of this case the fact that PIC are seeking a negative declaration is not a factor that should count against them. It is clear from the authorities that a negative declaration is an extraordinary form of relief and will only be considered if the applicant has good reason to seek it: see Camilla Cotton Oil Co. v. Granadex S.A., [1976] 2 Lloyd's Rep. 10 and New Hampshire Insurance Co. v. Phillips Electronics North America Corporation, (Court of Appeal, May 16, 1997). It is also clear from several decisions that proceedings in this jurisdiction to obtain negative declaratory relief are to be treated with great caution where there may be conflicts of jurisdiction: see The Volvox Hollandia, [1988] 2 Lloyd's Rep. 361 at p. 371; this was emphasized again in Sohio Supply Co. v. Gatoil (USA) Inc., [1989] 1 Lloyd's Rep. 588. If the counterclaim was made in an attempt to influence the proceedings properly brought in Australia where the issues were being considered by the Courts in accordance with the proper law of the contract, it would be difficult, to justify; it would fall within that category of applications to which Lord Justice Kerr referred in First National Bank of Boston v. Union Bank of Switzerland [1990] 1 Lloyd's Rep. 32 at p. 38 as:

. . .an attempt to persuade the Courts of one country to arrogate to themselves a jurisdiction which belongs more properly to the Courts of another country, so that the grant of the plaintiff's application in one jurisdiction may involve a breach of comity towards the Courts of another country.

However in this case, the only way in which PIC can seek to have the proper law of the contract applied is to seek such a declaration before these Courts. PIC has no remedy available in New South Wales; the High Court has decided that the proper law of the contract must give way to the Australian Insurance Contracts Act. In those circumstances, a negative declaration is an appropriate form of relief as it is the only form of relief available to PIC to have their rights determined by the agreed proper law.

Nor in my judgment is it a factor against PIC that they will seek to use in Singapore any declaration they obtain from this Court. They will be doing no more than using a judgment of the Court that the parties agreed should decide the dispute (applying the proper law upon which the parties agreed) to resist enforcement of a judgment given by a Court

[1998] 1 Lloyd's Rep. 90                                                                Page 19

1997 WL 1103548 (QBD (Comm Ct)), [1997] C.L.C. 1508, [1999] I.L.Pr. 24, [1998] 1 Lloyd's Rep. 90
**(Cite as: [1998] 1 Lloyd's Rep. 90)**

that the parties did not agree should decide the dispute and which will not be applying the agreed proper law. Although there is some dispute in the evidence before me as to Singapore law, I consider that such a declaration may well be useful in Singapore and real practical benefits will flow if it is granted.

Whether PIC are entitled to that declaration on one of the grounds of counterclaim is the fifth issue **\*107** before the Court; for the reasons given, I do not consider that it is possible to decide, on the evidence, that issue in this combined application. However in my judgment, there are strong reasons why PIC are entitled to invoke the jurisdiction of this Court to seek to have that issue determined, even though in the form of a negative declaration.

Seventh, the fact that the refusal of a stay of these proceedings may, if PIC are successful in their counterclaim, enable PIC to rely on the time bar under cl. VI.8 of the policy is a factor that I have considered. This is not a case where a party has issued proceedings in a non-contractual forum and overlooked the issue of proceedings in the contractual forum; in such a case the Court may, if strong reasons are shown, allow him to continue in the jurisdiction where the time bar does not take effect (see for example Citi-March Ltd. v. Neptune Orient Lines Ltd., [1997] 1 Lloyd's Rep. 72; [1996] 1 W.L.R. 1367). In this case, proceedings were begun at virtually the same time in both jurisdictions; if Akai's claim is time barred in this jurisdiction and not in New South Wales it is not for procedural reasons, but because of the difference in the substantive law to be applied by the Courts. The New South Wales Court will not apply the proper law of the contract; it will apply the Australian Insurance Contracts Act. If, as may be the case, the time bar defence that may remain available to PIC under the proper law of the contract is not available under the law that the New South Wales Court will apply, then it is not just to deprive PIC of that defence by refusing a stay.

