# Exhibit 4



Westlaw UK

[1983] 2 Lloyd's Rep. 419                                                                 Page 1
1983 WL 216725 (QBD (Comm Ct)), [1983] 2 Lloyd's Rep. 419, [1983] Com. L.R. 195
(Cite as: [1983] 2 Lloyd's Rep. 419)

*419 Arab African Energy Corp. Ltd. v.
Olieprodukten Nederland B.V.

Queen's Bench Division (Commercial Court)

QBD (Comm Ct)
May 6, 1983; May 12, 1983

Before Mr. Justice Leggatt

Arbitration -- Award -- I.C.C. rules -- Leave to appeal -- I.C.C. rules incorporated in contract -- Whether valid exclusion agreement which precluded leave to appeal -- Art. 24 of I.C.C. rules.

By a contract dated Dec. 30, 1980, the plaintiffs (Arafenco) agreed to sell to the defendants (O.P.N.) 25,000/30,000 tonnes of gas oil f.o.b. Constanza. The contract was concluded orally between two firms of brokers in Paris and confirmed by telex messages which contained all the essential terms of the contract including the following:
Inco terms 1980
English law -- arbitration, if any, London according I.C.C. rules.

Article 24 of the I.C.C. rules provided, inter alia:
1. The arbitral award shall be final.
2. By submitting the dispute to arbitration by the International Chamber of Commerce, the parties shall be deemed to have undertaken to carry out the resulting award without delay and to have waived their right to any forms of appeal insofar as such waiver can validly be made.

Various disputes arose between the parties in which Arafenco claimed moneys due to them amounting to $440,000 and O.P.N. claimed $107,500 by way of demurrage.

The dispute was referred to arbitration and the arbitrator made his award on Feb. 4, 1983. He held that the claim failed and the counterclaim succeeded in part.

The plaintiffs applied for leave to appeal under s. 1 of the Arbitration Act, 1979, but the defendants contended that there was a valid exclusion agreement which precluded the appeal since the parties had incorporated the I.C.C. rules by reference.

Held, by Q.B. (Com. Ct.) (LEGGATT, J.), that
(1) arbitration "according" I.C.C. rules meant "in

conformity with " them; no process was envisaged whereby the procedural rules had to be winnowed out of the remainder for the process of administering the conduct of the arbitration but not its effect and s. 3 (1) of the Arbitration Act, 1979, did not require the overt demonstration of an intention to exclude the right of appeal (see p. 423, col. 1);

(2) the phrase "an agreement in writing . . . which excluded the right of appeal" in s. 3 (1) of the 1979 Act, was apt to apply to an exclusion agreement incorporated by reference and the exclusion of every right of appeal which could lawfully be excluded not only achieved that result but achieved it in a way which was harmonious with the 1979 Act, and allowed for those particular matters in which the right of appeal could not be excluded; it was impossible to hold that if the parties had agreed that they should be deemed to have waived their right to any form of appeal they had not thereby done so and the plaintiff was disentitled from applying for leave to appeal (see p. 423, cols. 1 and 2).

The following cases were referred to in the judgment:

Estasis Salotti v. RUWA, [1976] E.C.R. 1831;

Frank Fehr & Co. v. Kassam Jivraj & Co. Ltd., (1949) 82 Ll.L.Rep. 673;

Nema, The, [1981] 2 Lloyd's Rep. 239; [1982] A.C. 724;

Segoura v. Bonakdarian, [1976] E.C.R. 1861;

Tracomin S.A. v. Sudan Oil Seeds Co. Ltd., [1983] 1 Lloyd's Rep. 560; [1983] 1 All E.R. 404.

This was an application by the plaintiffs, Arab African Energy Corp. Ltd. for leave to appeal under s. 1 of the Arbitration Act, 1979, against an award made by the arbitrator in a dispute between the plaintiffs and the defendants, Olieprodukten Nederland B.V.

**Representation**

Mr. Anthony Diamond, Q.C. and Mr. Simon Crookenden (instructed by Messrs. Shaw & Croft) for the plaintiffs; Mr. Steven Gee(instructed by Messrs. Holman, Fenwick & Willan) for the defendants.

The further facts are stated in the judgment of Mr.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[1983] 2 Lloyd's Rep. 419
1983 WL 216725 (QBD (Comm Ct)), [1983] 2 Lloyd's Rep. 419, [1983] Com. L.R. 195
**(Cite as: [1983] 2 Lloyd's Rep. 419)**

Page 2

Justice Leggatt.

Judgment was reserved.

Thursday, May 12, 1983

## JUDGMENT

Mr. Justice LEGGATT:

There is before me an application by the plaintiffs for leave to appeal under s. 1 of the Arbitration Act, 1979. With the concurrence of both parties I have heard first a preliminary question of whether there was a **\*420** valid exclusion agreement in this case, such as would have the effect of precluding the proposed appeal. I shall refer to the plaintiffs by their customary abbreviation of "ARAFENCO" and to the defendants as "O.P.N.".

By a contract made on Dec. 30, 1980, Arafenco agreed to sell to O.P.N. 25,000/30,000 tonnes of gas oil f.o.b. Constantza. There ensued disputes between the parties in which Arafenco claimed moneys due to them amounting to \$440,000 and O.P.N. claimed \$107,500 by way of demurrage. The contract was concluded orally between two firms of brokers in Paris, Davis & Newman acting as brokers for O.P.N. and Méditerranée Courtage acting as brokers for Arafenco. The agreement thus reached was confirmed by two telex messages from Davis & Newman to each of the parties. The telex began: "Ref. various to-day's telcons, are pleased to confirm following business . . .". All the essential terms of a contract were then set out and there were included as "general terms " the following provisions:

. . . Inco terms 1980

English law-- arbitration, if any, London according I.C.C. rules.

Thereafter the arbitrator was agreed as Mr. Nicholas Phillips, Q.C. Having conducted the hearing, he made his award on Feb. 4, 1983. He held that the claim failed and the counterclaim succeeded in part. The question for me is whether, if the parties incorporated the I.C.C. rules by reference, they have (whether they appreciated it or not) made a valid exclusion agreement for purposes of s. 3 of the Arbitration Act, 1979. That section reads, so far as material, as follows:

(1) Subject to the following provisions of this section and section 4 below -- (a) the High Court shall not, under section 1 (3) (b) above, grant leave to appeal with respect to a question of law arising out of an award . . . if the parties to the reference in question have entered into an agreement in writing (in this section referred to as an "exclusion agreement") which excludes the right

of appeal under section 1 above in relation to that award . . . (2) An exclusion agreement may be expressed so as so relate to a particular award, to awards under a particular reference or to any other description of awards, whether arising out of the same reference or not; and an agreement may be an exclusion agreement for the purposes of this section whether it is entered into before or after the passing of this Act and whether or not it forms part of an arbitration agreement. (4) Except as provided by sub-section (1) above, sections 1 and 2 above shall have effect notwithstanding anything in any agreement purporting -- (a) to prohibit or restrict access to the High Court; or (b) to restrict the jurisdiction of that court; or (c) to prohibit or restrict the making of a reasoned award.

Section 4 of the Act provides for exclusion agreements not to apply in certain cases. It is common ground between the parties that it had no application for the purposes of this case. The provision of the I.C.C. rules which is relied upon as an exclusion agreement is art. 24, which reads as follows:

1. The arbitral award shall be final. 2. By submitting the dispute to arbitration by the International Chamber of Commerce, the parties shall be deemed to have undertaken to carry out the resulting award without delay and to have waived their right to any form of appeal insofar as such waiver can validly be made.

For the plaintiffs Mr. Diamond advances four reasons why art. 24 does not constitute a valid exclusion agreement: (1) There was no agreement in writing, as distinct from telex messages confirming an oral agreement; (2) there was no writing by Arafenco or any agent authorized by them, but only by the agent of O.P.N.; (3) the provision in the telex message for arbitration "according I.C.C. rules" related only to the procedure of the arbitration and not to the effect of the award, with the result that art. 24 was not incorporated; and (4) s. 3 of the 1979 Act requires a provision which itself excludes the right of appeal and not one which merely incorporates such a provision by reference.

Mr. Diamond also submitted that art. 24 does not fulfil the requirements of the section as to the exclusion of a right of appeal because (a) it does not say that it does so but is only a "deeming" provision and (b) it is not sufficiently specific as to the rights intended to be excluded. It is convenient to consider first the respective contentions of the parties.

Mr. Diamond reminds me that before the passing of the 1979 Act it had been clear in England that it

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

was not permissible to contract out of the statutory jurisdiction of the High Court to require an arbitrator to state his award in the form of a special case. In support of his first two arguments he submitted that to constitute a valid exclusion agreement a provision must constitute a consensus between the parties agreeing to forego their right. Only so can the parties be said to have "entered into" an exclusion agreement. The telex confirmation by the broker evidences an agreement but does *421 not contain one. Section 3 (1) of the 1979 Act envisages an agreement in writing excluding the right of appeal, whereas here the exclusion was at best oral, albeit evidenced by writing.

For the defendants Mr. Gee began by referring to the definition of "a written agreement", as it originally appeared in the 1889 Act, continuing in the 1931 Act and to be found now in s. 32 of the 1950 Act. That section provides:

In this Part of this Act, unless the context otherwise requires, the expression "arbitration agreement" means a written agreement to submit present or future differences to arbitration, whether an arbitrator is named therein or not.

Mr. Gee contends that the written agreement contemplated by this section need upon authority neither be contemporaneous nor signed by the parties. Although in Frank Fehr & Co. v. Kassam Jivraj & Co. Ltd., (1949) 82 Ll.L.Rep. 673, at p. 676, Lord Greene, M.R., assumed without deciding that signatures were necessary, the weight of authority is against it: see Mustill & Boyd on Commercial Arbitration at p.57. Nor is it necessary that a written agreement should be made at the outset of a transaction or contemporaneously with any oral agreement initially reached. Mr. Gee submits that Mr. Diamond is confronted with Hobson's choice: if there was no written agreement, then by force of s. 7 of the 1979 Act, which incorporates s. 32 of the 1950 Act, there can be no appeal under s. 1 (3) of the 1979 Act, whereas if there is an "agreement in writing", that is sufficient to negative Mr. Diamond's first two submissions. He argues that it would be undesirable for the Court to recognize any material distinction between the two expressions, and that if Mr. Diamond were right, in compulsory stay cases, involving GAFTA agreements, charter-parties or bill of lading contracts, the stay would not apply. If the legislature had wished to distinguish between the two expressions they would have done so expressly. Moreover it accords with the policy of the 1979 Act that there should be finality in arbitrators' awards. In particular he relies upon the dictum of Lord Diplock in The Nema, [1981] 2 Lloyd's Rep. 239; [1982] A.C. 724, at pp. 246 and

740G, where he said:

Section 3 gives effect to a reversal of public policy in relation to arbitration as it had been expounded more than half a century before in Czarnikow v. Roth, Schmidt & Co., [1922] 2 K.B. 478. Exclusion agreements, which oust the statutory jurisdiction of the High Court to supervise the way in which arbitrators apply the law in reaching their decisions in individual cases, are recognised as being no longer contrary to public policy. In principle they are enforceable, subject only to the special limitations imposed, for the time being, by s. 4 in the case of awards made in respect of certain limited classes of contracts which, important as they are to the role of London as a forum for international arbitrations, represent what is numerically only a small fraction of the total arbitrations, both large and small, which take place in England.

Finally, Mr. Gee contends that it would be strange if the legislature required a higher standard of protection in relation to s. 3 of the 1979 Act than is required in respect of land or guarantees, where the writing does not have to be contemporaneous.

