# Exhibit 7

ORIGINAL

**\*265** Reliance Marine Insurance Company v. Duder

In the Court of Appeal

CA

Cozens-Hardy M.R., Kennedy and Buckley L. JJ.

1912 April 17, 18; May 18

Insurance (Marine)--Re--insurance Policy--Construction--Intention of Assured--Right of Assured to recover--Marine Insurance Act, 1906 (6 Edw. 7, c. 41), s. 26, sub--s. 3.

By three policies of insurance dated respectively May 6, May 11, and August 4, 1910, the plaintiffs insured the ship *Kynance*. The first two policies were for 500l. each and covered the vessel from Newcastle, New South Wales, to port or ports on the west coast of South America. The vessel was valued at 12,000l. and the risk was to continue until thirty days after arrival at final port of discharge or until sailing on next voyage. The third policy, for 1000l., covered the vessel from Valparaiso and/or port or ports on the west coast of South America to the United Kingdom or Continent or the United States. The vessel was valued at 10,000l. Risk to commence from expiration of previous policy.

On August 9, 1910, the plaintiffs re-insured the vessel with the defendant at and from Valparaiso and/or any port or ports on the west coast of South America to the United Kingdom, Continent, or United States. The ship was valued as in original policy. The policy was stated to be a re-insurance "subject to the same terms clauses and conditions as the original policy or policies and to pay as may be paid thereon." The charterparty under which the vessel made her voyage with a cargo from Newcastle, New South Wales, to the west coast provided that she should discharge at Valparaiso, or if ordered by the charterers' agents after her arrival there should discharge at any safe port on the west **\*266** coast not north of P., and by arrangement between charterers and owners she did not discharge all her cargo at Valparaiso, but proceeded towards T., a west coast port not north of P., where she was to load a cargo under a fresh charterparty for a voyage to a European port. On her voyage from Valparaiso to T. she became a total loss. The plaintiffs having paid the owners for a loss under the first two policies sued the defendant on the policy of re-insurance. The defendant contended that the plaintiffs did not intend by the re-insurance to cover any risk except that under the third policy and adduced in support of that contention evidence of the instructions given by the plaintiffs to their brokers (but uncommunicated to the defendant) on effecting the re-insurance:--

Held, by the Court of Appeal (Cozens-Hardy M.R. and Kennedy L.J., Buckley L.J. doubting), that the re-insurance policy covered the plaintiffs' risk under "original policies," and the natural meaning of the contract could not be narrowed as applying to one only out of the three original policies by evidence of intention on the part of the plaintiffs, uncommunicated to the defendant, to protect themselves only in respect of that single policy.

Decision of Bray J. affirmed.

Lower Rhine and Würtemberg Insurance Association v. Sedgwick [1899] 1 Q. B. 179, distinguished.

The meaning of s. 26, sub-s. 3, of the Marine Insurance Act, 1906, considered.

APPEAL from a decision of Bray J. in an action in the Commercial Court.

The plaintiffs sued the defendant upon a policy of re-insurance. The policy was dated August 9, 1910, and was expressed to be for 500l. upon the vessel Kynance, valued as in the original policy, against the risks of total and/or constructive total loss only, subject to the same terms, clauses, and conditions as the original policy or policies and to pay as may be paid thereon. The voyage insured was "at and from Valparaiso and/or any port or ports, place or places on the west coast of South America" to any port or ports, place or places in the United Kingdom and/or on the Continent of Europe between and including Bordeaux and Hamburg or held covered or in the United States of America.

The plaintiffs alleged that on July 29 the Kynance while on the insured voyage from Valparaiso to Tocopilla, whence she was to sail to the United Kingdom, was totally lost by perils insured against, namely, perils of the sea. Previously to August 9, 1910, the plaintiffs had insured the Kynance under three policies dated respectively May 6, May 11, and August 4, 1910. Of these **\*267** policies the first two, for 500l. each, covered the vessel from

Newcastle, New South Wales, to port or ports, place or places, in any order or rotation on the west coast of South America. The vessel was valued at 12,000l., and the risk was to continue until thirty days after arrival at final port of discharge or until sailing on next voyage, whichever might first occur. One of those two policies stated: "Cargo to be screened coal or held covered." The third policy, dated August 4, 1910, was for 1000l. and covered the vessel "at and from Valparaiso and/or port or ports and/or place or places in any order or rotation on the west coast. of South America to the United Kingdom or Continent, or the United States." The vessel was valued at 10,000l. This policy also provided: "In the event of total and/or constructive loss underwriters' subscriptions to be limited to 50 p. c. of their lines Warranted nitrate or held covered at a premium to be arranged Risk to commence from expiration of previous policy." The instructions given by the plaintiffs to their brokers to effect the policy of re-insurance were for a voyage "at and from Valparaiso and/or west coast of South America or held covered to United Kingdom, and/or Continent or to United States of America, or held covered ... warranted nitrate or held covered. Valuation clause. Hull &c. valued 10,000l. or v. o. p."

The charterparty under which the Kynance made her voyage with a cargo of coal from Newcastle, New South Wales, to the west coast of South America provided that she should discharge at Valparaiso, or, if ordered by the charterers' agents, after her arrival there, should discharge at any safe port on the west coast not north of Pisagua. By arrangement between the charterers and owners, she did not discharge all her coal at Valparaiso, but proceeded with 800 or 900 tons on board towards Tocopilla, a west coast port not north of Pisagua, where she was to load a cargo of nitrate under a second charterparty for a European port. Between Valparaiso and Tocopilla she was stranded and became a total loss. The plaintiffs having paid the owners for a loss under the first two policies sued the defendant on the policy of re-insurance. The defendant contended that the general words of the policy must be limited by the intention of the assured, and that the plaintiffs did not intend by the re-insurance to cover any risk *268 except that under the third policy; and they having been held liable to pay, and having paid under the two earlier policies only, could not recover on the re-insurance policy.

Bray J. gave judgment for the plaintiffs. He said that he was unable to find that the intention of the plaintiffs was to cover only their liability under the third policy. It might be that they expected the liability to arise under the third policy, but it was not their intention to cover that liability only.

Against that decision the defendant appealed.

*J. R. Atkin, K.C.*, and *D. C. Leck*, for the appellant. In the first two policies in this case the ship is valued at 12,000l. and the cargo is described as coal. In the third policy the valuation is 10,000l. and the cargo nitrate. The rule in these cases is laid down in the Marine Insurance Act, 1906 (6 Edw. 7, c. 41), s. 26, sub-s. 3: "Where the policy designates the subject-matter insured in general terms, it shall be construed to apply to the interest intended by the assured to be covered." The same rule prevailed before the Act: see the judgment of Brett J. in Allison v. Bristol Marine Insurance Co. [FN1] Lower Rhine and Würtemberg Insurance Association v. Sedgwick [FN2] shews that a difference in the valuation of a ship in two policies is a strong reason against inferring an intention that a re-insurance policy should cover both. In this case the parties clearly intended that the re-insurance policy should apply only to the third policy for the return voyage which had not commenced when the ship was lost.

FN1 (1876) 1 App. Cas. 209, 216.

FN2 [1899] 1 Q. B. 179.

*Bailhache, K.C.*, and *F. D. Mackinnon*, for the respondents. No intention can be shewn on the part of the respondents to limit the risks covered by the re-insurance policy to the risk under the third policy of August 4, although it may be that they anticipated that any claim against them in respect of the voyage of the Kynance from Valparaiso to Tocopilla would fall on them under the third policy.

This case is not covered by the decision of the Court of Appeal in Lower Rhine and Würtemberg Insurance Association v. Sedgwick [FN3], but it comes within the propositions of law upon *269 which the decision of Kennedy J. rested in the same case in the Court below. [FN4] His decision was not reversed upon those propositions of law, but upon the finding by the Court of Appeal that the particular interest insured was defined by the re-insurance policy in that case.

FN3 [1899] 1 Q. B. 179.

FN4 [1898] 1 Q. B. 739.

The facts in this case are different. At the time of the re-insurance the respondents were at risk under the three policies. All that can be said is that they expected to be liable under the third policy,

whereas in fact they were held liable under the first two policies. That cannot make any difference.

The Marine Insurance Act, 1906, s. 26, sub-s. 3, has no bearing on this case. The policy does not designate the subject-matter insured "in general terms" but in very specific terms. The subject-matter insured is the Kynance. The insurable interest in the Kynance is another thing, and so is the risk. Sub-s. 3 only applies where the subject-matter is defined "in general terms."

[KENNEDY L.J. Collins L.J. in Lower Rhine and Würtemberg Insurance Association v. Sedgwick [FN5]says:
"The question here is whether, looking at the plain words of the policy, taken in conjunction with the surrounding facts, the subject-matter of the contract was not risks already undertaken by the assured under existing policies capable of being described."

