# Exhibit 9



Westlaw UK

[1968] 2 Lloyd's Rep. 158                                                                                    Page 1
1968 WL 23263 (CA (Civ Div)), [1968] 2 Lloyd's Rep. 158
(Cite as: [1968] 2 Lloyd's Rep. 158)

**\*158** Unterweser Reederei G.M.B.H v. Zapata Off-
Shore Company, (The
"Chaparral")

Court of Appeal

CA
Tuesday, July 23, 1968

Before Lord Justice Willmer, Lord Justice Diplock
and Lord Justice Widgery

Practice--Writ--Service out of jurisdiction--
Towage contract--"Any dispute arising must be
treated before the London Court of Justice"--
Proceedings commenced in U.S. Court--Whether
English Court was a convenient forum.

In November, 1967, plaintiffs and defendants
entered into contract for towage of defendants' oil
rig Chaparral from Venice (La.) to Ravenna by
plaintiffs' tug Bremen. Contract provided (inter
alia):
    Any dispute arising must be treated before the
London Court of Justice.
On Jan. 9, 1968, tow was forced to take refuge in
Tampa (Fla.). Defendants commenced proceedings
in U.S. District Court at Tampa for damages
against plaintiffs contending that tug was not
seaworthy to undertake voyage. *Bremen* was
arrested in those proceedings and released on
security being given by plaintiffs. On Feb. 21
plaintiffs issued writ in English High Court
claiming damages against defendants. Admiralty
Registrar gave leave to serve writ out of
jurisdiction and plaintiffs made efforts to serve in
Texas and Delaware. Plaintiffs had taken steps to
defend themselves against action in Tampa Court,
but had instituted proceedings to set aside or stay
that action. Judgment was reserved in those
proceedings on Apr. 29, 1968. In July, 1968,
plaintiffs commenced proceedings in U.S. Court
for exoneration from or limitation of their liability.
Defendants moved in High Court proceedings to
set aside writ issued in U.K. and order for its
service on grounds (1) that English Court was not
convenient forum for determination of dispute; (2)
that proceedings had already been commenced in
U.S. Court; and (3) that copy of writ was not
served on defendants or their appointed agents for
such service. Karminski, J., in dismissing motion,
held (1) that the service of notice in Delaware was
good under Delaware law; (2) that plaintiffs had
taken no steps in Florida Court except to protect

their position for future; (3) that although, in cases
of this kind, the contract by itself was not
conclusive and Court had a discretion, in this case
parties should stick to their bargain, Motion
dismissed. Defendants appealed.

Held, by C.A. (WILLMER, DIPLOCK and
WIDGERY, L.JJ.), that, prima facie, it was the
policy of the Court to hold parties to the bargain
into which they had entered; that that was not an
inflexible rule; and that Court had a discretion
which, in the ordinary way and in the absence of
strong reason to the contrary would be exercised in
favour of holding parties to their bargain; that it
had not been shown that the learned Judge's
exercise of his discretion had been plainly wrong;
and that, therefore, Court should not interfere.
Appeal dismissed.

The following cases were referred to:

Fehmarn, [1957] 1 Lloyd's Rep. 511; (C.A.)
[1957] 2 Lloyd's Rep. 551;

Hagen, [1908] P. 189;

Mackender and Others v. Feldia A.G. and Others,
[1967] 2 Q.B. 590; [1966] 2 Lloyd's Rep. 449.

This was an application by the defendants, Zapata
Off-Shore Company, for leave to appeal from a
decision of Mr. Justice Karminski on July 4, 1968,
rejecting their application to set aside an order
giving leave to the plaintiffs, Unterweser Reederei
G.m.b.H., to serve a writ on the company outside
the Court's jurisdiction.

In giving judgment, Mr. Justice Karminski said:

"This is a motion on behalf of the defendants,
Zapata Off-Shore Company, to set aside a writ
issued in this country and an order for its service
outside the jurisdiction, on three grounds. First, that
this Court--that is, the English Court-- is not a
convenient forum for the determination of the
dispute concerned in the action: secondly, that the
proceedings have already been commenced in a
foreign Court, namely, the United States District
Court in and for the Middle District of Florida,
Tampa Division; and thirdly that the purported
service of the notice of the said writ on the
defendants and all subsequent proceedings in the
action may be set aside on the grounds already
mentioned and/or the further ground that the copy
of the writ was not served on the defendants or
their appointed agents for such service; and the

defendants ask for costs of the action and of this application to be taxed.

**\*159** "The dispute arose out of a towage contract entered into between the plaintiffs, a limited company incorporated in the Federal German Republic, and the defendants, the Zapata Off-Shore Company, who are incorporated under the law of the State of Delaware and have a registered office in that State but carry on their business in Houston, Texas.

"The contract was to tow an oil drill from Venice, Louisiana, to Ravenna in Italy, but difficulties arose as to the towage, and the operation got no farther than some position in the Gulf of Mexico. It then became necessary to go to the port of Tampa in the State of Florida as a port of refuge; and there the plaintiffs' tug was arrested and proceedings were started in the Federal District Court there.

"In due course a writ was issued, a month or so later, in this country. Meanwhile, the plaintiffs applied to stay the proceedings in the Federal District Court of Tampa. Argument was heard there some weeks ago, but judgment has not yet been given.

"The plaintiffs meanwhile had issued their writ here, and it is that writ which it is sought to set aside, together with the order directing service on the defendants in the United States. A good deal of difficulty was experienced in service on the defendants, and one of the matters which have been much canvassed before me on behalf of the defendants is whether or not notice was properly served. I think it is desirable to deal with that at once.

"There were two efforts to serve, one in Houston, Texas, and the other in Delaware. I am satisfied that the service of the order, or the notice of it, in Delaware was good under Delaware law: there is evidence by affidavit to support that. But the matter has been admirably argued by Mr. Rokison, for the defendants, that the notice was not properly served because there is no evidence to show that the procedure is the same for service of notice of a foreign writ. If there had been any force in that argument, I apprehend that I should have had some evidence in support from the defendants' side. It has been said that, in some way which I do not understand, the service of the notice may be an offence against the Constitution of the United States. But what was done here was that notice was served on a proper officer of the agents of the defendant company, which I find to have been good service under the law of Delaware. There is nothing which I can find which indicates at all that

there are some other requirements for serving foreign writs in the jurisdiction of that State. I therefore find as a fact that the service of the notice in Delaware was good service. I make no finding as to the other service at Houston.

"Mr. Lloyd submitted that if I were not satisfied with this service I should now make an order for substituted service but as I have found that there has been good service, there is no need to my mind for a further order for substituted service.

"I return briefly to the contract which was executed between the parties in this case. It was a contract for towage in a form which, I imagine, is not uncommon. What is material is the last of the general towage conditions, which expressly stipulates that any dispute arising must be treated before the London Court of Justice. Apparently there had been some negotiation as to the proper course to be adopted in the unhappy event of a dispute. It was said that the plaintiff company usually requires resort to the German Courts, but by way of compromise they agreed to London as the forum to be used. But it is said on behalf of the defendants that in spite of the contract it would be wrong to allow that agreement to be carried out without at least some reference to other material matters. It is alleged that the plaintiffs here have to some extent taken part in the Florida proceedings. That is true: they have indeed filed a petition for limitation, because if they did not do that within a certain time, namely six months, they would be out of time for limitation before that tribunal. But I have no doubt at all that they have taken no steps in the Florida Court at Tampa, except to protect their position for the future.

"For the plaintiffs, Mr. Lloyd argued that the parties should be at least encouraged to stick to their agreement, and he called my attention to a line of cases which emphasized that point of view. It is, I think, necessary for me to refer only briefly to a decision of Sir Samuel Evans, P., in The Cap Blanco, [1913] P. 130. At p. 136 the President said this:

In dealing with commercial documents of this kind, effect must be given, if the terms of the contract permit it, to the obvious intention and agreement of the parties. I think the parties clearly agreed that disputes under the contract **\*160** should be dealt with by the German tribunal, and it is right to hold the plaintiffs to their part of the agreement. Moreover, it is probably more convenient and much more inexpensive, as the disputes have to be decided according to German law, that they should be determined in the Hamburg Court.

"Mr. Rokison rightly emphasized that the

President was not resting his decision solely on the ground of the agreement between the parties, but called attention to what was in that case the fact, namely that the German Court in Hamburg was in the circumstances convenient to the parties. I accept at once-- and so did Mr. Lloyd-- that the position of the issue of convenience is material to be considered and that the agreement of the parties does not conclude the matter. Mr. Rokison relied on The Fehmarn, [1957] 1 Lloyd's Rep. 511; [1957] 1 W.L.R. 815; (C.A.) [1957] 2 Lloyd's Rep. 551; [1958] 1 W.L.R. 159. It is not necessary to consider in detail the facts of that case, but it was a question of a cargo of turpentine which was discovered to be contaminated in the course of a voyage. The vessel was a German one, but the turpentine came from a port in Russia; the plaintiffs were an English company who were the holders of a bill of lading. It was held there that the English Courts had jurisdiction, and accordingly the writ of summons should not be set aside, although the parties had agreed that any claims and disputes should be judged in the Soviet Union of Russia. That, Mr. Rokison argued, shows quite clearly that the Courts will in proper circumstances depart from the agreement entered into between competent parties when the circumstances warrant it. I accept at once that in cases of this kind the contract by itself is not conclusive. If it could be shown that other circumstances made it fair and right that the contract should be departed from, the Court in its discretion could do that very thing.

