LAWRENCE J. TEKER
**TEKER TORRES & TEKER, P.C.**
Suite 2-A, 130 Aspinall Avenue
Hagåtña 96910-5018, Guam
Telephone: (671) 477-9891
Facsimile: (671) 472-2601

JOHN E.D. POWELL, WSBA #12941
**CAIRNCROSS & HEMPELMANN, PS**
524 Second Avenue, Suite 500
Seattle WA 98104
Telephone: (206) 587-0700
Facsimile: (206) 587-2308

Attorneys for Defendants *Marwan Shipping & Trading, Five Seas Shipping Co., LLC, and Al-Buhaira National Insurance Co.*

FILED
DISTRICT COURT OF GUAM
MAR -6 2007
MARY L.M. MORAN
CLERK OF COURT

UNITED STATES DISTRICT COURT
DISTRICT OF GUAM

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>MARWAN SHIPPING & TRADING CO., FIVE SEAS SHIPPING CO., LLC AND S.J. GARGRAVE SYNDICATE 2724, IN PERSONAM, NAVIGATORS PROTECTION & INDEMNITY, AND AL-BUHAIRA NATIONAL INSURANCE COMPANY,<br><br>Defendants<br><br>AND CROSS-CLAIMS, COUNTERCLAIMS, THIRD-PARTY COMPLAINT, AND CLAIM IN INTERVENTION. | NO. CIV06-00011<br><br>**MARWAN SHIPPING AND TRADING CO. AND FIVE SEAS SHIPPING CO, LLC'S TABLE OF AUTHORITIES**<br><br>Accompanying Documents: Opposition, Memorandum of Points and Authorities; Declaration of John E.D. Powell; Table of Foreign Authorities; Proposed Order<br><br>Complaint Date: April 19, 2006<br>Trial Date: Not set |

Defendants and cross-claimants Marwan Shipping & Trading Company and Five Seas Shipping Company, LLC (collectively, "Marwan") provide this Table of Authorities pursuant to General Rule 4.1 and Local Rule 7.1(g).

MARWAN AND FIVE SEAS' TABLE OF AUTHORITIES

CAUSE No. CIV06-00011

*Cairncross & Hempelmann, P.S.*
*Law Offices*
*524 Second Avenue, Suite 500*
*Seattle, Washington 98104-2323*

ORIGINAL

Case 1:06-cv-00011    Document 112    Filed 03/06/2007    Page 1 of 18

A.  **Federal Cases:**

Argueta v. Banco Mexicano, S.A., 87 F.3d 320 (9th Cir. 1996).

Bender v. Williamsport Area School Dist., 475 U.S. 534, 106 S. Ct. 1326 (1986).

Blue Ridge Ins. Co. v. Stanewich,, 142 F.3d 1145 (9th Cir.1998).

Brown v. Philadelphia Housing Authority, 350 F.3d 338 (3rd Cir. 2003).

Evolution Online Systems, Inc. v. Koninklijke PTT Netherland N.V., 145 F.3d 505 (2nd Cir. 1998).

Frye v. Paine Webber, Jackson & Curtis, Inc., 877 F.2d 396 (5th Cir. 1989).

Hoffman Const. of Oregon v. Active Erectors and Installers, Inc., 969 F.2d 796 (9th Cir. 1992).

Klamath Water Users Protective Ass'n v. Patterson, 204 F.3d 1206 (9th Cir. 1999).

M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 92 S.Ct. 1907 (1972).

Murphy v. Schneider National, Inc., 362 F.3d 1133 (9th Cir. 2004).

Mylan Pharmaceuticals, Inc. v. American Safety Razor Co., 265 F. Supp.2d 635 (D. W. Va. 2002).

Stroehmann v. Mutual Life Ins., Co. of New York, 300 U.S. 435, 57 S.Ct. 607 (1937)

Taylor Investment Corp. v. Weil, 169 F.Supp.2d 1046(D.Minn.2001)

B.  **State Cases**

Reserve Insurance Co. v. Pisciotta, 640 P.2d 746 (Cal. 1982)

C.  **Foreign Authorities**

Arbitration Act, 1996, 45 Eliz. 2, ch 23 (England). A copy of this authority has already been provided to the court by Gargrave.

Akai Pty Ltd. v. People's Insurance Co. Ltd., Lloyds Rep. 90 (1998) (England). A copy of this authority has already been provided to the court by Gargrave.

Antaios Naviera SA v. Salen Rederierna AB, AC 191 (1985) (England). A copy is provided herewith.

MARWAN AND FIVE SEAS' TABLE OF AUTHORITIES

CAUSE NO. CV06-0001

*Cairncross & Hempelmann, P.S.*
*Law Offices*
*524 Second Avenue, Suite 500*
*Seattle, Washington 98104-2323*

Case 1:06-cv-00911    Document 112    Filed 03/06/2007    Page 2 of 18

Jumbo King Ltd v Faithful Properties Ltd., 2 HKCFAR 279 (1999) (England). A copy is provided herewith.

**D.   Treatises**

13 Williston on Contracts § 39:24

DATED this 6th day of March, 2007.

          **CAIRNCROSS & HEMPELMANN, PS**

          **TEKER TORRES & TEKER, P.C.**

          By /s/ Lawrence J. Teker
          **LAWRENCE J. TEKER, ESQ**
          Attorneys for Defendants, *Marwan Shipping & Trading Co., Sharjah, Five Seas Shipping Co., LLC, Sharjah, and Al-Buhaira National Insurance Co.*

MARWAN AND FIVE SEAS' TABLE OF AUTHORITIES

*Cairncross & Hempelmann, P.S.*
**Law Offices**
*524 Second Avenue, Suite 500*
*Seattle, Washington 98104-2323*

CAUSE NO. CIV06-00011    Case 1:06-cv-00011   Document 112   Filed 03/06/2007   Page 3 of 18

# Antaios Naviera SA v. Salen Rederierna AB, AC 191 (1985) (England)

WestlawUK

[1985] A.C. 191 Page 1
1984 WL 283135 (HL), [1985] A.C. 191, [1984] 3 All E.R. 229, [1984] 2 Lloyd's Rep. 235, [1984] 3 W.L.R. 592, (1984) 81 L.S.G. 2776, (1984) 128 S.J. 564
**(Cite as: [1985] A.C. 191)**

*191 Antaios Compania Naviera S.A. Appellants v. Salen Rederierna A.B. Respondents

[1984] 3 W.L.R. 592

House of Lords
HL
Lord Diplock, Lord Keith of Kinkel, Lord Scarman, Lord Roskill and Lord Brandon of Oakbrook
1984 July 2; 26

Arbitration--Appeal--Award--Charterparty--Withdrawal of vessel--Whether owners only entitled to withdraw on a repudiatory breach--Whether reasonable time expired before withdrawal Grounds for granting leave to appeal-- Arbitration Act 1979 (c.42), s.1(3)(b) (6A) (as amended by Supreme Court Act 1981 (c.54), s.148(2) )

