# Jumbo King Ltd v Faithful Properties Ltd., 2 HKCFAR 279 (1999) (England)

# IN THE COURT OF FINAL APPEAL OF THE
# HONG KONG SPECIAL ADMINISTRATIVE REGION

### FINAL APPEAL NO. 7 OF 1999 (CIVIL)
### (ON APPEAL FROM CACV No. 180 OF 1998)

---

Between:

| | |
|---|---|
| **JUMBO KING LIMITED** | **Appellant** <br> **(Plaintiff)** |
| - and - | |
| **FAITHFUL PROPERTIES LIMITED** | **1st Respondent** <br> **(1st Defendant)** |
| **TARGET POWER LIMITED** | **2nd Respondent** <br> **(2nd Defendant)** |
| **GOLD NATION DEVELOPMENT LIMITED** | **3rd Respondent** <br> **(3rd Defendant)** |

---

| | |
|---|---|
| Court: | Chief Justice Li, Mr Justice Litton PJ <br> Mr Justice Ching PJ, Mr Justice Nazareth NPJ <br> and Lord Hoffmann NPJ |
| Date of Hearing: | 17 November 1999 |
| Date of Judgment: | 2 December 1999 |

---

## J U D G M E N T

---

Chief Justice Li:

I have read the judgments in draft of Mr Justice Litton PJ and of Lord Hoffmann NPJ and agree with them.   I would dismiss the appeal with costs.

Mr Justice Litton PJ:

## *Introduction*

Hankow Centre is a well-known landmark in Tsimshatsui, Kowloon. It stands on an island site, KIL No. 8219 and Extension.   The site was owned at one time by Mr J.E. Hotung who developed it into a large composite building, the occupation permit for which was issued in February 1968.   It was then called J. Hotung House.   This appeal concerns sales of undivided shares in the land and building and of units therein made by a written agreement dated 14 October 1997.   The appellant Jumbo King Ltd. was the purchaser and the three respondents the vendors.   The interests agreed to be sold by the respondents were as follows:-

### 1st respondent Faithful Properties Ltd.

6,734 undivided 720,000 shares in the land and building together with the right to the exclusive use, occupation and enjoyment of *Shops* G-5 and G-6 on the ground floor.

### 2nd respondent Target Power Ltd.

9,861 undivided 720,000 shares in the land and building together with the exclusive use, occupation and enjoyment of *Shops* G-7 and G-8 on the ground floor, *Utility rooms* U3A and 302A on the 3rd floor, *Flat roofs* on the 10th floor, and *Flat roofs* on the main roof of the building.

## 3rd respondent Gold Nation Development Ltd.

10,916 undivided 720,000 shares in the land and building together with the exclusive use, occupation and enjoyment of *Shops* G-9/9A and G-10 on the ground floor, *Utility rooms* 213A on the 2nd floor, and *Utility room* 413A on the 4th floor.

The total consideration for the property summarized above was HK$257.5m, whereof $10m had been paid as initial deposit on the signing of an earlier provisional agreement dated 22 March 1997, and $15.75m was paid as a deposit on 20 October 1997. The agreement provided for a further deposit of $25.75m to be paid on 15 November 1997 and the balance of the purchase price to be paid on completion on 26 January 1998.

In the agreement the respondents are referred to collectively as "the Vendor" and the property agreed to be sold is described as "the Property".

The clauses in the agreement relevant to the appeal are as follows:

"10.  Any requisitions or objections in respect of the title or otherwise arising out of this Agreement shall be delivered in writing to the Vendor's Solicitors within ten (10) working days after the receipt of the title deeds by the Purchaser's Solicitors otherwise the same shall be considered as waived (in which respect time shall be of the essence of the Agreement) and the Purchaser shall be deemed for all intents and purposes to have accepted the title of the Property ....

18(b)  The Vendor hereby warrants and declares that the Vendor has not received any notice from any Government or other competent authority requiring the Vendor to demolish or reinstate any part of the Property. If it should be discovered that such notice existed prior to the date hereof or if any such notice shall be issued before the date for completion and if the same is not due to any breach of any of the terms of the tenancy/licence agreements by the tenant(s)/licensee(s), the costs for such demolition or re-instatement shall be borne by the Vendor Provided that the Purchaser shall not be entitled to rescind this Agreement or claim any compensation or damages or reduction in the Price other than the said costs for such demolition or reinstatement ....

