*Conveyancing Law and Practice* 4th ed. at p.266. This is an implication arising from the obligation to make a good title: An obligation which the parties are free to modify by their own agreement.

Here, the parties have made elaborate provisions as regards existing encumbrances and the possibility of future encumbrances which might affect the title to the property. In summary the effect of those provisions is as follows:

    (1)    The property was sold subject to existing tenancies and licences: clause 6(a).

    (2)    By clause 18(b) the vendors warranted that they had not received any notice from any authority requiring them to demolish or reinstate any part of the property: But if it should be discovered that such notice existed, the cost of demolition or reinstatement would be borne by the vendors, but the purchaser was not entitled to rescind or claim damages or reduction in the purchase price on that account.

    (3)    By clause 19 the purchaser declared that it was purchasing the property in its present state and would make no objection as to title in connection therewith: The property was sold on an "as is" basis.

    (4)    One then comes to clause 18(e) which clearly contemplates that there might be structures on the property not erected in compliance with the Building Ordinance and its subsidiary legislation: For instance, unauthorized cocklofts. The clause in plain terms passes the risk of government action being taken in relation to such structures to the purchaser.

It would burden this judgment unnecessarily by considering whether the presence of unauthorized structures within the premises agreed to be sold constitutes an "encumbrance", so as to affect the vendors' obligation to pass a good title. It is a matter of degree. No ready answer can be given. An attempt to address this issue was made by the Court of Appeal in *Active Keen Industries Ltd v. Fok Chi-keong* [1994] 1 HKLR 396 at 407-10, in

circumstances somewhat different from the present case. Assuming the matter did go to title, nevertheless, in my judgment, Godfrey JA and Mortimer VP are plainly correct when they found for the vendors on the basis of clause 18(e). As Godfrey JA remarked, if the purchaser had raised, in time, an objection to the title based on the (alleged) unauthorized nature of the cocklofts, the vendors would have been entitled to reply that, by virtue of clause 18(e), the purchaser was not entitled to take that objection to the title.

### Clause 10

The Recorder, and all three Justices of Appeal, held that the purchaser was debarred by the time limit in clause 10 from objecting to the vendors' title on the "common areas" and "cocklofts" points, the objections not having been raised within the time limit of 10 days. As those points are in any case without substance, and cannot relieve the purchaser of its obligation to complete, nothing turns on a further consideration of the effect of clause 10. I do no more than to say this: There are undoubtedly cases in the books where a clause restricting inquiries into the title offered by the vendor was held not to be a bar to rescission when the purchaser discovered from other sources that the proffered title was worthless: *Becker v. Partridge* [1966] 2 QB 155, referred to in the course of argument, was such a case. Whether the court gives relief to the purchaser in such circumstances as a matter of the proper construction of the contract – reading into the contract an implication that in such extreme circumstances the restriction was not meant to apply – or whether it is the application of some principle of equity which empowers the court to moderate the harsh terms of the contract: These are interesting points, but academic in this case. They must await consideration another day.

Clause 10 is clear. Nothing said by counsel for the purchaser persuades me that the lower courts were wrong in concluding that it applied to make the objections raised by the purchaser ineffective.

### Conclusion

For the reasons above, I would dismiss the purchaser's appeal with costs.

Mr Justice Ching PJ:

I agree with the judgment of Litton PJ and have nothing to add.

Mr Justice Nazareth NPJ:

I agree with the judgment of Litton PJ and also the additional reasons given by Lord Hoffmann.

Lord Hoffmann NPJ:

I entirely agree with the reasons which Litton P.J. has given for dismissing this appeal but will also add some reasons of my own.

The chief point in the case turns on the construction of the First Schedule to the DMC of 1 May 1968. This was executed contemporaneously with a deed of assignment of the same date by which Mr Hotung (as he then was) assigned to Mr Cheng Ah Loong an undivided 1/720th share in the building. This assignment, without more, would have entitled each to the use and possession of the whole building: see *Bull* v. *Bull* [1955] 1 Q.B. 234, 237. By the DMC, however, each co-owner covenanted with the other, as owner of an undivided share, that he would by virtue of that share be entitled to the exclusive occupation of a specific part of the building. Such a covenant is binding contractually between the parties and runs with the undivided shares in the land so as to enure for the benefit of and be binding upon successors in title. So clause 1 of the DMC provided that Mr Hotung and Mr Cheng

were to be entitled to the exclusive occupation of the parts of the building specified against their names in the First Schedule. The problem is to decide exactly what these parts were.