Eighth, I do not consider that the conduct of PIC's solicitors when they agreed the extension of time should lead to a stay. Akai contended that, if I reached the conclusion on the third issue that there was no agreement or estoppel, nonetheless the conduct of PIC's solicitors was such that it would constitute strong reasons for not enforcing the jurisdiction clause. However for the reasons I have already given, I do not consider that their conduct was such as should lead to this result.

Finally I have taken into account the fact that in refusing to stay these proceedings, the effect may be that there is simultaneous litigation here and in

New South Wales with the inevitable and undesirable consequences that follow. Although the Court will always lean against that, it is the consequence of Akai not abiding by a freely negotiated jurisdiction clause; it would not be just that they should be entitled to take advantage of their own breach of contract to achieve this result.

### (iii) Should an anti-suit injunction be granted?

The fact that in my judgment the proceedings in this Court should not be stayed does not mean that I should grant an anti-suit injunction to prevent the continuation of the proceedings in New South Wales. I must consider whether in all the circumstances such an injunction should be granted and in particular whether the conduct of PIC should disentitle them from obtaining such relief.

I first must consider whether PIC's failure to apply in 1993 to this Court instead of attempting to obtain a stay in Australia is a reason for refusing an anti-suit injunction. It is well understood that such an injunction of this kind must be applied for promptly. Since the decision of the Court of Appeal in The Angelic Grace which was given in May, 1994 it has been clear that a party need not await the decision of the foreign Court before applying for an injunction. However in June, 1993, when PIC decided to apply for a stay in Australia, this was not as clear. In Tracomin S.A. v. Sudan Oil Seeds Co. Ltd., [1983] 2 Lloyd's Rep. 384; [1983] 1 W.L.R. 1026, the Court of Appeal granted an injunction to enforce an arbitration clause to a party who had sought a stay in the overseas Court and failed there. In The Golden Anne, [1984] 2 Lloyd's Rep. 489, Mr. Justice Lloyd refused an injunction because the foreign Court had not ruled on the application in relation to its jurisdiction. Given the state of the authorities in this developing area of the law at the time PIC decided to seek a stay in Australia, their decision to seek a stay in Australia and their delay in seeking relief from this Court is not a sufficiently strong reason to refuse the grant of the injunction. After the decision in the High Court, they did not delay long; they did nothing further in Australia, unlike the applicants in Toepfer International G.M.B.H. v. Molino Boschi Srl, [1996] 1 Lloyd's Rep. 510, who allowed the foreign proceedings to proceed almost to judgment.

However PIC did not then apply to this Court. Instead, they obtained an anti-suit ex parte in Singapore. It was submitted by Akai that this conduct should disentitle them for obtaining an injunction in this Court or if this Court was minded to grant an injunction it should be on terms that PIC discontinued their proceedings in Singapore to obtain an anti-suit injunction there.

[1998] 1 Lloyd's Rep. 90

1997 WL 1103548 (QBD (Comm Ct)), [1997] C.L.C. 1508, [1999] I.L.Pr. 24, [1998] 1 Lloyd's Rep. 90
(Cite as: [1998] 1 Lloyd's Rep. 90)

Page 20

PIC explained their conduct in obtaining an injunction on the basis of their belief in March, 1997 that an English injunction might not be effective. It is difficult to see on what basis that belief could have been justified as they sought the injunction without making any enquiry of Akai. Although a justifiable application to the Singapore Court might not have been a breach of the exclusive jurisdiction clause (as it might be regarded as analogous to the claim for ancillary relief made in The Lisboa, [1980] 2 Lloyd's Rep. 546 and Marazura Navegacion S.A. v. Oceanus Mutual Underwriting (Bermuda) Ltd., [1977] 1 Lloyd's Rep. 283), there was, in my judgment, no justification for *108 the application to the Singapore Court, as the Court itself concluded.