Mr. Diamond's third argument is that arbitration "according to I.C.C. rules" relates only to rules which are concerned with how the arbitration is to be conducted. Mr. Gee seeks to meet this argument by submitting that the form of words used most naturally results in the incorporation of the whole of that part of the I.C.C. rules which is headed "arbitration".

According to Mr. Diamond's fourth argument, the agreement must demonstrate an intention to exclude the right of appeal: it is not enough to incorporate such a provision by reference. He seeks to support this submission by two cases decided successively by the European Court of Justice: Estasis Salotti v. RUWA, [1976] E.C.R., 1831, and Segoura v. Bonakdarian, ibid. p. 1861. Both were decisions on art. 17 of the Convention of Sept. 27, 1968, on Jurisdiction. In 1976 the effect of that article was that if the parties "by agreement in writing or by an oral agreement confirmed in writing", agreed that the Courts of the state in which one party was domiciled were to have jurisdiction to settle any disputes, those Courts were accorded exclusive jurisdiction. In the first case the Court held that in view of the consequences that it might have for the parties to an action the requirements of art. 17 must be strictly construed. Article 17 imposes on a Court the duty of satisfying itself that the clause conferring jurisdiction was in fact the subject of a consensus between the parties. In the second case the Court similarly concluded that in relation to an

orally concluded contract, the requirements of art. 17 as to form are satisfied only if the vendor's confirmation in writing accompanied by notification of his general conditions of sale has been accepted in writing by the purchaser. These cases have been the subject of comment in an article by Sir Michael Kerr on the Arbitration Act, 1979, in (1980) 43 M.L.R. 45. When considering the question whether a contract incorporating I.C.C. arbitration clauses would now qualify as containing a valid exclusion agreement, the learned author referred *422 to the two cases decided in the European Court as holding that the mere incorporation by reference of a document containing an appropriate provision was insufficient to constitute "writing" and that a specific written acceptance was required. He continued at p. 54:

However, this decision provoked considerable surprise and dissent in the context of commercial contracts and ultimately led to an amendment before the United Kingdom acceded to the Convention in 1978. It seems highly doubtful whether the English Courts would adopt such a narrow construction, but the decision of the European Court may provide some persuasive authority in favour of it. If the narrow construction should prevail, then parties to contracts containing I.C.C. arbitration clauses would have to decide whether or not to enter into a further express exclusion agreement, although in reality they will already have done so (whether they appreciated it or not) when they agreed to subject themselves to the I.C.C. Rules.

Urging that the two cases constitute persuasive authority, Mr. Diamond contends for a construction of s. 3 of the 1979 Act which takes account of the mischief aimed at and is purposive rather than literal. In short, he says that the agreement in writing relied upon must in terms exclude the right of appeal.

Mr. Gee submits that Mr. Diamond's fourth argument should be rejected, because, first, it would be wrong in principle to permit the incorporation by reference of an arbitration clause, yet not of an exclusion agreement; secondly, the legislature must be taken to have been aware of the English law in 1979 relating to incorporation of provisions into contracts, and in particular into contracts for the sale of land and contracts of guarantee, in both of which incorporation by reference is permissible; and, thirdly, the policy of the Act, as witness the passage earlier cited from the speech of Lord Diplock in The Nema, is in favour of finality. Of the European cases Mr. Gee says that they have found no particular acceptance within the European Economic Community, that they reflect different approaches in different

jurisdictions, as the first case itself shows, and that the 1979 Act was not passed to give effect to any E.E.C. convention.

Finally, Mr. Diamond argues that as a matter of construction the article does not fulfil the requirements of s. 3 of the 1979 Act because the right of appeal is not stated to be excluded but merely deemed to be, and because for the exclusion of the right more specific and precise words are needed. He relies upon an inconclusive passage in Mustill & Boyd on Commercial Arbitration at p. 591 in which it is remarked that there is sufficient doubt about the terms in which an exclusion agreement should be expressed, to make it desirable that the form of words used should directly refer to s. 3 (1) of the 1979 Act. He relies also on a passage in the Annual Practice, 1982, vol. 11, par. 3864:

. . . It is thought, or at any rate it would be wise, that an exclusion agreement should expressly exclude the exercise of each of these rights [specified in s. 3 (1)] rather than that it should be expressed in general terms.

All that these passages do in the absence of authority is to counsel caution.

In summary Mr. Diamond argues for a conclusion which preserves a balance between technicality on the one hand and the effect of "deeming" or incorporation by reference on the other.

For his part Mr. Gee refers again to the article by Sir Michael Kerr; he contends that the French Courts adopt the view that the right of appeal is successfully renounced in these circumstances; and he remarks that any lack of specificity in the I.C.C. rules is accounted for by the fact that they are intended to have effect in a variety of different jurisdictions. The phrase in art. 24 "in so far as such waiver can validly be made" has the effect of ensuring that the article goes so far as is legitimate in any given context and no further.

The result of Mr. Diamond's argument, from which he does not shrink, is that, without recourse to the terms of reference subsequently entered into, the telex message of Dec. 30, 1980, constituted, at any rate upon adoption by Arafenco, a "written agreement" under s. 32 of the 1950 Act to submit to arbitration the differences between the parties, and yet was not an "agreement in writing " under s. 3 (1) of the 1979 Act for the purpose of excluding the right of appeal. In English law, by contrast with certain continental jurisdictions, no special wording is required to incorporate an arbitration clause. Reference in a contract to a particular form of contract which itself provided for arbitration would suffice in England, though not, it would seem, in

[1983] 2 Lloyd's Rep. 419

1983 WL 216725 (QBD (Comm Ct)), [1983] 2 Lloyd's Rep. 419, [1983] Com. L.R. 195
**(Cite as: [1983] 2 Lloyd's Rep. 419)**

Page 5

Switzerland or Italy: c.f. Tracomin S.A. v. Sudan Oil Seeds Co. Ltd., [1983] 1 Lloyd's Rep. 560; [1983] 1 All E.R. 404 per Mr. Justice Staughton at pp. 562-563 and 406j-408e. In my judgment, the Commercial Court would be doing no service to commercial men if, without compulsion from Parliament, it were to recognize and endorse the distinction contended for by Mr. Diamond. Let us see then whether it is so compelled.

**\*423** Mr. Diamond invokes the canon of construction that different words in associated legislation are prima facie to be given different meanings, without however being able to point to any word or words in s. 3 (1) of the 1979 Act which can be said to produce any material difference in effect. It may be noted that before 1979 in the Frank Fehr case (sup.) Lord Greene used the terms "written agreement" and "agreement in writing" indifferently (see ibid. at p. 676), while after 1979 the learned authors of Mustill & Boyd on Commercial Arbitration discussed the terms as if they were synonymous (see pp. 56-57). Adopting the same approach, I hold that the phrase "agreement in writing" in s. 3 (1) of the 1979 Act does have the same meaning as "written agreement" in s. 32 of the 1950 Act, that is, a written expression adopted by both parties of an agreement reached between them or their agents. What is required, as Lord Greene said, is writing "recognizing, incorporating or confirming the existence of an agreement": see ibid at p. 676. Moreover, the adoption of the agreement by both parties constitutes it as one which both have "entered into" without it being necessary for them to have signed it. By their agents the parties have entered into an agreement which has been embodied in a written form. The purpose of both statutory provisions, which is to ensure that the terms of agreement can be ascertained with certainty, has thereby been fulfilled.

Arbitration "according" I.C.C. rules must in my judgment mean "in conformity with" them. No process is envisaged whereby the procedural rules have to be winnowed out from the remainder for the purpose of administering the conduct of the arbitration but not its effect. Such a process would itself be a fruitful source of dissension.

Section 3 (1) of the 1979 Act does not require the overt demonstration of an intention to exclude the right of appeal. True it is, that formerly the Court was careful to maintain its supervisory jurisdiction over arbitrators and their awards. But that aspect of public policy has now given way to the need for finality. In this respect the striving for legal accuracy may be said to have been overtaken by commercial expediency. Since public policy has

now changed its stance, I see no reason to continue to adopt an approach to the construction of exclusion agreements which might well have been appropriate before it had done so. In my judgment, the phrase "an agreement in writing . . . which excludes the right of appeal" is apt to apply to an exclusion agreement incorporated by reference. I reach this conclusion unpersuaded to the contrary by the decisions of the European Court which I consider might be misleading in this essentially domestic context. Whatever considerations of good sense may support those decisions and however much one, might be impressed by them if approaching the matter a priori, the pursuit of homogeneity should not deter me from the broader approach hitherto adopted by the common law. It is more important that commercial men should know that the English Courts are consistent than that the Courts should turn towards Luxembourg when Parliament has not directed them to do so.

While recalling Sir Alan Herbert's dictum about "deeming", I am quite unable to hold that if parties agree that they should be deemed to have waived their right to any form of appeal they have not thereby done so. It also seems to me that the exclusion (in effect) of every right of appeal which can lawfully be excluded, not only achieves that result but achieves it in a way which is harmonious with the 1979 Act and allows for those particular matters in which the right of appeal cannot be excluded.

For these reasons the applicant is disentitled from applying for leave to appeal and there will be judgment for the respondent. The conclusion is, as I venture to think, one which would have been reached directly by commercial men without having to tread the lawyers' maze.

*(After discussion on leave to appeal and costs)*

Mr. Justice LEGGATT: The action is dismissed with costs. There will be leave to appeal, subject to the condition that the plaintiffs agree to the Court of Appeal having jurisdiction to order security not only as to the costs of appeal but as to those costs which Mr. Gee has identified as "the surplus costs".

(c) Lloyds of London Press Limited

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit 5



Westlaw UK

[1994] 1 Lloyd's Rep. 382                                                        Page 1
1993 WL 965558 (CA (Civ Div)), [1994] I.L.Pr. 367, [1994] 1 Lloyd's Rep. 382
(Cite as: [1994] 1 Lloyd's Rep. 382)

**\*382** Hamed El Chiaty & Co. (T/A Travco Nile Cruise Lines) v. The Thomas Cook Group Ltd., (The "Nile Rhapsody")

Court of Appeal

CA

Nov. 22, 23, 24, 25 and 26, 1993; Nov. 26, 1993

Before Lord Justice Neill,Lord Justice Staughton Lord Justice Simon Brown

Charter-party (Time - Stay of action - Jurisdiction - Forum non conveniens - Plaintiffs claimed damages under the contract - Charters prescribed Egyptian law as property law of contract but silent as to jurisdiction - Whether parties orally agreed contracts subject to exclusive jurisdiction of Egyptian Courts - Whether Egypt more appropriate forum - Whether action should be stayed.

The plaintiffs were an Egyptian tourist company specializing in Nile cruises and were based in Cairo. Their managing director was Mr. Hamed El Chiaty and their former managing director was Mr. Nagui Erian.

The defendants were an international holiday and travel company registered and based in England with their head office in Peterborough. The general manager of their holiday division was at all material times Mr. Simon Laxton.

The plaintiffs and defendants entered into negotiations in 1987. The defendants were to help to finance the construction of *Nile Rhapsody* by the plaintiffs and to charter the vessel from the plaintiffs for use by the defendants on their package tours.

The charter rates were calculated on the basis of the number of passenger trips and the agreement stipulated a guaranteed minimum number of passengers for the defendants to supply for each trip. A series of written contracts entitled issues 1, 2, 3, 4, 5 and 6 were drawn up with the later versions containing substantially identical terms to the earlier ones save that such details as tour dates and passenger rates changed. All five written issues prescribed Egyptian law as the proper law of the contract but were silent as to choice of jurisdiction.