FN5 [1899] 1 Q. B. 179, 189.

]

Sub-s. 3 of s. 26 only applies to cases where the particular interest assured is not specified at the time of taking out the policy, such as Irving v. Richardson [FN6]and Scott v. Globe Marine Insurance Co. [FN7]See also Allison v. Bristol Marine Insurance Co. [FN8]; Stephens v. Australasian Insurance Co. [FN9]

FN6 (1831) 2 B. & Ad. 193.

FN7 (1896) 1 Com. Cas. 370.

FN8 1 App. Cas. 216.

FN9 (1872) L. R. 8 C. P. 18.

[KENNEDY L.J. referred to Royal Exchange Assurance v. McSwiney. [FN10]]

FN10 (1850) 14 Q. B. 646.

Here the policy of re-insurance by its words aptly covers the loss which has happened. The Kynance was lost on a voyage marked out by the policy of re-insurance. The respondents shew that they had an insurable interest under the first two policies, and the appellant, the re-insurer, declines to pay because *270 he alleges that the respondents' insurable interest arose under the first two policies, whereas they expected it to arise under the third policy. He is not entitled to say that. If the specific interest does not exist at the time of the re-insurance the assured cannot recover; but that is not this case.

Unless this case is concluded by the decision in Lower Rhine and Würtemberg Insurance Co. v. Sedgwick [FN11] the respondents are entitled to succeed. That decision was based upon grounds which do not affect this case.

FN11 [1899] 1 Q. B. 179, 189.

In Denoon v. Home and Colonial Assurance Co. [FN12]Willes J. in the course of delivering the judgment of the Court said:
"In this state of facts, and upon the construction of the policy in question, we adopt the view of the assured, that the freight of merchandise only was assured, according to his intention declared to his agent, and upon which the valuation took place; which intention, however, not being communicated to the underwriters, could not of itself have altered the construction of the policy whatever effect it may have had to shew a mistake on both sides as to the subject-matter of the valuation, and so to open the policy."

FN12 (1872) L. R. 7 C. P. 341, at p. 350.

*Leck* in reply. In Lower Rhine and Würtemberg Insurance Association v. Sedgwick [FN13]Collins L.J. said: "This ... is the essence of the contract. Its purpose is to cover in whole or in part the risk actually undertaken on 'an original' policy." Here the risks insured against are so distinct that it is necessary to ascertain which was intended to be re-insured.

FN13 [1899] 1 Q. B. at p. 190.

*Cur. adv. vult.*

May 18. COZENS-HARDY M.R. I agree with the judgment which Kennedy L.J. will read.

KENNEDY L.J.

stated the facts, and continued: The question to be decided in the present action arises in respect of a re-insurance policy which was effected with the defendant, an underwriter, by the plaintiffs on August 9, 1910, and, therefore, after they had executed all the three policies of May 6 *271 and 11 and August 4, and during the subsistence of those original policies. The plaintiffs sued the defendant in the present action upon this re-insurance policy in order to recoup themselves for the amount of the total loss which they have been held liable to pay and have paid to the owners of the Kynanceunder the original policies of May 6 and 11. [His Lordship then stated the terms of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

re-insurance policy, and continued:] It was not argued at the trial, as Bray J. states in his judgment, and I did not understand the defendant's counsel to argue before us, that the loss in respect of which the plaintiffs have paid under the policies of May 6 and 11 did not fall within the words of the re-insurance policy, and I agree with the learned judge in thinking that they could not successfully have so argued. The language of this re-insurance policy is both sufficient and apt to constitute a contract between, the plaintiffs, the Reliance Company, and the defendant, whereunder the plaintiffs, having paid in respect of the total loss of the Kynance upon the two original policies of May 6 and 11, became therefore entitled to be indemnified by the defendant in respect of such payments. In other words the policy of re-insurance, according to the natural meaning of its terms, covers the plaintiffs' risk of having to pay for the loss of the Kynance as and when in fact that loss occurred under any original policy or policies or at all events any original policy or policies existing at the time of the re-insurance under which that risk was insured by the plaintiffs: see Lower Rhine and Würtemberg Insurance Association v. Sedgwick [FN14]; and each of the policies of May 6 and 11 was such an original policy.

FN14 [1899] 1 Q. B. 179.

It is of course immaterial, in regard to the liability of the defendant, as a re-insurer, to indemnify the plaintiffs in respect of a loss to which both the original policies of May 6 and 11 and the re-insurance policy extend, that the re-insurance policy would also have protected the original insurer in respect of a loss of the Kynance at a further stage, i.e., on the intended homeward voyage in regard to which the plaintiffs could have been liable to her owners only under the third policy of August 4. The applicability of a re-insurance policy in no way depends upon the period *272 of risk which it covers being conterminous with the risk in the original policy. So far there is not, I think, any difference between the parties. But the defendant, whilst admitting that the plaintiffs both at the time of the re-insurance and at the time of the loss of the Kynance had an insurable interest arising from their liability to the owners of the Kynance under the original policies of May 6 and 11, and not disputing that that risk is a risk which apparently comes within the terms of the re-insurance policy, and that the plaintiffs have in fact been held legally liable to pay under those original policies, resists the plaintiffs' claim because, as he contends, and as he contended before Bray J., that the general words must be limited by the intention of the assured, and the case shewed that the plaintiffs did not intend to cover by the re-insurance any risk except the risk under the third policy--the policy of August 4 - and it is not upon that policy, but only upon the two earlier policies of May 6 and 11, that the plaintiffs have been held liable to pay for the loss of the Kynance. He has taken upon himself the burden of proving, not merely that the plaintiffs in re-insuring intended to cover their risk on the third policy, but intended to exclude their liability under the two earlier existing policies.

I am of opinion that this contention of the defendant fails both upon the facts and in point of law. Such an intention as the defendant imputes to the plaintiffs is, to say the least, improbable. It is difficult to imagine why the plaintiffs, as business men, having risks subsisting under all the three policies of insurance, should, when subsequently taking out through their brokers a policy of re-insurance in terms sufficient and apt to cover their risk on the Kynance during her stay on the west coast under all the three policies as well as during her intended further voyage homeward under the third policy, have intended to limit the protection of re-insurance to the risk under the third policy and to exclude the risks under the other two. It is, however, unnecessary to dwell upon this antecedent improbability. The defendant at the trial endeavoured to make out his case by an inference of intention which he invited the learned judge to draw from certain entries in the plaintiffs' books, from written communications passing between the plaintiffs and their insurance brokers and *273 between those brokers and their London agents, and also by oral evidence of a sort of constructive notice of the alleged intention given in conversation between those agents and the defendant. The learned judge, who had this written and oral evidence before him, has held that upon the facts the defendant wholly failed to prove his case. In the course of a considered judgment, after carefully reviewing the evidence, Bray J. stated his conclusion in the following terms:--
"I am unable to find that the intention of the plaintiffs was to cover only their liability under the third policy. It might be true to say that they expected the liability to arise under the third policy, but I find it is not true that their intention was to cover that liability only."

As I see no reason for differing from my brother Bray in regard to this finding of fact, it is not necessary for my judgment on this appeal to consider the law. But, as it was much discussed in the course of the argument in this Court, I think that I ought, shortly, to give reasons for my view that the basis of the defendant's contention is unsound and, the terms of the written contract between the parties being what they are, that the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

evidence adduced by the defendant was not legally admissible.

It is, I conceive, a fundamental principle of our law, that, where you have a contract which has a plain natural meaning, and which is not impeached upon the ground of common mistake or upon the ground of fraud and misrepresentation, it is not permissible to alter its effect according to the intention of one of the two contracting parties, or to adduce evidence in order to shew such an intention. If A. and B. enter into a written contract it is immaterial to consider what either of them intended to effect. The only question is, What have they said by their contract?

But it is just the opposite of this which the defendant, in resisting the plaintiffs' claim, has tried to do. We have here a re-insurance policy covering the insurer's risk under "original policies" ("subject to the same terms clauses and conditions as the original policy or policies and to pay as may be paid thereon") insuring the Kynance at the time and the place of her loss; and the defendant, the re-insurer, has attempted to narrow the natural *274 and prima facie meaning of the contract contained in the re-insurance policy to one out of three of the original policies which existed at the time of the re-insurance, and to each of which the contract of re-insurance is, in regard to the safety of the Kynance whilst on the west coast, equally applicable, by proof of an intention on the part of the plaintiffs, uncommunicated to the re-insurer, to protect themselves only in respect of that single policy. Such a proceeding appears to me unjustifiable in point of law.

Willes J. in Denoon v. Home and Colonial Assurance Co. [FN15], referring to the intention of the assured as to insuring the freight upon merchandise only, says "which intention, however, not being communicated to the underwriters could not of itself have altered the construction of the policy whatever effect it might have had to shew a mistake on both sides as to the subject-matter of the valuation, and so to open the policy."