"My attention was called to other and later authorities. Two quite recent. In Mackender and Others v. Feldia A.G. and Others, [1967] 2 Q.B. 590; [1966] 2 Lloyd's Rep. 449, it was held by the Court of Appeal that in the circumstances in that particular case, which stemmed from non-disclosure, it would not be right to give leave to serve the writ out of the jurisdiction. It is, I think, necessary to refer only briefly to the judgment of Lord Justice Diplock, who having dealt with non-disclosure, came to the conclusion that Mr. Justice McNair had taken the wrong view of English law and apparently the wrong view also of the effect of Belgian law. The Court of Appeal therefore was entitled to exercise its discretion de novo. On the particular facts of that case they upset the judgment given below, and dealt with the matter in that way.

"The last case which I think it is necessary to refer to dealt with the somewhat different point as to the law applicable. That was Tzortzis and Sykias v. Monark Line A/B, heard in the Court of Appeal in January, 1968, and reported in [1968] 1 Lloyd's Rep. 337; [1968] 1 W.L.R. 406. That was an arbitration case. A dispute arose, and each party appointed an arbitrator; a third was appointed by

the High Court here. But the question arose as to which law was to be applied. It is necessary to refer briefly to the judgment of Lord Justice Salmon. He said that where parties had agreed as to the place, then it was a proper inference that the law applicable should be the law of the country in which the parties wish to have the case tried; in that case, English law. I do not think that case takes me much farther in relation to this matter.

"I want to deal now with the question of the matters on which I find I have a discretion and to see whether in all the circumstances it would be right here to depart from the terms of the contract, having regard to the balance of convenience. Mr. Rokison pointed out that in this case the balance of convenience so far as witnesses were concerned pointed in the direction of having the case heard and tried in the United States District Court at Tampa in Florida because the probability is that most, but not necessarily all, of the witnesses will be American. The answer, as it seems to me, is that a substantial minority at least of witnesses are likely to be German. The tug was a German vessel and was, as far as I know, manned by a German crew, judging by the names of some of them. Where they all are now or are likely to be when this matter is litigated I do not know, because the experience of the Admiralty Court here strongly points out that maritime witnesses in the course of their duties move about freely. The homes of the German crew presumably are in Germany. There is probably a balance of numbers in favour of the Americans, but not, as I am inclined to think, a very heavy balance.

*161 "It is said that the documents likewise are all in the United States. It is also said that there is a risk here of double litigation and we are faced with a *lis alibi pendens*. How far that is right depends, it seems to me, on the judgment to be given at some future date by the United States District Court at Tampa.

"It is said also that the enforcement of the judgment, certainly if the plaintiffs win, would be more difficult here and rather easier in the United States. The defendants have no business here, although there apparently is some kind of associate company in this country, but it is said that their chances of recovering are somewhat remote. That, as it seems to me, is a matter of choice for the plaintiffs. They must consider that risk; and I have to look at the general picture and at the question of convenience, which I have summarized, and then come to a decision as to whether or not the balance of convenience here liberates the parties from their agreement to resort to what is called in the contract 'the London Court of Justice'. I have tried in this

Case 1:06-cv-00011    Document 104-3    Filed 02/20/2007    Page 4 of 21

case to deal with the balance of those matters. The force of an agreement for litigation in this country, freely entered into between two competent parties, seems to me to be very powerful.

"Mr. Lloyd said he could find no reported case where, in an English reference, that agreement had been departed from. I ventured to point out that the absence of litigation on a particular point was seldom conclusive. It is interesting, but no more, that that apparently is the position. But I have approached the matter with, I hope, an unprejudiced mind--that is, unprejudiced by past history--and I have come to the clear conclusion here that the parties should, even after giving full consideration to the matters of convenience and the other matters concerned here, stick to their bargain. Having come to that conclusion, this motion fails and must be dismissed."

On July 11, 1968, Mr. Justice Karminski dismissed an application by the defendants for leave to appeal to the Court of Appeal. The defendants applied to the Court of Appeal for leave to appeal.

**Representation**

Mr. F. P. Neill, Q.C., and Mr. K. S. Rokison, (instructed by Messrs. Thomas Cooper & Co.) appeared for the appellant defendants; Mr. A. J. L. Lloyd, Q.C., and Mr. J. H. S. Cooke (instructed by Messrs. Richards, Butler & Co.) represented the respondent plaintiffs.

**JUDGMENT**

Lord Justice WILLMER:

We need not trouble you further, Mr. Lloyd.

This is an application for leave to appeal from an order made by Mr. Justice Karminski on July 4, 1968, whereby he dismissed the defendants' application to set aside an order of the learned Registrar giving leave to serve a writ out of the jurisdiction. In order to deal with the application, it has been necessary to go into all the circumstances of the case, and in substance to hear the appeal. The question at issue between the parties arises out of a marine casualty which took place in January, 1968. The plaintiffs are well-known towage contractors and owners of a tug called the *Bremen*. The defendants are a company incorporated in the United States of America who carry on business *inter alia* in the operation of oil rigs.

In November, 1967, the plaintiffs and the defendants entered into a contract in writing for the towage of an oil rig called the *Chaparral* belonging to the defendants from a place called Venice in Louisiana to Ravenna in Italy by the tug *Bremen*. We have been referred to a number of the clauses in the contract, only one of which need be mentioned now. The concluding provision of the contract was:

Any dispute arising must be treated before the London Court of Justice.

The towage from Venice began on Jan. 4, 1968. By Jan. 9, when the tow was still within the Gulf of Mexico, disaster overtook it, and it was necessary to take refuge in the port of Tampa in Florida. Each party blamed the other for the disaster which occurred, and each has asserted a claim for damages. The plaintiff tug-owners say that the defendants were at fault in that the oil rig being towed was not in a seaworthy condition. The defendants on their part say that the tug was not seaworthy to undertake the voyage, and also that it was negligently operated. There are all the elements present for an interesting battle to ascertain whose fault it was. The defendants got their blow in first, because immediately upon arrival of the tug and tow at Tampa they instituted proceedings in Admiralty in the United States District Court at Tampa, and in the course of those proceedings the tug was arrested. The release of the tug was eventually obtained upon security being furnished satisfactory to the defendants in the sum of U.S. $3,500,000.

On Feb. 21, 1968, the plaintiffs issued the writ in the present action and sought leave to serve that writ out of the jurisdiction on the American owners of the oil rig. Leave to serve the writ out of the jurisdiction was obtained from the learned Registrar, and it was that matter which came before the learned Judge. The grounds upon which the plaintiffs sought leave to serve the writ out of the jurisdiction were, first, that the contract was one which "by its terms, or by implication, was governed by English law", and secondly, that the contract contained an express term to the effect that the High Court should have jurisdiction.

In the meantime, however, the present plaintiffs had taken steps to defend themselves in the proceedings which were being carried on in Tampa. Those proceedings involved taking depositions from a number of witnesses, and in that operation both the present plaintiffs and the present defendants took part. Depositions appear to have been taken from a considerable number of witnesses. But from an early date the plaintiffs took exception to the jurisdiction of the Court at Tampa, and instituted proceedings to set aside or stay the American action. Those proceedings came before

the United States District Court in Tampa on Apr. 29, 1968, when judgment was reserved. Up to date, so far as we have been informed, no judgment has yet been delivered, and it is not, therefore, known whether the action instituted by the defendants in America will be set aside or stayed. At present, however, assuming that leave to serve this writ out of the jurisdiction stands, there is a situation when proceedings are on foot in both countries. The position is further complicated by the fact that, just before the matter came before Mr. Justice Karminski at the beginning of this month, the plaintiffs launched proceedings for exoneration or limitation of their liability in the United States of America. It is to be pointed out that that is a course which they had to take, if the American proceedings were allowed to continue, within six months of the institution of those proceedings. Time was running out against them, and they were, therefore, forced to institute those proceedings at the beginning of this month in order to preserve their rights.

The learned Judge knew of the institution of those proceedings but he did not actually know (although I have no doubt that he had good reason to suspect) that, immediately following the institution of those proceedings, an order would be made by the American Court which, among other things, enjoined the defendants against prosecuting any claim of theirs against the plaintiffs pending the determination of the plaintiffs' limitation proceedings. That, it has been said, would effectively prevent the defendants, if they were so minded, from putting forward a counterclaim in any proceedings in this country. That is a matter much relied upon by the defendants as showing that, as a matter of convenience, leave ought not to be granted to serve this writ out of the jurisdiction.

Reliance is also placed upon the fact that, under American procedure, it appears that a party sued as a defendant there (as are the present plaintiffs) who has a counterclaim against the plaintiff in that country, is compelled to assert that counterclaim within a certain limit of time, or he will be for all time barred. That is another reason why it is suggested on behalf of the defendants that, as a matter of convenience, proceedings ought not to be allowed to continue in this country, since it is said that it will be necessary for the present plaintiffs to assert their claim by way of counterclaim in the United States.