Ships' Names--Antaios

The charterers chartered a vessel from the shipowners on 3 November 1978 on a three-year time charter in the N.Y.P.E. form. The charterparty contained a London arbitration clause and disputes which had arisen between the parties were referred to arbitration. One of the main issues in the arbitration was *192 whether the owners were entitled to withdraw the vessel from the service of the charterers on discovering that inaccurate bills of lading had been issued. Clause 5 of the charterparty provided "on any breach of this charterparty, the owners shall be at liberty to withdraw the vessel ..." On 7 May 1980 the owners had learned of the inaccuracy of the bills of lading but the vessel was not withdrawn until 20 May. The arbitrators found, inter alia, that the breach by the charterers was non-repudiatory and that clause 5, properly construed, gave a right of withdrawal only where there was a repudiatory breach. They found further that even if, contrary to that finding, the owners had a right of withdrawal that right had to be exercised within "a reasonable time," which, in the circumstances, was some two days, and that therefore the right to withdraw had been lost before 20 May 1980. The owners applied pursuant to section 1(3)(b) of the Arbitration Act 1979 [FN1] for leave to appeal against the arbitration award:

FN1 Arbitration Act 1979, s.1: "(2) Subject to subsection (3) below, an appeal shall lie to the High Court on any question of law arising out of an award made on an arbitration agreement; and on the determination of such an appeal the High Court may by order - (a) confirm, vary or set aside the award, or (b) remit the award to the reconsideration of the arbitrator or umpire together with the court's opinion on the question of law which was the subject of the appeal; and where the award is remitted under paragraph (b) above the arbitrator or umpire shall, unless the order otherwise directs, make his award within three months after the date of the order. (3) An appeal under this section may be brought by any of the parties to the reference - (a) with the consent of all the other parties to the reference, or (b) subject to section 3 below, with the leave of the court. (4) The High Court shall not grant leave under subsection (3)(b) above unless it considers that, having regard to all the circumstances, the determination of the question of law concerned could substantially affect the rights of one or more of the parties to the arbitration agreement; ... (6A) Unless the High Court gives leave, no appeal shall lie to the Court of Appeal from a decision of the High Court - (a) to grant or refuse leave under subsection (3)(b) or (5)(b) above; or (b) to make or not to make an order under subsection (5) above."

Staughton J. dismissed the application on the grounds that although the true construction of clause 5 of the charterparty was a matter of public interest on which there was some measure of uncertainty concerning the true answer, the determination of that issue was immaterial in that it was incapable of affecting the rights of the parties substantially or at all unless the arbitrators were wrong in finding that the owners by their own inactivity lost any right of withdrawal and on that issue the arbitrators were probably right. Subsequently, pursuant to section 1(6A) of the Act, the judge granted the owners leave to appeal to the Court of Appeal from his refusal to allow an appeal to the High Court. On appeal by the owners the Court of Appeal dismissed the appeal.

On appeal by the owners:-

Held, dismissing the appeal, that since the arbitrat-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[1985] A.C. 191
1984 WL 283135 (HL), [1985] A.C. 191, [1984] 3 All E.R. 229, [1984] 2 Lloyd's Rep. 235, [1984] 3 W.L.R. 592, (1984) 81 L.S.G. 2776, (1984) 128 S.J. 564
**(Cite as: [1985] A.C. 191)**

Page 2

ors were plainly right in determining that clause 5 of the charterparty only gave a right to withdrawal where there was a repudiatory breach and the breach by the charterers did not fall into that category and the fact that by their delay the owners had in any event lost the right of withdrawal, the judge was right to refuse leave to appeal to the High Court but should not have granted leave to appeal to the Court of Appeal against the refusal of such leave (post, pp. 205B-D, 207G - 208B, 209E-F).

Pioneer Shipping Ltd. v. B.T.P. Tioxide Ltd. (The Nema) [1982] A.C. 724, H.L.(E.); Miramar Maritime Corporation v. Holborn Oil Trading Ltd. [1984] A.C. 676, H.L.(E.) and B.V.S. S.A. v. Kerman Shipping Co. S.A. (The Kerman) *193 B.V.S. S.A. v. Kerman Shipping Co. S.A. (The Kerman) [1982] 1 W.L.R. 166 considered.

*Per curiam* (i) Unless judges are prepared to be vigilant in the exercise of the discretions conferred upon them by sections 1 and 2 of the Arbitration Act 1979, they will allow the intention of Parliament to promote speedy finality in arbitral awards to be frustrated (post, p. 199D-E). Accordingly (a) leave to appeal to the High Court from an arbitrator's award under section 1(3)(b) should only be given, even in a case turning on the construction of a standard term, where the judge considers that a strong prima facie case has been made out that the arbitrator had been wrong in his construction, and that applied even though there might be dicta in other reported cases suggesting that there might be two schools of thought among commercial judges upon the term's construction; if there were conflicting decisions the judge should give leave (post, pp. 203G - 204A); (b) leave to appeal from a decision to grant or refuse leave to appeal to the High Court from an arbitral award should only be granted under section 1(6A) where the decision called for some amplification, elucidation or adaptation to changing practices of existing guidelines (post, p. 205D-E).

(ii) On the hearing of applications under section 1(3)(b) for leave to appeal to the High Court against arbitral awards a judge ought not normally to give reasons for a grant or refusal of leave and should follow a practice similar to that adopted by the House of Lords when dealing with petitions for leave to appeal (post, pp. 205H - 206A).

Decision of the Court of Appeal [1983] 1 W.L.R. 1362; [1983] 3 All E.R. 777 affirmed on different grounds.

The following cases are referred to in their Lordships' opinions:

Associated Provincial Picture Houses Ltd. v. Wednesbury Corporation [1948] 1 K.B. 223; [1947] 2 All E.R. 680, C.A..

B.V.S. S.A. v. Kerman Shipping Co. S.A. (The Kerman) [1982] 1 W.L.R. 166; [1982] 1 All E.R. 616

Edwards v. Bairstow [1956] A.C. 14; [1955] 3 W.L.R. 410; [1955] 3 All E.R. 48, H.L.(E.).

Mardorf Peach & Co. Ltd. v. Attica Sea Carriers Corporation of Liberia (The Laconia) [1977] A.C. 850; [1977] 2 W.L.R. 286; [1977] 1 All E.R. 545, H.L.(E.).

Miramar Maritime Corporation v. Holborn Oil Trading Ltd. [1984] A.C. 676; [1984] 3 W.L.R. 1; [1984] 2 All E.R. 326, H.L.(E.).

Pioneer Shipping Ltd. v. B.T.P. Tioxide Ltd. (The Nema) [1980] 2 Lloyd's Rep. 83; [1980] Q.B. 547; [1980] 3 W.L.R. 326; [1980] 3 All E.R. 117, C.A.; [1982] A.C. 724; [1981] 3 W.L.R. 292; [1981] 2 All E.R. 1030, H.L.(E.).

The following additional cases were cited in argument:

Allen v. Robles [1969] 1 W.L.R. 1193; [1969] 3 All E.R. 154, C.A..

Astro Valiente Compania Naviera S.A. v. Government of Pakistan Ministry of Food and Agriculture [1982] 1 All E.R. 578

Evans v. Bartlam [1937] A.C. 473; [1937] 2 All E.R. 646, H.L.(E.).

Halfdan Greig & Co. A/S v. Sterling Coal and Navigation Corporation (The Lysland) [1973] Q.B. 843; [1973] 2 W.L.R. 904; [1973] 2 All E.R. 1073, C.A..