(e)  The Vendor does not warrant or represent that each and every ... structure (if any) on the Property or any part thereof is erected in all respects in compliance with the Building Ordinance and/or its subsidiary legislation .... The Vendor shall be under no liability whatsoever if it is

discovered at any time (whether before or after Completion) that at the date hereof or before Completion, there is any ... structure in or to any part of the Property which is in contravention of the Building Ordinance and/or its subsidiary legislation ... the Vendor shall not be held responsible for the demolition, ... removal, ... or any other works relating to such illegal ... structure or for any costs or expenses of or incidental thereto whether or not such works are required by the Building Authority or other authority or body or otherwise. The Purchaser shall not be entitled to raise any requisition or objection or to rescind this Agreement or to annul the sale or to claim any compensation or damages from the Vendor by reason of or in connection with any such contravention.

19.　　Notwithstanding anything to the contrary herein, the Purchaser shall be deemed to have duly inspected the Property prior to the signing of this Agreement and the Purchaser expressly declares that he is fully aware that he is purchasing the Property in its present state and user thereof and shall not make any objection as to title or otherwise or raise any requisition thereto or in connection therewith. The Property is and will be sold on an "as is" basis. Without prejudice to the generality of the foregoing no warranty is given by the Vendor on any of the following matters, namely :-

> (a)　　The physical state and condition, quality or fitness of the fixtures fittings and finishes or the installations and appliances (if any) incorporated in the Property or in the Building;
>
> (b)　　The physical state and condition of the Property and the Building;
>
> (c)　　....
>
> (d)　　...."

On 22 October 1997 the vendors' solicitors sent to the purchaser's solicitors the title deeds and documents. On 3 November 1997 the purchaser's solicitors raised (among others) the following requisition:

> "It appears that no undivided shares were allotted to Units U3A, 302A, 213A, 413A, Flat Roof on 10th Floor and Flat Roof on the Main Roof of the building. Kindly show how these properties can be validly assigned to our client."

Before that requisition was answered, the purchaser's solicitors rescinded the agreement. Their letter, dated 14 November 1997, reads as follows:-

> "It is discovered by our client that the cocklofts in the said properties are unauthorized structures. Under the existing Sale and Purchase Agreement dated 14th October, 1997, your clients are obliged to show good title to the said properties. The existence of the these unauthorized structures renders your clients' title defective. Firstly, these unauthorized cocklofts are liable to be

demolished by the Buildings Authority. As a consequence thereof, the size of the property which your clients have agreed to sell to our client will be substantially reduced and your clients will in effect compel our client to accept property substantially different from that agreed in the Agreement. This is of course unacceptable by our client who will be substantially prejudiced by the difference. Furthermore, these unauthorized structures may also give rise to enforcement action by the Government (including the exercise of the Government's right of re-entry) under the relevant Government Leases. It is also noted that the Deed of Mutual Covenant of Hankow Centre expressly prohibits structural alteration to any part of the building. These unauthorized structures may also give rise to action by the co-owners of the building and/or the manager thereof.

All the rights mentioned above are neither fanciful nor remote particularly so due to the substantial size of the cocklofts in question.

Furthermore, up to the moment hereof, you have still failed and/or refused to assure us as to how Units U3A, 302A, 213A, 413A, Flat Roof on 10/F and Flat Roofs on the Main Roof of the building can be validly assigned to our client as no undivided shares of and in the building and the land are allotted or attached to them. Our client should not be compelled to accept just the exclusive right to use these Units and Flat Roofs but without the corresponding undivided shares. Nor are your clients legitimately entitled to assign just the exclusive right but without the corresponding undivided shares.