There is no difficulty about the part allotted to Mr Cheng. He took Flat A5 on the sixth floor and Portion 11 of the Main Roof. The argument is about what was allotted to Mr Hotung. The Schedule says he took the "Shop Spaces" on the ground and first floors, the "Offices" on the second third and fourth floors and flat roof on the 10th floor level. The right to occupy these areas was to be attributed to 482 of his 719 undivided shares. But the ground to fourth floors included more space than could literally be described as "shop spaces" and "offices". There were corridors, lobbies, lavatories, machine rooms, lift shafts, staircases and the "utility rooms" of which some are in issue in this appeal. To whom did the DMC allocate these? The judge said that they were not allocated to anyone. The DMC said Mr Hotung took shop spaces and offices. The utility rooms were not shop spaces or offices and that was that. Miss Eu, in her excellent argument, supported his judgment on the principle that a grantor who desires to reserve something out of his grant must be clear about what he is keeping. If the grant is ambiguous, the doubts will be resolved against him.

I have some doubt about whether the principle for construing reservations applies to a DMC. The grant is the assignment of the undivided share. The DMC is, as its name says, mutual. The parties contract as covenantor and covenantee and do not reserve anything. But whether or not the principle applies, it is only a last resort to resolve an ambiguity. In the present case, I do not think that there can be any doubt about what the parties intended. In my respectful opinion, the judge's approach was far too narrow and literal. The construction of a document is not a game with words. It is an attempt to discover what a reasonable person would have understood the parties to mean. And this involves having regard, not merely to the individual words they have used, but to the agreement as a whole, the factual and legal background against which it was concluded and the practical objects which it was intended to achieve. Quite often this exercise will lead to the conclusion that although there is no

reasonable doubt about what the parties meant, they have not expressed themselves very well. Their language may sometimes be careless and they may have said things which, if taken literally, mean something different from what they obviously intended. In ordinary life people often express themselves infelicitously without leaving any doubt about what they meant. Of course in serious utterances such as legal documents, in which people may be supposed to have chosen their words with care, one does not readily accept that they have used the wrong words. If the ordinary meaning of the words makes sense in relation to the rest of the document and the factual background, then the court will give effect to that language, even though the consequences may appear hard for one side or the other. The court is not privy to the negotiation of the agreement – evidence of such negotiations is inadmissible – and has no way of knowing whether a clause which appears to have an onerous effect was a quid pro quo for some other concession. Or one of the parties may simply have made a bad bargain. The only escape from the language is an action for rectification, in which the previous negotiations can be examined. But the overriding objective in construction is to give effect to what a reasonable person rather than a pedantic lawyer would have understood the parties to mean. Therefore, if in spite of linguistic problems the meaning is clear, it is that meaning which must prevail.

The factual background to the DMC was, as its Third Schedule said, that the building was new and consisted of two self-contained parts. The upper floors were flats (the "Domestic Portion") and the lower floors shops and offices (the "Commercial Portion"). Each had their own staircases and lifts. If, therefore, rooms in the Commercial Portion were left unallocated, Mr Cheng would continue to enjoy joint rights of occupation. He would be entitled to occupy the utility rooms and so forth. Mr Hotung would not have been entitled to let them or re-arrange the partitioning of the commercial floors without Mr Cheng's consent. This makes no practical sense. Why should the parties have intended that Mr Cheng in his flat on the sixth floor should have rights of occupation in the Commercial Portion of the building?

Then there is the context provided by other parts of the document. Clause 3 says that each owner, i.e. Mr Hotung and Mr Cheng, shall hold "his" part of the building subject to "the following rights privileges and obligations". Since, technically speaking, each of them owned the whole building in undivided shares, the reference to "his" part can only mean the part of which he was allotted exclusive occupation. So each held such part subject to allowing the other certain rights over it. One could call these rights quasi-easements because one cannot have a real easement over one's own property. But for practical purposes they were easements. And the very first of these quasi-easements is 3(a), which gives a right of way over the "entrances, staircases, landings, passages and lifts." On the judge's construction, this clause makes no sense at all. Neither of the parties could say that the entrances, staircases, landings, passages and lifts were in "his" part of the building. They had not been allotted to either of them. Therefore neither could hold them subject to the rights of way in clause 3(a). They were jointly occupied and clause 3 was quite unnecessary. The clause is meaningful only on the basis that Mr Hotung was allotted exclusive occupation, subject to quasi-easements, of the whole of the rest of the building, including lifts, staircases, passages – and utility rooms.