In discharging the ex parte injunction on June 13, 1997, Mr. Judicial Commissioner Choo Han Teck in the High Court in Singapore decided that the application should have been made to this Court: he said:

Although the parties had agreed to refer disputes to the English court, one of them has now chosen to refer to the Australian court, which has accepted that it has jurisdiction and will adjudicate on the claim. It remains for the other party to seek an order from an English court as to whether they have a greater jurisdiction to try the dispute, or to leave that to be resolved in the Australian court. In these circumstances, the Singapore court should not assume the role of an international busybody and direct that the parties litigate in England when the English court may well decline to assume jurisdiction on the ground of forum non conveniens. The courts of the two competing jurisdictions are entitled to come to different conclusions, and that does not concern the Singapore courts unless the parties come to this jurisdiction for the purposes of enforcing their respective judgments, but that would be an entirely different matter.

The question for me is whether this unjustifiable conduct on the part of PIC should disentitle them from the grant of an injunction by this Court. PIC should have applied to this Court; they have now done. The real question therefore is whether their application to the wrong forum should disentitle them. In my judgment it does not. Had they applied to this Court in March, 1997 instead of the Singapore Court, they would have been entitled to an anti-suit injunction as I consider that their delay was not a sufficiently strong reason to refuse for the reasons I have given.

In those circumstances, I consider that the right course is to compensate Akai by an indemnity against all the expense to which they have been

wrongly put in Singapore and grant the relief to PIC. Further, in my judgment, PIC must discontinue their claim for an injunction in Singapore .

I am therefore prepared to grant an injunction to PIC restraining further continuance of the proceedings in New South Wales on terms that they forthwith indemnify Akai against the costs of the proceedings in Singapore and discontinue those proceedings. I assume, as there is no suggestion by Akai to the contrary, that Akai will abide by the injunction granted by this Court; on that assumption, I will also require PIC to undertake not to institute any further proceedings in Singapore.

*(iv) Should an anti-enforcement injunction be granted?*

I do not consider that an anti-enforcement injunction should be granted.

It was argued for PIC that on the general principles set out in Ellerman Lines Ltd. v. Reed, [1928] K.B. 144 Akai should be enjoined from seeking to enforce in Singapore (or elsewhere) any judgment that they might obtain in Australia.

However, in the circumstances of this case I do not consider that it would be right in the exercise of my discretion to grant such an injunction. First, there is no suggestion that Akai would breach the injunction that I have granted in respect of the continuation of the proceedings in Australia. The question therefore does not presently arise.

Even if it ever arose, it would only arise in circumstances where the Courts of New South Wales had given judgment in favour of Akai and there was either a judgment of this Court in favour of PIC or the current proceedings still pending. In such circumstances, PIC would in effect be inviting this Court to interfere, albeit indirectly, with the process of the Court in Singapore and the right of that Court to decide in accordance with their own law whether to recognize and enforce a judgment of a foreign Court. In such circumstances a Court in this country would have to act with great caution; there are very powerful arguments that it is more consistent with comity to leave it to the Courts in Singapore to decide what course to take in the light of their own law - see E.D. & F. Man (Sugar) Ltd. v. Harvanto, [1991] 1 Lloyd's Rep. 429 and The Eastern Trader, [1996] 2 Lloyd's Rep.585 at p. 603.

*5. Are PIC entitled to judgment on their counterclaim for a declaration that the claim is time barred?*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[1998] 1 Lloyd's Rep. 90

1997 WL 1103548 (QBD (Comm Ct)), [1997] C.L.C. 1508, [1999] I.L.Pr. 24, [1998] 1 Lloyd's Rep. 90
(Cite as: [1998] 1 Lloyd's Rep. 90)

Page 21

It is accepted by Akai that the 12-month period under cl. VI8 started to run at the latest on Feb. 15, 1992 and that therefore the time for commencing proceedings had expired prior to Mar. 5, 1993 when they commenced proceedings in this Court and in the Court in New South Wales. They therefore accept that the claim is time barred under English law unless PIC have waived the right to raise the defence or are estopped from raising the defence. Akai say PIC are because they said nothing about raising a time bar defence until March, 1997. PIC contend that this answer provides no defence to their application for a declaration that the claim is time barred and therefore seek summary judgment.

*(i) The relevant events*

As mentioned in the outline of the background on p. 93, PIC set out in their letter of Dec. 30, 1992 *109 four specific breaches of the policy in declining liability. The letter concluded:

Please note that the matters set out above are not exhaustive and we reserve the right to raise further breaches or incidents of non compliance as they become apparent.