The negotiations leading up to the signing of issue 1 at the end of February, 1988 were conducted almost entirely by Mr. Laxton for the defendants and by Mr. Erian for the plaintiffs. The defendants contended that during the course of these negotiations and in particular at one in January, 1988 Mr. Laxton and Mr. Erian agreed, with the knowledge and approval of Mr. Chiaty that the agreement would be subject to the exclusive jurisdiction of the Egyptian Courts.

Disputes arose between the parties and the plaintiffs claimed about $1.1m. gross under the various **\*383** charter agreements contending inter alia that the defendants had failed to supply the minimum number of tourists agreed under the contracts to fill *Nile Rhapsody* during the Gulf crisis and its aftermath.

The defendants applied to stay the actions on the grounds that they had established a contractual term stipulating both Egyptian law and exclusive Egyptian jurisdiction and that the Courts were bound to enforce that term unless the plaintiffs could show good reason why it should not be enforced. Alternatively the defendants contended that Egypt was a more appropriate forum for the trial of their actions in the interest of both parties and of the ends of justice.

Held, by Q.B. (Com. Ct.) HIRST, J.), that

(1) on the evidence and the facts there was an oral agreement between Mr. Laxton and Mr. Erian with the approval of Mr. Chiaty that all disputes between the parties howsoever arising should be subject exclusively both to Egyptian law and to Egyptian jurisdiction in relation both to issue 1 and all future contracts in continuation thereof;

(2) the evidence of both Mr. Laxton and Mr. Erian showed that the oral agreement, far from being separate from the main transaction was central to it and the plaintiffs' submission that the oral agreement was a collateral contract would be rejected;

(3) the words "Egyptian law" were clear and unambiguous and meant that the agreement was to be governed by Egyptian law simpliciter;

(4) no estoppel by convention arose;

(5) the Court had power to treat an agreement as rectified without making an actual order for rectification and since the defendants had satisfied the stringent test that there had to be convincing proof that there was a prior agreement; that such agreement was still effective when the contract was concluded; that by mistake the contract failed to carry out that agreement and that if rectified the instrument would carry out that agreement, all the relevant issues would be treated as rectified, so that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the words "This agreement shall be governed by English law" read "This agreement shall be governed by Egyptian law and all disputes hereunder shall be referred to the exclusive jurisdiction of the Egyptian Court";

(6) the defendants had established a contractual term in the agreement stipulating both Egyptian law and exclusive Egyptian jurisdiction and the plaintiffs having failed to satisfy the Court that there were strong grounds for refusing to give effect to the agreements so treated as rectified were not entitled to stay the actions:

(7) the evidence as a whole pointed overwhelmingly in favour of Egypt as the natural forum for these actions since the actions had their most real and substantial connection with Egypt and Egypt was another available forum with competent jurisdiction which was clearly and distinctly the appropriate forum for the trial of the actions; although in respect of costs and to a small extent in respect of delay and interest the plaintiffs would suffer juridical disadvantage if the actions were stayed in England this fell far short of establishing that the plaintiffs would be deprived of substantial justice if the actions were stayed and the trial took place in Egypt; justice did not require that a stay should not be granted.

The plaintiffs appealed.

Held, by C.A. (NEILL, STAUGHTON and SIMON BROWN, L.JJ.) that,

(1) it was impossible to say that there was not sufficient evidence which, if accepted, justified the Judge in reaching the conclusion that an oral agreement that the Egyptian Courts should have jurisdiction had been reached; both parties who were said to have made that agreement gave evidence that there was but it was not suggested that either witness was lying or dishonest and the Judge saw and heard the witnesses; the findings of the Judge would not be interfered with (see p. 385, col. 2; p. 389, cols. 1 and 2; p. 393, col. 2; p. 394, col. 1);

(2) the submission by the plaintiffs that effect could not be given to the oral agreement unless the charter was rectified should be rejected; s. 49(3) of the Supreme Court Act, 1981 (which now had to be read subject to s. 49 of the Civil Jurisdiction and Judgments Act, 1982) was in sufficiently wide terms to enable justice to be done between the parties and rectification was an equitable remedy; once it had been found that there was an oral agreement relating to jurisdiction, the Court should give effect to it and it was unnecessary that any formal rectification should take place (see p. 389, col. 2; p. 390, col. 1; p. 393, col. 2; p. 394, col. 1);

(3) even if it was legitimate to take procedural disadvantages into account in a situation where the

parties had chosen the forum the disadvantages relied on were wholly insufficient and the Judge's decision that Egypt was the appropriate forum would be upheld (see p. 390, cols. 1 and 2; p. 391, col. 1; p. 393, col. 2; p. 394, col. 1);

(4) the Court declined to refer to the European Court the question whether an English Court still retained the power to stay proceedings in a case where there was an exclusive jurisdiction clause or on forum conveniens grounds; the appeal would be dismissed (see p. 392, col. 2; p. 394, col. 1).

The following cases were referred to in the judgments:

Attock Cement Co. Ltd. v. Romanian Bank for Foreign Trade, (C.A.) [1989] 1 Lloyd's Rep. 572; [1989] 1 W.L.R. 1147;

Borrows v. Delaney, (1889) Law Rep. Ir. 504;

Bulmer (H.P.) Ltd. v. J. Bollinger S.A., (C.A.) [1974] 1 Ch. 401;

El Amria, The (C.A.) [1981] 2 Lloyd's Rep. 119;

Harrods (Buenos Aires) Ltd., In Re (C.A.) [1992] Ch. 72; [1991] 3 W.L.R. 397;

Law v. Warren, (1843) Ir. R.Ch. 31;

Polydor and Rso Records Inc. v. Harlequin Record Shops Ltd., [1982] C.M.L.R. 413;

Spiliada, The (H.L.) [1987] 1 Lloyd's Rep. 1; [1987] A.C. 460.

This was an appeal by the plaintiffs, Hamed El Chiaty & Co. (T/A Travco Nile Cruise Lines) from the decision of Mr. Justice Hirst ([1992] 2 Lloyd's Rep. 399) given in favour of the defendants, The Thomas Cook Group Ltd. staying the actions brought by the plaintiffs against the defendants on the ground that there was an oral agreement between the parties that all disputes under the contracts would be referred to the exclusive jurisdiction of the Egyptian Courts.

**Representation**

Mr. Jonathan Gaisman (instructed by Messrs. Linklaters & Paines) for the plaintiffs; Mr. Charles Haddon-Cave (instructed by Messrs. Field Fisher Waterhouse) for the defendants.

The further facts are stated in the judgment of Lord Justice Neill.

Judgment was reserved.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Friday Nov. 26, 1993

## JUDGMENT

Lord Justice NEILL:

The plaintiffs are a limited partnership established under Egyptian law. I shall call the plaintiffs "Travco". The defendants are The Thomas Cook Group Ltd. I shall call the defendants "Thomas Cook".

By a series of charter agreements (entitled issues 1 to 6) made in 1988, 1989 and 1990, Thomas Cook agreed to charter the vessel *Nile Rhapsody* from Travco for cruises on the River Nile. The cabin capacity of *Nile Rhapsody* was 23 passenger cabins and two suites. By cl. L of the charter agreements, Thomas Cook granted "materialisation" of 18 cabins and two suites for every cruise specified in the agreement.

It is common ground that "materialisation" of 18 cabins and two suites was not achieved for each of the cruises. Indeed, for many cruises no cabins or suites were occupied at all.

By two writs issued in April, 1991, and re-issued in July, 1991, and by a further writ issued in July, 1991, Travco claimed a net aggregate sum of about U.S.$750,000. It was alleged in the points of claim in the three actions that Thomas Cook were in breach of cl. L and that they failed to pay the sums due to Travco under the charter agreements. The writs related to issues 4 and 6.

On July 17, 1991, Thomas Cook issued two summonses seeking orders under R.S.C., O. 12, r. 8 and/or s. 49 of the Supreme Court Act, 1981 and/or pursuant to the inherent jurisdiction of the Court that the proceedings should be stayed on the grounds that Egypt was the appropriate forum for the hearing of the matters raised in the actions because (1) it had been orally agreed between the parties that all disputes arising under the charters in question would be governed by Egyptian law and be subject to the exclusive jurisdiction of the Egyptian Court; and/or (2) the matters raised in the action had a close and real connection with Egypt and could be heard at substantially less inconvenience and expense in Egypt.

A third summons to the same effect was issued on Aug. 2, 1991.

The summonses came on for hearing before Mr. Justice Hirst in the Commercial Court in March, 1992. The hearing lasted eight days. The Judge had

before him two affidavits sworn by Mr. Simon Laxton who conducted the relevant negotiations on behalf of Thomas Cook in the period leading up to the conclusion of the first charter agreement at the end of February, 1988. In addition he had affidavits from other witnesses, including Mr. Nagui Erian and Mr. Hamed El Chiaty. Mr. Erian had been a managing director of Travco in 1987 and 1988 and had conducted the negotiations leading up to the first charter agreement on behalf of Travco. Mr. Chiaty was the managing director of Travco at the time of the hearing before Mr. Justice Hirst and had been a managing director at the time of the negotiations.

The proceedings were based on breaches of issues 4 and 6 but for the purpose of this appeal it is sufficient to refer to the first charter agreement (issue 1). It is common ground that the later charter agreement included, so far as is material, terms which were the same as those in the first agreement.

Mr. Laxton, Mr. Erian and Mr. El Chiaty gave evidence before the Judge. Mr. Laxton and Mr. Erian gave evidence on behalf of Thomas Cook. Mr. Chiaty gave evidence on behalf of Travco. We have been provided with transcripts of the extensive cross-examination of these three gentlemen. On May 5, 1987 Mr. Justice Hirst delivered his reserved judgment. The judgment is reported at [1992] 2 Lloyd's Rep. 399.

In support of the application for a stay, Counsel for Thomas Cook put forward two *385 principal arguments: (a) that the charter agreement contained an exclusive jurisdiction clause; (b) that in any event the action should be stayed. It was submitted that if one applied the tests laid down by Lord Goff in Spiliada Maritime Corporation v. Cansulex Ltd., [1987] 1 Lloyd's Rep. 1; [1987] 1 A.C. 460, the proper forum for the hearing of the proceedings was Egypt.

On behalf of Travco it was argued before the Judge that the proceedings had been properly brought in England where Thomas Cook were domiciled. Reliance was placed on, inter alia, art. 2 of the Convention on Jurisdiction and the Enforcement of Judgments in Civil and Commercial Matters 1968 ("the 1968 Convention"). It was denied that there was any exclusive jurisdiction clause between the parties and further, on the proper application of the *Spiliada* tests, England was the proper forum. The suggested defences to the claim by Travco were waiver and force majeure. Evidence on both these issues would in the main be provided by English witnesses. There would also be an issue on

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

damages but this would depend on accounts which were in English form. It was true that there were issues of Egyptian law which might arise, but the area of dispute between the expert witnesses was quite small and the necessity for expert evidence of Egyptian law did not provide a good reason for a stay.

Much of the evidence which the Judge heard from the three witnesses was directed to the question whether an exclusive jurisdiction clause was agreed between the parties. It was common ground that in the first charter agreement (and in the subsequent agreements) the words "This agreement shall be governed by Egyptian law" were included. The history of how these words came to be included in the agreement and their legal effect was a matter of dispute.