FN15 L. R. 7 C. P. at p. 350.

When the assured, whether in an original policy or in a re-insurance policy, has proved his interest at the time of the loss, the only other questions in the absence of some special provisions in the policy, relevant to the question of the insurer's liability, are: Was the subject-matter a subject-matter covered by the terms of the contract appearing in the policy? and, Was the risk occasioning the loss of that subject-matter a risk included in the terms of the contract appearing in the policy?

But then, says the defendant, "I rely upon s. 26, sub-s. 3, of the Marine Insurance Act, 1906." That enactment runs thus:

"Where the policy designates the subject-matter insured in general terms, it shall be construed to apply to the interest intended by the assured to be covered."

I hope that I shall not be judged lacking in due respect either to the Legislature or to the eminent judicial authority (Lord Esher, then Brett J., in Allison v. Bristol Marine Insurance Co. [FN16]) whose language has been in this sub-section imported into the statute. if I venture to say that I think, as I understand Scrutton J. to think (see S.S. Kynance Co. v. Young [FN17]), in agreement with the learned editors of the last edition of *275 Arnould on Marine Insurance, vol. i., pp. 327, 328, that this sub-section might have been less obscurely worded. Possibly, as those learned editors suggest, a question may some day arise under it in regard to opening a valued policy in cases where the designation of the subject-matter in the policy is larger than the insurable interest of the assured, as the valuation was opened by Lord Ellenborough in Forbes v. Aspinall [FN18], and by Willes J. in Denoon v. Home and Colonial Assurance Co. [FN19] But, be this as it may, I do not think that this sub-section can rightly be interpreted to mean that an insurer is thereby entitled to exclude the assured from the benefit of the insurance of any of the risks which are within the terms expressed in the written policy, and which have been, presumably, considered by the insurer in fixing his premium, by shewing that, at the time when the insurance was effected, the assured "intended" in his own mind to cover only some of them. On the contrary, I think that, if this sub-section is read, as it ought to be, in connection with the rest of s. 26, the purpose of which, as appears by the marginal note, is to deal with "Designation of subject-matter," the principal object of the sub-section is to prevent an assured who at the time of a loss within the policy has only a limited interest in the subject-matter which is designated in the policy in general terms--such e.g., as "cargo" or "freight" - from being prejudiced by such generality of designation, provided that the designation is not inappropriate, as, e.g., "rice" would be, if intended to cover an interest in profits which might arise collaterally from a contract relating to the rice: see per Blackburn J. in Anderson v. Morice [FN20] and McSwiney v. Royal Exchange. [FN21] Having regard to the words "interest intended by the assured to be covered," I think that those who introduced the sub-section into the Act may also have had in view the one class of case in relation to marine insurance in which the "intention" of one of

the two parties to the contract--i.e., the assured--is properly (I say "properly" because it is required by the very terms of the contract) matter of inquiry in regard to rights under the contract. According to the common form of policy (which appears in the re-insurance *276 policy which we are considering in this case) the insurance is effected by the insurance brokers "as well in their own name as for and in the name and names of all and every other person or persons to whom the subject-matter of this policy does may or shall appertain in part or in all." The persons for whose benefit the policy was intended to enure have therefore to be ascertained. It is expressly provided by s. 14 of this Act that persons, such, e.g., as mortgagee or consignee, having only themselves a limited interest, may insure for and on behalf of other persons interested, as well as for their own benefit, and may recover accordingly upon the policy; although, of course, as laid down by Bowen L.J. in Castellain v. Preston [FN22], the plaintiff in such a case can keep for himself only so much of the amount recovered from the insurer as will be due in respect of his own limited interest. Even in such circumstances the claim to inquire into the intention of those who contract with the underwriter--not appearing in the policy and not communicated to him--has been criticized in a recent insurance case in the House of Lords. In Boston Fruit Co. v. British and Foreign Marine Insurance Co. [FN23] Lord Atkinson made the following remarks: "The underwriter, it would seem, was held to have insured those whom the persons who dealt with him intended should be insured, though that intention was never communicated to him. I doubt very much whether that doctrine can long survive the decision of your Lordships' House in Keighley, Maxsted & Co. v. Durant [FN24], or whether the rule of construction thus adopted in the case of marine policies from earlier times is not inconsistent with the root principle which lies at the foundation of all the law of contract, namely, that there must always be the consent ad idem of the two contracting minds to make a valid contract." I do not think that s. 26, sub-s. 3, assists the defendant in the present case.

FN16 1 App. Cas. at p. 216.

FN17 (1911) 16 Com. Cas. 123, at p. 131.

FN18 (1811) 13 East, 323.

FN19 L. R. 7 C. P. 351.

FN20 (1875) L. R. 10 C. P. 609, at p. 621.

FN21 (1849) 14 Q. B. 634.

FN22 (1883) 11 Q. B. D. 380, at pp. 398, 399.

FN23 [1906] A. C. 336, at p. 343.

FN24 [1901] A. C. 240.

The defendant appeared to some extent to seek to support his argument by a reference to the decision of the Court of Appeal in the case of Lower Rhine and Würtemberg Insurance Association v. Sedgwick *277 . [FN25] I do not think that that case has really any bearing upon the question which we have to consider. So far as it goes, it is, when the grounds of the decision of the Court of Appeal are appreciated, rather adverse to the present defendant. The Court held, in the words of A. L. Smith L.J., that "prima facie a person who effects a re-insurance reinsures the liability he is under at the time when he effects the re-insurance, and not a liability he is not then under and may never thereafter come under"; and that the words of the "rubber clause" in that policy of re-insurance -- "original policy or policies" - ought accordingly to be interpreted as referring to the two original policies which were in existence at the time of the re-insurance. The policy to which the defendant in that case was seeking to apply the re-insurance policy was a policy which had been effected upon the expiration of the two original policies which had existed at the time of the re-insurance and after the re-insurance policy had been effected. The Lord Justice proceeded to point out that he was not deciding that under no circumstances could a policy afterwards effected be covered by a re-insurance policy, but that, in face of the fact that there were at the time of the re-insurance two original policies to which it did apply and to which prima facie it must be held to apply, the words of the "rubber clause" were not sufficient to embrace a policy effected afterwards which in material terms differed from the two original policies. The reasoning of Rigby L.J. and Collins L.J. was substantially the same as that of A. L. Smith L.J. which I have cited. There is, as I have said, nothing in all this which assists the present defendant. The question of "intention" dehors the contract itself and existing only in the mind of the person who effected the re-insurance policy had not to be, and was not, considered at all. The Court of Appeal decided as it did, reversing the judgment which I had given in favour of the defendant, upon the grounds (1.) that it was the duty of the Court, as a matter of construction, to treat the re-insurance policy as prima facie applying, under the phrase "original policies," to the two policies already existent; (2.) that in a case, at any rate, where such original policies existed at the *278 time, a subsequent policy in essentially different terms ought not to be treated as covered by the re-insurance policy.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN25 [1899] 1 Q. B. 179.

BUCKLEY L.J.

I have had the advantage of reading and considering the judgment which Kennedy L.J. has delivered. I do not differ, but I still doubt. Whether the risk is a risk which comes within the words of the re-insurance policy upon its true construction is, I think, the question to be decided. As matter of construction of the words "original policy or policies" in the re-insurance policy the question is whether all or some and which of the three insurance policies is described by those words. Looking at the valuation given and the voyage described in the policy of August 4 as contrasted with those given and described in the policies of May, and looking at the voyage described in the re-insurance policy of August 9, it is I think a question of construction whether the policy of August 4 to the exclusion of those of May is not that which the re-insurance policy calls the "original policy or policies." To answer this question of construction no resort need be or ought to be had to intention. The documents alone and a proper regard to the surrounding circumstances are the only materials for the decision. I had elaborated this more fully in the judgment which I had written, but I think it unnecessary to deliver it.

**Representation**

Solicitors for appellant: W. A. Crump & Son . Solicitors for respondents: Field, Roscoe & Co., for Batesons, Warr & Wimshurst, Liverpool.

Appeal dismissed. (G. A. S. )

(c) Incorporated Council of Law Reporting For England & Wales

END OF DOCUMENT

# Exhibit 8



WestlawUK

[2005] 1 Lloyd's Rep. 461 Page 1
2004 WL 2714105 (HL), [2005] 1 All E.R. 191, [2005] 1 C.L.C. 451, [2005] Lloyd's Rep. I.R. 294, [2005] 1 Lloyd's Rep. 461, (2004) 148 S.J.L.B. 1435, [2004] 1 W.L.R. 3251, [2005] 1 All E.R. (Comm) 117, (2004) 101(48) L.S.G. 25, 12-03-2004 Times 2714,105, [2004] UKHL 54
(Cite as: [2005] 1 Lloyd's Rep. 461)

*461 Sirius International Insurance Co. (Publ) v. FAI General Insurance Ltd.
[2004] UKHL 54

House of Lords

HL
Dec. 2, 2004

Before Lord Bingham of Cornhill, Lord Nicholls of Birkenhead, Lord Steyn, Lord Walker of Gestingthorpe and Lord Brown of Eaton-under-Heywood

Reinsurance - Agreement for fronting arrangement supported by back-to-back retrocession - Reinsurers requiring letter of credit - Agreement that no draw down was possible until retrocessionaires agreed that reinsurers should pay a claim - Dispute between parties resolved by Tomlin order - Whether Tomlin order amounted to agreement that reinsurers should pay a claim - Whether reservation of rights in Tomlin order in relation to letter of credit overrode right to recover under letter of credit following agreement that payment should be made.