The law on the subject, I think, is not open to doubt, and I do not think that it is really necessary to cite the authorities to which we have been

referred. It is always open to parties to stipulate (as they did in this case) that a particular Court shall have jurisdiction over any dispute arising out of their contract. Here the parties chose to stipulate that disputes were to be referred to the "London Court", which I take as meaning the High Court in this country. *Prima facie* it is the policy of the Court to hold parties to the bargain into which they have entered. *Prima facie* it is to be presumed, therefore, that the plaintiffs should have leave to prosecute their proceedings in this country, and in pursuance of that to serve their writ out of the jurisdiction. But that is not an inflexible rule, as was shown, for instance, by the case of The Fehmarn, [1957] 1 Lloyd's Rep. 511; (C.A.) [1957] 2 Lloyd's Rep. 551, in which I was myself concerned, and which came to this Court. That was a case in which the Court in its **\*163** discretion declined to give effect to a stipulation made by the parties in their contract conferring jurisdiction on a foreign Court.

I approach the matter, therefore, in this way, that the Court has a discretion, but it is a discretion which, in the ordinary way and in the absence of strong reason to the contrary, will be exercised in favour of holding parties to their bargain. The question is whether sufficient circumstances have been shown to exist in this case to make it desirable, on the grounds of balance of convenience, that proceedings should not take place in this country, the stipulated forum, but that the parties should be left to fight out their battles in the United States of America.

The learned Judge in his discretion came to the conclusion that it was proper to grant leave to serve the writ out of the jurisdiction so that the action might proceed in this country. We in this Court should not interfere with the Judge's exercise of his discretion unless it is shown that he acted on some wrong principle, or misapprehended the facts, or unless it is shown that his exercise of his discretion was plainly wrong.

It is said that the situation has to some extent altered since the time when the learned Judge had the matter before him, by reason particularly of the plaintiffs' institution of exoneration and limitation proceedings in the United States to which I have referred. That is the only new factor which has arisen since the time when the learned Judge delivered his judgment.

I am unable to see that the Judge acted on any wrong principle. I do not think that the new facts said to have been brought to light really alter the complexion of the case to any material extent, nor am I prepared to say that the learned Judge's

Case 1:06-cv-00011 Document 104-5 Filed 02/20/2007 Page 6 of 21

[1968] 2 Lloyd's Rep. 158
1968 WL 23263 (CA (Civ Div)), [1968] 2 Lloyd's Rep. 158
**(Cite as: [1968] 2 Lloyd's Rep. 158)**

Page 6

exercise of his discretion is shown to have been plainly wrong.

I should record the fact that in an affidavit put in on behalf of the plaintiffs today, the offer is made (and Mr. Lloyd on behalf of the plaintiffs has renewed it in the course of the argument) to waive the provisions of the restraining order which has been obtained by the plaintiffs in the United States so as to relieve the defendants of any difficulty which they might otherwise have in putting forward a counterclaim in this country if they want to. I should also record the fact that an offer has been made on behalf of the plaintiffs (which still holds good) to hold the security which has been furnished in America as available to cover any counterclaim which may be brought in this country. I refer to those two circumstances because I think that they are in their turn relevant to the question whether it is right to allow these plaintiffs to pursue their action in this country in accordance with their contractual bargain. I think that it is, and that the learned Judge reached the right conclusion.

In the circumstances I think that the appropriate order for us to make is that the defendants be granted leave to appeal, but that the appeal be dismissed.

Lord Justice DIPLOCK:

I agree, and add very little.

It has long been recognized that the jurisdiction of the High Court to give leave for service of a writ, or notice of a writ, out of the jurisdiction under Order 11, r. 1, is one which should be exercised with caution, because there are circumstances set out in that rule in which service outside the jurisdiction is authorized which are in conflict with the ordinary rules of comity, that is to say, the Courts in this country assert a jurisdiction in themselves wider than that which they recognize in the Courts of other countries. That need for caution has been frequently expressed. It was expressed by Lord Justice Farwell 50 years ago in The Hagen, [1908] P. 189, at p. 201, and has been re-asserted fairly recently by this Court in 1967 in Mackender and Others v. Feldia A.G. and Others, [1967] 2 Q.B. 590; [1966] 2 Lloyd's Rep. 449.

Those observations should be read in relation to an application for service out of the jurisdiction under r. 1. Rule 2, which is a separate rule and applies to this case, authorizes service out of the jurisdiction where the contract contains a term to the effect that the High Court has jurisdiction to hear and determine any action in respect to the contract. This does not raise any question of

conflict with ordinary comity because, so far as I know, it is the policy of the Courts of most countries, if it be reasonable at any rate to do so, to see that parties keep their word; and having had the privilege of reading a memorandum brief which has been accepted in the Federal District Court at Tampa on behalf of the plaintiffs in this action, it looks to me as if there is some ground at any rate for saying that the Federal Courts and State Courts in the United States take the same view.

**\*164** When it comes to a case under Order 11, r. 2, as distinct from a case under Order 11, r. 1, I say again in this case, as I said in Mackender (*sup.*), at pp. 604 and 459 of the respective reports):

. . . Where parties have agreed to submit all their disputes under a contract to the exclusive jurisdiction of a foreign court, I myself should require very strong reasons to induce me to permit one of them to go back on his word. . . .

We should, I think, apply the same principle whether the forum of contractual choice is England or of some other country. The question arises more frequently before us where the forum of contractual choice is some other country, as in Mackender's Case, *sup.*, where the choice was Belgium. In the present case the choice of the parties was the English Court, and as I say I should myself require strong grounds for saying that one of the parties should not keep his word.

There is, of course, undoubtedly a discretion on the part of the Court in this case to refuse to allow service of the writ outside the jurisdiction, despite the contractual term in the contract. The learned Judge from whom this appeal is brought recognized that he had a discretion. So far as I can see he applied his mind to all the relevant matters; and, even if I myself might have come to some other conclusion, I do not think that any ground has been put forward which would justify the Court in interfering with his discretion. Having said that, let me say, as must have been apparent during the course of this hearing, I agree entirely with his decision. I should have done the same myself.

Lord Justice WIDGERY:

I agree with both judgments. The parties here have quite deliberately chosen that their dispute shall be decided in the Courts of this country, and it would need strong grounds in my view to deprive either party who sought to take advantage of that course from receiving the advantage which he expects from it. I also would put my decision on the footing that there is no reason here to suppose that the learned Judge exercised his discretion improperly. But, like my Lord, I feel that had I had to decide the matter myself, I should have reached

precisely the same conclusion.

I also would dismiss this appeal.

Mr. LLOYD: I have to ask for the costs of the appeal, my Lord.

Lord Justice WILLMER: Yes, I think that follows.

Mr. NEILL: As a matter of technicality, I think that two of your Lordships said "Appeal dismissed". Does it follow, my Lord, that you granted leave to appeal?

Lord Justice WILLMER: Thank you for reminding me; I am afraid that it had slipped my mind that the whole matter was before us.

Mr. NEILL: Sometimes the two arguments run into one another, and that did happen here.

Mr. LLOYD: I would rather like your Lordships to say that this is a case in which leave should not be given, though I do not think that it very much matters. There is the danger that leave will be treated as being automatic. I would submit that leave was required, and the learned Judge who heard the case did refuse leave. I ask your Lordships, having heard my learned friend's argument, to say that leave ought not to be given.

Lord Justice DIPLOCK: You have had a long *obiter* judgment!

*(Their Lordships conferred.)*

Lord Justice WILLMER: I think that is right. I think that we must grant leave, but on the hearing of the appeal we dismiss the appeal.

Lord Justice DIPLOCK: Costs will probably tax higher on that footing.

Mr. LLOYD: I suppose there will be some separate costs of the application for leave to appeal.

Lord Justice WILLMER: Well, there was a notice of motion; I do not know how much costs that carries.

(c) Lloyds of London Press Limited

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit 10



Westlaw.UK

[1939] A.C. 277                                                                                    Page 1
1939 WL 33092 (Privy Council), [1939] 1 W.W.R. 433, [1939] A.C. 277, [1939] 1 All E.R. 513, [1939] 2 D.L.R. 1,
(1939) 63 Ll. L. Rep. 21, 1939 CarswellNat 65, 48 C.R.C. 262
**(Cite as: [1939] A.C. 277)**

**\*277** Vita Food Products, Incorporated Appellant;
v. Unus Shipping Company,
Limited (In Liquidation) Respondent.

Privy Council

PC

Lord Atkin, Lord Russell of Killowen, Lord
Macmillan, Lord Wright, and Lord
Porter.

1939 Jan. 30.

On Appeal from the Supreme Court of Nova Scotia
en Banc.

Contract--Conflict of laws--Bill of lading--
Shipment in Newfoundland-- Contract not in
conformity with direction of Newfoundland law--
Clause in contract that it shall be governed by
English law--Action in Nova Scotia-- Proper law of
contract--Newfoundland Carriage of Goods by Sea
Act, 1932, s. 3.

The Newfoundland Carriage of Goods by Sea
Act, 1932, incorporated the Hague Rules, subject
to certain modifications, and gave them the force of
law. Sect. 3 of the Act enacted that every bill of
lading "shall contain an express statement that it is
to have effect subject to the provisions of the said
rules as expressed in this Act." By these rules any
clause or agreement relieving the carrier from the
liability for negligence imposed by the rules is
void.