*194 Italmare Shipping Co. v. Ocean Tanker Co. Inc. (The Rio Sun) [1982] 1 W.L.R. 158; [1982] 1 All E.R. 517, C.A..

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[1985] A.C. 191

1984 WL 283135 (HL), [1985] A.C. 191, [1984] 3 All E.R. 229, [1984] 2 Lloyd's Rep. 235, [1984] 3 W.L.R. 592, (1984) 81 L.S.G. 2776, (1984) 128 S.J. 564
(Cite as: [1985] A.C. 191)

Page 3

Moel Tryvan Ship Co. Ltd. v. Andrew Weir & Co. [1910] 2 K.B. 844, C.A.

Scandinavian Trading Tanker Co. A.B. v. Flota Petrolera Ecuatoriana (The Scaptrade) [1981] 2 Lloyd's Rep. 425

APPEAL from the Court of Appeal.

This was an appeal, by leave of the House of Lords (Lord Diplock, Lord Bridge of Harwich and Lord Brandon of Oakbrook) on 19 January 1984, by the appellants, Antaios Compania Naviera S.A., from the judgment dated 8 July 1983 of the Court of Appeal (Sir John Donaldson M.R. and Fox L.J., Ackner L.J. dissenting) dismissing an appeal from the judgment dated 19 November 1982 of Staughton J. [1983] 2 Lloyd's Rep. 473, 476 refusing the appellants' application for leave to appeal to the High Court from the award of arbitrators pursuant to section 1 of the Arbitration Act 1979.

At all material times the *Antaios* owned by the appellants, was time chartered to the respondents, Salen Rederierna A.B., on the New York Product Exchange form charterparty. There were a number of sub-charters on substantially the same terms. The charterparty contained a London arbitration clause and disputes arising between the parties were referred to arbitration before a tribunal of three arbitrators, Mr. Anthony Diamond Q.C., Mr. Bruce Harris and Mr. John Potter.

One of the main issues in the arbitration, and the issue which led to the present appeal, was whether the appellants were entitled to withdraw the vessel from the service of the respondents under the time charter upon discovering that inaccurate bills of lading had been issued. Clause 5 of the charterparty provided "on any breach of this charterparty, the owners shall be at liberty to withdraw the vessel ..." On 7 May 1980 the appellants learned of the inaccuracy of the bills of lading but the vessel was not withdrawn until 20 May. The arbitrators found, inter alia, that the breach by the respondents was non-repudiatory and that clause 5, properly construed, gave a right of withdrawal only where there was a repudiatory breach. They found further that even if, contrary to their finding, the appellants had a right of withdrawal that right had to be exercised within "a reasonable time," which was, in the circumstances, some two days, and that therefore the right to withdraw had been lost before 20 May 1980. The appellants applied pursuant to section 1(3)(b) of the Arbitration Act 1979 for leave to appeal against the arbitration award.

The facts are set out in the opinion of Lord Diplock.

*Gordon Pollock Q.C., Angus Glennie* and *Geraldine Andrews* for the appellants, the ship owners. The first issue raised by this appeal is: did the decision by the arbitrators to the effect that the appellants had lost their right to withdraw the vessel by the mere effluxion of a period of time of two days raise a question of law? In the present case Staughton J. did not give leave to appeal to the High Court because he held that there was no issue of law which could affect the rights of the parties. In this he was wrong: there was an issue of law on the withdrawal of the vessel. The arbitrators state that whether the owners *195 lost the right of withdrawal is a question of law and a difficult question of law. The analysis of the arbitrator's position by Ackner L.J. [1983] 1 W.L.R. 1362, 1373A-D, is plainly right.

It is emphasised that the arbitrators' decision raises an important question of law, namely, whether mere lapse of time can defeat a right to exercise a contractual right to terminate even where that lapse of time does not give rise to any inference of an affirmation of the contract or some election not to exercise the right to terminate. This question was clearly a question of law which affected their decision as to whether the right to withdraw was lost, since they made it clear that if the relevant principle was one of "election " (which is used in the present context to include affirmation, election, waiver and estoppel), they would have found in favour of the appellants on this point.

The arbitrators found the point difficult because it is a question on which there are, or appear to be, two "schools of thought." On the one hand there are dicta in such cases as Mardorf Peach & Co. Ltd. v. Attica Sea Carriers Corporation of Liberia (The Laconia) [1977] A.C. 850, 872, *per* Lord Wilberforce, which, if read out of context, might be taken to suggest that there is an implied term or rule of law that such a right be exercised within a reasonable time otherwise it is lost, regardless of whether any inference of election can be drawn from the

passage of such time. On the other hand, there are decisions - conveniently summarised by Lloyd J. in Scandinavian Trading Tanker Co. A.B. v. Flota Petrolera Ecuatoriana (The Scaptrade) [1981] 2 Lloyd's Rep. 425 which appear to make it clear that such a right will only be lost by election, whether expressed or inferred from the circumstances. In the appellants' submission the dicta which are relied upon as suggesting an implied term or rule of law regardless of an election were made in cases where this problem did not arise and do not support the proposition. In The Scaptrade [1981] 2 Lloyd's Rep. 425, 429, Lloyd J. analyses Lord Wilberforce's speech in The Laconia [1977] A.C. 850 as laying down that it is a question of waiver or election not of an implied term. In this connection attention is drawn to the argument of Mr. Hobhouse in The Laconia [1977] A.C. 850, 853G, 854E, 856B for it would appear that Lord Wilberforce adopted the proposition there put forward. Mr. Hobhouse had relied upon Allen v. Robles [1969] 1 W.L.R. 1193.

While it has always been assumed that the passage of time could give rise to an inference of election, it will not always do so. Until recently it has not been suggested that a party was under a duty to exercise such a right within a reasonable time regardless of any consideration of election. The point is a novel one and has never arisen directly for consideration. It is of great commercial importance not only in relation to questions of withdrawal but affecting also all contractual rights to terminate and even the common law right to terminate for repudiatory breach. The arbitrators, having expressly found no inference of election could be drawn, were wrong in holding that the right to withdraw the vessel under the charterparty had been lost.

If the appellants fail on this issue no other issue arises in the appeal. [LORD DIPLOCK. Their Lordships are of the opinion that this case does not raise any point of law fit to go to the High Court. But the appeal *196 does raise questions of principle in relation to the guidelines that should be laid down in relation to appeals from arbitrators. The first question is: in what circumstances should a judge who is refusing leave to the High Court give leave to appeal to the Court of Appeal from his decision refusing such leave?]

It is plain that it was the intention of the amendment introduced in section 1 of the Arbitration Act 1979 by section 148(2) of the Supreme Court Act 1981 to give the judge of first instance control whether there should be an appeal from the grant or refusal of leave to the High Court. But section 1(6A) does not limit the judge's discretion in relation to whether or not there should be an appeal to the Court of Appeal.