Moreover, The Deed of Mutual Covenant of the building Memorial No. 624356 has not even mentioned about the aforesaid Units at all. Indeed, under the said Deed, Joseph Edward Hotung was granted exclusive right to inter alia, offices on the 2nd Floor and offices on the Fourth Floor. Utility rooms are obviously not offices but are more appropriately regarded as common area or common facilities for the relevant floors or building. It follows that these Units should since become and remain to be part of the common area of the building. As such, it is extremely doubtful whether your clients have exclusive right and possession to these Units capable of being assigned away. Even if (which is denied) these Units are regarded as Reserved Area, it is extremely doubtful whether your clients (as opposed may be to Mr. Joseph Hotung) shall have the legitimate right to assign them away.

It is therefore considered that the present defects in title are not one that can be remedied before completion. In particular, as for the unauthorized cocklofts, even if they are reinstated, your clients are not entitled to compel ours to accept property substantially different from that agreed to be sold under the existing Agreement. Obviously, our client will be seriously prejudiced by the difference.

Hence, in view of such title defects and/or your clients' fundamental breach and/or repudiation which defects and/or breach and/or repudiation is unlikely (if not possible) to be remedied before Completion, our client is not required to wait until completion in order to exercise its right of rescission. Notice is hereby given to you that our client hereby exercises its right of rescission and requires your clients to refund the deposit to our client forthwith."

(There had been no previous mention of the cocklofts, or of the contention that the utility rooms were "common areas").

On 18 November 1997, the vendor's solicitors replied as follows:-

"We refer to your letter dated 14th November, 1997 and are most surprised by the allegations therein.

As you have rightly admitted, our clients are only required to prove good title to the properties before completion. It is certainly premature to say that the matters raised by you in the said letter constitute any defect in title or if they do constitute any defect in title (which is denied) that they cannot be remedied before completion.

Furthermore, the time for raising requisitions has expired and our clients are not, in any event, obliged to deal with any matters raised out of time. We would also remind you of the provisions of Clause 18(e) of the Agreement … dated 14th October, 1997 (…) dealing with unauthorised structures.

As your client has failed to pay the further deposit of HK$25,750,000.00 on 15th November 1997 in accordance with the terms of the said Agreement, our clients hereby exercise their rights under the said Agreement to terminate the said Agreement and the deposit of HK$25,750,000.00 already paid to our clients has been forfeited.

In the meantime, all our clients' rights and remedies in the matter including but not limited to recovering from your client further damages as hereby expressly reserved."

## Proceedings below

On 13 January 1998 the purchaser instituted proceedings to recover the $25.75m paid on the basis (i) that the requisition as to title had not been sufficiently answered; (ii) that a good title to the property had not been shown, and (iii) that there had been a "fundamental breach of contract" by the vendors. The action was heard by Mr Kenneth Kwok SC (sitting as a Recorder) who gave judgment in the purchaser's favour. He declared that the purchaser was entitled to and did effectively terminate the agreement by its solicitor's letter dated 14 November 1997 and ordered the repayment of the sum of $25.75m plus interest. On appeal, the Recorder's judgment was quashed by the Court of

Appeal (Mortimer V-P, Godfrey and Rogers JJA) who entered judgment in the vendors' favour. Hence the purchaser's appeal to this Court.

It would be convenient in this judgment to identify the issues by the same labels as used in the courts below.

In essence, three points were taken by the purchaser in its objections to the vendors' title: The "undivided shares" point, the "common areas" point and the "cocklofts" point.

### Dealings by the developer

The entire property interest in the land and building was, in February, vested in the developer Mr Hotung who held the land from the government subject to conditions of regrant. Under those conditions Crown rent and annual instalments of premium were payable to the government.

The new building consisted of two self-contained parts, one commercial and one domestic. The *commercial* part comprised the basement, ground to 4th floors and a piping service floor. The floors above – 5th to 16th floors and the main roof – comprised the *domestic* part. The domestic floors were served by entrances, lobbies, corridors, staircases, lifts etc. exclusive to those floors: Persons going to the domestic floors did not need to pass through any part of the commercial floors.