A further aid to construction is the contemporaneously executed assignment. This contained a covenant by Mr Hotung to pay the premium due under the Conditions of Regrant which described him as "having exclusive right to the use and occupation and enjoyment of the basement, ground, first, second, third and fourth floors and the piping service floor of the said building". If the judge is right, this description was a mistake. But an alternative view is that the assignment reflects exactly what the parties to the DMC intended.

This means that the words (for example) "offices on the second floor" must be understood to mean the whole floor and the reference to offices merely describes its general use. I quite agree that this is not the normal meaning of the words. It is sloppy draftsmanship. But having regard to all the surrounding circumstances, I have no doubt that it is what the parties intended the words to mean.

So Mr Hotung's 719 shares carried the right to exclusive occupation of the utility rooms and the roof and there is no substance in the purchaser's complaint that they were, from the beginning, unallocated "common parts". The next question is whether Mr Hotung passed on those rights of occupation to the vendors. On what I consider to be the true construction of the DMC, the utility rooms and the flat roofs on the 10th floor formed part of the Commercial Portion, the whole of which attached to 482 of Mr Hotung's shares. Miss Eu accepts that, if this is right, Mr Hotung was at liberty to assign the right to occupy them together with all or any of the 482 shares. But she says that he could not assign the right to occupy the main roof, which the DMC did not attach to any particular shares. She advances the same argument in respect of the utility rooms and 10th floor roofs after the sub-DMC which was executed on 1 September 1981. This attached rights of occupation of individual shops and offices in the Commercial Portion to specific numbers of the 482 shares (increased by subdivision to 482,000) to which the whole Portion was attached by the first DMC. But the utility rooms and 10th floor roofs were not attached to any of those shares. So Miss Eu says that Mr Hotung lost the power to assign a right to occupy them, except by way of a personal licence.

In fact the sub-DMC dealt specifically with the right to assign the right to occupy the utility rooms and 10th floor roofs. Clause 4(ii) provided that Mr Hotung should have power to "assign the exclusive use occupation and enjoyment of any such spaces with any shop or office unit in the Commercial Portion." That is exactly what Mr Hotung did when, on 7 April 1992, he assigned to Target Power Ltd ("Target"), the vendor's predecessor in title, 204,587 shares with the right to occupy the shops which are the subject of the present sale. He attached to the same shares the right to occupy the utility rooms and roofs. Miss Eu says that this was not conceptually possible and, if allowed, would destroy the fundamental principles of Hong Kong conveyancing. A right to occupy which has not been attached to specific shares cannot be assigned.

I do not agree. A covenant which will run with the land must be made between owners of land, including owners of undivided shares in the same land: see section 41(7) of the Conveyancing and Property Ordinance. Cap. 219. It must also relate to the land, but since the owner of any undivided share has a share in the whole building, a covenant concerning the occupation of any part will relate to his land. Thus both requirements were satisfied in this case. Mr Hotung was entitled, as against anyone bound by the first DMC, to the exclusive occupation of the parts of the building in question. He had the same rights, in respect of the parts within the Commercial Portion, against anyone bound by the sub-DMC. He could therefore assign those rights to Target and covenant with Target, as owner of 204,587 shares, that it should have exclusive occupation of those parts. In my opinion, if an owner in common of some undivided share in a building has the right, under a covenant with him as such owner, to occupy a specific part of the building, there is no conceptual objection to his assigning the right to occupy together with any undivided share. Thus Mr Hotung, who was entitled to occupy the roof spaces, utility rooms and so forth under covenants made with him as owner of 719 out of 720 shares (in the case of the first DMC) and as owner of 474,601 out of the 482,000 shares (in the case of the sub-DMC) to which occupation of the Commercial Portion was attributable, was entitled to assign those rights of occupation to Target together with 204,587 of those shares, notwithstanding that they had not previously been "attached" to any particular number of his undivided shares.

Miss Eu said that conveyancing chaos would ensue if owners of shares could at whim assign rights of occupation with any shares they chose, or even assign them without any shares at all to people who happened to own shares already. I do not think that this is likely to happen for the practical reason that the owner's liabilities are invariably related both to the shares he has and the particular part he is entitled to occupy and it would usually be extremely unwise for him to deal with the one differently from the other. But it seems to me that no such practical problem arises in this case and there is in my view no conceptual reason why the obvious intention of the parties should be frustrated.