This was reiterated by PIC in a letter dated Jan. 15, 1993; nothing was said about the time bar, although it is PIC's case that the time bar had expired on Jan. 14, 1993. Between that date and the issue of proceedings on Mar. 5, 1993, there was a further exchange of correspondence; both parties referred to the detailed terms of the policy, but PIC said nothing about a time bar.

Under New South Wales procedural rules, the plaintiff is obliged to set out the issues in his originating process. Akai summarized those in the following terms:

4. The application of the [Australian] Insurance Contracts Act 1984 to the Policy.

5. The proper law of the contract as a consequence of the application of the Act.

6. Whether there has been a breach of policy in respect of:

(a) Clause V 4 requiring confidentiality in relation to the existence of the policy; (b) Clause IV 6 in relation to notification of occurrences likely to give rise to a claim; (c) Clause 1 C.1 b in respect of failing to adhere to standard credit evaluation; (d) generally in relation to alleged failure to submit details of credit control procedures.

7. If the Act applies, the entitlement of the plaintiff to be excuse for any breaches of condition which might be proved against it under the policy.

At the directions hearing on June 11, 1993, PIC's

Counsel told the Court, when stating that PIC intended to apply for a stay, that the issues which would arise in the action were the issues listed in the originating process. On Dec. 21, 1993 Akai's Australian solicitor, Mr. Peken, in an affidavit sworn in support of the application for leave to appeal to the New South Wales Court of Appeal, referred to what had happened on June 11, 1993 and added:

To this stage, the defendant has not given any other indication of the defences which it will raise in relation to the claim made by the plaintiff . . .

Mr. Peken then set out the four defences that PIC had raised in their letter of Dec. 30, 1992.

On Mar. 10, 1994 Akai's Australian solicitors enquired by letter of PIC's Australian solicitors whether they would advise them of the following:

1. What are the defences which your client intends to rely upon in response to our client's claim set out in the summons filed herein?

2. Please provide full particulars of breaches of policy conditions raised in response to 1 above.

3. Is your client prepared to undertake that, if the appeal. . .is dismissed, your client will not raise any other defences other than those set out in the response to 1 and 2 in the English proceedings?

They asked a further specific question about the conduct of the brokers and stated that that was relevant to the issue of whether they might need to join the brokers. PIC's Australian solicitors responded on Mar. 22, 1994:

The issue raised by our client's notice of motion, and on appeal, is whether the jurisdiction of the courts of New South Wales to entertain your client's claim should be exercised, or whether the proceedings should be stayed.

As you will appreciate, it will be necessary to undertake a detailed investigation and analysis of the facts in order to finally identify all the defences available to our client, and then provide you with the particulars you seek. It is not appropriate for our client to have to do this or to incur the expense of doing this given the stay of the proceedings. Accordingly, our client is not in a position to provide further details of the defence it may raise in defence to our client's claim; or to give the undertaking sought in relation to the English proceedings.

In any event, the defences set out in paragraph 4 of Mr Peken's affidavit sworn 21 December 1993 include the defences that our client will raise in defence to your client's claim.

Akai's solicitors again raised the issue in June, 1995 in the terms recorded in the letter of June 29, 1995 (set out at p. 102 above). As that letter also records, PIC's solicitors maintained the same position.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 22

[1998] 1 Lloyd's Rep. 90
1997 WL 1103548 (QBD (Comm Ct)), [1997] C.L.C. 1508, [1999] I.L.Pr. 24, [1998] 1 Lloyd's Rep. 90
**(Cite as: [1998] 1 Lloyd's Rep. 90)**

Nothing further was said until Mar. 6, 1997 when PIC's English solicitors served the defence and counterclaim in these proceedings which pleaded the defences PIC had raised and the time bar. They also served the application seeking summary judgment on their counterclaim in relation to the time bar.

### (ii) Knowledge of the time bar

Those events are not in dispute. However a question does arise in relation to the knowledge of the parties.

Although PIC never responded to several requests from Akai to state when they first became aware of their entitlement to rely on the time bar *110 defence and they did not volunteer during the proceedings any answer on the topic, there can be little doubt that they were aware of the availability of that defence from at least March, 1993.