The case for Thomas Cook was that in January, 1988 Mr. Laxton and Mr. Erian had agreed that the charter agreements should be subject to Egyptian law and that any disputes arising from the agreements should be decided by the Egyptian Courts. It was accepted that the word "jurisdiction" was not used. Mr. Laxton said, however, that the question of a trial in Egyptian Courts had certainly been discussed because he remembered some reference to the fact that he would not be able to speak Arabic when any such proceedings were heard. It was further said that the question of Egyptian law was discussed later in February, 1988 when the subject of insurance came up for consideration. Mr. Laxton explained that the words "this agreement shall be governed by Egyptian law " were inserted in the final form of the agreement which he signed on Feb. 26, 1988 because, on going through his notes of earlier meetings, he noticed that any reference to the choice of law had been omitted. He further explained that he thought the words "Egyptian law" were sufficient to deal both with the law governing the contract and with the question of jurisdiction or the Courts which were to try any proceedings. Mr. Erian, who signed the first issue on Feb. 28, 1988, gave similar evidence about the January agreement and about his understanding that both the law and the Courts to try any proceedings would be Egyptian. He said that he signed the agreement intending that the agreements should be subject to Egyptian law and subject to the adjudication of the Egyptian Courts. He said further that this was done with the knowledge of Mr. Chiaty.

The case for Travco, on the other hand, was quite different, though it is important to emphasize that at no stage was it suggested that either Mr. Laxton or Mr. Erian was being dishonest or deliberately untruthful. The cross-examination went no further

than to suggest that they were completely mistaken in their recollection.

Counsel for Travco cross-examined Mr. Laxton at length about the different accounts which he had given about the origin in the agreement of the words "Egyptian law". In his first affidavit in these proceedings, Mr. Laxton said that the matter had been agreed in January, 1988 and was never discussed again. In the second affidavit he said that the matter was discussed in February, 1988. Moreover, in both affidavits he claimed (contrary to the facts) that the reference to Egyptian law had been inserted in the draft agreements which were then in existence. In the early stages of his cross-examination Mr. Laxton repeated that there had been no further discussion about Egyptian law or Egyptian Courts after January but he later said that the question of Egyptian law, though not jurisdiction, had been raised in February when the topic of insurance had arisen.

It was submitted to the Judge that the contemporary documents indicated a much more likely source of the words "Egyptian law". There was no mention about law or jurisdiction in the communications passing between the parties up until the final agreement which was signed by Mr. Laxton on Feb. 26. The first person, it was said, to raise the question of law and jurisdiction was the solicitor who had been instructed on behalf of Thomas Cook. He had *386 spoken to Mr. Davis of Thomas Cook, who had then, though not showing the letter from the solicitors to Mr. Laxton, mentioned the question of the governing law to Mr. Laxton.

Counsel submitted that in a case such as the present, where the events took place some years before the trial, the Court should test any oral evidence very carefully against the contemporary documents. The contemporary documents indicated clearly that the source of the words "Egyptian law" was the prompting about law from Mr. Davis. Furthermore, there was a heavy burden on Thomas Cook before they could satisfy the Court that an oral agreement about jurisdiction had been made despite the fact that there was no reference whatever to jurisdiction or any Court system in the charter agreement. The point was of particular importance because Mr. Chiaty had not, and would not have, authorized the inclusion of an Egyptian jurisdiction clause. He preferred trial abroad.

I should refer to parts of the Judge's judgment on this aspect of the case. He expressed his opinion of the witnesses as follows ([1992] 2 Lloyd's Rep. 399 at p. 405):

*Evaluation of the witnesses' credibility.*

Before I come to assess the witnesses individually, it is important not to overlook the obvious and very significant point, namely that the only two parties to the negotiations, namely Mr. Laxton and Mr. Erian, are unanimous that the oral agreement was entered into. Mr. Laxton was an impressive and convincing witness, who gave his evidence very fairly and was willing to make concessions not favourable to the defendants' case.

The Judge then went on to consider the criticisms which Mr. Gaisman had advanced concerning Mr. Laxton's evidence.

A little later the Judge turned, at p. 406, to consider the position of Mr. Erian. He said:

So far as Mr. Erian was concerned, he was a most admirably fair witness, and never more so than when, at a stage after the evidence was closed, and final addresses were well under way, Mr. Gaisman sought and obtained permission for Mr. Erian to be recalled for the purposes of exploring any motive Mr. Erian might have for assisting the plaintiffs. During this resumed cross-examination, no impropriety was suggested against Mr. Erian, but he acknowledged with the utmost candour that in his own tourist business, in which he is now in competition with the plaintiffs, upwards of 90 per cent of his customers come from Thomas Cook, that he is heavily reliant upon Thomas Cook, and that he was anxious to provide any honest evidence to support their case, but would always stick to the truth. This forthright attitude strongly reinforced the view I had already formed that Mr. Erian was a witness of solid reliability.

The Judge then went on to consider Mr. Chiaty. He said:

I now turn to Mr. Chiaty. He himself made very clear in his evidence that he is a very successful and busy entrepreneur with many other business deals in progress at the same time as the present one. He was not a party to any of the discussions between Mr. Laxton and Mr. Erian, and it is not in the least surprising that, having regard to his many other preoccupations, he would not now remember the conversation to which Mr. Erian testifies. His evidence, though generally fair, was occasionally somewhat dogmatic, and I was not impressed by his suggested preference for foreign jurisdiction in the present case, seeing that most of the reasons he gave would, as already pointed out, be to Travco's advantage in the only type of dispute then in contemplation, namely with Travco as respondents. There is no suggestion whatsoever against his integrity as a witness, but I have come to the conclusion that he has honestly but wrongly convinced himself, as this case has gone on, that

the conversation with Mr. Erian never took place.

The Judge was there referring to the evidence of Mr. Erian to the effect that he had acquainted Mr. Chiaty with the fact that the law and the jurisdiction were to be in Egypt, a matter which Mr. Chiaty had strongly contested.

At p. 406 of the report the Judge set out his conclusion about the oral agreement. He said this:

As a result, taking into account both the probabilities and my assessment of the witnesses, I accept Mr. Erian's evidence in preference to Mr. Chiaty's as to his conversation with the latter, and find as a fact that it was in accordance with Mr. Erian's description. I also uphold the evidence of both Mr. Laxton and Mr. Erian that they did enter into the oral agreement which they described for both Egyptian law and exclusive Egyptian jurisdiction, that they thought (of course wrongly) that the clause inserted into the contract had this effect, and that they intended Egyptian *387 law and Egyptian jurisdiction to govern both Issue 1 and all future contracts in continuation thereof. This last point is fully in accord with the long-term aspirations enshrined in clause (Q) of the agreement, and it would indeed be extraordinary if the governing law and jurisdiction were to change as successive agreements were entered into, on otherwise virtually identical terms, in relation to a continuing enterprise involving the same vessel.

Finally, the Judge considered the argument that even if there was an agreement about Egyptian law, the ambit of the oral agreement did not extend to the question of jurisdiction. He expressed his conclusions at p. 407 in these terms:

I therefore find as a fact that there was an oral agreement between the parties entered into in January, 1988, between Mr. Laxton on the one hand and Mr. Erian with due authority on the other, that all disputes between the parties howsoever arising should be subject exclusively both to Egyptian law and to Egyptian jurisdiction, in relation both to Issue 1 and all future contracts in continuation thereof.

The Judge then went on to consider what effect, if any, he could give to this finding that an oral agreement as to an exclusive jurisdiction clause had been concluded in January, 1988. Thomas Cook did not seek rectification of the charter agreement for the simple reason that to do so might expose them to the risk that they would thereby submit to the jurisdiction of the English Court.

The Judge was referred to a passage at p. 626 of Snell's Equity (29th edition) to the effect that any Division of the High Court may give effect to a

[1994] 1 Lloyd's Rep. 382
1993 WL 965558 (CA (Civ Div)), [1994] I.L.Pr. 367, [1994] 1 Lloyd's Rep. 382
**(Cite as: [1994] 1 Lloyd's Rep. 382)**

Page 6

defence of rectification as regards past transactions without actually rectifying the instrument. The Judge accepted this statement as an accurate statement of the law, subject only to a qualification, which is immaterial for the purposes of this case.

The Judge then continued, at p. 409, as follows:

I must next consider whether the Chancery Division would in this case make an order for rectification, bearing in mind the stringent test that there must be "convincing proof" that there was a prior agreement between the parties, that this was still effective when the relevant instrument was executed, that by mistake the instrument failed to carry out that agreement, and that if rectified as claimed, the instrument would carry out that agreement (Snell op cit. pp. 628-632, Josce Lyne v. Nissen, [1970] 2 Q.B. 86, which is the modern locus classicus on this doctrine.)

Having regard to my findings of fact above, I am completely satisfied that there is convincing proof of all four aspects. Mr. Gaisman urges me nonetheless to refuse, in the exercise of my discretion, to treat the agreement as rectified, on the grounds that the Court should not be too tender to the defendants, seeing that they are an English company being sued in their own forum, and that they retain the right to rely on *The Spiliada* principle. I do not accept the second part of this submission, since, ex hypothesi, once the defendants sought a formal decree of rectification, they would face the risk of losing their entire summons to stay, including that part based on *The Spiliada*; as to the first part of the submission, in my view it would be the height of injustice that, in the present case, the defendants should be tripped up on such a technicality.

It follows that, in the exercise of my discretion, I shall treat all relevant issues as rectified in the manner sought by the defendants in their amended summonses, so that the words "This agreement shall be governed by English law" be read as "This agreement shall be governed by Egyptian law and all disputes hereunder shall be referred to the exclusive jurisdiction of the Egyptian Courts.
(It seems plain that the reference to English law in the last paragraph was an error for Egyptian law.)

The Judge then turned to consider how his discretion should be exercised having regard to the decisions in The Spiliada and The El Amria, [1981] 2 Lloyd's Rep. 119.

The Judge concluded:

(1) That the 1968 Convention had no application to the facts of the present case. He held that he was bound by the decision of the Court of Appeal in Re Harrods (Buenos Aires) Ltd., [1992] Ch. 72.

(2) That applying the first test in The Spiliada

the evidence pointed overwhelmingly in favour of Egypt as the natural forum for the proceedings. Egypt was therefore another forum with competent jurisdiction which was clearly and distinctly the appropriate forum for the trial of the actions.

(3) That though Travco would suffer juridical disadvantages if the action were tried in England, these disadvantages fell far short of establishing that Travco would be deprived of substantial justice if the actions in England were stayed and the trial took place in Egypt.

**\*388** (4) That, applying *The El Amria* test, and assuming without deciding that Travco were entitled to invoke the juridical disadvantages they might suffer if the trial took place in Egypt, Travco had not established the strong case which they required to establish to resist a stay based on an exclusive jurisdiction clause.

Mr. Justice Hirst therefore stayed the three actions. Travco have appealed.

Before turning to consider the arguments which have been advanced in this Court, it is necessary to bear in mind the words of Lord Templeman in The Spiliada, [1987] 1 Lloyd's Rep. 1 at p. 3, col. 2; [1987] 1 A.C.460, at p. 465:

. . . it seems to me that the solution of disputes about the relative merits of trial in England and trial abroad is pre-eminently a matter for the trial Judge. Commercial Court Judges are very experienced in these matters. In nearly every case evidence is on affidavit by witnesses of acknowledged probity. I hope that in future the Judge will be allowed to study the evidence and refresh his memory of the speech of my noble and learned friend Lord Goff of Chieveley in this case in the quiet of his room without expense to the parties; that he will not be referred to other decisions on other facts; and that submissions will be measured in hours and not days. An appeal should be rare and the Appellate Court should be slow to interfere.

It is true that in the present case the matter was greatly complicated by the fact that there was a dispute as to the existence of any exclusive jurisdiction clause. Furthermore, the Judge had to consider a number of authorities relating to the law of rectification. Nevertheless, in my view it remains a matter of concern that the hearing before the Judge took eight days and that in this Court the hearing lasted over three.

The Court is much indebted to both Counsel for the written arguments which have been put before the Court together with the careful analyses which have been prepared of the Judge's judgment. These written arguments have enabled the Court to focus

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

its attention on the essential questions which require a decision. I mean no disrespect, however, to these written arguments, nor to the quality of the oral arguments, if I say at the outset that I do not intend, nor would it be appropriate, to deal in detail with the various points which have been urged upon us.