Agnew, a syndicate at Lloyd's, wished to reinsure its liabilities. Its brokers, Lambert Fenchurch Ltd., proposed FAI General Insurance Ltd. as reinsurers. Agnew had doubts as to the financial stability of FAI, and wanted an "A" rated reinsurer. An arrangement was established whereby Sirius International Insurance Co. Ltd. became the fronting reinsurer, and retroceded the risk to FAI. As a requirement for fronting for FAI, Sirius obtained a letter of credit from a bank, Westpac, on terms contained in an offer letter of Sept. 3, 1999, the contract being concluded by an acceptance letter of Oct. 22, 1999. Under the terms of the side letter, the following conditions were accepted by Sirius:

We...undertake that we will not agree or pay any claim presented to Sirius by the Agnew Syndicate without FAI's prior agreement in writing, nor will we draw down under the LOC, unless (1) FAI has agreed that Sirius should pay a claim but has not put Sirius in funds to do so, notwithstanding the simultaneous settlements clause in our retrocession contract...or (2) the Agnew Syndicate obtains a judgment or binding arbitration award against Sirius which Sirius is obliged to pay.

The letter of credit was issued by Westpac on Jan. 24, 2000, but by this time Agnew had made a claim against Sirius under the reinsurances and a dispute arose as to Sirius's liability to Agnew. On Mar. 23, 2000 Lambert, Sirius and Agnew entered into a tripartite funding arrangement under which Sirius acknowledged that Agnew had a reasonable cause for arguing that there was no ground upon which to challenge the reinsurances, so that the reinsurances should be deemed fully binding and effective. It further provided that Agnew would not take steps to enforce payment by Sirius until specified proceedings against FAI were concluded, and Lambert agreed to fund Agnew for its losses by way of loan until then. Sirius agreed that it would allow Lambert to use its name to obtain recovery from FAI, and that any recoveries were to applied by Lambert on behalf of Sirius towards payment of Sirius' liability to Agnew under the reinsurances.

In May, 2000 an arbitration was commenced in Sirius's name against FAI, but this was stayed following the appointment of provisional liquidators owing to the insolvency of FAI's parent company. Under a Tomlin order dated Apr. 6, 2001 the arbitration proceedings were settled, on the basis that Sirius could prove in FAI's liquidation for the sum of U.S.$22,500,000, and that Sirius would draw down on the letter of credit and pay the proceeds into an escrow account. The Tomlin order also provided:
1. FAI General Insurance Company Limited (FAI') is indebted to the applicant [Sirius] in the sum of U.S.$22,500,000 and the applicant shall be entitled to prove in the liquidation or scheme of arrangement of FAI in the said sum of U.S.$22,500,000.
. . ..
4. For the avoidance of doubt, the position and all arguments of the applicant and the respondents in respect of the LOC are preserved in respect of the proceeds notwithstanding the terms of this Schedule.

The issue in the present case was whether the proceeds of the letter of credit in the escrow account belonged to Sirius or to FAI. FAI argued that the effect of the conditions in the letter of credit were to prevent draw down in the absence of FAI's consent, and that the Tomlin order preserved the position under the letter of credit: as FAI's consent could no longer be forthcoming, Sirius had

[2005] 1 Lloyd's Rep. 461    Page 2
2004 WL 2714105 (HL), [2005] 1 All E.R. 191, [2005] 1 C.L.C. 451, [2005] Lloyd's Rep. I.R. 294, [2005] 1 Lloyd's Rep. 461, (2004) 148 S.J.L.B. 1435, [2004] 1 W.L.R. 3251, [2005] 1 All E.R. (Comm) 117, (2004) 101(48) L.S.G. 25, 12-03-2004 Times 2714,105, [2004] UKHL 54
(Cite as: [2005] 1 Lloyd's Rep. 461)

no right of draw down and the money was to be treated as belonging to FAI. Sirius argued that the principle of autonomy of letters of credit meant that it was entitled to draw down, and that the effect of the Tomlin order was to overcome the conditions on the enforcement of the letter of credit.

Mr. Justice Jacob held at first instance that Sirius succeeded on the preliminary points and that Sirius was entitled to the sum in the escrow account. He ruled that the effect of the first paragraph in the Tomlin order was that the first condition in the letter of credit had been satisfied, in that FAI had agreed that Sirius should pay a claim but had not put Sirius in funds to do so. The fourth paragraph of the Tomlin order did not treat all questions concerning the letter of credit as if the settlement had never happened, and merely preserved any pre-existing right, but did not require the letter of credit to be treated as torn up.

The first instance decision was reversed by the Court of Appeal, which held that the Tomlin order had not satisfied the first condition of the side letter relating to the letter of credit. While it was the case that the agreed determination of the arbitration proceedings in favour of Sirius in the Tomlin order necessarily carried with it an acceptance by FAI that Sirius were liable to Agnew under the reinsurances, the Tomlin order could not be *462 construed as an agreement by FAI that Sirius should pay Agnew's claim.

Sirius appealed to the House of Lords;

Held, , by H.L. (Lords BINGHAM, NICHOLLS, STEYN, WALKER and BROWN) that the appeal would be allowed.

(1) The aim of the inquiry was not to probe the real intentions of the parties but to ascertain the contextual meaning of the relevant contractual language. The inquiry was objective: the question was what a reasonable person, circumstanced as the actual parties were, would have understood the parties to have meant by the use of specific language. The answer to that question was to be gathered from the text under consideration and its relevant contextual scene. There had been a shift from literal methods of interpretation towards a more commercial approach. The tendency was generally speaking be against literalism ( see pars. 18 and 19);

- Antaios Compania Naviera S.A. v. Salen Rederierna A.B., [1985] AC 191, Mannai Investment Co. Ltd. v. Eagle Star Life Assurance Co. Ltd., [1997] A.C. 749, Investors Compensation Scheme Ltd v. West Bromwich Building Society, [1998] 1 W.L.R. 896, applied.

(2) From the surrounding circumstances preceding the making of the Tomlin order, and the text of the Tomlin order, it could be inferred that the parties had two major immediate objectives. First, they desired to compromise an arbitration that would have been long and costly. Secondly, the letter of credit had been extended but was due to expire on Nov. 15, 2001. Both parties wanted to obtain a draw down of the letter of credit on terms which left open the issue of the entitlement of the proceeds of the draw down ( see par. 20).

(3) The words of paragraph 1 of the Tomlin order necessarily meant that FAI agreed that, under the back to back reinsurances, and the simultaneous settlements procedure, Sirius should pay Agnew. While it was true that read literally paragraph 1 did not so provide, the correct interpretation of paragraph 1 of the Tomlin order was that the first condition of the side letter was satisfied. The Court of Appeal's interpretation was uncommercial and literalistic. If it had been necessary, the same conclusion could have been reached on the basis of a constructional implication ( see par. 25).

(4) Paragraph 1 was not to be read as entirely subordinate to paragraph 4. It did not follow from this conclusion that the reservation of rights under paragraph 4, and the payment of the proceeds into the escrow account, was to be given no meaning. Those features of the settlement were intended to enable the English provisional liquidators to decide whether, and if so, in what manner, they might wish to challenge Sirius' right to the proceeds of the letter of credit. It was to be borne in mind that the provisional liquidators took office only thirteen days before the Tomlin order and probably knew very little about the background. The reservation of rights would, for example, have entitled them to rely, for example, on dishonesty in the underlying transaction if that could be established. Only in such an attenuated sense were rights reserved. Given this reservation of rights, the arrangement to pay the proceeds into an escrow account was not surprising ( see par. 23).