Goods were shipped in Newfoundland under bills
of lading which did not contain the statement
required by s. 3, but which provided for exemption
from liability for damage due to the negligence of
the shipowners' servants, and contained a clause
that the contracts "shall be governed by English
law."

An action was brought in Nova Scotia against the
shipowner in respect of damage to the goods.

The shipowner pleaded exceptions under the
contract:-

Held, that the provisions of s. 3 of the Act were
directory and not mandatory and that failure to
obey the directions did not, therefore, make the

contract illegal.

The proper law of the contract was the law
intended by the parties - namely, English law.
Applying that law, the shipowner was within the
exceptions which exempted him from liability.

Dobell v. Steamship Rossmore Co. [1895] 2 Q. B.
408; Rex v. International Bondholders [1937] A. C.
500, 520; Ralli Bros. v. Compania Naviera Sota y
Aznar [1920] 2 K. B. 287; Jacobs, Marcus & Co. v.
Crédit Lyonnais (1884) 12 Q. B. D. 589; **\*278**
Liverpool and Great Western Steam Co. v. Phenix
Insurance Co. (1889) 129 U. S. 397; In re Missouri
Steamship Co. (1888) 42 Ch. D. 321; Liverpool
Borough Bank v. Turner (1860) 2 De G. F. & J.
502; Kearney v. Whitehaven Colliery Co. [1893] 1
Q. B. 700; Harland & Wolff v. Burns 1931 S. C.
722; Trinidad Shipping Co. v. G. R. Alston & Co.
[1920] A. C. 888; The Industrie [1894] P. 58; and
Elder, Dempster & Co. v. Paterson, Zochonis &
Co., Ld. [1924] A. C. 522, 564 referred to. The
Torni [1932] P. 78 dissented from.

Judgment of the Supreme Court En Banc
affirmed, but for different reasons.

APPEAL (No. 82 of 1938) from a decree of the
Supreme Court En Banc (March 2, 1938) which
affirmed a decree of the Chief Justice (July 5,
1937).

The action was against the respondents, the
owners of the *Hurry On*, for damages in respect of
a consignment of herrings.

The herrings were shipped in the *Hurry On* on
January 15, 1935, at Middle Arm, Newfoundland,
for carriage to New York. On the voyage the *Hurry
On* ran ashore in Nova Scotia, admittedly through
the negligence of the captain in navigation. The
herrings were unloaded, reconditioned and
forwarded from a port in Nova Scotia in another
ship to New York, where they were received by the
appellants, who were the consignees of the
herrings, in a damaged condition.

The *Hurry On* was registered in Nova Scotia and
the appellants brought their action for damages in
Nova Scotia.

The bills of lading under which the consignment
was made were not in conformity with the
provisions of the Newfoundland Carriage of Goods
by Sea Act, 1932, which incorporated the Hague

Case 1:06-cv-00011    © 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.
Document 104-5    Filed 02/20/2007    Page 10 of 21

[1939] A.C. 277                                            Page 2

1939 WL 33092 (Privy Council), [1939] 1 W.W.R. 433, [1939] A.C. 277, [1939] 1 All E.R. 513, [1939] 2 D.L.R. 1, (1939) 63 Ll. L. Rep. 21, 1939 CarswellNat 65, 48 C.R.C. 262

**(Cite as: [1939] A.C. 277)**

Rules, but were in an old form which was used by the shipper in ports outside Newfoundland. The Hague Rules provide that any clause or agreement relieving the carrier from the liability for negligence imposed by the rules is void. The bills provided (inter alia) for exemption from liability for damage due to the negligence of the shipowners' servants at or after the commencement of the voyage, and one of the terms was: "This contract shall be governed by English law." There was a further provision that, in the case of shipment from the United States, the Harter Act, 1893, should apply and that, save as so provided, the bill of lading *279 was subject to the terms of the Canadian Water Carriage of Goods Act, 1910.

The Canadian Act applied only to shipments from any port of Canada.

It was contended by the appellants before the Chief Justice of Nova Scotia and before the Supreme Court that, as the Act of 1932 had not been complied with, the exceptions did not avail the respondents and they were subject to the liabilities of common carriers. This contention was rejected by both Courts, and the Supreme Court also held that, if the bills of lading were illegal, the parties were in pari delicto and the action must fail.

1938. Nov. 24, 25, 28, 29. *G. McL. Daley K.C.* and *W. L. McNair* for the appellant. The shipowner having failed to comply with the provisions of s. 3 of the Newfoundland Carriage of Goods by Sea Act, 1932, the question arises as to whether he can rely on the exceptions in the bill of lading, and/or the Act. The proper law of the contract is that which the parties intended to apply, and their intention may be gathered from many factors. If the provisions of s. 3 are imperative, as I submit they are, and not merely directory, failure to comply with them renders the bill of lading void. Under the Newfoundland Interpretation Act the word "shall" is to be given, prima facie, an imperative meaning. The real test is the purpose of the Act: Liverpool Borough Bank v. Turner. [FN1]

FN1 (1860) 2 De G. F. & J. 502, 507.

Before the Hague Convention, several Acts were passed in different countries, as in Canada and Australia, the purpose of which was to protect the cargo-owner from oppressive clauses in bills of lading and to provide uniformity in bills of lading: Paterson Steamships, Ld. v. Canadian Co-operative Wheat Producers, Ld. [FN2], and Scrutton on Charterparties, 13th ed., p. 498. Effect could be given to the intention of these Acts only by compelling parties to incorporate in their contracts

the law of the port of shipment: Dobell & Co. v. Steamship Rossmore Co. [FN3]; In re Missouri Steamship Co. [FN4]; and *280 Scrutton, p. 534. A bill of lading which is illegal at the port of shipping will not be enforced anywhere: The Torni. [FN5]

FN2 [1934] A. C. 538, 544, 546.

FN3 [1895] 2 Q. B. 408, 413.

FN4 (1888) 42 Ch. D. 321, 336.

FN5 [1932] P. 78.

Here, if s. 3 were omitted, the parties would have absolute freedom of contract, and the whole Act would go by the board. Scrutton, p. 541, and Harland & Wolff v. Burns [FN6] were referred to.

FN6 1931 S. C. 722.

If the bill of lading is null and void, the common law liability would still remain and, if the purpose of the Act here is primarily the protection of the cargo-owner, he can come and ask for his rights. He is not affected in the same way as the shipowner, and the cases on illegality would have no application to him: Anson on Contract, 18th ed., p. 251; Bonnard v. Dott [FN7]; Victorian Daylesford Syndicate, Ld. v. Dott [FN8]; and Lodge v. National Union Investment Co., Ld. [FN9]

FN7 [1906] 1 Ch. 740, 746.

FN8 [1905] 2 Ch. 624, 629.

FN9 [1907] 1 Ch. 300, 306.

Whether the shipowner here is a common carrier does not depend on the contract but on the way he offered his ship. If a common carrier, he would be liable: London & North Western Ry. Co. v. Richard Hudson & Sons, Ld. [FN10] [Counsel for the respondent stated that he did not dispute this.] As to the effect of bailment, reference was made to Halsbury's Laws of England, 2nd ed., vol. iv., p. 13.

FN10 [1920] A. C. 324.

The delivery of the goods was a good bailment, and that could not be destroyed by a subsequent illegal contract. It is admitted now that the master was negligent in navigating the ship. The damage was caused by that negligence, and the shipowner is liable: Winfield, Province of the Law of Tort (1931), p. 100.

[1939] A.C. 277

Page 3

1939 WL 33092 (Privy Council), [1939] 1 W.W.R. 433, [1939] A.C. 277, [1939] 1 All E.R. 513, [1939] 2 D.L.R. 1, (1939) 63 Ll. L. Rep. 21, 1939 CarswellNat 65, 48 C.R.C. 262
(Cite as: [1939] A.C. 277)

We are not parties to the illegality in the contract, and we are not relying on the contract.

It is the respondent who is seeking to enforce the contract. [Reference was made to Donoghue v. Stevenson [FN11]; Feret v. Hill [FN12]; and Alexander v. Rayson. [FN13]]

FN11 [1932] A. C. 562, 610.

FN12 (1854) 15 C. B. 207.

FN13 [1936] 1 K. B. 169, 183.

W. L. McNair followed. The issue of the bill of lading without the paramount clause was prohibited by the positive law *281 of Newfoundland, being prohibited, the contract is void at the port of shipment, the contract will not be enforced in any country. The contract is to be construed and enforced according to the lex loci contractus: In re Missouri Steamship Co. [FN14] and Dicey's Conflict of Laws, 5th ed., pp. 160, 647 and 655. Where the purpose of the transaction is lawful, but illegality occurs in the performance of the contract, the party guilty of the illegality, here the shipowner, cannot rely on the contract: Hain Steamship Co. v. Tate & Lyle, Ld. [FN15]; Angliss & Co., Australia (Proprietors), Ld. v. Peninsular & Oriental Steamship Co. [FN16]; The Torni [FN17]; Sewell v. Burdick. [FN18]

FN14 (1888) 42 Ch. D. 321, 336.

FN15 (1936) 41 Com. Cas. 350.