It may be that in relation to a particular award one judge would grant leave because he considers that the arbitrator was probably wrong, whilst another judge would refuse leave because he was of the view that another judge would refuse leave because he was of the view that the arbitrator was probably right. In those circumstances it would be wrong for a judge to feel that his discretion in relation to the grant or refusal of leave to the Court of Appeal was fettered by the guidelines. Another instance where leave to appeal might be given is not at the stage of discretion but where the judge considers that a genuine issue of law arises on the terms of the award. In those circumstances he should allow the case to go to the Court of Appeal because in that case he is not asking the Court of Appeal to review his discretion. In those circumstances the judge has recognised that other judges would have come to a different view. There may well be cases which are unforeseen and fall outside the first class of cases referred to by Staughton J. in his judgment of 19 November 1982 [1983] 2 Lloyd's Rep. 473, 476. It is wrong to fetter a judge's discretion in advance: see Evans v. Bartlam [1937] A.C. 473, 488, *per* Lord Wright. Certainly a judge should be entitled to grant leave to appeal to the Court of Appeal where there is a conflict of judicial opinion on some important point of principle: see the judgment of Ackner L.J. [1983] 1 W.L.R. 1362, 1375D-E.

[LORD DIPLOCK. The second issue on which counsel's assistance is required is on the desirability of the judge who is refusing or granting leave to the Court of Appeal, giving reasons for his decision.]

If a judge is refusing leave from an arbitral decision to the High Court but is giving leave to the Court of Appeal against such refusal he must give reasons in order to assist the Court of Appeal. The only reason for giving judgment when the judge refuses leave to the High Court is to satisfy the curiosity of the disappointed party, or exceptionally there may be cases in this category when the judge considers it

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

necessary to give a reasoned judgment where it relates to the guidelines.

As to the guidelines themselves see the exemplification of the guidelines laid down in Pioneer Shipping Ltd. v. B.T.P. Tioxide Ltd. (The Nema) [1982] A.C. 724 by Parker J. in B.V.S. S.A. v. Kerman Shipping Co. S.A. (The Kerman) [1982] 1 W.L.R. 166 where the judge held that the categories of cases considered in The Nema were not exhaustive and that, in particular, leave to appeal should be granted where a particular point of principle needed to be clarified. There is also another category of case where the guidelines are not applicable: e.g. *197 Astro Valiente Compania Naviera S.A. v. Government of Pakistan Ministry of Food and Agriculture [1982] 1 All E.R. 578, - cases where the arbitration is of such complexity and the cases cited so numerous that the judge at the preliminary stage cannot decide whether the arbitrator was right or wrong. In conclusion it is pertinent to remember the observation of Lord Denning M.R. in Italmare Shipping Co. v. Ocean Tanker Co. Inc. (The Rio Sun) [1982] 1 W.L.R. 158, 162G: "Useful as guidelines often are, nevertheless it must be remembered that they are only guidelines. They are not barriers."

*Mark Saville Q.C.* and *Timothy Young* for the respondents, the charterers.

[LORD DIPLOCK. Their Lordships would like assistance on the question of the guidelines]

In so far as leave to appeal to the Court of Appeal is concerned reliance is placed on the judgment of Sir John Donaldson M.R. [1983] 1 W.L.R. 1362, 1369D-E. The Act of 1979 as construed in The Nema [1982] A.C. 724 charged the court of first instance with a discretion whether to grant leave or not and stressed the need for finality in awards. It is for the judge to make up his mind and if the judge decides that the arbitrator was probably not wrong then the case should go no further. If this position is departed from one is going back to Halfdan Greig & Co. A/S v. Sterling Coal & Navigation Corporation (The Lysland) [1973] Q.B. 843. The approach adopted by Ackner L.J. [1983] 1 W.L.R. 1362, 1375C-E is wrong. The present case on its facts shows the dangers of departing from the guidelines as laid down in The Nema [1982] A.C. 724 since it does not lead to finality. Moreover, it goes even further than The Lysland [1973] Q.B. 843. The respondents are not contending that The Nema laid down some rigid statutory position. The word "normally" is used in Lord Diplock's judgment because in general the object of the Act of 1979 is to achieve finality. It is to be remembered in this field that the parties have chosen their tribunal, namely arbitrators, and their decision should be the end of the matter. The approach adopted by Sir John Donaldson M.R., Fox L.J. and Staughton J. is correct. What has caused some disquiet in the city in relation to arbitrations is not The Nema principle but the extensive hearings before a commercial judge whether there should be an appeal from the arbitrator at all.

As to The Kerman [1982] 1 W.L.R. 166, the only passage in the judgment of Parker J. which the respondents would query is that at page 173B because what should be in the forefront of the judge's mind is finality.

In so far as the giving of reasons, where the judge refuses leave to appeal from the arbitrator to the High Court the respondents strongly contend that no reason should be given. If the judge grants leave to the High Court he should not give reasons because he has had only a preliminary view. If he refuses leave to appeal to the Court of Appeal from his grant or refusal to give leave to the High Court he should not give reasons but if he grants leave to go to the Court of Appeal then it is agreed that he should give reasons in order to assist the Court of Appeal.

*198 As to Astro Valiente Compania Naviera S.A. v. Government of Pakistan Ministry of Food and Agriculture [1982] 1 All E.R. 578, the difficulty that arose in that case could have been put right under the judicial review procedure. The fact that both parties required reasons is nihil ad rem. In that case the judge should not have been persuaded to give reasons for his decision.

Their Lordships took time for consideration.

26 July. LORD DIPLOCK.

My Lords, on 3 November 1978, the Antaios was chartered by the appellants ("the shipowners") to the respondents ("the charterers") on a three-year time charter in the New York Produce Exchange

("N.Y.P.E.") form which incorporated the standard withdrawal clause. The words appearing in the clause that are relevant to the dispute which is the subject matter of this appeal are:

"failing the punctual and regular payment of the hire or on any breach of this charter party the owners shall be at liberty to withdraw the vessel from the service of the charterers without prejudice to any claim they (the owners) may otherwise have against the charterers."

The Antaios was sub-chartered, and sub-sub-chartered, but nothing turns on this since the charterers were vicariously liable for any breaches of the head charter committed by the sub-charterers or sub-sub-charterers.

By May 1980 market rates of hire had risen, so it was very much to the interest of the shipowners to withdraw the vessel when the charter was only half-way through its term. This they purported to do on 20 May 1980, the charter being reinstated two days afterwards upon the usual "without prejudice " terms as to the rate of hire payable until the date of its expiry some 18 months later.

There were several disputes between the shipowners and the charterers which were submitted to arbitration under clause 17 of N.Y.P.E. which provides for arbitration in London. The arbitral hearing in the only dispute with which your Lordships are concerned took place in February 1982. It was about the shipowners' right to withdraw the vessel on 20 May 1980. The arbitrator's award was published on 9 July 1982. So far as is relevant to the instant appeal it awarded and declared that the shipowners were not entitled to withdraw the vessel Antaios from the service of the charterers on or about 20 May 1980. The award was accompanied by reasons that ran to no less than 96 pages, of which 78 were devoted to this issue.

On 30 July 1982 the shipowners applied to the High Court, under section 1(3)(b) of the Arbitration Act 1979, for leave to appeal on questions of law arising out of the award. Reduced to a single sentence the only question of law relied upon as so arising was the true construction of the words "on any breach of this charter party" in the standard N.Y.P.E. withdrawal clause.