By an assignment dated 1 May 1968 Mr Hotung assigned to Mr Cheng Ah Loong 1/720th undivided share in the land and building for the price of $63,000 together with the right to the exclusive use occupation and enjoyment of Flat A5 on the 6th floor and portion No. 11 on the main roof and "all rights, rights of way (if any) privileges easements and appurtenances thereto belonging or appertaining". This was the first sale of an undivided share. By the deed of assignment the purchaser covenanted to pay 1/720th share of the Crown rent and premium. Mr Hotung on his part covenanted that he his "successors in

title and the owners for the time being of the shares in the ... building having the exclusive right to the use occupation and enjoyment of the basement, ground, first, second, third and fourth floors and the piping service floor of the said building and of any part thereof" would pay the instalments of premium attributable to the domestic floors as they fall due until such time as the due proportion of the entire balance of the premium attributable to those floors had been fully paid.

### The deed of mutual covenants

Contemporaneously with the assignment the parties executed a deed of mutual covenants ("DMC"), clause 1 of which provides as follows:

> "1.     Each of the parties hereto for himself and his executors administrators and assigns hereby grant unto each of the other parties hereto their or his respective executors administrators and assigns the full right and privilege to the exclusive use occupation and enjoyment and the rents and profits of the part of the said building and the said premises set out in the Second Column of the First Schedule hereto opposite to the respective names of the grantees as set out in the First Column of the said First Schedule TO THE INTENT that each of the parties hereto shall be entitled to the exclusive use occupation and enjoyment and the rents and profits of the part of the said building and the said premises so set out opposite to his name as aforesaid."

The 1st Schedule sets out, as one would expect, Mr Cheng Ah Loong's name and his 1/720th share in the land and building in the first column and, in the second column "flat A5 on the 6th floor and main roof portion No. 11 (1/720th share)".   Immediately below Mr Cheng Ah Loong's name is the developer Mr Hotung's name and a statement to the effect that the remaining undivided 719/720th shares in the land and building were held by him.

Pausing here and viewing the position as between the parties at this point.   Mr Cheng Ah Loong, the first purchaser, was assigned 1/720th share in the land and building and was given exclusive possession of flat A5 on the 6th floor and portion No. 11 on the main roof.   He held his property subject to the covenants in the DMC.   This included an easement to "go pass and repass over

and along the entrances, staircases, landings, passages and lifts in the ...
building ... for all purposes connected with the proper use and enjoyment" of
his flat (and his portion of the main roof): clause 3(a).   The developer on his
part retained $719/720^{th}$ shares in the land and building and exclusive possession
of the rest of the building.

The description in the 1st Schedule of the parts of the building retained
by the developer was just that: A description.   It could not in anyway affect the
property rights as between him and the first purchaser, or as between him and
any subsequent parties or between the subsequent parties *inter se*.   Being the
owner of $719/720^{th}$ share in the land and building and entitled to possession of
the entire building other than those parts allotted to Mr Cheng for his exclusive
use Mr Hotung could, subject to the DMC, do with the building as he pleased.
In fact, in the second column of the 1st Schedule, undivided shares were allotted
to various parts of the building.   In relation to the commercial part one sees the
following:

> "SHOP SPACES on the GROUND FLOOR,
> SHOP SPACES on the FIRST FLOOR,
> OFFICES on the SECOND FLOOR,
> OFFICES on the THIRD FLOOR,
> OFFICES on the FOURTH FLOOR,
> FLAT ROOF on the TENTH FLOOR LEVEL
> $(482/720^{th}$ shares)"

There was no specific mention of spaces on those floors such as
"utility", "storage", "air-handling plant room", "meter" etc.   It is the
appellant's case that this made the property rights vested in the developer in
respect of those floors uncertain: That he cannot be deemed to have retained the
right of exclusive possession over the spaces marked "utility".   That
submission succeeded at trial.   I would reject that submission.   The allocation
of space within the commercial portion was of no conceivable interest to
Mr Cheng Ah Loong.   The deed of assignment and the DMC, both dated
1 May 1968, read together were clear: Mr Cheng Ah Loong had exclusive

possession of flat A5 on the 6th floor and portion No. 11 on the main roof. He had easements over portions of the domestic part of J. Hotung House for the purpose of passage. Full stop. The developer retained the right of exclusive possession over the rest as a legal incident of his $719/720^{th}$ share of the land and building.