On the question of the cocklofts I agree with Litton P.J. that clauses 18(e) and 19 preclude the purchaser from basing any objection to title on this ground. Miss Eu submitted that there was a rule of equity which prevented a vendor, as a matter of law, from relying on such clauses in a case in which he knows or ought to know of a defect in title. I think that is putting the matter far too broadly. Contracts for the sale of land are not exceptions to the principle that parties have freedom of contract and may agree to whatever terms they like. What the cases show is that the courts will be very reluctant to construe such a term as enabling the vendor to mislead the purchaser. As is stated in Farrand, *Contract and Conveyance* (4th ed.) at p. 93, such conditions are "subject to the overpowering principle that the vendor must not mislead the purchaser in any way; this means that a sufficient indication of the risk must be given before the contract is made." This may be said to leave it unclear whether the "overpowering principle" is an aid to construction of the contract or something which operates outside the contract. It probably does not matter, although for my part I think it is better regarded as a matter of construction. Thus it is inconceivable that a term will be construed as enabling a vendor to impose upon a purchaser a serious defect in title of which he actually knew. No purchaser would sign a contract which was bare-faced enough to stipulate expressly that the vendor need not disclose serious defects in title of which he had actual knowledge and, even if there was no objection on grounds of public policy, nothing less than the most express language would do. On the other hand, the position is different if the vendor did not actually know of the defect but had the means of knowledge, or if the matter was technically a defect in title but something which a purchaser might reasonably be prepared to accept. Prima facie it is the duty of the vendor to deduce and then convey a good title and if he relies upon the terms of the contract to shift the risk of any defect in title to the purchaser, the language must clearly do so. As Farrand says, the question is whether the purchaser would have been aware of the risk he was being asked to take. So, for example, general words which did not identify any specific defect in title have been held inadequate to protect the vendor against liability for a serious defect which he could easily have discovered: *Becker* v. *Partridge* [1966] 2

Q.B. 155.   In the present case, however, the language of clause 18 (e) was entirely apt to cover the cocklofts.   No one who had read that clause and saw the cocklofts could have failed to appreciate that he was being asked to bear the risk that they were unauthorised structures. The language seems to me perfectly clear.   And therefore, in the absence of any evidence that the vendor actually knew that they were unauthorised, the purchaser was in my opinion bound by the clause.

Chief Justice Li:

> The Court, being unanimous, dismisses the appeal with costs.

(Andrew Li)                         (Henry Litton)
Chief Justice                       Permanent Judge

(Charles Ching)        (G.P. Nazareth)          (Lord Hoffmann)
Permanent Judge      Non-Permanent Judge      Non-Permanent Judge

Ms Audrey Eu SC and Mr Andrew K N Cheung instructed by Messrs Kok & Ha for the Appellant

Mr Denis Chang SC and Mr Anderson Chow instructed by Messrs Vincent T K Cheung, Yap & Co. for the Respondents

## CERTIFICATE OF SERVICE

The undersigned certifies under the penalty of perjury according to the laws of the United States that on this date I caused to be served in the manner noted below a copy of this document entitled **MARWAN SHIPPING AND TRADING CO. AND FIVE SEAS SHIPPING CO, LLC'S TABLE OF AUTHORITIES** on the following individuals:

| | |
|---|---|
| R. Michael Underhill,<br>Mimi Moon<br>Torts Branch, Civil Division<br>US Department of Justice<br>450 Golden Gate Avenue, Room 7-5395<br>PO Box 36028<br>San Francisco, CA 94102-3463 | Forrest Booth<br>Ryan Donlon<br>Severson & Werson<br>One Embarcadero Center, 26th Floor<br>San Francisco, CA 94111 |
| David Ledger<br>Carlsmith Ball LLP<br>Bank of Hawaii Building, Suite 401<br>134 West Soledad Avenue<br>PO Box BF<br>Hagåtña, Guam 96932-5027 | Thomas M. Tarpley Jr.<br>Tarpley & Moroni LLP<br>Bank of Hawaii Building<br>134 West Soledad Ave., Suite 402<br>Hagåtña, Guam 96910 |
| Office of the United States Attorney<br>108 Hernan Cortez Avenue, Suite 500<br>Hagåtña, Guam 96910 | |

[ ] Via First Class Mail
[X] Via Messenger
[X] Via E-mail

DATED this 6th day of March, 2007.

_____
LAWRENCE J. TEKER

MARWAN AND FIVE SEAS' TABLE OF
AUTHORITIES

*Cairncross & Hempelmann, P.S.*
**Law Offices**
*524 Second Avenue, Suite 500*
*Seattle, Washington 98104-2323*