It would hardly have been possible for them otherwise to have maintained the argument that Akai were themselves aware of the time bar from the same time. PIC said that it was not credible that Akai was unaware of the availability of the time bar as the parties had in the exchange of correspondence prior to the issue of the proceedings referred to the terms of the policy in detail. PIC also relied on other matters for their contention Akai knew of the time bar:

(1) Akai had subsequently issued the proceedings without a letter before action; they had stated that the English proceedings were on a protective basis; Akai's English solicitor had deposed in an affidavit sworn in August, 1993 that his firm had been instructed to issue proceedings in England "so as to preserve Akai's position". In the affidavit sworn by him in relation to this application on Apr. 25, 1997, the issue of a writ was referred to as being "on a protective basis". PIC contended that there was nothing to protect other than the time limit and they must therefore have been aware of the provision in the policy, though been mistaken as to when it took effect.

(2) On Nov. 11, 1994, Akai's Counsel was asked in the Court of Appeal of New South Wales: "is there a time limit?" Leading Counsel had responded: "That is one of the problems".

(3) Akai had been represented by two firms of Australian solicitors, five Australian Counsel and the policy had been considered by three Courts in Australia. It was hardly credible, PIC submitted, that these had all failed to spot the time bar.

(4) Nowhere have Akai or their Australian or English solicitors deposed that they were unaware of the time bar.

This is an O. 14 application. On the materials before me, I cannot decide what their state of knowledge was and must at least assume for present purposes that they did not know that PIC would rely on that defence until it was raised in March, 1997.

### (iii) Was there a waiver?

Akai relied first on the submission that PIC waived their right to raise the defence of time bar; they relied on waiver (in contradistinction to estoppel) in the sense that they did not have to establish any reliance (see Chitty on Contract 27th ed., par. 24-005). Akai contend that PIC had by March, 1993 the accrued right of a defence of time bar; as PIC knew they had this right, PIC were entitled to make an election as to whether they would rely on it or not. By agreeing before the Court in New South Wales on June 11, 1993, PIC had elected not to rely on that right. Akai therefore contended, in reliance on The Kanchenjunga, [1990] 1 Lloyd's Rep. 391, that the right had been waived. If it had been, then they would not have to have shown reliance.

In view of the conclusion I have reached on estoppel, it is only desirable that I express a provisional view on this argument. I consider that there are grave difficulties in establishing a waiver in this sense; I do not consider that PIC had to make an election as to whether they would rely on the time bar defence and so no circumstances arose from which a waiver could have been founded.

Akai also contended that PIC waived their right to rely on the time bar by continuing negotiations after the issue of the writ; these negotiations took place after the writ was issue in March and April, 1993 and again in July, 1993; they were without prejudice. My provisional view is that the content of those negotiations is not admissible to determine whether a party has waived a defence; the exceptions to the general principle discussed in Family Housing Association v. Hyde, [1993] 1 W.L.R. 354 are not applicable. However having been invited to consider the evidence in relation to those negotiations in the course of submissions, I do not consider that they would have provided any further support to Akai's position. It is clear that after the time bar had in fact arisen and before proceedings were issued both in New South Wales and in this Court that the parties went on negotiating without the time bar point being raised.

### (iv) Was there an estoppel?

In considering the issues raised, I have been referred, in addition to The August Leonhardt and

The Stolt Loyalty, to The Ion, [1980] 2 Lloyd's Rep. 245 and the unreported judgment of Mr. Justice Phillips in Detker v. v/O Sovfracht, (Dec. 16, 1987) where the issue of estoppel in relation to time bar defences was considered.

To establish an estoppel by representation, it is necessary that there be a clear and unequivocal representation. It is clear that nothing can be implied from PIC's letter of Dec. 30, 1992 specifying the grounds on which it repudiated liability, as the time bar had not arisen. Nor in my judgment can anything be implied from the correspondence prior to the commencement of proceedings.