I think it is convenient to consider the arguments of Counsel for Travco under five broad headings:

(1) The exclusive jurisdiction agreement.

(2) Rectification.

(3) The first *Spiliada* test.

(4) The disadvantages to Travco of trial in Europe.

(5) The impact of the 1968 Convention.

*(1) The exclusive jurisdiction agreement*

A substantial part of the hearing before the Judge and in this Court was devoted to this aspect of the case. Counsel rightly reminded us of the high standard of proof required before a Court can be satisfied of the existence of an oral agreement which is not recorded in the contractual document. It was submitted that in the present case the evidence of Mr. Laxton and Mr. Erian did not begin to approach this high standard.

Counsel directed our attention to the two affidavits of Mr. Laxton, the latter sworn only a short time before the hearing before the Judge. He took us to a number of passages in the evidence of Mr. Laxton and the evidence of Mr. Erian. Basing himself on the inconsistencies displayed, particularly in the evidence of Mr. Laxton, and on the inferences which could properly be drawn from the contemporary documents, he mounted a formidable argument to the effect that there was no adequate ground for the finding that there had been any oral agreement between the parties even about Egyptian law. Furthermore, he submitted that, even if there had been some agreement about Egyptian law, the inconsistencies in the affidavits made it impossible to conclude that the scope of the agreement covered the question of jurisdiction or the Courts in which any disputes were to be tried. In fairness to Mr. Gaisman, I should refer to Mr. Laxton's first affidavit.

*January 1988 meeting in Cairo - Egyptian law and forum agreed*

13. It suited Thomas Cook because we wanted to ensure that we had recourse against Travco's assets in Egypt. I recall we discussed this in the context of the (albeit unlikely) event of the vessel sinking and Thomas Cook customers drowning. We were aware that Travco's only assets were in Egypt. It is the normal practice of Thomas Cook in respect of contracts with non-European suppliers to ensure that such contracts are subject to the local law and jurisdiction. This is because such suppliers normally only have local assets which are most easily attached by local judgments - enforcing English judgments in such **389** countries as Egypt has always been perceived as difficult.

14. It suited Travco because they felt more comfortable with their own law and courts and knew that a company with Thomas Cook's reputation and business operation in Egypt would have to honour any judgment of the Egyptian courts. I refer to the first affidavit herein of Mr. Erian - I have seen the draft of the first affidavit intended to be sworn by Mr. Erian, and references hereinafter to Mr. Erian's affidavits should be construed accordingly - in which he explains Travco's reasons for choosing and preferring Egyptian law and Egyptian courts.

15. I assumed that the words in the draft "this agreement shall be governed by Egyptian law" were sufficient to reflect our agreement that Egyptian law and courts would govern. As far as I was concerned - and I believe Mr. Erian and Mr. Chiaty as well - Egyptian "law" included the Egyptian "Courts" and "legal system". I drew no real distinction between these concepts in my mind since it seemed to be axiomatic that if Egyptian law was the governing law then any dispute also had to be determined by the Egyptian courts. I have since been advised that - at least as far as English conflicts of law is concerned - the clause ought to have included such words as " . . . and any dispute is to be subject to the jurisdiction of the Egyptian courts".

16. However, my recollection of our mutual understanding is clear: it was always intended in all the contracts between us that any disputes would be determined in the Egyptian courts according to Egyptian law.

Mr. Gaisman, not unnaturally, draws attention to the vagueness of that paragraph in the affidavit.

I have found this the most difficult part of the case and I have been troubled by the question of whether the evidence satisfied the standards of convincing proof. In the end, however, I have come to the conclusion that this Court cannot interfere with the findings of the Judge. My reasons for this conclusion are:

(a) Despite the inconsistencies in the evidence which Mr. Gaisman exposed with great skill and tenacity, Mr. Laxton adhered throughout his oral evidence to the central theme that in January, 1983 he had agreed with Mr. Erian that the charter agreements should be covered by Egyptian law and

that any disputes should be tried in the Courts in Egypt. He referred in his evidence to the fact that some joke had been made about his inability to speak Arabic which would make the giving of evidence by him in an Egyptian Court more difficult.

(b) The evidence about the oral agreement was given by both the men who took part in the discussions. Their recollection was vigorously challenged but at no time was it suggested on behalf of Travco that they were lying or being dishonest. Accordingly the oral evidence, if accepted, was all one way.

(c) Mr. Laxton said that it was the practice of Thomas Cook to insert in their contracts a provision that the law of the contract should be the law of the other party. In the present case it was contemplated that proceedings might have to be brought against Travco as the building of the *Nile Rhapsody* might be delayed and Thomas Cook might want to sue in Egypt. Mr. Erian for his part said that he wanted an Egyptian law clause. Both men said that they considered the term "Egyptian law" to be adequate to include the question of jurisdiction.

(d) The Judge saw the witnesses. They were extensively cross-examined. He preferred the evidence of Mr. Erian to the evidence of Mr. Chiaty. I find it impossible to say that there was not sufficient evidence which, if accepted, justified the Judge in reaching the conclusion that an oral agreement, to the effect set out at p. 407 of the judgment, had been reached.

*(2) Rectification*

Counsel for Travco argued that effect could not be given to the oral agreement unless the charter agreement was rectified. Until the agreement was rectified, it took effect according to its present terms. He referred the Court to the decision in *Law v. Warren*, (1843) Ir.R.Ch. 31 in the time of Lord Sugden.

I am unable to accept this argument. In the first place, it seems to me that _s. 49(3) of the Supreme Court Act, 1981_ (which now has to be read subject to _s. 49 of the Civil Jurisdiction and Judgments Act, 1982_) is in sufficiently wide terms to enable justice to be done between the parties. I should read these two provisions. Section 49 (3) of the 1981 Act provides:

Nothing in this Act shall affect the power of the Court of Appeal or the High Court to stay any proceedings before it, where it thinks fit to do so, either of its own motion or on the application of

any person, whether or not a party to the proceedings.

Section 49 of the 1982 Act provides:
Nothing in this Act shall prevent any court *390 in the United Kingdom from staying, sisting, striking out or dismissing any proceedings before it, on the ground of *forum non conveniens*, where to do so is not inconsistent with the 1968 Convention.

Furthermore, it is important to remember that rectification is an equitable remedy. The Judge relied on the passage in Snell on Equity to which I have already referred and on the two authorities which are there cited. Counsel for Thomas Cook referred, in addition, to the decision of the Exchequer Division in Ireland in Borrows v. Delaney, (1889) Law Rep.Ir. 504, where Baron Dowse said:
I think the plea (of mistake) is a good, substantial plea, for the purpose of raising the question without any counterclaim asking for a rectification of the deed. We are now in a position of a court of equity as well as a court of law; as a court of equity, we are not obliged to rectify an instrument.

Those words, it is right to say, as Mr. Gaisman pointed out, were used in a different context. Moreover, Mr. Gaisman questioned whether the Exchequer Division in Ireland at the time had, in fact, got the power to rectify at all; it may be that that power still remained in the Courts of Equity in Ireland, as would have been the position in England at that date.

However that may be, I am satisfied that we should give effect to the oral argument. In many cases, where the document is a document of title, or is a contract which is still to be performed, it will be necessary to rectify the document either by the execution of a substitute document or by the insertion of a correction or by the attachment of a sealed copy of the order for rectification. In the present case, however, it seems to me quite unnecessary that any formal rectification should take place. Equity can treat as done that which ought to be done. Once it has been found that there was an oral agreement relating to jurisdiction, the Court should give effect to it.

*(3) The first Spiliada test*

In the light of the conclusion which I have reached about the exclusive jurisdiction clause, I do not propose to say more than a few words about *The Spiliada* arguments. Mr. Gaisman mounted a careful and sustained attack on the Judge's conclusion on this part of the case. He drew

attention to a number of matters where he said the Judge had misdirected himself and where he had misapprehended the effect of the evidence.

For my part, I saw force in a number of his detailed criticisms, but I was not persuaded that these criticisms were sufficient to overturn the Judge's conclusion on the first *Spiliada* test.

### (4) The disadvantages to Travco of trial in Egypt

Mr. Gaisman drew attention to the three areas in which trial in Egypt would cause a serious disadvantage to Travco.

The Judge referred to these matters in the judgment under the heading: *"Alleged juridical disadvantage to the plaintiffs"*. He said this at p. 413:

Mr. Gaisman relies on three headings:
(i) Delay.
(ii) Interest.
(iii) Costs.

So far as delay is concerned, the plaintiffs' expert, Mr. Hosni Saad Abdel Wahed, who was a member of the Egyptian judiciary between 1969 and 1989, testified that the Egyptian legal process is very protracted, and that he would expect it to take at least four years for the Court to give a first instance judgment, with a likely delay of a further year for appeal, and possibly one to two years more for Cassation. Dr. Kamel, on the other hand, testifies that he would expect a first instance decision within three years of the issue of the writ.

An interval of three or even four years, although perhaps somewhat slower than the Commercial Court in 1992 (as contrasted with the 1980's when similar delays were not uncommon) does not seem to me by any means inordinate, and we have been warned recently on more than one occasion by Appellate Courts not to make invidious comparisons with foreign Courts. I therefore give minimal weight to the delay factor.

He then turned to the second heading, interest, and concluded that there would not be a very substantial difference between the likely rate of interest payable in Egypt as compared with the rate payable in England.

Then he turned to the question of costs which he said was undoubtedly a juridical disadvantage because it was common ground between the experts that costs are not recoverable in Egypt.

The Judge expressed his conclusion at p. 414 of his judgment:

It follows that I accept that, in respect of costs, and to a small extent in respect of delay and interest, the plaintiffs will suffer juridical disadvantages if the action is stayed in England. This, however, in my judgment, falls far short of establishing that the plaintiffs will **\*391** be deprived of substantial justice if the actions here are stayed and the trial takes place in Egypt. It follows that justice does not require that a stay should not be granted, and the plaintiffs have therefore failed under the second *Spiliada* test.

The Judge then went on to consider the position under *The El Amria* test;

It goes without saying, as already noted, that the defendants having succeeded under the first *Spiliada* test, there is no possibility of the plaintiffs establishing the strong case required under *The El Amria* test.

Then he discussed whether in any event the question of disadvantages could be taken into account when the parties themselves had chosen the forum. He concluded at p. 414:

Even assuming, without deciding that Mr. Gaisman is right, it seems to me manifest that under *The El Amria* test these factors must carry very considerably less weight than under the second *Spiliada* test, seeing that in the words of Lord Justice Ackner, (as he then was) in <u>The Benarty, [1984] 2 Lloyd's Rep. 244</u> at p. 251, the incidents of the foreign jurisdiction were a "part of the bargain" between the two sides.

Mr. Gaisman, in his argument in this Court, contended that the Judge underestimated the effect of these disadvantages. For my part, I do not think it is necessary to examine this matter in detail. Even if it is legitimate to take procedural disadvantages into account in a situation where the parties have chosen the forum, it seems to me that the disadvantages relied on in this case are wholly insufficient to tip the scales away from Egypt.

### (5) The 1968 Convention

It was argued on behalf of Travco that even if the Judge were right to hold that there was a valid exclusive jurisdiction clause, and even if he had applied *The Spiliada* tests correctly, he still had no power to grant a stay because of the provisions of the 1968 Convention. It was said that Travco had the right to bring proceedings in this country by reason of art. 2 of the Convention. Mr. Gaisman therefore submitted that if this Court were minded to uphold the decision of the Judge, the Court should refer to the European Court the question whether an English Court still retains the power to stay proceedings in circumstances such as the present.