The following cases were referred to in the judgments:

Antaios Compania Naviera S.A. v. Salen Rederierna A.B., (H.L.) [1985] A.C. 191;

Bank of Credit and Commerce International S.A. v. Ali, (H.L.) [2001] UKHL 8; [2002] 1 A.C. 251;

Bolivinter Oil S.A. v. Chase Manhattan Bank, (C.A.) [1984] 1 Lloyd's Rep. 251;

[2005] 1 Lloyd's Rep. 461 Page 3
2004 WL 2714105 (HL), [2005] 1 All E.R. 191, [2005] 1 C.L.C. 451, [2005] Lloyd's Rep. I.R. 294, [2005] 1 Lloyd's Rep. 461, (2004) 148 S.J.L.B. 1435, [2004] 1 W.L.R. 3251, [2005] 1 All E.R. (Comm) 117, (2004) 101(48) L.S.G. 25, 12-03-2004 Times 2714,105, [2004] UKHL 54
(Cite as: [2005] 1 Lloyd's Rep. 461)

Investors Compensation Scheme Ltd v. West Bromwich Building Society, (H.L.) [1998] 1 W.L.R. 896;

Mannai Investment Co. Ltd. v. Eagle Star Life Assurance Co. Ltd., (H.L.) [1997] A.C. 749;

On Demand Information plc v. Michael Gerson (Finance) plc, (H.L.) [2003] 1 A.C. 368.

This was an appeal by the claimants against the decision of the Court of Appeal, [2004] Lloyd's Rep. I.R. 47.

Geoffrey Vos, Q.C. and Peter Arden, instructed by Reynolds Porter Chamberlain, for the claimants; Gabriel Moss, Q.C. and Philip Marshall, Q.C., instructed by Ince & Co., for the defendants.

The further facts are stated in their Lordships' speeches

Thursday, Dec. 2, 2004

**JUDGMENT**

Lord BINGHAM of Cornhill

My Lords,

1. Left to myself, I should have accepted the interpretation put by the respondents on the Tomlin order agreed between the parties on Apr. 6, 2001. But no issue of principle on the construction of contracts divides the parties. The Tomlin order is expressed in terms which are one-off. If the appellants' argument on construction is accepted no point of law of general public importance arises. I must acknowledge that the judge adopted the construction favoured by a majority of my noble and learned friends. My own reasons for favouring a different construction differ from those of the Court of Appeal. This being so, no purpose is served by expounding the interpretation which I myself would have put on the Tomlin order, and I am content to accept that favoured by the majority. I would *463 accordingly agree that the appeal should be allowed.

Lord NICHOLLS of Birkenhead:

My Lords,

2. I have had the advantage of reading in draft the speeches of my noble and learned friends Lord Steyn and Lord Walker of Gestingthorpe. For the reasons they give, with which I agree, I would allow this appeal.

Lord STEYN:

My Lords,

3. When leave to appeal was granted by an Appeal Committee, it may have appeared that important issues regarding the so-called autonomy principle applicable to letters of credit issued by banks would have to be resolved. Certainly that was the main thrust of the petition. In the result it has turned out to be unnecessary to examine the arguments about the autonomy principle. Instead it has become clear that the appeal should be decided on the basis of the correct contextual interpretation of two related documents. Those two documents are a side letter to a letter of credit, agreed between the party setting up the letter of credit and the beneficiary, and a schedule to a Tomlin order settling a dispute that had arisen between the parties. These two documents are not in standard form. The interpretation of these documents is, like the construction of all texts, a matter of law but it does not involve a question of general public importance. The House would not ordinarily have given leave to appeal in such a one-off case. But the House is now seized with it, and the issue must be resolved.

*The commercial context*

4. Sirius International Insurance Company (Publ) is a company incorporated under the laws of Sweden. It carries on business as an insurer and reinsurer. FAI General Insurance Limited is a company incorporated under the laws of New South Wales. It also carries on business as an insurer and reinsurer. It is part of the insolvent HIH insurance group. FAI is in provisional liquidation in Australia and in England. The second to fourth respondents are FAI's English provisional liquidators, who were appointed as such by an order made by Mr. Justice Hart on Mar. 23, 2001.

5. In early 1997 a syndicate at Lloyd's, Agnew, wished to reinsure its liabilities on its onshore energy account. FAI offered to act as reinsurer but Agnew required an "A" rated reinsurer. FAI was not "A" rated. Accordingly, Agnew required the policy to be fronted by an acceptably rated reinsurer. Sirius was an "A" rated reinsurer. By its letter dated Oct. 15, 1997, Sirius agreed to "front" the reinsurance by writing the policy for Agnew, and then retroceding it "back-to-back" to FAI. For fronting the reinsurance Sirius received an annual

[2005] 1 Lloyd's Rep. 461  Page 4
2004 WL 2714105 (HL), [2005] 1 All E.R. 191, [2005] 1 C.L.C. 451, [2005] Lloyd's Rep. I.R. 294, [2005] 1 Lloyd's Rep. 461, (2004) 148 S.J.L.B. 1435, [2004] 1 W.L.R. 3251, [2005] 1 All E.R. (Comm) 117, (2004) 101(48) L.S.G. 25, 12-03-2004 Times 2714,105, [2004] UKHL 54
(Cite as: [2005] 1 Lloyd's Rep. 461)

fee of U.S.$65,000.

6. Sirius duly wrote the reinsurance for Agnew for two periods: Dec. 1, 1996 to Dec. 31, 1997 and Dec. 31, 1997 to Dec. 31, 1998 and FAI duly wrote the retrocessions for Sirius for the same periods. The premiums for the two years were respectively U.S.$2 m. and U.S.$1.6 m. These sums went to FAI. To summarize: Agnew was the insurer; Sirius was the fronting reinsurer, and FAI was the retrocessionaire.

7. By undertaking to act as fronting reinsurer Sirius assumed the risk, in the event of the insolvency or default of FAI, of having nevertheless to pay Agnew. The fact that the FAI was not an A-rated insurance company underlined the fact of the risk. Not surprisingly, Sirius required security. Sirius insisted on a letter of credit from a bank. A side letter, dated Sept. 3, 1999, which was negotiated between Sirius and FAI, provided:

We [Sirius] therefore undertake that we will not agree or pay any claim presented to Sirius by [Agnew] without FAI's prior agreement in writing, nor will we draw down under [the letter of credit], unless (1) FAI has agreed that Sirius should pay a claim but has not put Sirius in funds to do so, notwithstanding the simultaneous settlements clause in our retrocession contract (see below) or (2) [Agnew] obtains a judgment or binding arbitration award against Sirius which Sirius is obliged to pay.

Paragraph 3 of the side letter also recorded that "FAI has already agreed to a simultaneous settlements clause which provides that FAI shall pay their share of any loss under the retrocession simultaneously with Sirius' payment to Agnew". Thereafter, FAI (by now acting by its parent HIH) produced a draft letter of credit. The terms of the letter of credit, which incorporated the ICC Uniform Customs and Practice for Documentary Credits (1993 Revision), were approved by Sirius. On Jan. 24, 2000, Westpac Banking Corporation, an Australian bank, produced an irrevocable standby letter of credit for U.S.$5 m. in the terms agreed by the parties. Westpac was not aware of the terms of the side letter.

*The dispute*

8. By this time, Agnew had claimed against Sirius under the reinsurances, and a dispute had developed as to whether the reinsurances written by Sirius and, consequent upon that, the retrocessions written by FAI, should respond to the claims. On Mar. 23, 2000, Lambert Fenchurch Limited (Agnew's brokers), Agnew and Sirius entered into a funding agreement whereby inter alia Lambert *464 Fenchurch agreed to fund Agnew in respect of its paid losses due under the reinsurances and Sirius agreed to permit Lambert Fenchurch to commence proceedings on its behalf to enforce Sirius' rights under the retrocessions. Prior to the funding agreement, Sirius had suggested an ad hoc arbitration between Agnew and FAI. FAI refused to engage in such an arbitration. In May, 2000, Sirius started arbitration proceedings against FAI claiming to be entitled to payment by FAI under the retrocessions which issue necessarily involved the question whether Sirius was liable to Agnew. On Mar. 15, 2001, provisional liquidators were appointed in Australia over FAI. On Mar. 23, 2001, provisional liquidators were appointed in England by Mr. Justice Hart. This had the effect, under s. 130(2) of the Insolvency Act, 1986, of automatically staying the arbitration proceedings.

*The Tomlin order*

9. Sirius applied to court for a lifting of the automatic stay on the arbitration, which was by then about to come to a lengthy substantive hearing. By that time the provisional liquidators were running FAI. The application to lift the automatic stay on the arbitration were compromised between Sirius and the provisional liquidators of FAI by a Tomlin order dated Apr. 6, 2001. The material terms of the Tomlin order were as follows:

1. FAI General Insurance Company Limited ('FAI') is indebted to the applicant [Sirius] in the sum of U.S.$22,500,000 and the applicant shall be entitled to prove in the liquidation or scheme of arrangement of FAI in the said sum of U.S.$22,500,000.

2. [Sirius] shall draw down on Westpac Banking Corporation's Irrevocable Standby Letter of Credit No. 772 dated Feb. 3, 2000 (the LOC').

3. [Sirius] shall pay the proceeds of the LOC (the proceeds') into an escrow account to be held together with accrued interest thereon by Reynolds Porter Chamberlain pending the resolution of the parties' claims (if any) in respect of the LOC.