FN16 [1927] 2 K. B. 456, 459.

FN17 [1932] P. 78.

FN18 (1884) 10 App. Cas. 74, 105.

In Mahmoud v. Ispahani [FN19] the whole transaction was prohibited, and the Court would not enforce the contract. In Anderson, Ld. v. Daniel [FN20] the transaction was legal, but there was illegality in the performance. [Alexander v. Rayson [FN21] was also referred to.]

FN19 [1921] 2 K. B. 716, 726, 728, 730.

FN20 [1924] 1 K. B. 138, 142, 149.

FN21 [1936] 1 K. B. 169, 183, 189.

In comparable legislation it is noticeable that, where a penalty is imposed on failure to comply with statutory requirements, the penalty is imposed on the ship and not on the person who receives the bills of lading: Scrutton, p. 480, and the Stamp Act, 1891.

If both parties were parties to the illegality, then neither can rely on the contract, but, if the transaction is a lawful one, both are relegated to their relationship in common law. The shipowner is liable either as a common carrier or a bailee. If the damage to the goods is due to the negligence of the shipowner, the cargo-owner can recover in tort. He is not required to pray in aid the contract which is illegal and ineffective: Simpson v. Bloss (or Bliss) [FN22]; Foster v. Driscoll [FN23]; Hyams v. Stuart King [FN24]; Story on Bailments, 9th ed., s. 379, Note 4, and Scrutton, 13th ed., p. 292, art. 93, and Elder Dempster & Co. v. Paterson, Zochonis & Co. [FN25]

FN22 (1816) 7 Taunt. 246.

FN23 [1929] 1 K. B. 470.

FN24 [1908] 2 K. B. 696.

FN25 [1924] A. C. 522.

*282 I submit the shipowner here has failed to perform the obligation imposed on him by law to include the terms of the paramount section of the Act in the bill of lading issued by him, and he cannot rely on his illegal contract.

C. B. Smith K.C. and Cyril Miller for the respondent. We submit (1.) that by the Act the rules apply, whether the paramount clause is expressly incorporated or not; (2.) if, as a result of failure to incorporate the clause expressly the bill of lading is illegal, no cause of action can arise from it; (3.) if the contract is illegal, the appellants cannot entirely disregard it and sue in tort, basing the action either on the custom of the Realm or any liability of a bailee, nor can he base his claim on any presumed antecedent oral contract. If there is any antecedent contract, it is discharged by performance on signing and accepting the bills of lading or it is merged in them, and the contract contained in and evidenced by them is the only contract. The shipper (the appellant sues as shipper and not as indorsee of the bill of lading) cannot, as the result of an illegal contract in which he has participated, get rights and immunities against the shipowner which he never dreamt of at the time he entered into the contract: Elder, Dempster & Co. v. Paterson, Zochonis & Co. [FN26]

FN26 [1924] A. C. 522.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1939 WL 33092 (Privy Council), [1939] 1 W.W.R. 433, [1939] A.C. 277, [1939] 1 All E.R. 513, [1939] 2 D.L.R. 1, (1939) 63 Ll. L. Rep. 21, 1939 CarswellNat 65, 48 C.R.C. 262
**(Cite as: [1939] A.C. 277)**

The rights of the parties under the bills of lading here must be worked out, wherever the bills are construed, under English law: James Clark v. Sree Mutty Doorgamoney Dossee. [FN27] We cannot read into the section words such as, "If the express statement is omitted, the rules shall cease to apply"; but that is what the contention of the appellant requires. The shipowner might be subjected to a penalty for violating the provisions of the Act, but that would not affect the rights of the other party. [The Torni FN28] referred to.] The disobedience to the statute here was in form, not in substance, and the illegality, if any, would not have the effect of destroying the whole contract: Sir Roger Kerrison v. Cole [FN29] and Kearney v. Whitehaven Colliery Co. [FN30] If the rules *283 do not apply, there is no obligation to insert the express statement, and there is no illegality in omitting it. If the contract is illegal, the Courts would not work out the rights of the parties on the basis of a resultant liability as if there had been no contract.

FN27 (1840) 3 Moo. P. C. 252, 273.

FN28 [1932] P. 78.

FN29 (1807) 8 East, 231.

FN30 [1893] 1 Q. B. 700, 710.

*Cyril Miller* followed. I submit the rules are incorporated in the contract notwithstanding the non-compliance with s. 3 of the Act. The contract is not illegal under the municipal law of Newfoundland. The rules are imported by the clause that the contract shall be governed by English law. A foreign Court would so read the contract and give effect to it.

[Reference was made to Dicey's Conflict of Laws, 4th ed., r. 155 (p. 591), r. 161 (p. 623), and r. 161, sub-r. 3 (p. 631); Chatenay v. Brazilian Submarine Telegraph Co. [FN31]; The Torni [FN32]; Dobell & Co. v. Steamship Rossmore Co. [FN33]; Mahmound v. Ispahani [FN34]; and Taylor v. Chester. [FN35]]

FN31 [1891] 1 Q. B. 79.

FN32 [1932] P. 78.

FN33 [1895] 2 Q. B. 408, 413.

FN34 [1921] 2 K. B. 716, 726, 728, 730.

FN35 (1869) L. R. 4 Q. B. 309, 311, 313.

*W. L. McNair* replied. If the rules will not necessarily and in every event be given effect to in a foreign Court, that shows that the provisions of s. 3 of the Act are mandatory. [Reference was made to Scrutton, 11th ed., p. 481, and App. V. and VI., and to Angliss & Co., Australia (Proprietary), Ld. v. Peninsular and Oriental Steam Navigation Co. [FN36]] When it is said that the bill of lading shall be governed by English law, it means by such law as the English Courts would apply as being the proper law of the contract. The respondent's contention sets the whole scheme of the Newfoundland shipping legislation at naught.

FN36 [1927] 2 K. B. 456, 459.

1939. Jan. 30. The judgment of their Lordships was delivered by LORD WRIGHT.

This appeal arises out of a claim made against the respondent, a body corporate incorporated under the law of Nova Scotia, now in liquidation, as owner of the motor vessel *Hurry On* registered at the port of Halifax, Nova Scotia. The claim was made by the appellant, a body *284 corporate carrying on business at New York, in the United States, for damage and loss suffered in respect of consignments of herrings which were being carried in the *Hurry On* from Middle Arm, Newfoundland, to New York, and were delivered in a damaged condition.

In January, 1935, the *Hurry On* was put up as a general ship for the carriage of cargo, including herrings, from Newfoundland ports to New York. Middle Arm was one of these ports. At that port there were loaded in the *Hurry On* three lots of herrings in barrels for carriage to New York. The appellant purchased the herrings from M. G. Basha, whose name appears on the bills of lading. It is not clear when the property passed, but so far as concerns this case the appellant may be treated as owner of the herrings at all material times. Bills of lading were issued on behalf of the ship. They were dated Middle Arm, January 15, 1935, and acknowledged receipt on board of the goods in apparent good order and condition from M. G. Basha, and provided for delivery in the like apparent good order and condition at New York, "unto order Commercial National Bank and Trust Co., notify Vita Food Products, New York, or his or their assigns." W. A. Shaw acted for the ship as broker or agent in Newfoundland to secure the cargo, and J. Poole acted as a sort of super cargo, and signed the bills of lading for the ship. By some error or inadvertence the bills of lading so signed by Poole were old ones used outside Newfoundland

by Shaw at other ports for other vessels, and did not incorporate the Hague Rules, which had been adopted by the Carriage of Goods by Sea Act enacted in Newfoundland in 1932. It is this fact or accident which has led to the questions agitated in this case.

The *Hurry On* sailed from Middle Arm on January 16, 1935, bound for New York with the herrings on board. On January 18, 1935, she ran into bad weather and ice off the coast of Nova Scotia. The captain decided to make for a port of refuge, but in the attempt to do so ran ashore at Grady Point in Nova Scotia in a gale of wind. The ship was eventually got off and taken to Guysboro, where the herrings were **\*285** unloaded, reconditioned and forwarded by another ship to New York. At New York the appellant took delivery of the herrings in their damaged condition under the bills of lading and paid freight, and then claimed for the damage to the herrings and for salvage and other expenses. The allegation in the action that the ship was unseaworthy was rejected by the Courts in Canada and need not now be considered; it is, however, admitted that the loss was due to the captain's negligence in navigation. The provisions either of the bills of lading or of the Carriage of Goods by Sea Act would exempt the respondent from liability for a loss due to negligence, but it was contended on various grounds to be discussed later that, as the Act had not been complied with, the exceptions did not avail the respondent, and that it was subject to the liabilities of a common carrier. This contention was rejected by the Chief Justice of Nova Scotia, where the action was brought, and also by the Supreme Court of the Province. In addition the Supreme Court held that if the bills of lading were illegal, the parties were in pari delicto and on that ground also the action must fail.