Leave to appeal to the High Court was refused by Staughton J. on 5 November 1982, when he gave, as I think unwisely, reasons for his *199 decision, which take up four columns in [1983] 2 Lloyd's Rep. 473, 474. A fortnight later, on 19 November 1982, the same learned judge gave leave to appeal to the Court of Appeal [1983] 2 Lloyd's Rep. 473, 476 from his own refusal of leave to appeal to the High Court from the arbitrators' award. Again, but as I think in this case less unwisely, he gave his reasons for doing so. These will merit examination by your Lordships later. Pursuant to such leave, the appeal from Staughton J.'s decision was heard by the Court of Appeal who, on 8 July 1983 dismissed it by a majority (Sir John Donaldson M.R. and Fox L.J.; Ackner L.J. dissenting) [1983] 1 W.L.R. 1362. They refused leave to appeal to this House from their decision; so, in the result, at that stage approximately one year after its date, the award, which was in any event only an interim one, became final and conclusive on the issues which it decided.

My Lords, the course followed in the proceedings in the Supreme Court, illustrates the difficulty of preventing counsel instructed in commercial arbitrations of the kinds to which section 4 of the Arbitration Act 1979 applies, from indulging (no doubt in the supposed commercial interests of their clients) in delaying tactics, so as to attain a similar result to that which it had been possible to achieve before the passing of the Act of 1979 by using the procedure of demanding that an award be stated in the form of a special case whenever the contract sued upon raised a question of construction that was arguable, however faint the prospects of success.

Unless judges are prepared to be vigilant in the exercise of the discretions conferred upon them by sections 1 and 2 of the Arbitration Act 1979, including in section 1 the new subsection (6A) that was added by section 148(2) of the Supreme Court Act 1981, they will allow to be frustrated the intention of Parliament, as plainly manifested by changes in procedure that these statutes introduced, to promote speedy finality in arbitral awards rather than that insistence upon meticulous semantic and syntactical analysis of the words in which business men happen to have chosen to express the bargain made between them, the meaning of which is technically, though hardly commonsensically, classified in English jurisprudence as a pure question of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

law.

That such was Parliament's intention this House was at pains to indicate in the analysis of the provisions of the Arbitration Act 1979 made in my own speech in Pioneer Shipping Ltd. v. B.T.P. Tioxide Ltd. (The Nema) [1982] A.C. 724 in which the other members of the House who were present at the hearing concurred. At that time the way in which the parliamentary intention was being thwarted was by parties to arbitrations applying for leave to appeal from any award that involved a question that was even remotely arguable as to the construction of the relevant contract, and by some, though not all, commercial judges following a policy of granting leave in virtually all such cases, albeit upon conditions as to provision of security for, or payment into court of, the whole or a substantial part of the amount of the award. Accordingly, although the Court of Appeal's judgment in the The Nema [1982] A.C. 724, reversing that of Robert Goff J. [1980] 2 Lloyd's Rep. 83 granting leave to appeal from an arbitral award, appeared prima facie to an *200 Appeal Committee of this House to be right, leave to appeal from that judgment was granted by this House in order to afford it an opportunity of laying down guidelines as to the circumstances in which the statutory discretion to grant leave to appeal from arbitral awards by section 1(3)(b) ought to be exercised.

From the general guidelines stated in the The Nema I see, as yet, no reason for departing. Like all guidelines as to how judicial discretion should be exercised they are not intended to be all-embracing or immutable, but subject to adaptation to match changes in practices when these occur or to refinement to meet problems of kinds that were not foreseen, and are not covered by, what was said by this House in the The Nema. The instant case, too, in the view of an Appeal Committee of this House, disclosed a need for some addition to the The Nema guidelines particularly in relation to the practices to be followed upon the refusal by a commercial judge of leave to appeal to the High Court from an arbitral award. It was for that purpose that, despite the additional delay caused to the arbitrators' award in the instant case becoming final, that leave to appeal was granted.

My Lords, the dispute that was submitted to arbitration was a typical case of a shipowner seeking to find an excuse to bring a long-term time charter to a premature end in a rising freight market. Stripped to its essentials the shipowners were seeking to rely upon the charterer's breach of an innominate term in the charterparty relating to the charterer's right (acting through their sub-sub-charterers) to issue bills of lading on behalf of the master of the vessel, as constituting "any other breach of this charter party" within the meaning of the N.Y.P.E. withdrawal clause.

The arbitrators decided this issue against the shipowners. The 78 pages in which they expressed their reasons for doing so contained an interesting, learned and detailed dissertation on the law, so lengthy as to be, in my view, inappropriate for inclusion in the reasons given by arbitrators for an award. Their reasons can be adequately summarised as being (1) that "any other breach of this charter party" in the withdrawal clause means a repudiatory breach - that is to say: a fundamental breach of an innominate term or breach of a term expressly stated to be a condition, such as would entitle the shipowners to elect to treat the contract as wrongfully repudiated by the charterers, a category into which in the arbitrators' opinion the breaches complained of did not fall, and (2) that even if that were wrong, the word "on" immediately preceding "any other breach" meant "within a reasonable time of" their first knowledge of the breach; and the shipowners, in the arbitrators' opinion, had not given notice of withdrawal until after such reasonable time had expired.

To the semantic analysis, buttressed by generous citation of judicial authority, which led the arbitrators to the conclusions as to the interpretation of the wording of the withdrawal clause that I have summarised, the arbitrators' added an uncomplicated reason based simply upon business commonsense:

"We always return to the point that the owners' construction is wholly unreasonable, totally uncommercial and in total contradiction *201 to the whole purpose of the N.Y.P.E. time charter form. The owners relied on what they said was 'the literal meaning of the words in the clause.' We would say that if necessary, in a situation such as this, a purposive construction should be given to the clause so as not to defeat the commercial purpose of the contract."

This passage in the award anticipates the approach

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[1985] A.C. 191
1984 WL 283135 (HL), [1985] A.C. 191, [1984] 3 All E.R. 229, [1984] 2 Lloyd's Rep. 235, [1984] 3 W.L.R. 592, (1984) 81 L.S.G. 2776, (1984) 128 S.J. 564
(Cite as: [1985] A.C. 191)

Page 8

to questions of construction of commercial documents that was voiced by this House in the very recent case, Miramar Maritime Corporation v. Holborn Oil Trading Ltd. [1984] A.C. 676, which dealt with a bill of lading issued under a charterparty in Exxonvoy 1969 form. There, after referring to various situations which might arise if the construction for which the shipowners in that case contended were correct, I added, at p. 682, in a speech concurred in by my fellow Law Lords:

"There must be ascribed to the words a meaning that would make good commercial sense if the Exxonvoy bill of lading were issued in *any* of these situations, and not some meaning that imposed upon a transferee to whom the bill of lading for goods afloat was negotiated, a financial liability of unknown extent that no business man in his senses would be willing to incur."

While deprecating the extension of the use of the expression "purposive construction" from the interpretation of statutes to the interpretation of private contracts, I agree with the passage I have cited from the arbitrators' award and I take this opportunity of re-stating that if detailed semantic and syntactical analysis of words in a commercial contract is going to lead to a conclusion that flouts business commonsense, it must be made to yield to business commonsense.