The dealings with the commercial portion of J. Hotung House later on by the developer are wholly consistent with this view of the property rights. In August 1981, in anticipation of sales of shops and office units in the ground, first, second, third and fourth floors, the 482/720 shares referable to those floors were subdivided into 482,000/720,000 shares and shares were then allotted to the various shop spaces. No share was allocated to the flat roof space on the 10th floor. On 1 September 1981 the first sale of shop spaces was made. The purchaser was Shanghai Commercial Bank which bought shops No. G4 and G5A on the ground floor which totalled 7,399/720,000 shares. On the same day the parties entered into a sub-DMC relating to the commercial portion. Clause 4(ii) of the sub-deed provides:

> "4(ii)   Those portions of the Commercial Portion shown and coloured yellow on the floor plans hereto annexed being part of the premises to which the First Owner is entitled to the exclusive use occupation and enjoyment or any part or parts thereof may in future from time to time be designated by the First Owner to be common parts for the common use of all owners or the common use only to the owners entitled to the exclusive use occupation and enjoyment of the shop or office units on any one particular floor and such designation shall have effect accordingly until so designated the First Owner shall be entitled to assign the exclusive use occupation and enjoyment of any such spaces with any shop or office unit in the Commercial Portion."

The "First Owner" was the developer and the portions coloured yellow on the floor plans included the utility rooms on the various floors.

The 2nd Schedule to the sub-deed allotted the rights of exclusive possession as follows:

"

| Names, address and descriptions of the parties hereto and the share or shares held by each Party | Part or Parts of the said premises allotted |
|---|---|
| 1. JOSEPH EDWARD HOTUNG | (a) All shops and units on the ground floor of the Commercial Portion save and except the shops on the ground floor specified hereunder;<br><br>(b) The entirety of the first, second, third and fourth floors of the Commercial Portion including all shops and office units therein;<br><br>(c) the flat roofs on the tenth floor and the flat roofs on the main roof of J. Hotung House;<br><br>(d) all passages, landings, stairways and lavatories on the ground, first, second, third and fourth floors of the Commercial Portion save and except as may be designated common areas by the Sub-deed of Covenant or in accordance with the provisions herein contained. |
| 2. SHANGHAI COMMERCIAL BANK LIMITED.... | All those shops Nos. G4 and G5A on the ground floor. |

"

The position after this sale was that Shanghai Commercial Bank Ltd. held 7,399/720,000 shares and Mr Hotung the rest of the shares as remained unsold.

As regards the allocation of space relating to undivided shares the position resulting from the two DMCs was as follows: All the shop units and the domestic units had undivided shares allotted to them in differing proportions, but the utility rooms on the commercial floors, the flat roof space on the 10th floor and the flat roofs on the main roof had no shares allocated.

### The "undivided shares" point

Earlier, reference has been made to the purchase by the appellant of various undivided shares from the 3 respondents together with various units: These included the utility rooms and the roof space as to which no allocation of undivided shares was made. The Recorder considered this a fundamental defect in the vendors' title which justified the purchaser in rescinding the agreement. He was reversed by the unanimous judgment of the Court of Appeal on this point.

The issue is simple. *Prima facie*, the co-owners of land have the right of possession in common to every part of the land. In relation to a multi-storied building there cannot be a *proprietary* right to the *exclusive* possession of part of the building except as an incident of common ownership in the land and building. The vendors were, at the time of the agreement, co-owners. They all derived their title ultimately from the developer. So long as the developer had the right of *exclusive* possession to the utility rooms and the roof spaces, he was able to pass such right to subsequent purchasers of undivided shares, including the vendors in this case. Any person who acquires an undivided share can acquire the exclusive user of any space in the building and exercise proprietary rights over such space.

Take the instance of the utility rooms located in the commercial portion. Clearly, as between the developer and the first purchaser Cheng Ah Loong, the developer retained exclusive possession of the whole of the commercial portion as an incident of his 719/720 shares which he kept after the first sale. When the commercial portion came to be sold in 1981 the sub-DMC recited the fact that the developer retained exclusive possession of the yellow portions (which included the utility rooms): a right which he could assign to subsequent purchasers of the shares which he had retained after the first sale to Shanghai Commercial Bank.