Akai, however, relied heavily on PIC's conduct at the initial directions hearing on June 11, 1993. I was provided, after the conclusion of the oral argument, with short memoranda from both parties in relation to the obligations at a directions hearing in a commercial action in New South Wales. Under rules set out in a practice note issued on Nov. 12, *111 1986 by Sir Laurence Street, C.J. a plaintiff was required to set out in the originating process the issues likely to arise in the action; in the commentary to that practice note it was made clear that the Court would require the defendant to set out what the defendant perceived to be the issues; the practice note did not preclude subsequent amendments. In a subsequent practice note issued on Feb. 26, 1996 by Gleeson, C.J. what was set out in the commentary was expanded and set out in the practice note. This is all common ground. Akai's Australian lawyers say the 1996 practice note embodied the practice existing from 1987 that a defendant was expected at the first directions hearing to raise defences of which it was aware at the time. PIC do not agree this.

Under English procedure, there is no general obligation to disclose defences (see Hiscox v. Outhwaite, [1991] 2 Lloyd's Rep. 1 at p. 17, col. 2; [1992] 1 A.C. 562 at p. 577); however that may not be the position in New South Wales. On the evidence before me, it seems to me arguable that PIC were under a duty to disclose the time bar defence in New South Wales at that hearing; for over three years thereafter, the jurisdictional dispute continued before the Australian Courts without the time bar being raised by PIC; on the contrary they were told that the issues were those set out in the statement of issues. At first sight that is surprising as the existence of a time bar is one of the issues that a Court will ordinarily consider on such applications. Akai's costs in those proceedings were, I was told over Aus. $350,000, Aus. $70,000 of which are irrecoverable. The proceedings may have taken a different course much earlier had that

defence been put on the table. It is Akai's evidence that if they had known that PIC intended to rely on the time bar defence they might not have been willing to agree the extensions of time for service of the defence and they might have considered their overall position in the litigation and decided not to proceed further at all.

It may well be, as PIC submit, Akai was fully aware of the availability of this defence and the parties were "shadow boxing" round the point, each being aware of it, but neither, for differing tactical reasons, raising it (save in the oblique reference in the Court of Appeal to which I have referred above at p. 42). However the application is one for summary judgment and it would, as I have said, not be right to reach such a conclusion on Akai's knowledge on the basis of the affidavit evidence before the Court.

After that directions hearing when Akai tried to obtain from PIC a statement about their defence in March, 1994 and June, 1995, they were met with the replies on Mar. 22, 1994 (p. 109 above) and June 29, 1995 (p. 102 above) to the effect that a detailed investigation was necessary to identify finally all the defences available; that they therefore did not consider it appropriate to do so while the jurisdictional dispute continued. In the context of what had happened at the initial directions hearing in June, 1993, such a reply was not, on its face, one that would have indicated that a time bar defence was to be taken. However this may have been part of what has been described as the "shadow boxing" and Akai were all along aware of the possibility of the time bar defence. It may be Akai were merely trying to get PIC to place it on the record so that it could be used in the appeal on the stay application.

Akai contended that as a result of PIC's failure in such circumstances to tell the Australian Courts of their intention to rely on the time bar, PIC misled both Akai and the Courts. Although I am not concerned with this happening in circumstances where the Australian Courts had granted a stay without the time bar being raised, nonetheless such conduct, if established, might support an estoppel by silence or acquiescence arising though unconscionable conduct which prevents the time bar being relied on: see Detker v. Sovfracht at p. 16.

On this evidence, I cannot determine whether the circumstances giving rise to an estoppel can be made out. I am unable to determine the essential element relating to Akai's state of knowledge. PIC therefore is not entitled to summary judgment on the time bar point. I therefore have not considered

1997 WL 1103548 (QBD (Comm Ct)), [1997] C.L.C. 1508, [1999] I.L.Pr. 24, [1998] 1 Lloyd's Rep. 90
**(Cite as: [1998] 1 Lloyd's Rep. 90)**

Akai's further argument that as a matter of discretion the Court should, even if it considered that the time bar defence could be taken, not grant a declaration to this effect because of PIC's general conduct.

*Conclusion*

It is clearly convenient and appropriate that the issue on the time bar be tried as a preliminary issue as soon as this can be arranged.

(c) Lloyds of London Press Limited

END OF DOCUMENT