Counsel recognized that in <u>Re Harrods (Buenos</u>

Case 1:06-cv-00011    Document 104-3    Filed 02/20/2007    Page 16 of 26

Aires) Ltd., [1992] Ch. 72, the Court of Appeal had decided that art. 2 of the Convention had no application in a case where one of the parties to the contract was domiciled in a non-contracting state. He also recognized that the decision in the Harrods case applied a fortiori to a case where a domiciliary of a non-contracting state was a party to an exclusive jurisdiction clause. He argued nevertheless that a reference should be made. He drew attention to the following matters:

(1) The fact that when the Harrods case went to the House of Lords, the House of Lords made a reference to the European Court. This reference had lapsed, however, because the actions had been settled.

(2) The decision of the Court of Appeal in Harrods has been subjected to a substantial amount of academic and other criticism.

In order to decide what action this Court should take, it is first necessary to refer to the terms of arts. 2 and 3 of the 1971 Protocol.

That provides, under the heading *Brussels Convention*:

The Court of Justice of the European Communities shall also have jurisdiction to give rulings on the interpretation of the Convention . . .
Article 2 provides:

The following courts may request the Court of Justice to give preliminary rulings on questions of interpretation.
Paragraph 2:

The courts of the Contracting States when they are sitting in an appellate capacity.
That is the paragraph which gives this Court the power to request the European Court to give a preliminary ruling. Article 3.1 provides:

Where a question of interpretation of the Convention or of one of the other instruments referred to in Article 1 is raised in a case pending before one of the courts listed in point 1 of Article 2, that court shall, if it considers that a decision on the question is necessary to enable it to give judgment, request the Court of Justice to give a ruling thereon.

2. Where such a question is raised before any Court referred to in point 2 or 3 of Article 2, that court may, under the conditions laid down in paragraph 1, request the Court of Justice to give a ruling thereon.

It follows, therefore, that if this Court considers a decision on the question is necessary to enable it to give judgment, then the Court has a discretion whether or not to make a reference to the European Court, the question being a question of interpretation of the Convention.

Useful guidance as to the circumstances in *392 which a reference should be made, under art. 177 of the Treaty of Rome - and it is agreed that the same principles are applicable to a reference under arts. 2 and 3 of the 1968 Convention - is to be found in the judgment of Lord Denning, M.R. in H.R. Bulmer Ltd. v. J. Bollinger S.A., [1974] Ch. 401.

It is clear that before a reference can be made, an Appellate Court has to decide whether the reference is necessary. Necessary means necessary or at any rate "reasonably necessary" (see Polydor & Rso Records, Inc. v. Harlequin Record Shops Ltd., [1982] C.M.L.R. 413 at p. 428) for the purpose of giving judgment. A reference is not necessary, however, if the answer is so obvious that the national Court is confident that it can decide the matter itself. The matter is then said to be acte claire. If the Court decides that a decision on the question is necessary for the purpose of giving judgment, it then has a discretion whether or not to refer the question to the European Court. At this stage, the Court can take into account, among other things, the expense of a reference, the danger of overloading the European Court, the importance of the question and the wishes of the parties.

I have given anxious consideration to what course should be taken in the present case. The question of the effect of art. 2 on a national Court's power to stay proceedings on forum conveniens grounds or because of the existence of an exclusive jurisdiction clause, is an important question and one which at some stage will have to be determined by the European Court. On the other hand, in the present case there has already been a very substantial delay. The Court of trial is to be the Court of Travco's own domicile. It is not a foreign Court with whose procedures they are wholly unfamiliar. Though Travco wish the matter to be referred, Thomas Cook have made it quite plain that they have no wish for the matter to be further delayed or for there to be a reference to Europe. The claim, though quite substantial, is not particularly large by the standards of international trade.

I am prepared to assume (without deciding) that Mr. Gaisman is right in saying that it is "necessary" within the meaning of art. 3.2 of the 1971 Protocol, for this Court to decide the Convention matter for the purpose of giving judgment. I shall also assume (without deciding) that the matter is not acte claire. On this aspect of the case we have not heard the argument of Mr. Haddon-Cave for Thomas Cook, but nevertheless it is perhaps right that I should record my preliminary view that the matter is not acte claire. On this analysis the Court has a

discretion whether or not to refer a question to the European Court. I have come to the conclusion that it should not do so, for the reasons which I have already adumbrated.

I would therefore dismiss the appeal and decline to refer a question for the decision of the European Court.

Lord Justice STAUGHTON:

The dispute in this appeal is not about whether Thomas Cook owe the Egyptian company money. It is about where that dispute should be decided, in England or in Egypt. The case of Attock Cement Co. Ltd. v. Romanian Bank for Foreign Trade, [1989] 1 Lloyd's Rep. 572; [1989] 1 W.L.R., 1147, was concerned with a somewhat similar problem; that is to say, the circumstances in which jurisdiction under O. 11 of the Rules of the Supreme Court should be exercised. At p. 578, col. 2; p. 1156 I said this:

Having described the test which in my view should be applied, I would add that the Master or Judge should do his best to discourage voluminous evidence or prolonged argument as to whether it is fulfilled. In those cases where there is a critical dispute of fact, the decision which he has to make must necessarily be of a provisional or tentative nature. It would be a disservice to the law if the process of determination were treated as a trial in all but name. In particular we were referred to R.S.C., O. 12, r. 8(5):

Upon hearing an application under paragraph (1) the court, if it does not dispose of the matter in dispute, may give such directions for its disposal as may be appropriate, including directions for the trial thereof as a preliminary issue.

Paragraph (1) of the rule deals with many kinds of application besides one to set aside leave to serve a writ out of the jurisdiction. I know of no case where on such an application the trial of a preliminary issue has been ordered, or even cross-examination on affidavits. and I find it hard to imagine that such a case could arise, except perhaps at the suggestion of the defendant. He should not be compelled to come to trial in our Courts on a preliminary issue whether he can be compelled to come to trial.

That passage has survived, despite criticism of the judgment in that case in other respects, even though it was agreed to by the then Vice *393 Chancellor and Lord Justice Woolf. I think it appropriate to this sort of case also.

The Supreme Court Practice in par. 12/7-8/5 has this note:

The court normally disposes of the application

under ruling 8(1) on the basis of the material before it contained in the affidavits of the parties and the exhibits thereto. The trial of a preliminary issue is costly and is seldom ordered.

Authority is cited.

Nevertheless, an order was made in the Commercial Court for the determination of an issue in this case. I do not doubt that that was done with the best of motives. In the event, it has proved a disaster. The trial before the Judge took eight days. During the cross-examination of witnesses, the Judge plainly became irritated by excessive repetition. He attempted to stop Counsel from asking the same question again and again when it had already been answered. This is a practice which one meets from time to time. I have heard even the most distinguished Counsel express the view that one is entitled to ask the same question, despite the fact that it has already received a clear answer. In my judgment, that is not so, and if all other methods of dealing with that situation fail, the witness should be told not to answer a repeated question.

Then the matter came before this Court with an estimate of four to five days. We suggested that it might well be possible to determine the appeal in two days. Despite strenuous efforts on our behalf - strenuously resisted - the hearing of the argument took three-and-a-half days.

Lord Justice Neill has already mentioned what Lord Templeman said in The Spiliada, that the argument at first instance on these sort of applications should be measured in hours rather than days. We repeat and endorse that sentiment. As it does seem to prevail, the only other solution is that there should be a rationing of oral argument. The Court undoubtedly has power to adopt that course. In my opinion, it would be reluctant to do so but sometimes it is necessary, and it may have become necessary in this sort of case. The documents are beautifully prepared, extending over some 1500 pages, together with three volumes of authorities. I doubt if the costs incurred by each side up to now are less than a six figure sum in pounds.

Having made those observations, I turn to the issues in this appeal. The first is whether there is an agreement that the Egyptian Courts should have jurisdiction. Both parties who are said to have made that agreement gave evidence that there was. There were in consistencies in the evidence and in the affidavits. A degree of scepticism is called for when there is evidence of an oral agreement which does not accord with the terms of the written

document. But it was not suggested that either witness was lying or dishonest. A trial had been ordered, presumably for the very purpose of enabling the Judge to see and hear the witnesses. How can it then be right for this Court to disagree with his decision? I would not do so.

The second question is, does that agreement have legal effect? Mr. Haddon-Cave was evidently apprehensive that if he counterclaimed for rectification, it would be said that he had disqualified his clients from obtaining relief under O. 12, r. 8, staying the proceedings. Maybe that was too timid a view for Mr. Haddon-Cave to take - I personally think it was. But maybe also it was a very wise precaution, because if he had counterclaimed for rectification, he would have been met with that argument. So instead he asked that the contract should be deemed to be rectified without the Court making an order. There are authorities which show that the Court can take that course. Mr. Gaisman submits that the Court has only done that when it had no power actually to order rectification. I do not see that the Court should be any the less willing to deem rectification when it did have power to order rectification. I would not limit the Court's power on that ground.

The third point is that, there being an agreement for exclusive jurisdiction, there is still a discretion remaining in the Court. The Judge could still have refused to enforce the argument. It requires strong grounds for a Judge to reach that decision. I can see no ground whatever which would justify the Court in doing that in the present case. Indeed, if we were considering the different situation where there is no exclusive jurisdiction agreement, but merely an argument about which is the appropriate forum, I would uphold the Judge's decision in this case, that Egypt was the appropriate forum. I might well not have reached that decision myself, but it was one which lay within the Judge's discretion; and had that been the question I would not have disagreed with his view. It follows a fortiori that I would not exercise a discretion to refuse to enforce the exclusive jurisdiction agreement in this case.

*394 As to the question of a reference to Europe, I agree with what Lord Justice Neill has said.

Lord Justice SIMON BROWN:

I too would dismiss this appeal and decline to refer a question to the European Court of Justice for the reasons given by my Lord, Lord Justice Neill. I also share my Lord, Lord Justice Staughton's regret that this litigation has consumed so much Court time and legal expense.

(c) Lloyds of London Press Limited

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit 6



Westlaw.UK

[1995] 1 Lloyd's Rep. 617                                                          Page 1
1995 WL 1081866 (QBD (Comm Ct)), [1995] 1 Lloyd's Rep. 617, 2-24-1995 Times 1081,866
**(Cite as: [1995] 1 Lloyd's Rep. 617)**

**\*617** Mangistaumunaigaz Oil Production
Association v. United World Trade Inc.

Queen's Bench Division (Commercial Court)

QBD (Comm Ct)
Feb. 7, 8, 9, 1995; Feb. 21, 1995; Feb. 21, 1995

Before Mr. Justice Potter

Arbitration - Arbitration clause - Validity -
Rectification - Contract for development, sale and
export of crude oil - Clause in contract that
"Arbitration, if any, by I.C.C. Rules in London" -
Whether a binding arbitration clause - Whether
contract should be rectified.

The plaintiffs (M.O.P.) was a state-owned
enterprise of the Republic of Kazakhstan, the
function of which was to develop the oil and gas
resources in the Mangyshlak region of the republic.
The defendants (U.W.T.) was a corporation
incorporated under the laws of the state of
Colorado, U.S.A. involved exclusively in the
business of international commodities trading
principally in oil and was owned equally by Mr.
Chen and Mr. Rendon.

In 1991 Mr. Rendon entered into discussions with
the Kazakhstan Commerce Foreign Economic
Association (K.C.F.E.A.) a state organization
established to promote the foreign trade goals of
the republic and to assist its founder members
(including M.O.P.) in the promotion and conduct of
foreign trade activities. Mr. Nabiev was the
managing director.