4. For the avoidance of doubt, the position and all arguments of the applicant and the respondents in respect of the LOC are preserved in respect of the proceeds notwithstanding the terms of this Schedule.

5. Save for the parties' rights with respect to the LOC and the agreements associated to the LOC, the terms herein shall be in full and final settlement of all claims raised by either party in the arbitration proceedings.

[2005] 1 Lloyd's Rep. 461   Page 5
2004 WL 2714105 (HL), [2005] 1 All E.R. 191, [2005] 1 C.L.C. 451, [2005] Lloyd's Rep. I.R. 294, [2005] 1 Lloyd's Rep. 461, (2004) 148 S.J.L.B. 1435, [2004] 1 W.L.R. 3251, [2005] 1 All E.R. (Comm) 117, (2004) 101(48) L.S.G. 25, 12-03-2004 Times 2714,105, [2004] UKHL 54
**(Cite as: [2005] 1 Lloyd's Rep. 461)**

On about June 12, 2001, the letter of credit was drawn down in accordance with its terms and the proceeds were placed in escrow pursuant to the Tomlin order.

*The proceedings*

10. On July 31, 2001, Reynolds Porter Chamberlain, on behalf of Sirius, demanded payment of the sums held in escrow. The demand was not acceded to and these proceedings were commenced by Sirius by application dated Sept. 19, 2001. On May 27, 2002, Mr. Registrar Baister directed that certain questions be determined as preliminary issues: namely (a) what were the conditions upon which Sirius could draw down the letter of credit and (b) whether those conditions were satisfied.

11. On July 23, 2002, Mr. Justice Jacob decided that the first condition of the side letter had been satisfied by the terms of paragraph 1 of the Tomlin order and gave directions for the future conduct of the application and also gave FAI permission to appeal: Sirius International Insurance Co. (Publ) v. FAI General Insurance Ltd. & Others, [2002] EWHC 1611 (Ch.); [2003] 1 W.L.R. 87. In respect of the first condition of the side letter Mr. Justice Jacob observed, at p. 94, par. 26:

. . .[Counsel for FAI] submitted that FAI had never agreed that Sirius should pay a claim. [Counsel for Sirius] says that FAI in effect did so by clause 1 of the Tomlin schedule. By that clause FAI acknowledged an indebtedness of U.S.$22.5 m. to Sirius. Everyone knew that there was a back-to-back arrangement in place, that the U.S.$22.5m. would inure for Agnew's benefit. So in substance, submitted [counsel for Sirius], FAI agreed to payment by Sirius. They knew exactly who was really getting the benefit of clause 1 of the settlement agreement. I think that is right. No one ever thought that the right to the U.S.$22.5 m. was really that of Sirius. The commercial substance is that FAI had agreed that Sirius should pay a claim.

12. On Apr. 4, 2003, the Court of Appeal reversed the decision of the judge. The Court of Appeal held that the first condition of the side letter had not been satisfied and decided that FAI was entitled to the proceeds of the letter of credit: Sirius International Insurance Co. (Publ.) v. FAI General Insurance Ltd. & Others, [2003] EWCA Civ. 470; [2003] 1 W.L.R. 2214. On the point of interpretation Lord Justice May concluded, at pp. 2222-2223, par. 21:

[Counsel for Sirius] accepted that the second condition of the Sept. 3, 1999 agreement was not and is not fulfilled. He accepted that the first condition was not fulfilled before the Tomlin order. He accepted that the literal words of paragraph 1 do not express an agreement by FAI that Sirius should pay Agnew's claim. Creative *465 construction or implication is required to interpret it as doing so. He accepted, I think, that an award in contested arbitration proceedings would not have fulfilled the first condition. But the Tomlin order, he said, embodied an agreement not an award, and the agreement that Sirius should be entitled to prove in FAI's liquidation or administration for U.S.$22.5 m necessarily carried with it an agreement by FAI that Sirius should pay Agnew's claim. I do not think so.

Lord Justice Carnwath agreed, at p. 2227, par. 34, and Mr. Justice Wall came to the same conclusion, at p. 2228, par. 39. The Court of Appeal held that FAI were entitled to the proceeds of the letter of credit in the escrow account. The effect was Sirius became an unsecured creditor in the insolvency of FAI.

13. Sirius now appeals to the House of Lords.

*The issues*

14. The statement of issues agreed between the parties reads as follows:

(1) Whether paragraph 1 of the Tomlin order, on its true construction, constituted an agreement by FAI that [Sirius] should pay Agnew and thereby satisfied the first of the conditions for draw down set out in the agreement.

(2) Whether, having regard to paragraphs 4 and 5 of the Tomlin order, any of the provisions of that order can be construed as taking away FAI's argument that it was entitled to the proceeds of the letter of credit as a result of non-compliance with the conditions of draw down in the agreement.

(3) Whether, in the event that [Sirius] could not establish that the agreed conditions for draw down were satisfied, it follows that draw down in breach of the agreement gave rise to an entitlement on the part of FAI to the proceeds of the letter of credit, as opposed to a claim in damages. This question raises the following issues:

(a) Whether the effect of the autonomy principle, which is applicable to letters of credit and all other documentary credits, is such as to give [Sirius] the right to the proceeds, leaving FAI with its claim in damages; or

(b) Whether, in the circumstances of this case, FAI is entitled to the proceeds.

[2005] 1 Lloyd's Rep. 461    Page 6

2004 WL 2714105 (HL), [2005] 1 All E.R. 191, [2005] 1 C.L.C. 451, [2005] Lloyd's Rep. I.R. 294, [2005] 1 Lloyd's Rep. 461, (2004) 148 S.J.L.B. 1435, [2004] 1 W.L.R. 3251, [2005] 1 All E.R. (Comm) 117, (2004) 101(48) L.S.G. 25, 12-03-2004 Times 2714,105, [2004] UKHL 54
(Cite as: [2005] 1 Lloyd's Rep. 461)

*The point of construction*

15. The principal question is whether the first condition of the side letter was satisfied by the terms of paragraph 1 of the Tomlin order.

16. The judge ended his trenchant judgment by saying, at p. 94, par. 28:

I reach this conclusion without regret. The truth is that FAI got the benefit of Sirius fronting the deal. The price of that was the provision of the letter of credit. The letter of credit was properly drawn down. It was there to meet just the eventualities that happened.

This was a reference to the merits of the underlying dispute. In the construction of commercial documents a hard-headed approach is necessary. The merits of the underlying dispute, predating the Tomlin order, were as such entirely irrelevant to the determination of the question of construction. But the matrix of the Tomlin order may cast light on its meaning.

17. Turning now to the two documents to be considered, the meaning of the first condition of the side letter is not in doubt. It stipulates as a pre-condition for draw down under the letter of credit that:

FAI has agreed that Sirius should pay [to Agnew] a claim but has not put Sirius in funds to do so, notwithstanding the simultaneous settlements clause. . . .. (Words in square brackets inserted)

No dispute about the meaning of this pre-condition emerged during the oral hearing of the appeal. The critical question is whether the terms of paragraph 1 of the Tomlin order satisfied this condition.

18. The settlement contained in the Tomlin order must be construed as a commercial instrument. The aim of the inquiry is not to probe the real intentions of the parties but to ascertain the contextual meaning of the relevant contractual language. The inquiry is objective: the question is what a reasonable person, circumstanced as the actual parties were, would have understood the parties to have meant by the use of specific language. The answer to that question is to be gathered from the text under consideration and its relevant contextual scene.

19. There has been a shift from literal methods of interpretation towards a more commercial approach. In Antaios Compania Naviera S.A. v. Salen Rederierna A.B., [1985] A.C. 191, Lord Diplock, in an opinion concurred in by his fellow Law Lords, observed (at 201):

if detailed semantic and syntactical analysis of a word in a commercial contract is going to lead to a conclusion that flouts business common sense, it must be made to yield to business common sense.

In Mannai Investment Co. Ltd. v. Eagle Star Life Assurance Co. Ltd., [1997] A.C. 749, I explained the rationale of this approach as follows (771A-B):

In determining the meaning of the language of a commercial contract. . .the law. . .generally *466 favours a commercially sensible construction. The reason for this approach is that a commercial construction is more likely to give effect to the intention of the parties. Words are therefore interpreted in the way in which a reasonable commercial person would construe them. And the standard of the reasonable commercial person is hostile to technical interpretations and undue emphasis on niceties of language.