The bills of lading are in identical terms except as to the description of the goods included in each parcel, and it will be convenient to begin by stating briefly the substance of them and of the Act. The bills of lading contained, as already stated, an acknowledgment that the goods had been received on board for carriage to New York, with a proviso that they should be at shipper's risk while at the dock pending loading. There was a later clause by which in accepting the bill of lading the shipper, consignee and holder of the bill of lading agreed to be bound by all its stipulations as fully as if the shipper, consignee or holder had signed it. The bill of lading set out in detail the "Terms and Conditions of this Contract Bill of Lading which are hereby mutually agreed upon as follows." These terms and conditions, so far as material, may

be briefly summarized. There were the usual exceptions of sea and other perils, and the usual exemptions of specified classes of damage such as leakage, breakage and so forth. Of these latter clause 7 is specially material in this case. It contains **\*286** a general exemption in respect of the goods carried from liability for all damage capable of being covered by insurance, and from liability above a certain value per package unless a special declaration is made. There follows a wide general exemption of loss or damage due to negligence of the shipowners' servants at or after the commencement of the voyage, or to unseaworthiness, provided all reasonable means had been taken to provide against it. General average was to be settled according to York Antwerp Rules, 1924, and adjusted in the country selected by the owners. The same clause also provided that "This contract shall be governed by English law. " By clause 8 the liability of the goods to contribute to general average and similar charges was not to be affected though the necessity for that contribution was due to negligence or unseaworthiness, provided, however, that due diligence was exercised to make the ship seaworthy and properly manned, equipped or supplied. By clause 22 no claim was to be admitted unless made in writing within fifteen days after delivery or failure to deliver the goods. Provision was also made that in the case of shipments from the United States the Harter Act of 1893 was to apply. It was also stipulated that, save as so provided, the bill of lading was subject to the terms and provisions of and exemptions from liability contained in the then unrepealed Canadian Water Carriage of Goods Act, 1910, and the clause of that Act which declared illegal, null and void any clauses exempting the shipowners from liability save in accordance with the provisions of that Act was specifically incorporated. The Canadian Act only applies to shipments of goods from any port in Canada, whether to ports in Canada or ports outside Canada, and accordingly prima facie would not apply to a shipment from Newfoundland. In any event the incorporation of the Canadian Act, like the incorporation of the Harter Act, would only have effect as matter of contract on the principles laid down in Dobell v. Steamship Rossmore Co. [FN37]

FN37 [1895] 2 Q. B. 408.

The Newfoundland Act, passed in 1932, recited that it is expedient that the rules agreed to as a draft convention for **\*287** the unification of certain rules relating to bills of lading by the delegates of a number of States, including the delegates representing His Majesty at the International Conference on Maritime Law held at Brussels in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

October, 1922, and afterwards amended at a further conference at Brussels in October, 1923, should, subject to the provisions of the Act, "be given the force of law with a view to establishing the responsibilities, liabilities, rights and immunities attaching to carriers under bills of lading."

Of the sections of the Act, it is necessary to set out ss. 1 and 3 in full. They are as follows:-

Sect. 1: "Subject to the provisions of this Act, the rules shall have effect in relation to and in connection with the carriage of goods by sea in ships carrying goods from any port in this Dominion to any other port whether in or outside this Dominion."

Sect. 3: "Every bill of lading or similar document of title issued in this Dominion which contains or is evidence of any contract to which the rules apply shall contain an express statement that it is to have effect subject to the provisions of the said rules as expressed in this Act."

Sects. 4, 5 and 6, sub-s. 3, contain certain provisions to which the rules are subject. Sect. 7 gives any Court in Newfoundland having jurisdiction to the amount claimed power to try any action for loss or damage to goods carried by sea to or from the Dominion of Newfoundland, notwithstanding any stipulation in the bill of lading or similar document.

The rules which are thus given the force of law are set out in full in the Schedule to the Act. These rules, often called the Hague Rules, are identical with those scheduled to the British Carriage of Goods by Sea Act, 1924, and have now been adopted with or without modifications by certain foreign States, including recently the United States, and also by the Crown Colonies, by Australia, by Canada, and by New Zealand. They confer rights and immunities and also impose liabilities upon the shipowner; liabilities which he cannot escape, since art. III. (8.) avoids any clause or agreement relieving the carrier from the liability for negligence imposed **\*288** by the rules or lessening that liability. But the Act and rules only apply where a bill of lading is issued and there is no provision making it imperative for the carrier to issue a bill of lading save on demand of the shipper.

If the rules are compared with the provisions of the bills of lading in suit, they agree in substance in respect of the relevant matters - namely, liability in respect of negligence and unseaworthiness. In some respects the rules go beyond the bills of lading, as

for instance where they provide that the carrier is to be released from liability if suit is not brought within one year after delivery has been or should have been made. In other respects the bills of lading contain provisions which are outside the scope of the Act and rules. The bills of lading are furthermore documents of title which define the contractual voyage and provide for general average and for the obligation to deliver the goods which are received at the dock and actually loaded. Moreover they expressly stipulate that the proper law of the contract is to be English law. It is necessary to bear such matters in mind when the central questions in the case are being considered, that is, the questions whether the failure to obey s. 3 of the Act is illegal under the law of Newfoundland, the place where the contract was made, and whether that failure renders the contract void in the Courts of Nova Scotia, and in either event what is the resultant legal position. The learned Chief Justice held that notwithstanding the non-inclusion of the clause paramount (by which is meant the clause specified in s. 3) the bills of lading were effective documents but are subject to the exemptions, not of the bills themselves, but to those prescribed in the rules, and that in the circumstances the latter exemptions gave a good defence to the shipowner so that the action failed. The Supreme Court also held that the action failed, but reached that conclusion by a different route. The reasoning of the learned judges did not in all respects agree, but in substance they held that disobedience to s. 3 constituted an illegality in which both parties were equally concerned, and accordingly the action failed whether laid in contract or in tort. They held that the appellant's arguments involved it in a dilemma, **\*289** either the bills of lading were good or they were illegal. In either event the suit failed.

Their Lordships are of opinion that the bills of lading were not illegal, and must be accepted as valid documents by the Courts of Nova Scotia. The precise meaning of this statement, however, and the reasoning on which it is based require elucidation.

The first question to determine is the true construction of ss. 1 and 3 of the Act. Sect. 1 provides for the application of the rules to every bill of lading for the carriage of goods by sea in ships from any port in Newfoundland to any other port, whether in or outside that Dominion. The appellant contended that since s. 1 only provided that the rules should have effect "subject to the provisions of this Act," the rules could not apply to a bill of lading unless the terms of s. 3 were complied with. Their Lordships do not so construe the section. In their opinion the words "subject to

Case 1:06-cv-00011  Document 104-5  Filed 02/20/2007  Page 15 of 21

the provisions of this Act " merely mean in this connection that the rules are to apply but subject to the modifications contained in ss. 2, 4, 5 and 6, sub-s. 3, of the Act. To read these words as meaning that the rules are only to have effect if the requirements of s. 3 are complied with, would be to put an unnecessarily wide interpretation upon them instead of the narrower meaning, which is more natural and obvious. In their Lordships' judgment s. 1 is the dominant section. Sect. 3 merely requires the bill of lading to contain an express statement of the effect of s. 1. This view of the relative effect of the sections raises the question whether the mandatory provision of s. 3, which cannot change the effect of s. 1, is under Newfoundland law directory or imperative, and, if imperative, whether a failure to comply with it renders the contract void, either in Newfoundland, or in Courts outside that Dominion.

It will be convenient at this point to determine what is the proper law of the contract. In their Lordships' opinion the express words of the bill of lading must receive effect, with the result that the contract is governed by English law. It is now well settled that by English law (and the law of Nova **\*290** Scotia is the same) the proper law of the contract "is the law which the parties intended to apply." That intention is objectively ascertained, and, if not expressed, will be presumed from the terms of the contract and the relevant surrounding circumstances. But as Lord Atkin, dealing with cases where the intention of the parties is expressed, said in Rex v. International Trustee for, etc., Bondholders A.-G. [FN38] (a case which contains the latest enunciation of this principle), "Their intention will be ascertained by the intention expressed in the contract if any, which will be conclusive." It is objected that this is too broadly stated and that some qualifications are necessary. It is true that in questions relating to the conflict of laws rules cannot generally be stated in absolute terms but rather as prima facie presumptions. But where the English rule that intention is the test applies, and where there is an express statement by the parties of their intention to select the law of the contract, it is difficult to see what qualifications are possible, provided the intention expressed is bona fide and legal, and provided there is no reason for avoiding the choice on the ground of public policy. In the present case, however, it might be said that the choice of English law is not valid for two reasons. It might be said that the transaction, which is one relating to the carriage on a Nova Scotian ship of goods from Newfoundland to New York between residents in these countries, contains nothing to connect it in any way with English law, and therefore that choice could not be seriously