Leave to appeal to the High Court from the arbitrators' award was refused by Staughton J. In giving reasons for his refusal, as is apparently his habit, he regarded the award as raising two questions: that which I have numbered (1) which he regarded as a question of construction and thus of law; and that which I have numbered (2), viz., whether a reasonable time had expired before the notice of withdrawal was given, which he regarded as one of fact for the arbitrators. The arbitrators' decision that a reasonable time had already expired before notice of withdrawal was given, even on the assumption that the breaches relied upon by the shipowners although not classifiable in law as being repudiatory, nevertheless had entitled the shipowners when they learnt of them to give notice of withdrawal provided it were prompt, had the result that whichever way question (1) was decided it could not substantially affect the rights of any parties to the arbitration, and leave to appeal upon that point of law was therefore barred by section 1(4) of the Act of 1979.

Staughton J., however, indicated that but for the "reasonable time" point he would have been strongly minded to give leave to appeal on the construction of the N.Y.P.E. withdrawal clause since this was in a standard form which is widely used and conflicting judicial dicta are to be found as to the meaning which the arbitrators had ascribed to the expression "any other breach of this charter party" appearing in the clause. Staughton J., however, noted in his reasons for refusing leave *202 that while there were alternative jurisprudential concepts from which the requirement that notice of withdrawal should be given within a reasonable time might be derived, i.e., "implied term " of the contract and "waiver," both of which concepts had been referred to indifferently by Lord Wilberforce in Mardorf Peach & Co. Ltd. v. Attica Sea Carriers Corporation of Liberia (The Laconia) [1977] A.C. 850 (a case which dealt only with withdrawal in default of punctual and regular payment of the hire), whichever concept were applied to the facts of the instant case it would lead to the same result; and although the arbitrators had plumped for "implied term" and excluded "waiver," the grounds which they said precluded the existence of waiver were in the view of Staughton J. and of the majority of the Court of Appeal (which is also shared by me) quite manifestly wrong.

In his judgment of 19 November 1982 [1983] 2 Lloyd's Rep. 473, 476, in which he gave to the shipowners leave under section 1(6A) of the Act of 1979 to appeal to the Court of Appeal from his refusal on 5 November of leave to appeal to the High Court from the arbitrators' award, Staughton J. ventured upon a classification of those kinds of cases in which a High Court judge ought to give leave to appeal to the Court of Appeal under that subsection and those kinds of cases in which he ought not. The conclusion that he reached was that included in the former class were cases where the decision whether or not to give leave to appeal to the High Court, under section 1(3)(b) in the particular case in the judge's view called for some amplification, elucidation or adaptation to changing practices, of the guidelines that had previously been laid down in appellate courts. The judgment of Parker J. in B.V.S. S.A. v. Kerman Shipping Co. S.A. (The Kerman) [1982] 1 W.L.R. 166, he cited as an example of a case that fell within this class. He expressed his own view that if the judge took the

view that upon a substantial and arguable point of law arising in a "standard term" case that the arbitrators so far from being probably wrong were on the contrary probably right, he should refuse both leave to appeal to the High Court under section 1(3)(b), and also leave to appeal to the Court of Appeal from such refusal under section 1(6A). This, with respect, appears to me to be in complete accord with The Nema guidelines [1982] A.C. 724; but paradoxically, Staughton J. treated this statement as bringing his judgment into The Kerman class [1982] 1 W.L.R. 166, and for that reason he gave leave to appeal to the Court of Appeal under section 1(6A).

Since the judge had given leave under section 1(6A) and had given the above-mentioned reason for doing so, the Court of Appeal was faced with two distinct questions: the first, which I shall call "the (6A) question" invited the court to lay down guidelines for judges to apply when deciding whether or not to grant leave to appeal to the Court of Appeal from their own decision to grant or refuse leave to appeal to the High Court from an arbitral award; the second, which I shall call "the (3)(b) question," required the Court of Appeal to determine whether or not Staughton J.'s exercise of his discretion by refusing such leave in the instant case could be shown to have been unreasonable in the Wednesbury sense [Associated Provincial Picture Houses Ltd. v. *203 Wednesbury Corporation [1948] 1 K.B. 223] of that term or, since he had in his judgment of 5 November 1982, given reasons for his decision, it could be shown to be wrong on the principle stated by Lord Radcliffe in Edwards v. Bairstow [1956] A.C. 14, 36. On the (6A) questions The Nema [1982] A.C. 724 did not lay down any guidelines: on the (3)(b) question it did.

Because he had taken the view that the arbitrators were probably right on the question I have numbered (2) in their award, the "reasonable time" point, Staughton J. forebore to say whether or not he had himself formed any view as to whether the arbitrators had probably been right or had probably been wrong on the question I have numbered (1), the "repudiatory breach" point. Nevertheless, he said that he would have been strongly inclined to give leave had he not been debarred from granting leave by section 1(4). In the Court of Appeal [1983] 1 W.L.R. 1362 it was common ground between counsel for all parties that: because there had been conflicting dicta in cases reported at first instance which indicated the existence of two schools of thought among commercial judges as to whether "any breach" in the withdrawal clause was confined to repudiatory breaches or embraced all breaches however trivial and whether known to the charterer or not, Staughton J. would have been right to give leave to appeal to the High Court under section 1(3)(b), irrespective of whether he himself thought that the arbitrators were probably right in their acceptance of the repudiatory breach construction or thought that they were probably wrong. This common ground between counsel shaped the way in which the argument developed in the Court of Appeal. That it should have been accepted without question illustrates not only the reluctance of the commercial Bar, to which I have earlier made reference, to abandon the practices and modify those attitudes of mind which had the effect of breeding litigation and delaying finality on arbitral awards to which the Bar had become accustomed before the Act of 1979. Its uncritical acceptance by the majority of the Court of Appeal illustrates also the need for judicial vigilance to ensure that the Bar does so.

Ackner L.J. in his dissenting judgment made effective play with this common ground, which he rightly characterised as being in conflict with The Nema guidelines. There were also conflicting dicta, he pointed out, that demonstrated the existence of two schools of thought on whether the jurisprudential basis of the rule that notice of withdrawal must be given in a reasonable time was that of implied term or waiver, and what was a reasonable time in a particular case might depend upon which school was right.

My Lords, I think that your Lordships should take this opportunity of affirming that the guideline given in The Nema [1982] A.C. 724, 743 that even in a case that turns on the construction of a standard term, "leave should not be given ... unless the judge considered that a strong prima facie case had been made out that the arbitrator had been wrong in his construction," applies even though there may be dicta in other reported cases at first instance which suggest that upon some question of the construction of that standard term there may among commercial judges be two schools of thought. I am confining

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[1985] A.C. 191
1984 WL 283135 (HL), [1985] A.C. 191, [1984] 3 All E.R. 229, [1984] 2 Lloyd's Rep. 235, [1984] 3 W.L.R. 592, (1984) 81 L.S.G. 2776, (1984) 128 S.J. 564
(Cite as: [1985] A.C. 191)

Page 10

myself to conflicting *204 dicta not decisions. If there are conflicting decisions, the judge should give leave to appeal to the High Court, and whatever judge hears the appeal should in accordance with the decision that he favours give leave to appeal from his decision to the Court of Appeal with the appropriate certificate under section 1(7) as to the general public importance of the question to which it relates; for only thus can be attained that desirable degree of certainty in English commercial law which section 1(4) of the Act of 1979 was designed to preserve.