Counsel for the appellant Ms Audrey Eu SC spoke of shops or offices "carrying" undivided shares. This turns the legal position on its head. As mentioned earlier, the proprietary right of a co-owner in a multi-storied building is the right to an undivided share in the land and building: *Prima facie* the owner is entitled to exert rights of possession to every part of the building, in common with his co-owners. This is what is meant by the expression "unity of possession". But by the deed of assignment and by the DMC the rights of exclusive possession to individual parts are marked out as between the co-owners. To use Ms Eu's vocabulary: The true analysis is that an undivided share may "carry" a right to exclusive possession of a defined space. Not the other way round. Here, so long as the vendors were owners of undivided shares in the land and building, deriving title from the developer, they were entitled to assert rights of exclusive possession to parts of the building, such as the utility rooms and the roof spaces. Their title to those units cannot be impeached.

In my judgment the Court of Appeal was plainly correct in reversing the judge on this point.

### *The "common areas" point*

What is said above effectively disposes of the "common areas" point as well. Miss Eu's argument for the purchaser turned on an artificial construction of the 1st Schedule. It will be recalled that in setting out the commercial portion in the 1st Schedule as being allotted to Mr Hotung there was no specific mention of "utility room", or for that matter of air-handling plant rooms, meter rooms etc. either. It would be far-fetched to suggest that the parties intended thereby that the right to occupy those spaces in the commercial portion should be shared as between the developer and Mr Cheng Ah Loong, the first purchaser of a domestic unit: Nothing leads to such a conclusion when the

DMC is read as a whole: particularly in light of the assignment contemporaneously executed.

The Recorder's conclusion on this point is unsound and the Court of Appeal was right to reverse him.

### The "cocklofts" point

Before the parties entered into the agreement the purchaser had inspected the property and knew that there were extensive cocklofts in the ground floor shops accessible by steel staircases.    In the case of unit G-7 a small goods lift connected the ground floor with the cockloft.    The area of the cocklofts was about 32% of the total floor area of the shops agreed to be sold. All the shops were, at the time of the agreement, occupied by tenants and the sale was subject to existing tenancies.

When the purchaser's solicitors raised their requisition as to title on 3 November 1997 nothing was asked about the cocklofts.    In purporting to rescind the agreement on 14 November 1997 the first point put forward in the solicitors' letter of that date was that the purchaser had "discovered" that the cocklofts were "unauthorized structures" which rendered the vendors' title defective: It was defective allegedly for two reasons: (1) The unauthorized cocklofts were "liable to be demolished by the Building Authority" and (2) the unauthorized structures gave rise to "enforcement action by the Government (including the exercise of the Government's right of re-entry) under the relevant Government Leases".

At trial there were two distinctive issues arising from the "cocklofts" point: (1) Whether, having regard to clauses 18(e) and 19 of the agreement, the purchaser could raise objections to the vendors' title on the ground that the cocklofts were, or might have been, unauthorized structures and (2) assuming that the purchaser was not so debarred, whether the purchaser must be deemed

nevertheless to have accepted the title, it not having raised requisitions or objections within 10 working days after receipt of the title deeds, in terms of clause 10 of the agreement.

    The Recorder in dealing with point (2) said this:

> "The mere presence of cocklofts is no evidence of [there] being unauthorized structures. The cocklofts might or might not have formed part of the original approved building plans. They might or might not have been subsequently approved alterations. The objection of the Purchaser on this ground is one which could not be properly considered, let alone dealt with, without enquiries and investigation. The Purchaser purported to rescind on this ground on 14th November 1997 without having raised with the Vendor any enquiry, requisition or objection, and without showing how the cocklofts were said to be 'unauthorized structures'. There is no suggestion that the Purchaser had any evidence as at 14th November 1997 that the cocklofts were unauthorized structures. The Vendor was not given any opportunity to consider or investigate this alleged defect in title."