Following     further     discussions     in
October/December, 1991 M.O.P., K.C.F.E.A. and
U.W.T. entered into an agreement (the preliminary
agreement) and further negotiations led on Jan. 23,
1992 to the signing of a contract for the sale of
crude oil. By this contract M.O.P. agreed to sell
and U.W.T. agreed to buy 200,000 tonnes
plus/minus 10 per cent. of Buzachi and Urals crude
oil. The contract provided inter alia: -
  (15) Other terms: -
  - FOB incoterms latest issue.
  - Arbitration, if any, by I.C.C. rules in London.
  - English law to apply.

Pursuant to the contract four shipments were
made and cargoes delivered over the period
January to April, 1992. Shipment three took place

in March, 1992 and shipment four in April, 1992.
U.W.T. failed to pay for shipment three and had
paid less than the full amount for shipment four,
the     sum     outstanding     amounting     to
U.S.$6,007,537.59 plus interest.

On Feb. 26, 1993 pursuant to cl. (15) M.O.P.
lodged a request for arbitration with the I.C.C. in
order to claim the sums owing, alternatively
damages from U.W.T.

U.W.T. resisted the arbitration proceedings
declining to nominate its own arbitrator or to pay
any share of the advance costs provided for in the
I.C.C. rules. It contended that on its true
construction cl. (15) did not constitute a binding
arbitration clause. U.W.T. submitted that cl. (15)
on its true construction merely indicated that, if the
parties agreed at some future date to arbitrate such
arbitration would be according to I.C.C. rules in
London, and no such agreement had been reached.
In the alternative U.W.T. claimed that if cl. (15) did
constitute a binding agreement to arbitrate then it
did not reflect the true intention of the parties and
that U.W.T. was entitled to claim rectification in
that respect.

Held, by Q.B. (Com. Ct.) (POTTER, J.), that
  (1) the words "Arbitration, if any, by I.C.C. rules
in London" amounted to a valid and binding
arbitration clause; the clause as a whole, read in the
context of an international contract for the sale of
oil demonstrated that the parties intended to settle
any dispute which might arise between them by
arbitration according to I.C.C. rules in London with
English law to apply; and the words "if any" were
to be treated as surplusage or as an abbreviation for
the words "if any dispute arises"; unless the
defendants could establish that the parties were, at
the time the contract was made, ad idem on the
meaning contended for by Mr. Rendon, M.O.P.
were entitled to the declaration sought (*see* p. 620,
col. 2; p. 621, col. 1);
  (2) on the facts and evidence little if anything
was said (let alone agreed) about dispute resolution
prior to the final negotiation of the contract at
which stage the arbitration clause was discussed
and agreed without any reservation or qualification
of any kind; the claim for rectification failed (*see* p.
621, col. 1; p. 622, col. 1);
  (3) in all the circumstances of the case, an Order,
that the defendants pay the plaintiffs' costs on an
indemnity basis was appropriate (*see* p. 622, col.
1).

The following case was referred to in the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

judgment:

Arab African Energy Corporation Ltd. v.
Olieprodukten Nederland B.V., [1983] 2 Lloyd's
Rep. 419.

In these proceedings the plaintiffs,
Mangistaumunaigaz Oil Production Association
(M.O.P.), sought a declaration that a contract made
between inter alios M.O.P. and the defendants,
United World Trade Inc. (U.W.T.), dated Jan. 23,
1992 incorporated a valid effective and binding
agreement to arbitrate.

**Representation**

Mr. Peter Gross, Q.C. (instructed by Messrs.
Freshfields) for the plaintiffs; Mr. Jonathan Hirst,
Q.C. (instructed by Messrs. Ince & Co.) for the
defendants.

The further facts are stated in the judgment of Mr.
Justice Potter.

Judgment was reserved.

Tuesday Feb. 21, 1995

**\*618 JUDGMENT**

Mr. Justice POTTER:

*Introduction*

In these proceedings, commenced by an
originating summons dated Feb. 25, 1994,
following which the case for each of the parties has
been elaborated in points of claim and points of
defence and counterclaim as subsequently ordered
by the Court, the plaintiff ("M.O.P.") seeks a
declaration that a contract made between inter alios
M.O.P. and the defendant ("U.W.T.") dated Jan.
23, 1992 incorporates a valid, effective and binding
agreement to arbitrate in the following terms:
"Arbitration, if any, by I.C.C. rules in London".

U.W.T. by its defence and counterclaim, denies
that the arbitration clause is binding and, in the
alternative, claims rectification of it so as to reflect
what U.W.T. asserts to have been the common
intention of the parties, namely that the clause was
not intended to be binding unless there was a
further and specific agreement for arbitration, in
which case it would be an I.C.C. arbitration in
London.

M.O.P. is a state-owned enterprise of the Republic
of Kazakhstan, the function of which is to develop
the oil and gas resources in the Mangyshlak region

of the republic.

U.W.T. is a corporation incorporated under the
laws of the state of Colorado, U.S.A., involved
exclusively in the business of international
commodities trading, principally in oil. It is owned
equally by Mr. Chen and Mr. Rendon, the latter
being the person directly concerned with the
negotiation and formation of the contract, the
subject of this litigation.

In 1991, Mr. Rendon entered into discussions with
the Kazakhstan Commerce Foreign Economic
Association ("K.C.F.E.A."), a state organization
established to promote the foreign trade goals of
the republic and to assist its founders and members
(including M.O.P.) in the promotion and conduct of
foreign trade activities. The discussions were
principally between Mr. Rendon and Mr. Nabiev,
the managing director of K.C.F.E.A. and explored
the possibilities of co-operation and eventual
contractual relations between U.W.T. and M.O.P.
for the development, sale and export of crude oil
produced in Kazakhstan by M.O.P. Once matters
had progressed beyond the merely preliminary
stage, Mr. Nabiev introduced Mr. Rendon to the
managing director of M.O.P., Mr. Bekbosynov in
October, 1991.

*The contractual background*

On July 25, 1991 a document called "Protocol
(Letter of Intent)" was signed by a number of
Russian officials on behalf of the various industrial
and economic interests which they represented
(including Mr. Nabiev) on the Kazakhstan side, and
by Mr. Rendon and a Mr. Haque (the representative
of a computer company) on the American side. It
was in general terms both as to its subject matter
and its expressed intention to co-operate. It was not
intended to be legally binding and need not be
quoted.

Following further discussions in
October/December, M.O.P., K.C.F.E.A. and
U.W.T. entered into an agreement, signed by Mr.
Bekbosynov, Mr. Nabiev and Mr. Rendon entitled
"Preliminary Agreement".

So far as U.W.T. was concerned, it agreed to
provide a selection of several buyers specialized in
refining Buzachi oil (a blend with peculiar
characteristics) for an allotment of up to 1 m.
tonnes per year, being buyers who would agree on
a long term basis to enter into a pricing and profit
sharing arrangement; to bring such buyers to
Moscow for negotiations during January, 1992 in
respect of the sale of a first parcel of oil of 200,000
tonnes, with delivery in the first quarter of 1992;

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

and to present preliminary proposals with goals and objects for creation of a long term joint venture.

M.O.P., on the other hand, expressed readiness to hold negotiations in the above respects;

. . .upon achievement of mutually advantageous conditions of realisation of sales of oil. . .

to sign a contract for sale of the first parcel of 200,000 tonnes with delivery in the first quarter of 1992; not to circumvent U.W.T. or K.C.F.E.A.; and to deal directly with anyone identified by U.W.T. as a potential customer or brought in for negotiations.

There has been some dispute in the course of the evidence whether (as Mr. Rendon asserted) the preliminary agreement was intended to create legally binding obligations or, as (inter alios) Mr. Nabiev asserted, it was no more than a more detailed letter of intent. It is not necessary for me to resolve this issue beyond saying that I am satisfied that Mr. Rendon at least believed and intended it to be binding and that nothing was said upon the Russian side to indicate that it was not intended to be binding. As I understood the evidence of Mr. Nabiev, his assertion as to the state of the agreement was based upon its nature and terms rather than on any suggestion that a specific reservation was made to Mr. Rendon on that score.

Negotiations continued and on Jan. 23, 1992 the same parties signed a "Contract for sale of crude oil" ("the contract") by which M.O.P. agreed to sell and U.W.T. agreed to buy 200,000 tonnes plus/minus 10 per cent. of Buzachi and Urals crude oil on terms and conditions fully set out as to quality, *619 quantity, price, payment, delivery, determination of quantity and quality, laytime, demurrage, inspections and notices. Such terms were numbered (1) to (14), followed by the words:

(15) Other terms:
- FOB incoterms latest issue.
- Arbitration, if any, by I.C.C. rules in London.
- English law to apply. . .

and ending with the date and signatures.

Mr. Rendon intended, and subsequently confirmed, back-to-back arrangements for on-sale to I.S.A.B., an Italian refiner.

Pursuant to the contract, four shipments were made and cargoes delivered over the period January/April, 1992. Shipment three took place in March, 1992 and shipment four in April, 1992. U.W.T. has failed to pay for shipment three and has paid less than the full amount for shipment four, the sums outstanding amounting to U.S.$6,007,537.59 plus interest.

On Feb. 26, 1993, pursuant to cl. (15) of the contract, M.O.P. lodged a request for arbitration with the I.C.C. in order to claim the sums owing, alternatively damages from U.W.T.

*The dispute as to jurisdiction*

U.W.T. resisted the arbitration proceedings, declining to nominate its own arbitrator or to pay any share of the advance costs provided for in the I.C.C. rules. It contended that, on its true construction, cl. (15) of the contract does not constitute a binding arbitration clause.

U.W.T. also argued that the arbitration should not proceed because of litigation commenced by U.W.T. against M.O.P. and others in Colorado in late 1992, in which it advanced claims arising from the preliminary agreement of Dec. 17, 1991. In May, 1993 those claims were dismissed by the U.S. District Court in Colorado for want of jurisdiction and the appeal of U.W.T. in that respect has recently likewise been dismissed.

Following the dismissal by the U.S. District Court, the I.C.C. Court expressed the view that there was prima facie an agreement to arbitrate and passed the file to the arbitration tribunal in November.

On Jan. 31, 1994, U.W.T. confirmed to the chairman of the tribunal that it challenged the jurisdiction on the grounds that there was no binding agreement to arbitrate, in that cl. (15) on its true construction merely indicated that, if the parties agreed at some future time to arbitrate, such arbitration would be according to I.C.C. rules in London. U.W.T. asserted that such agreement had never been reached.

In the alternative, U.W.T. claimed that, if cl. (15) did constitute a binding agreement to arbitrate, then it did not reflect the true intention of the parties and that U.W.T. was entitled to claim rectification in that respect.

That was the first time in any correspondence or proceedings between the parties, that a case for rectification had been asserted. At that stage no positive case as to the true intention of the parties was advanced.

On Feb. 25, 1994 M.O.P. issued its originating summons, thereafter obtaining leave to serve U.W.T. out of the jurisdiction. On June 17, 1994, in the first affidavit of Miss Calnan, U.W.T.'s solicitor, the positive case for U.W.T. was first developed. It was, and has in substance remained,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

that, at the time of the preliminary agreement, Mr. Rendon and Mr. Bekbosynov orally: (a) confirmed an understanding stated by Mr. Rendon that the terms of the preliminary agreement would govern those of any subsequent oil contracts; (b) agreed that in the event of dispute the parties would be free to commence Court proceedings in the U.S.A. or in Kazakhstan, but that they might also agree to arbitration at a later date.