The tendency should therefore generally speaking be against literalism. What is literalism? It will depend on the context. But an example is given in The Works of William Paley (1838 ed.), Vol. III, 60. The moral philosophy of Paley influenced thinking on contract in the 19th century. The example is as follows: The tyrant Temures promised the garrison of Sebastia that no blood would be shed if they surrendered to him. They surrendered. He shed no blood. He buried them all alive. This is literalism. If possible it should be resisted in the interpretative process. This approach was affirmed by the decisions of the House in Mannai Investment Co. Ltd v. Eagle Star Life Assurance Co. Ltd, [1997] A.C. 749, at 775 E-G, per Lord Hoffmann and in Investors Compensation Scheme Ltd v. West Bromwich Building Society, [1998] 1 W.L.R. 896, at 913D-E, per Lord Hoffmann.

20. From the surrounding circumstances preceding the making of the Tomlin order, and the text of the Tomlin order, it can be inferred that the parties had two major immediate objectives. First, they desired to compromise an arbitration that would have been long and costly. This objective was achieved by paragraph 5 of the Tomlin order. Secondly, the letter of credit had been extended but was due to expire on Nov. 15, 2001. Both parties wanted to obtain a draw down of the letter of credit on terms which left open the issue of the entitlement of the proceeds of the draw down. Paragraph 2 of the Tomlin order provided for the draw down.

21. That brings me directly to the effect of

[2005] 1 Lloyd's Rep. 461                                                                 Page 7
2004 WL 2714105 (HL), [2005] 1 All E.R. 191, [2005] 1 C.L.C. 451, [2005] Lloyd's Rep. I.R. 294, [2005] 1 Lloyd's Rep. 461, (2004) 148 S.J.L.B. 1435, [2004] 1 W.L.R. 3251, [2005] 1 All E.R. (Comm) 117, (2004) 101(48) L.S.G. 25, 12-03-2004 Times 2714,105, [2004] UKHL 54
(Cite as: [2005] 1 Lloyd's Rep. 461)

paragraph 1 of the Tomlin order read in context of the remainder of the paragraphs of the schedule to it. At first glance there are countervailing indications. Counsel for Sirius emphasised the unqualified acknowledgement of indebtedness in a specific sum in paragraph 1. While literally paragraph 1 recorded the indebtedness of FAI to Sirius, counsel for Sirius argued that by reason of the back to back fronting arrangement, and the simultaneous settlement clause referred to in the side letter itself, paragraph 1 necessarily meant that FAI acknowledged the indebtedness of Sirius to Agnew in the same sum. At the very least, he argued, it meant that FAI accepted that the insured events had occurred and that liability in the sum of U.S.$22,500,000 had been incurred under the matching reinsurances and retrocessions. As against this counsel for FAI relied heavily on the words in paragraph 4 that "all arguments of [Sirius] and [FAI] are preserved in respect of the proceeds notwithstanding the terms of this schedule". His primary argument was that paragraph 1 must be read as entirely subordinate to paragraph 4. He submitted that the very fact that it was agreed that the proceeds would be paid into an escrow account, rather than be paid over to Sirius, supported this argument.

22. If this argument of FAI is accepted, it follows inexorably that by virtue of the terms of the settlement in the Tomlin order Sirius abandoned the chance of ever fulfilling either condition of the side letter. That must be so since the arbitration proceedings were compromised. In his judgment the judge trenchantly commented on such an outcome, at p. 93, pars. 21-22:

If one follows the logic of [the] argument through, its effect is that the letter of credit was agreed at the time to be unenforceable. It might as well have been torn up by the agreement. . .This is such a bizarre conclusion that it cannot be right.

On this point May LJ came to the same conclusion. He said, at p. 2222, par. 19:

In my judgment, the Judge was correct to reject FAI's extreme submissions based on paragraphs 4 and 5 of the schedule to the Tomlin order. The short point is that paragraphs 4 and 5 cannot, in my view, be read as leaving open for future contention that which paragraph 1 compromised. Paragraph 1 compromised the arbitration proceedings. It did not purport to determine questions arising out of the letter of credit. Available arguments as to the letter of credit were preserved, but the indebtedness of FAI to Sirius under the retrocessions was determined.

Lord Justice Carnwath agreed with the judgment of Lord Justice May and in a separate judgment Mr. Justice Wall took the same view. In my view the outcome contemplated by the argument of counsel for FAI is so extraordinary as to be commercially implausible.

23. I would accept the argument of counsel for Sirius and reject the argument of counsel for FAI. It does not follow from this conclusion that the reservation of rights under paragraph 4, and the payment of the proceeds into the escrow account, is to be given no meaning. These features of the settlement were intended to enable the English provisional liquidators to decide whether, and if so, in what manner, they might wish to challenge Sirius' right to the proceeds of the letter of credit. One must bear in mind that the provisional liquidators took office only thirteen days before the *467 Tomlin order and probably knew very little about the background. The reservation of rights would, for example, have entitled them to rely, for example, on dishonesty in the underlying transaction if that could be established. Only in such an attenuated sense were rights reserved. Given this reservation of rights, the arrangement to pay the proceeds into an escrow account was not surprising.

24. For all these reasons I would reject the primary argument of counsel for FAI.

25. That leaves the reasoning of the Court of Appeal to the effect "that the literal words of paragraph 1 do not express an agreement by FAI that Sirius should pay Agnew's claim": p. 2223, par. 21, per Lord Justice May and p. 2228, par. 39, per Mr. Justice Wall. It is indeed true that literally paragraph 1 did not so provide. But it is also clear that the words of paragraph 1 necessarily meant that FAI agreed that, under the back to back reinsurances, and the simultaneous settlements procedure, that Sirius should pay Agnew. If it were necessary I would reach this conclusion on the basis of a constructional implication. I do not, however, think that it is necessary to resort to an implication. In my view the judge was right to conclude that on a correct interpretation of paragraph 1 of the Tomlin order the first condition of the side letter was satisfied. With due respect to the members of the Court of Appeal their interpretation was uncommercial and literalistic.

26. Given this conclusion it is common ground that all remaining issues fall away.

27. For these reasons, as well as the reasons given

[2005] 1 Lloyd's Rep. 461 Page 8

2004 WL 2714105 (HL), [2005] 1 All E.R. 191, [2005] 1 C.L.C. 451, [2005] Lloyd's Rep. I.R. 294, [2005] 1 Lloyd's Rep. 461, (2004) 148 S.J.L.B. 1435, [2004] 1 W.L.R. 3251, [2005] 1 All E.R. (Comm) 117, (2004) 101(48) L.S.G. 25, 12-03-2004 Times 2714,105, [2004] UKHL 54

(Cite as: [2005] 1 Lloyd's Rep. 461)

by my noble and learned friend Lord Walker of Gestingthorpe, I would allow the appeal against the order of the Court of Appeal and restore the order of Mr. Justice Jacob.

Lord WALKER of Gestingthorpe:

My Lords,

28. I have had the advantage of reading in draft the speech of my noble and learned friend Lord Steyn. I agree with it, and for the reasons which he gives I would allow this appeal. But because of the differences of opinion between your Lordships on the first issue, the issue of construction, I wish to add a few observations in my own words.

29. The House has to construe two contractual documents which interact on each other. One is a letter dated Sept. 3, 1999 written by Ms. Monica Cramer Manhem, a senior vice president of the principal company in the group which includes the appellant, Sirius. The letter is part of an exchange of correspondence between reinsurance executives, and none of the correspondence appears to have been drafted by lawyers. The other document is the schedule to a Tomlin order made on Apr. 6, 2001. The order was made on what had originally been an application to lift a stay of arbitration proceedings between Sirius and the first respondent, FAI. It had the effect of bringing the arbitration proceedings to an abrupt end. What further effect it had is a matter of acute controversy, on which Mr. Justice Jacob and the Court of Appeal reached different conclusions.

30. The Tomlin order was drafted by competent and experienced lawyers (the House was not told its exact provenance, but both sides had solicitors and counsel of high standing). But it seems to have been produced under severe time constraints, and at a time when (because of the recent appointment of provisional liquidators with solicitors and counsel who were new to the matter) one side at least was by no means well informed about the tangled history of these reinsurances. Sirius (and the brokers, Lambert Fenchurch, who were in substance conducting the arbitration in the name of Sirius) had much more opportunity to become acquainted with the complexities of the position but for them too FAI's dramatic plunge into insolvency was a new factor calling for specialised advice.

31. When a commercial dispute arises it is sometimes convenient to both sides to reach a limited agreement involving some immediate action, but to leave other issues unresolved, to be compromised or litigated at some future time. In the present case it is reasonably clear - whatever other difficulties there are about the construction and effect of the schedule to the Tomlin order - that both sides wanted to achieve two immediate objectives. One was to put an end to the arbitration proceedings, in which a long and expensive hearing was due to start very soon. The other was to obtain draw-down on the letter of credit (which had been extended but was to expire on Nov. 15, 2001) while leaving open the issue of entitlement to the proceeds of the draw-down.