taken. Their Lordships reject this argument both on grounds of principle and on the facts. Connection with English law is not as a matter of principle essential. The provision in a contract (e.g., of sale) for English arbitration imports English law as the law governing the transaction, and those familiar with international business are aware how frequent such a provision is even where the parties are not English and the transactions are carried on completely outside England. Moreover in the present case the *Hurry On*, though on a Canadian register, is subject to the Imperial statute, the **\*291** Merchant Shipping Act, 1894, under which the vessel is registered, and the underwriters are likely to be English. In any case parties may reasonably desire that the familiar principles of English commercial law should apply. The other ground urged is that the choice of English law is inconsistent with the provisions of the bill of lading, that in respect of certain goods the Harter Act or the Canadian Water Carriage of Goods Act of 1910 (now repealed, but in force at the date of the bill of lading) was to apply. It has been explained that the incorporation of these Acts may have only contractual effect, but in any case, though the proper law of the contract is English, English law may incorporate the provisions of the law of another country or other countries as part of the terms of the contract, and apart from such incorporation other laws may have to be regarded in giving effect to the contract. The proper law of the contract does indeed fix the interpretation and construction of its express terms and supply the relevant background of statutory or implied terms. But that part of the English law which is commonly called the conflict of laws requires, where proper, the application of foreign law; e.g., English law will not enforce a performance contrary to the law of the place of performance in circumstances like those existing in Ralli Bros. v. Compania Naviera Sota y Aznar [FN39], and the law of the place of performance, though it will not be effective to affect the construction of the contract in regard to its substance (which must be ascertained according to the rule of the proper law, as was held in Jacobs, Marcus & Co. v. Credit Lyonnais [FN40]), will still regulate what were called in that case the incidents and mode of performance in that place. English law will in these and sometimes in other respects import a foreign law, but the contract is still governed by its proper law. The reference to the United States and the Canadian Acts does not on any view supersede English law which is to govern the contract, nor does Newfoundland law, though Newfoundland was the place where the contract was made, apply to oust **\*292** English law from being the law of the contract, and as such from being the law which defines its nature, obligation

and interpretation, though Newfoundland law might apply to the incidents of performance to be done in Newfoundland. There is, in their Lordships' opinion, no ground for refusing to give effect to the express selection of English law as the proper law in the bills of lading. Hence English rules relating to the conflict of laws must be applied to determine how the bills of lading are affected by the failure to comply with s. 3 of the Act.

FN38 [1937] A. C. 500, 529.

FN39 [1920] 2 K. B. 287.

FN40 (1883-4) 12 Q. B. D. 589.

If, however, by reason of this failure to obey the Act the bills of lading were illegal in Newfoundland, it would not follow as a necessary consequence that a Nova Scotian Court, applying the proper law of the contract, would in its own forum treat them as illegal, though the position of a Court in Newfoundland might be different, if it held them illegal by Newfoundland law. A Court in Newfoundland would be bound to apply the law enacted by its own Legislature, if it applied, and thus might treat the bills as illegal, just as the Supreme Court in the United States treated as void an exemption of negligence in a bill of lading issued in the United States, though in relation to the carriage of goods to England in an English ship: Liverpool and Great Western Steam Co. v. Phenix Insurance Co. [FN41] Such a clause, it was held, was against public policy and void by the law of the United States, which was not only the law of the forum but was also held to be the proper law of the contract. This decision may be contrasted with In re Missouri Steamship Co. [FN42], where in similar circumstances the Court of Appeal, holding the proper law of the bill of lading to be English, held that English law did not apply the American rule of public policy, though the shipment took place in America and the bill of lading was issued there, and that the clause, being valid in English law, must receive effect.

FN41 (1889) 129 U. S. 397.

FN42 (1888) 42 Ch. D. 321.

With these considerations in mind it is necessary first to consider if the bills of lading are illegal by Newfoundland law. If they are not, the question of illegality cannot arise *293 in the Courts of another jurisdiction, e.g., those of Nova Scotia. Illegality is a concept of so many varying and diverse applications, that in each case it is necessary to scrutinize the particular circumstances with

precision in order to determine if there is illegality and if so what is its effect. As Lord Campbell said in reference to statutory prohibitions in Liverpool Borough Bank v. Turner [FN43]: "No universal rule can be laid down for the construction of statutes, as to whether mandatory enactments shall be considered directory only or obligatory with an implied nullification for disobedience. It is the duty of courts of justice to try to get at the real intention of the legislature by carefully attending to the whole scope of the statute to be construed."

FN43 2 De G. F. & J. 502, 507.

In that case the Court, by a careful examination of the object of the Act and the public importance of compliance with it, held the transfer of a vessel to be a nullity for breach of a registration law. The same result has been reached in other cases, some of which have been cited in argument where breaches of statutes were held to nullify the transactions in question, even without express words of nullification. On the other hand, cases can be cited where the contract was not avoided by some particular illegality, e.g., Kearney v. Whitehaven Colliery Co. [FN44], where an illegality in a certain respect in an agreement of employment was held not to vitiate the whole contract. Each case has to be considered on its merits. Nor must it be forgotten that the rule by which contracts not expressly forbidden by statute or declared to be void are in proper cases nullified for disobedience to a statute is a rule of public policy only, and public policy understood in a wider sense may at times be better served by refusing to nullify a bargain save on serious and sufficient grounds.

FN44 [1893] 1 Q. B. 700.

Are there such grounds for holding that the Newfoundland law does in Newfoundland nullify bills of lading such as those in question? In their Lordships' opinion there are not. The matter can be tested by asking what would be the position if a bill of lading set out in extenso the exact provisions of the rules, but failed to contain an express statement in *294 compliance with s. 3, that the provisions of the rules applied to it. Surely such a bill of lading could not be regarded as illegal. Or again, what is the position where not only is a shipment made in a Newfoundland port but the port of delivery also is in Newfoundland? In such a case s. 1, by its own force, imports the rules, and s. 3 is merely an intimation of what, if the parties concerned are all residents or natives of Newfoundland and bound by that law, they must be taken to be aware. At least this is the position if Newfoundland law governs

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the contract. It seems impossible to hold that in such cases the bills of lading would be illegal and void. If that is so of a transaction beginning and ending in Newfoundland, and if such a transaction is not illegal, their Lordships do not think that such a transaction is to be treated as illegal because the place of delivery is outside Newfoundland and the parties or some of them are outside that Dominion and are not bound by its laws. It is said that the rules are not made part of the contract save when there is an express clause in the contract stating that they are to apply as provided in s. 3, and that to hold the bills of lading legal and effective documents without such a clause would frustrate the purpose of the Hague Rules and of the International Conference, which aims at an obligatory unification of bills of lading all over the world, at least so far as particular nations adopt them. The Act, however, does not in terms provide that the bill of lading is to be deemed illegal and void merely because it contravenes s. 3, nor does it impose penalties for failure to comply with s. 3, nor does it in terms expressly prohibit the failure. Indeed there is nothing to prevent a contract of sea carriage in respect of which there is no bill of lading at all: see Harland & Wolff v. Burns. [FN45] The inconveniences that would follow from holding bills of lading illegal in such cases as that in question are very serious. A foreign merchant or banker could not be assumed to know or to inquire what the Newfoundland law is, at any rate when the bill of lading is not expressed to be governed by Newfoundland law and still less when it provides that it is governed by English law, and **\*295** it would seriously impair business dealings with bills of lading if they could not be taken at their face value, and as expressing all the relevant conditions of the contract. It was partly for that reason that in Dobell v. Steamship Rossmore Co. [FN46] the Court of Appeal refused to treat the Harter Act as having any effect as a foreign law affecting the validity of the contract, but treated it only as part of the English contractual document which expressly embodied it. A bill of lading fulfils other functions than merely that of setting out the conditions of carriage. It is a document of title which if endorsed passes the property, and which, if money is advanced upon it, as is done in ordinary course of business, passes a special property by way of pledge to the banker or other lender. It would be a grave matter if business men when dealing with a bill of lading had in a case like the present to inquire into the foreign law ruling at the port of shipment.

FN45 1931 S. C. 722.

FN46 [1895] 2 Q. B. 408.

All these reasons seem to justify the conclusion that the omission of what is called the clause paramount does not make the bills of lading illegal documents, in whole or in part, either within Newfoundland or outside it. Sect. 3 is in their Lordships' judgment directory. It is not obligatory, nor does failure to comply with its terms nullify the contract contained in the bill of lading. This, in their Lordships' judgment, is the true construction of the statute, having regard to its scope and its purpose and to the inconvenience which would follow from any other conclusion. If that is so, the bills of lading are binding according to their terms and consequently the respondent is entitled to succeed in its defence.

But on the basis that the bills of lading were illegal in Newfoundland in that their issue without the clause paramount was prohibited by the law of that country it was argued that no Court in any country would enforce their terms and exemptions, and the carriage would therefore be upon the terms implied where goods are taken for carriage by a common carrier, i.e., subject only to the exception of the Act of God and the King's Enemies. No further terms, it was said, could **\*296** be implied nor could any reliance be put upon the provisions of the Hague Rules, since they had not been incorporated in the bills of lading by the insertion of the clause paramount. The appellant contended that, unless the clause was inserted, no contract between carrier and shipper which included the provisions of the Hague Rules was entered into. Nor could the Act be said to have incorporated them even in Newfoundland itself, since s. 1 only provided that the rules should have effect "subject to the provisions of this Act," a phrase which the appellant maintained meant (inter alia) that the rules were not incorporated unless the provisions of s. 3 were complied with. For reasons already explained their Lordships do not so construe the section.