Decisions are one thing; dicta are quite another. In the first place they are persuasive only, their persuasive strength depending upon the professional reputation of the judge who voiced them. In the second place, the fact that there can only be found dicta but no conflicting decisions on the meaning of particular words or phrases appearing in the language used in a standard term in a commercial contract, especially if, like the N.Y.P.E. withdrawal clause, it has been in common use for very many years, suggests either that a choice between the rival meanings of those particular words or phrases that are espoused by the conflicting dicta is not one which has been found in practice to have consequences of sufficient commercial importance to justify the cost of litigating the matter; or that businessmen who enter into contracts containing that standard term share a common understanding as to what those particular words and phrases were intended by them to mean.

It was strenuously urged upon your Lordships that wherever it could be shown by comparison of judicial dicta that there were two schools of thought among commercial judges on any question of construction of a standard term in a commercial contract, leave to appeal from an arbitral award which involved that question of construction would depend upon which school of thought was the one to which the judge who heard the application adhered. Maybe it would; but it is in the very nature of judicial discretion that within the bounds of "reasonableness" in the wide Wednesbury sense [1948] 1 K.B. 223 of that term, one judge may exercise the discretion one way whereas another judge might have exercised it in another; it is not peculiar to section 1(3)(b). It follows that I do not agree with Sir John Donaldson M.R. [1983] 1 W.L.R. 1362, 1369H-1370B where in the instant case he says that leave should be given under section 1(3)(b) to appeal to the High Court on a question of construction of a standard term upon which it can be shown that there are two schools of thought among puisne judges where the conflict of judicial opinion appears in dicta only. This would not normally provide a reason for departing from The Nema guideline [1982] A.C. 724 which I have repeated earlier in this speech.

Staughton J. was accordingly right in applying those guidelines to the "reasonable time" point despite the existence of judicial dicta which indicated that there were two schools of thought as to the juristic basis of the requirement that notice of withdrawal should be given within a reasonable time, the "implied term" school and the "waiver" school which, in some cases, might make a difference as to what amounted to "a reasonable time" but did not in the instant case, because the facts found by the arbitrators which they considered excluded "waiver" were not capable in law of doing so. If, on the contrary, he had formed the *205 view that a strong prima facie case had been made out that the arbitrators had been wrong on the "reasonable time" point, so that their decision one way or the other on the repudiatory breach point would substantially affect the rights of the parties to the arbitration agreement, it would have been necessary for Staughton J. to make up his own mind whether a strong prima facie case had been made out that the arbitrators had also been wrong on the "repudiatory breach" point. If such had been his opinion it would have been a proper exercise of his discretion to grant leave to appeal from the arbitral award to the High Court under section 1(3)(b). In the event, however, since this was not a matter to which the reasons in his judgment of 5 November 1982 reveal that he ever gave his mind, your Lordships would not be trespassing on the field of a discretion that a judge upon whom it was conferred had in fact exercised if you were to take this opportunity of stating, consistently with the recent decision of this House in Miramar Maritime Corporation v. Holborn Oil Trading Ltd. [1984] A.C. 676, as to semantic and syntactical analysis yielding to business commonsense in the construction of commercial documents, that the arbitrators in the passage in their award that I have cited earlier were not obviously wrong but were obviously right in their decision on the "repu-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

diatory breach" question.

This brings me to the "(6A) question" canvassed in Staughton J.'s second judgment of 19 November 1982: when should a judge give leave to appeal to the Court of Appeal from his own grant or refusal of leave to appeal to the High Court from an arbitral award? I agree with him that leave to appeal to the Court of Appeal should be granted by the judge under section 1(6A) only in cases where a decision whether to grant or to refuse leave to appeal to the High Court under section 1(3)(b) in the particular case in his view called for some amplification, elucidation or adaptation to changing practices of existing guidelines laid down by appellate courts; and that leave to appeal under section 1(6A) should not be granted in any other type of case. Judges should have the courage of their own convictions and decide for themselves whether, applying existing guidelines, leave to appeal to the High Court under section 1(3)(b) ought to be granted or not.

In the sole type of case in which leave to appeal to the Court of Appeal under section 1(6A) may properly be given the judge ought to give reasons for his decision to grant such appeal so that the Court of Appeal may be informed of the lacuna, uncertainty or unsuitability in the light of changing practices that the judge has perceived in the existing guidelines; moreover since the grant of leave entails also the necessity for the application of Edwards v. Bairstow [1956] A.C. 14 principles by the Court of Appeal in order to examine whether the judge had acted within the limits of his discretion, the judge should also give the reasons for the way in which he had exercised his discretion.

However, save in the exceptional case in which he does give leave to appeal to the Court of Appeal under section 1(6A) because it falls within this limited category, a judge ought not normally to give reasons for a grant or refusal under section 1(3)(b) of leave to appeal to the High Court from an arbitral award. He should follow the practice that has been adopted in your Lordships' House ever since a would-be *206 appellant from a judgment of the Court of Appeal was required to petition this House for leave to appeal to it when leave to do so had not been granted by the Court of Appeal itself. It has been the practice of this House at the close of the short oral argument on the petition, to say no more than that the petition is allowed or refused as the case may be.

Save in very exceptional circumstances which I find myself unable at present to foresee, I can see no good reason why a commercial judge in disposing of an application under section 1(3)(b) should do more than that, and several good reasons why he should not. In the first place, he is not himself deciding at this stage the question of law arising out of the award which usually involves a question of construction of a commercial contract. He is simply deciding whether the case is of a kind that is recognised, under the current guidelines laid down by appellate courts, as suitable to be admitted to appeal. In the second place, it adds to the already excessive volume of reported judicial semantic and syntactical analysis of particular words and phrases appearing in commercial contracts which judges are inveigled to indulge in by the detailed oral arguments which it appears to be current practice to allow on applications under section 1(3)(b); whereas all that the judge has to decide on the application is: first, is this dispute, on the one hand, about a one-off clause or event, or, on the other hand, about a standard term or an event which is a common occurrence in the trade or commercial activity concerned? If it is the former, he must then consider: whether the arbitrator was in the judge's view so obviously wrong as to preclude the possibility that he might be right; if it is the latter, he must then consider whether a strong prima facie case has been made out that the arbitrator was wrong? Unless the answer he would give to the question appropriate to the type of case to which the application with which he is concerned is: "Yes," he should refuse leave to appeal.

The proliferation of reported judicial statements made in applications under section 1(3)(b), which are refused, that become available for subsequent citation in argument in cases where the actual question of law that arose in the arbitration does fall to be decided by the court itself, may have been mitigated since the date of Parker J.'s judgment in The Kerman [1982] 1 W.L.R. 166 by the change in practice in the hearing of applications under section 1(3)(b), from hearings on motion in open court to hearings in chambers; but your Lordships have been informed that this has not prevented judges from allowing to have inflicted on them on such applications protracted arguments by counsel

[1985] A.C. 191
1984 WL 283135 (HL), [1985] A.C. 191, [1984] 3 All E.R. 229, [1984] 2 Lloyd's Rep. 235, [1984] 3 W.L.R. 592, (1984) 81 L.S.G. 2776, (1984) 128 S.J. 564
(Cite as: [1985] A.C. 191)

Page 12

which frequently extend over two or three days.