    It was on this ground that he found against the purchaser on the "cocklofts" point. As to point (1) – whether the purchaser had, by clauses 18(e) and 19 of the agreement, contracted to take the risk of the cocklofts being unauthorized structures – the Recorder's judgment is obscure. He said:

> "At best, clause 18(e) might cover innocent non-disclosure. There is no suggestion that the non-disclosure was innocent and clause 18(e) does not avail the Vendor".

    This seems to suggest that there was some fact, relevant to the vendors' title, which was known to them and concealed from the purchaser. What that fact might be is not explained. Moreover, the suggestion of concealment and trickery on the vendors' part – if this is what the Recorder meant to convey – is contradicted by his own findings set out earlier.

    In my judgment the only proper basis for approaching the "cocklofts" point is to regard the factual situation as neutral at the time the parties entered into the agreement. The shops were occupied by tenants and had been so for some time. There were extensive cocklofts within the shop units. These

were of course known facts. But whether the cocklofts (or some of them) formed part of the original building plans (going back some 30 years) or whether they were subsequent alterations, who had put them up, whether the persons responsible for erecting the cocklofts had sought approval for the alterations: The evidence was neutral as regards the vendors' knowledge. The purchaser on its part made no inquiries. Both parties must have been well aware of the possibility that some or all of the cocklofts were unauthorized structures. The parties were contracting on that basis.

In the Court of Appeal Godfrey JA (with whom Mortimer VP agreed) appears to have proceeded on the assumptions as summarized above. He said:

> "'Unauthorized structures' are all too common in Hong Kong and present a real problem for conveyancers. A vendor whose title is, or may be, open to objection because there is, or may have been, erected on the property of which he is granting exclusive use to his purchaser some unauthorised structure is well advised to protect himself by precluding his purchaser, by contract, from raising any requisition or objection to the title based on an 'unauthorised structure' point. Of course, if the vendor's conduct is tricky or unfair; if by concealment or non-disclosure, he misleads the purchaser about the matter, it will be held that he has disqualified himself by his conduct from relying on any such provision."

He concluded that the vendors were protected by clause 18(e) in this case.

Rogers JA on the other hand held that the vendors were not entitled to rely on clause 18(e), for reasons which are difficult to follow. He began this part of his judgment by saying:

> " On the face of Clause 18(e), the [vendors] would appear to have good grounds for saying that the contract was made upon the basis that whatever erections or structures were on the premises, whether they complied with the Buildings Ordinance or not and whether they were liable to be demolished or removed, the Purchaser was unable to complain about the same and was required to take the property with such erections and structures. In my view, Clause 18(e) would clearly cover cocklofts if they were present on the premises, moreover, given the fact that cocklofts do not appear to be a rarity in Hong Kong buildings, the reader of Clause 18(e) would, in my view, very possibly think in terms of the cocklofts being covered."

On its face this is a clear finding, upholding the effect of clause 18(e) whereby the purchaser was taking upon itself the risk of some or all of the cocklofts being unauthorized. But, two pages later on, Rogers JA said:

> "Whilst this matter has given me some concern, I have come to the conclusion that the Vendors are not entitled to rely upon clause 18(e)...."

He upheld the Recorder, however, on the clause 10 time limit point.

At the hearing we were told that the contradictory statements on this issue in the courts below have thrown the conveyancing world into confusion. In these circumstances it would be best to go back to first principles.

### First principles

An agreement to sell and convey an interest in land is, like any other contract, a matter for the parties themselves. Generally speaking, the court would give effect to the parties' intentions as evidenced by their agreement. If the agreement is clear, the parties would generally not resort to litigation. It is therefore not surprising that the reported cases tend to deal with contracts which are unclear, where there is ambiguity in their provisions. Take the instance often referred to in the cases and in the text-books as an "open contract": where only the property, price and parties have been agreed. To make an open contract work, terms must arise by implication: For instance, that the vendor will on completion make a good title. Hence the proposition that a court will not, by an order of specific performance, force a doubtful title upon an unwilling purchaser: *Emmet on Title* 19th ed. Para. 7.033. The obligation to make a good title "requires the vendor to show that he alone, or with the concurrence of some person or persons whose concurrence he can compel, can convey the whole legal estate and equitable interest in the land sold, free from encumbrances except for those disclosed by the contract": *Barnsley's*