It is also U.W.T.'s case that, in the period between Dec. 17, 1991 and the date when the contract was signed on Jan. 23, 1992, there were several meetings at which the terms of the contract were discussed and negotiated, including the question of dispute resolution. Such meetings took place between Mr. Rendon and Mr. Akhmedjanov, Mr. Bekbosynov's assistant. Both expressly agreed and confirmed that they were obliged to follow the earlier oral agreement that the parties would be free to commence Court proceedings but might subsequently agree arbitration. However, they further agreed and decided that: (c) given the multitude of possible arbitration forums it would be useful to identify the particular forum which would be used in the event of any subsequent agreement to refer the dispute to arbitration (rather than to pursue ordinary litigation) and, in this respect, they agreed and provided for arbitration by the I.C.C. in London according to English law.

The assertions of U.W.T. above set out are denied in virtually every particular by M.O.P., on whose behalf Mr. Nabiev and Mr. Akhmedjanov orally, (supported by Mr. Bekbosynov, in a written statement tendered under the Civil Evidence Act, 1968), have stated that the arbitration clause was negotiated and agreed as the sole method of dispute resolution, the only issue in negotiations being as to the venue which was at first suggested on M.O.P.'s behalf to be Moscow, but then agreed to be London.

**\*620** This trial has been concerned with the following issues:

(1) Does cl. (15) of the contract, on its true construction, constitute a valid, effective and binding agreement to arbitrate? ("the construction issue").

(2) If the answer to issue (1) is yes, should cl. (15) of the contract be rectified to accord with the true intention of the parties, as alleged by U.W.T. in pars. 6 and 7 of its revised amended points of defence and counterclaim ("the rectification issue").

There has also been a plea by U.W.T., that, in the circumstances, M.O.P. is estopped or otherwise precluded from relying upon the arbitration clause as binding. However, it emerged early in argument that the plea of estoppel was based upon identical facts to those relied upon by U.W.T. in support of the rectification issue. The parties are agreed that, *if* those facts are proved, then U.W.T. would be entitled to rectification and, if not, then neither rectification nor a plea of estoppel is available. Accordingly, I give no separate consideration to the plea of estoppel or the written issue numbered (3) which was placed before me at the outset of the proceedings.

*The witnesses*

I do not propose to set out in detail the evidence of the rival witnesses.

So far as U.W.T. is concerned, I heard evidence from Mr. Rendon, who was cross examined at some length. I also received in evidence a statement of Ms. Khakimova pursuant to a Civil Evidence Act notice. She was the Russian-speaking personal assistant and interpreter to Mr. Rendon in his contacts with M.O.P. and K.C.F.E.A. By her statement, she confirmed his evidence in most material respects. In particular, she confirmed that on Jan. 23, 1992, the day the contract was signed, there was a specific discussion and agreement between Mr. Rendon and Mr. Akhmedjanov that any disputes between the parties would be decided by the Courts of Kazakhstan or the U.S.A. and that the arbitration clause incorporated into the contract (which was produced by Mr. Rendon from a small library of clauses within his lap-top computer) was only incorporated pursuant to a specific oral agreement that it would operate as a binding clause if Mr. Rendon and Mr. Bekbosynov *subsequently* agreed to arbitrate a particular dispute arising under the contract. Finally, I received in evidence statements from Mr. Chen (who was not present at any of the negotiations and whose evidence was of questionable admissibility or relevance) and Mr. Phillip Barber, an American attorney who represented U.W.T. in their proceedings in the U.S. District Court of Colorado. The latter was concerned to explain why, in the U.S. proceedings, it was not (as he asserted) necessary, relevant or appropriate to mention in relation to the preliminary agreement the subject of the U.S. proceedings that there had been express oral agreement between the parties at the time that either should be free to litigate in the U.S. or Kazakhstan Courts.

From M.O.P.'s side, I heard oral evidence from Mr. Nabiev and Mr. Akhmedjanov. I also received in evidence the statement of Mr. Bekbosynov, previously mentioned, and statements from Mr. Davis O'Connor, the attorney for M.O.P. in the

[1995] 1 Lloyd's Rep. 617
1995 WL 1081866 (QBD (Comm Ct)), [1995] 1 Lloyd's Rep. 617, 2-24-1995 Times 1081,866
**(Cite as: [1995] 1 Lloyd's Rep. 617)**

Page 5

U.S. proceedings. The last-named contradicted the assertions of Mr. Barber in relation to those proceedings and made clear that, had there been an oral agreement in the terms spoken to by Mr. Rendon before me, it would have been a matter of substantial relevance for mention in the U.S. proceedings, in the sense that it would have advanced the arguments of U.W.T. as to the U.S. Court's jurisdiction.

*Construction*

Considered on its face, and without resort to the negotiations or any suggestion as to additional oral terms, I consider that the words: "Arbitration, if any, by I.C.C. rules in London" amount to a valid and binding arbitration clause.

Mr. Hirst, Q.C., for U.W.T. has acknowledged that, but for the words "if any ", the intention of the parties would be plain. In English law, an agreement to arbitrate need be in no particular form; on the contrary, an arbitration agreement may be in a most summary form, tersely expressed: see Mustill & Boyd on Commercial Arbitration (2nd ed.) at p. 107. By insertion of a formula of this kind in a contract for the sale of oil the parties make quite clear that they are choosing arbitration as the appropriate form of dispute resolution rather than resort to the Courts.

It is Mr. Hirst's argument that the words "if any" are inconsistent with an unconditional contractual undertaking to arbitrate future disputes. He says that they amount to words of qualification which at best create an ambiguity and throw doubt on the parties' true intent. In those circumstances, he says that the ambiguity should be resolved by applying the presumption that the parties are not agreeing to oust the jurisdiction of the courts. He points out that the parties, while providing for I.C.C. rules of arbitration, have failed to use the standard I.C.C. arbitration clause recommended by the I.C.C. and that the clause contains no provisions stating that any arbitration award will be final and binding.

I do not find these arguments convincing.

**\*621** It is perhaps of interest to note that the clause is in virtually the same terms (in particular by inclusion of the words "if any") as the arbitration clause considered by Mr. Justice Leggatt in Arab African Energy Corporation Ltd. v. Olieprodukten Nederland B.V., [1983] 2 Lloyd's Rep. 419. However, in that case no issue arose as to the effect of the inclusion of those words upon the binding nature of the clause. The dispute before the Court concerned the issue of whether the incorporation of the I.C.C. rules by reference amounted to a valid exclusion agreement for the purposes of s. 3 of the Arbitration Act, 1979.

In my opinion the clause as a whole, read in the context of an international contract for the sale of oil, demonstrates that the parties intended to settle any dispute which might arise between them by arbitration according to I.C.C. rules in London with English law to apply. The alternative is that, by providing for arbitration "if any", the parties were merely binding themselves in advance to the arbitral rules and venue which would govern any ad hoc agreement for arbitration which they might subsequently make if a dispute arose. The terms of the written contract suggest no need or reason to take so unusual a course. I consider that the commercial sense of an agreement of this kind, and the presumed contractual intention of the parties in importing the words used, can best be effected either by treating the words "if any" as surplusage, or as being an abbreviation for the words "if any dispute arises ". Any other construction appears to me to strain common sense and to breach the overall rule of construction which is to give effect to the presumed intention of the parties having regard to the context in which the words appear.

Accordingly, unless the defendant can satisfy me that the parties were, at the time the contract was made, ad idem upon the meaning contended for by Mr. Rendon, M.O.P. are entitled to the declaration which they seek.

*Rectification*

In relation to a claim for rectification, the standard of proof is the civil standard of the "balance of probability" with the rider that "convincing proof " is required in order to counteract the cogent evidence of the parties' intention displayed by the instrument itself.

Having heard and considered all the evidence, I am wholly unsatisfied that the burden of proof has been discharged by U.W.T. I consider that the general clarity with which Mr. Rendon gave his evidence as to the detailed discussions and clear mutual understanding expressed on the topic of dispute resolution owed more to ex post facto reconstruction than accuracy of recollection.

Mr. Rendon apparently had no notes or memoranda to assist him in reconstructing events; yet in his evidence he gave a carefully structured account of clear oral agreements reached between the parties which found no reflection in their written bargains. They were, first, an oral side agreement for "plaintiff's forum" at the time of the preliminary agreement. Second, an oral agreement

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

at the same time that the governing law would either be Kazakhstan or U.S. law. Third, a further oral agreement at that time that the preliminary agreement would be the controlling or master agreement for any subsequent contract in relation to oil shipment. Fourth, an express oral agreement at the time of the contract that it should be governed by the (oral) agreement reached at the time of the preliminary agreement. In this respect, the absence of any supporting written evidence (quite apart from the denial of the witnesses for M.O.P.) is plainly a matter for some remark. In such unusual circumstances, I felt unable to attach any substantial weight to the supporting statement of Ms. Khakimova, untested by cross examination.

Further, in judging the probability of Mr. Rendon's account being accurate, there are additional features to be taken into account.

First, he was, by education, a lawyer. Although he had never practised, he was experienced in the negotiation of international commodity contracts (frequently of a back-to-back nature) and familiar with arbitration agreements as a method of dispute resolution. Second, in extracting (without alteration) a dispute resolution clause from the small library in his lap-top computer, he introduced into the contract a clause which he presumably believed to be binding in its unaltered form. In those circumstances, it is curious to say the least that he was apparently prepared to rely on a collateral oral agreement for a "plaintiffs forum", unrecorded even at the time of the preliminary agreement. Third, I have no real doubt that, had U.W.T.'s case always been so clear cut in the recollection of Mr. Rendon as it appeared at trial, it would have been advanced to his U.S. lawyers and deployed by them in the U.S. proceedings. While those proceedings did not involve the contract, but rather were directed to the preliminary agreement, the existence of the alleged collateral oral agreement as to the jurisdiction of the U.S. and Kazakhstan Courts was in my view plainly relevant to matters under argument in the U.S. District Court. Fourth, when being tested in cross examination, Mr. Rendon was faced with a great difficulty in giving any sensible explanation as to the position as to forum and/or governing law which would, upon his thesis as to the agreements between the parties, have prevailed, whether in disputes between U.W.T. and M.O.P. on the one hand, or U.W.T. and their Italian sub-buyers **\*622** I.S.A.B. on the other, it being Mr. Rendon's case that he always intended to make back-to-back arrangements (as he did).

Finally, while I was not satisfied in every respect as to the accuracy of recollection of Mr. Nabiev and Mr. Akhmedjanov, I readily accepted the broad thrust of their evidence that little if anything was said (let alone agreed) about dispute resolution prior to the final negotiation of the contract, at which stage the arbitration clause (introduced into the draft by Mr. Rendon) was discussed and agreed without any reservation or qualification of the kind asserted by Mr. Rendon.

In those circumstances, the claim for rectification (as well as the alleged estoppel, with which I have not separately dealt) must fail.

Subject to any further submissions by the parties as to the wording of relief which I should grant, I consider that M.O.P. is entitled to the declaration which it seeks and the counterclaim of U.W.T. is dismissed.

*(After discussion)*

MR. JUSTICE POTTER: So far as my order is concerned, I will grant the orders made and dismiss the counterclaim; I have already covered that in the last paragraph of my judgment. The plaintiffs are plainly entitled to their costs. Having considered the matter with care, I propose to accede to Mr. Gross' application and make an order for indemnity costs in this case. It does seem to me that the motivation for resistance to arbitration was, as Mr. Gross described it, simply an effort to ward off the evil day rather than to pursue a sincere defence and counterclaim or seek any genuine or bona fide advantage in having the matter tried before a U.S. or Kazakhstani Court. I am quite satisfied that the parties intended, when providing as they did in the arbitration clause, to provide for a binding arbitration and that, at the time, that was appreciated by Mr. Rendon. I do think in all the circumstances that it is a case appropriate for an indemnity order.

(c) Lloyds of London Press Limited

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.