32. When parties are under severe time pressure, and one or both of them have inadequate information, such a limited agreement may be all that the parties can achieve. But in such difficult circumstances they may have to accept that the immediate action on which they do agree inevitably alters the context of the issues which remain unresolved. For instance, a consent order for sale of equipment subject to a finance lease may raise the question whether relief from forfeiture, which the lessee was seeking from the court, is still available (see the decision of this House in On Demand Information plc v. Michael Gerson (Finance) plc, [2003] 1 A.C. 368, especially in the speech of Lord Millett, at p. 381, pars. 36-39).

33. So in this case the two important points on which the parties did agree inevitably had an effect on the issues which were not resolved. Paragraphs *468 1 and 5 of the schedule had the effect of putting a final end to the arbitration. It was no longer possible for Sirius to obtain declaratory relief (sought, in addition to a money award, in the arbitration) to the effect that Sirius was bound to pay Agnew and FAI was bound to pay Sirius. Moreover, paragraphs 2 and 3 of the schedule had the effect that Westpac, the issuer of the letter of credit, dropped out of the picture. The escrow account was a sort of substitute for the letter of credit but it was of a different kind, as the element of "the great and fundamentally important separation" (the expression used by Sir John Donaldson MR in Bolivinter Oil S.A. v. Chase Manhattan Bank, [1984] 1 Lloyd's Rep. 251, 256) between banker and re-insurers was no longer there. The deceptively simple language of par. 4 of the schedule must in my view be approached with these points in mind.

34. The terms in the schedule, and paragraph 4 in particular, must also be viewed, like any other contractual document, in their commercial context. In this House there was not much common ground between counsel as to how the commercial context

[2005] 1 Lloyd's Rep. 461    Page 9

2004 WL 2714105 (HL), [2005] 1 All E.R. 191, [2005] 1 C.L.C. 451, [2005] Lloyd's Rep. I.R. 294, [2005] 1 Lloyd's Rep. 461, (2004) 148 S.J.L.B. 1435, [2004] 1 W.L.R. 3251, [2005] 1 All E.R. (Comm) 117, (2004) 101(48) L.S.G. 25, 12-03-2004 Times 2714,105, [2004] UKHL 54
(Cite as: [2005] 1 Lloyd's Rep. 461)

of the Tomlin order should be characterized. The Courts below saw much more of the extensive documentary evidence than has been placed before your Lordships. But the limited evidence before the House discloses some uncontroversial facts which may be material.

(a) The order of Mr. Registrar Baister made on May 27, 2002 (that is, more than a year after the Tomlin order) shows that there was still no agreement as to what the basic contractual documents were. Between August, 1999 and January, 2000 there had been a lengthy exchange of correspondence (identified in the affidavit dated Sept. 18, 2001 of Mr. Timothy Brown of Reynolds Porter Chamberlain and the witness statement dated Nov. 2, 2001 of Ms Kathryn Carr of Ince & Co.) from which the effective contractual terms had to be identified and extracted.

(b) In an affidavit made on Apr. 5, 2001 (that is, the day before the Tomlin order) Mr. Timothy Bull of Reynolds Porter Chamberlain deposed (in relation to the letter of Sept. 3, 1999) to his belief that:

"The agreement does not say so however the intention is that FAI's written agreement would not be unreasonably withheld."

Whether or not this was admissible or cogent on the issue of construction of the letter, it appears to have been the only clear instance of an argument about the letter of credit put forward openly before the making of the Tomlin order.

(c) There is mention (in a letter dated July 31, 2001 from Reynolds Porter Chamberlain to Freshfields Bruckhaus Deringer, and also in an affidavit of Mr. Timothy Brown of Reynolds Porter Chamberlain sworn on Sept. 18, 2001) of a suggestion put forward on behalf of the provisional liquidators that (in the words of the letter) "the security given by the LOC must be downgraded' as a result of FAI's insolvency to security for any distribution in the estate of FAI." This suggestion was evidently put forward after the appointment of the provisional liquidators but before the Tomlin order.

(d) However, it does not seem to have been a considered view, since on Aug. 7, 2001 Freshfields (for the provisional liquidators) stated that their clients had still not had an opportunity to acquaint themselves with the facts and take a view as to the merits of Sirius's claim. In order to do so they would need (among other things) to contact Ince & Co. (who had acted for FAI at the time). Freshfields' state of knowledge on Apr. 6, 2001 must have been even more deficient.

(e) In her witness statement of Nov. 2, 2001 Ms. Carr put forward further arguments (based on allegations of champerty and misrepresentation) on behalf of the provisional liquidators but there is no suggestion that these arguments were live at the date of the Tomlin order.

35. Against that background I turn to paragraph 4 of the schedule to the Tomlin order:

For the avoidance of doubt, the position and all arguments of [Sirius] and [FAI and the provisional liquidators] in respect of the LOC are preserved in respect of the proceeds notwithstanding the terms of this Schedule.

Meticulous verbal analysis of this paragraph is not appropriate, at any rate not to the exclusion of common sense, or its commercial context. Nevertheless I make three short verbal points. First, the words "For the avoidance of doubt", although sometimes loosely used, suggest that the paragraph is going to spell out what is fairly obvious (or at any rate unsurprising) rather than subverting the other provisions of the Schedule. Second, the reference to arguments being "preserved" cannot in the circumstances sensibly restrict the parties to arguments which had already been articulated and advanced (compare the mirror-image issue of the release of unknown claims considered by this House in Bank of Credit and Commerce International S.A. v. Ali, [2001] UKHL 8; [2002] 1 A.C. 251); at the time when the Tomlin order was made there seems to have been doubt even as to the identity of the relevant contractual documents. Any arguments, whether or not already canvassed, could be put forward (the parenthesis " (if any)" in paragraph 3 is consistent with that). Third, the repetition of "in respect of" ("the arguments. . .in respect of the LOC are preserved in respect of the proceeds") is *469 not careless drafting but serves to emphasise the intended parallel between the letter of credit before draw-down and the proceeds after draw-down.

36. Then there are the most controversial words in paragraph 4, "notwithstanding the terms of this Schedule". Plainly they are intended to have some sort of overriding effect: in particular, since the issues left unresolved centre on the letter of credit, to require entitlement to the letter of credit to be determined as if there had been no draw-down. That hypothetical approach may give rise to more difficulties than the parties had fully thought through, but it is consistent with their commercial objectives.

37. Does the Schedule intend the hypothesis to be stretched further, so as to require the apparently

[2005] 1 Lloyd's Rep. 461 Page 10
2004 WL 2714105 (HL), [2005] 1 All E.R. 191, [2005] 1 C.L.C. 451, [2005] Lloyd's Rep. I.R. 294, [2005] 1 Lloyd's Rep. 461, (2004) 148 S.J.L.B. 1435, [2004] 1 W.L.R. 3251, [2005] 1 All E.R. (Comm) 117, (2004) 101(48) L.S.G. 25, 12-03-2004 Times 2714,105, [2004] UKHL 54
(Cite as: [2005] 1 Lloyd's Rep. 461)

unqualified acknowledgement in paragraph 1 of FAI's liability to be disregarded in determining entitlement to the proceeds of the letter of credit? The Judge thought that that would be an extraordinary result. He said, at p. 93, pars. 21-22:

If one follows the logic of [the] argument through, its effect is that the letter of credit was agreed at the time to be unenforceable. It might as well have been torn up by the agreement. . .This is such a bizarre conclusion that it cannot be right.

38. In the Court of Appeal Lord Justice May took the same view. He said, at p. 2222, par. 19:

In my judgment, the Judge was correct to reject FAI's extreme submissions based on paragraphs 4 and 5 of the Schedule to the Tomlin order. The short point is that paragraphs 4 and 5 cannot, in my view, be read as leaving open for future contention that which paragraph 1 compromised. Paragraph 1 compromised the arbitration proceedings. It did not purport to determine questions arising out of the letter of credit. Available arguments as to the letter of credit were preserved, but the indebtedness of FIA to Sirius under the retrocessions was determined.

Lord Justice Carnwath agreed with Lord Justice May and Mr. Justice Wall expressed similar views.

39. The ground on which the Court of Appeal disagreed with the Judge was not as to a far-reaching counterfactual hypothesis introduced by paragraph 4, but as to the proper meaning of paragraph 1, construed in its commercial context. On that point, for all the reasons given by Lord Steyn, I respectfully prefer the reasoning of the Judge to that of the Court of Appeal. As the Judge said, at p. 94, par. 26:

The commercial substance is that FAI had agreed that Sirius should pay a claim.

For these reasons I would allow the appeal.

Lord BROWN of Eaton-Under-Heywood:

My Lords,

40. I find myself in precisely the same position as my noble and learned friend, Lord Bingham of Cornhill. I too was inclined to the construction of the Tomlin order contended for by the respondents. For the reasons given by Lord Bingham, however, I too am content to agree that the appeal should be allowed.

(c) Lloyds of London Press Limited

END OF DOCUMENT