But whatever view a Newfoundland Court might take, whether they would hold that the contracts contained in the bills of lading must be taken to have incorporated the Hague Rules or whether they would hold them to have been illegal, the result would be the same in the present case, where the action was brought not in a Newfoundland but in a Nova Scotian Court. It may be that, if suit were brought on these bills of lading in a Newfoundland Court, and the Court held they were illegal, the Court would refuse to give effect to them, on the basis that a Court is bound to obey the laws of its own Legislature or its own common law, as indeed the United States Supreme Court did in Liverpool

1939 WL 33092 (Privy Council), [1939] 1 W.W.R. 433, [1939] A.C. 277, [1939] 1 All E.R. 513, [1939] 2 D.L.R. 1, (1939) 63 Ll. L. Rep. 21, 1939 CarswellNat 65, 48 C.R.C. 262
**(Cite as: [1939] A.C. 277)**

and Great Western Steam Co. v. Phenix Insurance Co. [FN47] But it does not follow that any other Court could properly act in the same way. If it has before it a contract good by its own law or by the proper law of the contract, it will in proper cases give effect to the contract and ignore the foreign law. This was done in the Missouri case [FN48], both by Chitty J. and by the Court of Appeal. Lord Halsbury, having stated that the contrary view would mean that no country would enforce a contract made in another country unless their laws were the same, said [FN49]: "that there may be stipulations which one country may enforce and which another country *297 may not enforce, and that to determine whether they are enforceable or not you must have regard to the law of the contract, by which I mean the law which the contract itself imports to be the law governing the contract." Having held that the law of the contract was English, he went on to hold that the exception of negligence, even if of no validity in the place where made, must receive effect in English law, although the exception of negligence was invalid in the United States as being against the public policy of that country, and although to do an act contrary to public policy is one type of illegal action. The same attitude is illustrated in Dobell v. Steamship Rossmore Co. [FN50], where the Harter Act, which declares certain stipulations to be unlawful and imposes penalties on shipowners inserting them in bills of lading, was not considered as affecting the English contract as a part of the contract where its provisions were infringed, save so far as it was expressly incorporated. Foreign law was also disregarded in Trinidad Shipping Co. v. G. R. Alston & Co. [FN51], where the contract was an English contract and payment of certain rebates on freight were rendered illegal by the law of the United States, where the freight was payable. From the rule which he states Lord Halsbury in the Missouri case puts aside: "questions in which the positive law of the country [sc. the foreign country] forbids contracts to be made. Where a contract is void on the ground of immorality, or is contrary to such positive law as would prohibit the making of such a contract at all, then the contract would be void all over the world, and no civilised country would be called on to enforce it." In this passage Lord Halsbury would seem to be referring to matters of foreign law of such a character that it would be against the comity of nations for an English Court to give effect to the transaction just as an English Court may refuse in proper cases to enforce performance of an English contract in a foreign country where the performance has been expressly prohibited by the public law of that country. The exact scope of Lord Halsbury's *298 proviso has not been defined. There may also be

questions in some cases as to the effect of non-performance of conditions which by the foreign law of the place where a contract was entered into are essential to its formation, though even in that case the validity of the contract may depend on its proper law. But whatever the precise ambit of that saving expression, it is clear that it does not apply to such a statutory enactment as s. 3, even if disobedience to it were regarded as rendering the bill of lading in some sense illegal.

FN47 129 U. S. 397.

FN48 (1888) 42 Ch. D. 321.

FN49 Ibid. 336.

FN50 [1895] 2 Q. B. 408.

FN51 [1920] A. C. 888.

It is, however, necessary before parting with this aspect of the case to consider whether The Torni [FN52] (in which the Court of Appeal affirmed the judgment of Langton J.) should be applied, as the respondent's counsel contend it should, in the respondent's favour. The bills of lading in that case had been issued in Palestine, a territory over which His Majesty held a mandate. Two bills of lading, the only bills material in the case, had been endorsed to Hull merchants. The shipment was to Hull. The question was whether these bills of lading were to be construed according to their actual terms or whether those terms were supplemented or supplanted by the Hague Rules, there being a Sea Carriage of Goods Ordinance in Palestine corresponding to the Newfoundland Act. There were certain differences between that case and the present. One was that the bills of lading had a clause providing that they were "to be construed in accordance with English law" not as in the present case "shall be governed by English law." In their Lordships' judgment that distinction is merely verbal and is too narrow to make a substantial difference. The construction of a contract by English law involves the application to its terms of the relevant English statutes, whatever they may be, and the rules and implications of the English common law for its construction, including the rules of the conflict of laws. In this sense the construing of the contract has the effect that the contract is to be governed by English law. In addition, even apart from that term (and a fortiori with it) the form of the bill of lading would point to it being an English contract: The Industrie. [FN53] The law *299 of the flag was Esthonian, which was not likely to be taken as the proper law of the contract. The other distinction was in s. 4 of the

Palestine Ordinance which corresponded to s. 3 of the Newfoundland Act. The former section, which was otherwise identical with s. 3, contained the additional words "and shall be deemed to have effect subject thereto, notwithstanding the omission of such express statement." In view of the effect of s. 1 as construed by their Lordships the additional words seem to them to add nothing in substance. The indorsees were claiming in the action for damage and short delivery, and the question was set down for trial as a preliminary issue whether the bills of lading were subject to the provisions of the Ordinance. The Court of Appeal held that they were. The grounds of this decision were that the bills would have been illegal because they did not contain the stipulated express clause had it not been for the fact that its omission was immaterial, because by the law of Palestine the clause was incorporated whether expressly inserted or not and the bills of lading were therefore legal. It was also held that the stipulation that the contract should be construed by English law did not mean that English law should be the proper law of the contract but merely that English rules of construction, as contrasted with English substantive law, should apply. The law of Palestine was the substantive law to be applied and governed the contract.

FN52 [1932] P. 78.

FN53 [1894] P. 58.

As already indicated their Lordships do not agree with this view. With the greatest respect to the Court of Appeal their Lordships are of opinion that the decision is contrary to the principles on which they have proceeded in the previous part of this judgment and that it cannot be supported. The Palestine Ordinance, so far as appears, did not any more than the Newfoundland Act make the contract illegal so as to nullify the contract. There was no sufficient ground for refusing to give effect to the express or implied intention of the parties that the proper or substantive law of the contract, that is the law by which it was to be enforced and governed, should be English law. To do so is to contravene the fundamental principle of the English rule of conflict **300** of laws that intention is the general test of what law is to apply. The effect of the judgment seems to be to read the bill of lading as if it expressly provided that it was to be governed by the law of Palestine. Nor does the Court of Appeal seem to have had its attention directed to the prima facie rule that an English Court dealing with a contract made in a foreign jurisdiction, as Palestine was, must first ascertain what was the bargain of the parties and give effect to that bargain unless debarred by some provision of the foreign law

which binds the Court. In general, for reasons already explained, legislative provisions such as those in question do not have extra-territorial effect and do not debar the Court from giving effect to the bargain of the parties. The exceptions to this general rule do not apply here. It may be that a Court in Palestine, bound to give effect to the laws under which it exercises jurisdiction, might arrive at a different conclusion. No opinion can here be expressed on that matter nor would it be material in considering the effect which a Court outside Palestine should give to the contract. Nor is it necessary to consider what the position would have been if the bills of lading had expressed that they were governed by the law of Palestine. Their Lordships do not think that they should follow or apply the reasoning in The Torni. [FN54]

FN54 [1932] P. 78.

A further question strenuously argued on the assumption that the bills of lading were illegal and void was that the appellant was entitled to recover in tort against the respondent as a bailee, which had no contractual protection but was simply liable for its admitted negligence whether as common carrier or bare bailee. As the assumption, in their Lordships' judgment, fails, the question does not arise. It may, however, be pointed out that, if there were illegality in respect of the bills of lading, both parties would be in pari delicto. In a case like this, the bills of lading contain the contract. On that footing they are issued by the shipowner and accepted by the shipper, as indeed the bills expressly state. The question of illegality would not depend on pleading or procedure or who first might or should **301** produce the documents. It would be a question of substance, of which if necessary the Court would of its own motion take cognizance and to which the Court would give effect. Furthermore, though there may be cases in which an action may be brought indifferently either in contract or in tort, this is not such a case. The actual transaction between the parties cannot be ignored even in an action in tort. The transaction includes as an essential part the bills of lading whether regarded from the point of view of the contractual exceptions or of illegality. To apply the language of Lord Sumner in the Elder Dempster case [FN55] there is not here a bald bailment with unrestricted liability, or tortious handling independent of contract. Such a view would be a travesty of fact. Hence even on that footing the respondent would fail, either because it was party to an illegality avoiding the contract or alternatively because the contractual exemptions could not be ignored.

FN55 [1924] A. C. 522, 564.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1939 WL 33092 (Privy Council), [1939] 1 W.W.R. 433, [1939] A.C. 277, [1939] 1 All E.R. 513, [1939] 2 D.L.R. 1,
(1939) 63 Ll. L. Rep. 21, 1939 CarswellNat 65, 48 C.R.C. 262
**(Cite as: [1939] A.C. 277)**

Their Lordships are of opinion that the appeal should be dismissed with costs and will humbly so advise His Majesty.

## Representation

Solicitors for the appellant: Ince, Roscoe, Wilson & Glover.

Solicitors for the respondent: Botterell & Roche.

(Reported by C. Sidney Smith, Esq., Barrister-at-Law.)

(c) Incorporated Council of Law Reporting For England & Wales

END OF DOCUMENT