My Lords, to permit such prolonged and therefore costly arguments on applications for leave to appeal to the High Court under section 1(3)(b), assists in frustrating the policy of Parliament in enacting the Act of 1979. As respects the extent to which detailed argument should be tolerated on such applications, too, it is appropriate that the practice of this House in dealing with petitions for leave to appeal from judgments of the Court of Appeal in civil actions should be followed. In the first instance, a three-member Appeal Committee of the House peruses the judgments delivered in the courts below and the grounds set out in the written petition for leave to appeal that are relied upon by the petitioner *207 as making the case one in which leave ought to be granted. Upon this material the members of the Appeal Committee, if they are all three of opinion that the petition could not possibly succeed, may dismiss it ex parte without requiring or permitting any oral argument; but this is exceptional; generally a brief oral hearing inter partes is permitted of which the average duration is ten to fifteen minutes; the parties are not allowed to use the hearing as an opportunity to argue the appeal that is the subject of the petition. The only question to be determined is whether the case in which leave to appeal is sought is of such a nature that it ought to be re-argued in this House instead of leaving the judgment appealed from as the final judgment in the case. If argument of this length is found to be adequate by the House of Lords to enable it to decide a question whether leave to appeal ought to be given, it should be good enough for commercial judges who have to make up their minds upon a similar question where the criteria as to whether to grant leave or not are, under The Nema guidelines [1983] A.C. 724, less complex than those applicable to the grant of leave to appeal to this House from judgments of the Court of Appeal.

In The Kerman [1982] 1 W.L.R. 166, Parker J. pointed out that the passage in The Nema guidelines dealing with cases concerned with the construction of a "one-off" clause it appeared to be contemplated by this House that applications in such cases would normally be dealt with on the papers alone. It is correct that it was contemplated that a painstaking perusal of the award and the reason set out in the application as constituting the grounds why leave to appeal should be granted, would play the major part in the decision-making process of the commercial judge; but not so as to preclude subsequent brief oral argument limited to the question whether the grant of leave would fall within The Nema guidelines to the exclusion of any anticipatory argument directed to the merits of the appeal if leave should be granted.

My Lords, it may be, as your Lordships have found in the course of exercising the analogous jurisdiction of an Appeal Committee of this House, that there are occasionally applications for leave to appeal under section 1(3)(b) that are so hopeless that they can be properly disposed of by a refusal made ex parte on the papers alone without incurring the delay and expense of an oral hearing. The introduction of any such procedure to deal with obviously hopeless applications would be a matter for the Rules Committee rather than your Lordships so I limit myself to the suggestion that it may be worthy of consideration by that committee.

I would dismiss the appeal.

LORD KEITH OF KINKEL.

My Lords, I have had the benefit of reading in draft the speech of my noble and learned friend, Lord Diplock. I agree with it, and for the reasons he gives I too would dismiss the appeal. I also agree with the supplementary observations of my noble and learned friend, Lord Roskill.

LORD SCARMAN.

My Lords, I have had the advantage of reading in draft the speeches of my noble and learned friends, Lord Diplock and *208 Lord Roskill. I agree with them, and for the reasons they give, I also would dismiss the appeal.

LORD ROSKILL.

My Lords, I have had the advantage of reading in draft the speech of my noble and learned friend, Lord Diplock. I agree with it in all respects and I would dismiss this appeal for the reasons he gives. I add some observations of my own only to reinforce what my noble and learned friend has said regarding the stopping, as a matter of urgency, of practices which your Lordships were told have recently grown up in connection with the hearing of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

applications for leave to appeal against arbitral awards and which if allowed to continue unchecked can only have the effect of what my noble and learned friend has called "frustrating the intention of Parliament" in enacting the Arbitration Act 1979.

My noble and learned friend has referred to and indeed quoted from his speech in The Nema [1982] A.C. 724. I venture to repeat what I said in my own speech in that case, at pp. 745-746, in expressing my agreement with what he had already said:

> "I entirely agree with [that speech] and respectfully adopt the criticisms which he has made of the several judgments of Robert Goff J. on this question in the instant case and in two subsequent cases ... in which that learned judge felt free not to follow the decision of the Court of Appeal in the instant case. I would only add with profound respect to Robert Goff J. that if that learned judge's view were allowed to prevail I find it difficult to see what useful purpose has been served by the passing of the Act of 1979 which had as one of its primary targets the abolition of the special case since it seems to me that if leave to appeal from an arbitral tribunal to the High Court is to be given in accordance with the principles which the learned judge there enunciated, the notoriously unsatisfactory results to which special cases have given rise in recent years will be perpetuated albeit in a different form."

My Lords, I see no reason to depart from a single word of what I then said. But unhappily the warnings uttered in that case do not appear to have had the intended effect and must now, I fear, be repeated.

One purpose of arbitration, especially in commercial disputes, is the avoidance of delays, traditionally if often unfairly associated with the judicial process. The award of an arbitral tribunal can, it is supposed, be obtained swiftly and simply and without elaboration. Unhappily, the former virtually unrestricted right to demand a special case from arbitral tribunals made these admirable objectives almost impossible of attainment. The arbitral process became even more protracted than the judicial, with one or sometimes, as in commodity trade arbitrations, two extra tiers of tribunal added below the High Court, the Court of Appeal and your Lordships' House. The resultant abuse was notorious. Hence the demand for the abolition of the special case successfully accomplished in 1979. But if the restricted appellate system substituted for the special case and the equally outdated motion to set aside an award for error of law on its face, is to be operated in such a way as to make appeals to *209 the High Court, and even beyond the High Court, readily available, not only are the worst features of the system now abolished restored but the additional, albeit not unrestricted autonomy, of arbitral tribunals which the Act of 1979 was designed to establish, seriously hampered. Moreover, with all respect to the three arbitrators in the present case, whose lengthy reasons for their award I have read with admiration for their legal learning, if reasons for which the Act of 1979 makes provision are to be given with such elaboration, the very preparation of those reasons must itself defeat the possibility of obtaining speedy arbitral decisions, independently of any question of further delay brought about by a possible appeal or appeals. In general, businessmen are interested in the decision, not in its underlying legal philosophy, however much lawyers may have that wider interest.

It is for these reasons, in addition to those which my noble and learned friend, Lord Diplock, has given that I respectfully endorse every word that he has said as to the need for circumspection as well as brevity in the granting of leave to appeal and for applications for such leave, whether successful or unsuccessful, to be dealt with as simply and informally as possible. I also entirely agree with what he has said regarding leave to appeal from the High Court to the Court of Appeal.

Returning to the instant case, like my noble and learned friend, I entertain no doubt whatever that the arbitrators were "obviously right in their decision on the 'repudiatory breach' point." For that reason and because Staughton J. rightly thought that the findings of fact on "the reasonable time" point concluded the matter, I think that this application for leave to appeal should have been rejected by the learned judge out of hand.

LORD BRANDON OF OAKBROOK.

My Lords, I have had the advantage of reading in draft the speeches prepared by my noble and learned friends, Lord Diplock and Lord Roskill. I agree with both of them entirely, and for the reasons which they give, I would dismiss the appeal.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Representation**

Solicitors: Vincent Stokes French & Browne; Richards Butler & Co.

Appeal dismissed. (J. A. G. )

(c) Incorporated Council of Law Reporting For England & Wales

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.