1  LAW OFFICE
   **THOMAS MCKEE TARPLEY**
2  A Professional Corporation
   Bank of Hawaii Building
3  134 Soledad Avenue, Suite 402
   Hagatna, Guam 96910
4  Telephone: (671) 472-1539
   Facsimile: (671) 472-4526
5  Electronic mail: tarpley@guam.net

6  **FORREST BOOTH (Cal. Bar No. 74166) (Admitted *pro hac vice*)**
   **RYAN C. DONLON (Cal. Bar No. 229292) (Admitted *pro hac vice*)**
7  **SEVERSON & WERSON**
   A Professional Corporation
8  One Embarcadero Center, Suite 2600
   San Francisco, CA 94111
9  Telephone: (415) 398-3344
   Facsimile: (415) 956-0439
10 Electronic mail: fb@severson.com
   Electronic mail: rcd@severson.com
11
   Attorneys for Defendant, Cross-Claimant and
12 Counterclaimant S.J. GARGRAVE SYNDICATE 2724

**FILED**

DISTRICT COURT OF GUAM

MAR 13 2007 wbo

**MARY L.M. MORAN**
**CLERK OF COURT**

13 **IN THE DISTRICT COURT OF GUAM**

14 **TERRITORY OF GUAM**

15

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.: 1:06-CV-00011 |
| 16           Plaintiff, | **TABLE OF ADDITIONAL FOREIGN AUTHORITIES IN SUPPORT OF REPLY TO OPPOSITION OF MARWAN SHIPPING & TRADING CO, LLC AND FIVE SEAS SHIPPING CO, LLC RE: MOTION TO DISMISS/ STAY CROSSCLAIMS** |
| 17     vs. | |
| 18 INCHAPE SHIPPING SERVICES GUAM, LLC, | |
| 19           Plaintiff in Intervention, | |
| 20 | |
| 21     vs. | Accompanying Papers: Memorandum in Reply |
| 22 MARWAN SHIPPING & TRADING CO., FIVE SEAS SHIPPING CO., LLC, and S.J. | Date:     May 14, 2007[1] |
| 23 GARGRAVE SYNDICATE 2724, *in personam*, | Time:     1:30 p.m. |
| | Judge:   Hon. Frances M. Tydingco-Gatewood |
| 24          Defendants. | |
| 25 | Complaint Filed:   April 19, 2006 |
| | Trial Date:       May 12, 2008 |

26

27

28     [1] Hearing date set pursuant to agreement of parties and subject to Court's approval.

11620/0002/618925.1

ORIGINAL

Pursuant to rule 4.1 of the General Rules, Local Rules of Practice for the District Court of Guam, S.J. GARGRAVE SYNDICATE 2724 submits the following Table of Additional Foreign Authorities, with true and correct copies of pertinent parts of the authorities appended hereto, in support of its memorandum in reply to the opposition of MARWAN SHIPPING & TRADING CO, LLC, and FIVE SEAS SHIPPING CO., LLC to Gargrave's motion to dismiss or stay their crossclaims. This table supplements the one Gargrave submitted in support of its initial moving papers.

## AUTHORITIES

| | Citation | Sovereign Authority |
|---|---|---|
| Exhibit 11: | Arbitration Act, 1996, 45 Eliz. 2, ch. 23 [§§ 12, 16, 17, 18, 19, 42, 43, 44, 45, 66-69, 71] | England |
| Exhibit 12: | Cal. Civ. Code, § 3537 | California |
| Exhibit 13: | *Alberto-Culver Co. v. Aon Corp.*, 351 Ill.App.3d 123, 132 (2004) | Illinois |
| Exhibit 14: | *Cunard S.S. v. Marten* [1903] 2 K.B.511 | England |
| Exhibit 15: | *Dudgeon v. Pembroke* (1876-1877) L.R. 2 App. Cas. 284, 293 (House of Lords) | England |
| Exhibit 16: | *Habour Assurance Co. (UK) Ltd v. Kansa Gen. Int'l Ins. Co. Ltd.* [1993] 1 Lloyd's Rep. 455, 456, 459-461 (Court of Appeal, Civil Div) | England |
| Exhibit 17: | *Polpen Shipping Co., Ltd. v. Commercial Union Assur. Co. Ltd.* [1943] K.B. 161 | England |
| Exhibit 18: | *Western Assur. Co. of Toronto v. Poole* [1903] 1 K.B. 376 | England |

DATED: March  17  , 2007

THOMAS M. TARPLEY, JR., P.C.

By:

Thomas M. Tarpley, Jr.

Attorneys for S.J. GARGRAVE SYNDICATE 2724

- 2 -

# Exhibit 11

**SWEET & MAXWELL UNITED KINGDOM LAW IN FORCE**
**ARBITRATION ACT** 1996 CHAPTER 23
**PART I ARBITRATION PURSUANT TO AN ARBITRATION AGREEMENT**
**COMMENCEMENT OF ARBITRAL PROCEEDINGS**
UK Statutes Crown Copyright. Reproduced by permission of the
Controller of Her Majesty's Stationery Office.

In-force date: January 31, 1997 (see Analysis Tab for Commencement Information)

**§ 12 Power of court to extend time for beginning arbitral proceedings, etc.**

(1) Where an arbitration agreement to refer future disputes to arbitration provides that a claim shall be barred, or the claimant's right extinguished, unless the claimant takes within a time fixed by the agreement some step--

(a) to begin arbitral proceedings, or

(b) to begin other dispute resolution procedures which must be exhausted before arbitral proceedings can be begun,

the court may by order extend the time for taking that step.

(2) Any party to the arbitration agreement may apply for such an order (upon notice to the other parties), but only after a claim has arisen and after exhausting any available arbitral process for obtaining an extension of time.

(3) The court shall make an order only if satisfied--

(a) that the circumstances are such as were outside the reasonable contemplation of the parties when they agreed the provision in question, and that it would be just to extend the time, or

(b) that the conduct of one party makes it unjust to hold the other party to the strict terms of the provision in question.

(4) The court may extend the time for such period and on such terms as it thinks fit, and may do so whether or not the time previously fixed (by agreement or by a previous order) has expired.

(5) An order under this section does not affect the operation of the Limitation Acts (see <u>section 13</u>).

(6) The leave of the court is required for any appeal from a decision of the court under this section.

...

**§ 16 Procedure for appointment of arbitrators.**

(1) The parties are free to agree on the procedure for appointing the arbitrator or arbitrators, including the procedure for appointing any chairman or umpire.

(2) If or to the extent that there is no such agreement, the following provisions apply.

(3) If the tribunal is to consist of a sole arbitrator, the parties shall jointly appoint the arbitrator not later than 28 days after service of a request in writing by either party to do so.

(4) If the tribunal is to consist of two arbitrators, each party shall appoint one arbitrator not later than 14 days after service of a request in writing by either party to do so.

(5) If the tribunal is to consist of three arbitrators--

11620/0002/619021.1

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(a) each party shall appoint one arbitrator not later than 14 days after service of a request in writing by either party to do so, and

(b) the two so appointed shall forthwith appoint a third arbitrator as the chairman of the tribunal.

(6) If the tribunal is to consist of two arbitrators and an umpire--

(a) each party shall appoint one arbitrator not later than 14 days after service of a request in writing by either party to do so, and

(b) the two so appointed may appoint an umpire at any time after they themselves are appointed and shall do so before any substantive hearing or forthwith if they cannot agree on a matter relating to the arbitration.

(7) In any other case (in particular, if there are more than two parties)  section 18 applies as in the case of a failure of the agreed appointment procedure.

...

### § 17 Power in case of default to appoint sole arbitrator.

(1) Unless the parties otherwise agree, where each of two parties to an arbitration agreement is to appoint an arbitrator and one party ("the party in default") refuses to do so, or fails to do so within the time specified, the other party, having duly appointed his arbitrator, may give notice in writing to the party in default that he proposes to appoint his arbitrator to act as sole arbitrator.

(2) If the party in default does not within 7 clear days of that notice being given--

(a) make the required appointment, and

(b) notify the other party that he has done so,

the other party may appoint his arbitrator as sole arbitrator whose award shall be binding on both parties as if he had been so appointed by agreement.

(3) Where a sole arbitrator has been appointed under subsection (2), the party in default may (upon notice to the appointing party) apply to the court which may set aside the appointment.

(4) The leave of the court is required for any appeal from a decision of the court under this section.

...

### § 18 Failure of appointment procedure.

(1) The parties are free to agree what is to happen in the event of a failure of the procedure for the appointment of the arbitral tribunal.

There is no failure if an appointment is duly made under section 17 (power in case of default to appoint sole arbitrator), unless that appointment is set aside.

(2) If or to the extent that there is no such agreement any party to the arbitration agreement may (upon notice to the other parties) apply to the court to exercise its powers under this section.

(3) Those powers are--

(a) to give directions as to the making of any necessary appointments;

(b) to direct that the tribunal shall be constituted by such appointments (or any one or more of them) as have been made;

11620/0002/619021.1

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(c) to revoke any appointments already made;

(d) to make any necessary appointments itself.

(4) An appointment made by the court under this section has effect as if made with the agreement of the parties.

(5) The leave of the court is required for any appeal from a decision of the court under this section.

...

### § 19 Court to have regard to agreed qualifications.

In deciding whether to exercise, and in considering how to exercise, any of its powers under section 16 (procedure for appointment of arbitrators) or section 18 (failure of appointment procedure), the court shall have due regard to any agreement of the parties as to the qualifications required of the arbitrators.

...

### § 42 Enforcement of peremptory orders of tribunal.

(1) Unless otherwise agreed by the parties, the court may make an order requiring a party to comply with a peremptory order made by the tribunal.

(2) An application for an order under this section may be made--

(a) by the tribunal (upon notice to the parties),

(b) by a party to the arbitral proceedings with the permission of the tribunal (and upon notice to the other parties), or

(c) where the parties have agreed that the powers of the court under this section shall be available.

(3) The court shall not act unless it is satisfied that the applicant has exhausted any available arbitral process in respect of failure to comply with the tribunal's order.

(4) No order shall be made under this section unless the court is satisfied that the person to whom the tribunal's order was directed has failed to comply with it within the time prescribed in the order or, if no time was prescribed, within a reasonable time.

(5) The leave of the court is required for any appeal from a decision of the court under this section.

...

### § 43 Securing the attendance of witnesses.

(1) A party to arbitral proceedings may use the same court procedures as are available in relation to legal proceedings to secure the attendance before the tribunal of a witness in order to give oral testimony or to produce documents or other material evidence.

(2) This may only be done with the permission of the tribunal or the agreement of the other parties.

(3) The court procedures may only be used if--

(a) the witness is in the United Kingdom, and

(b) the arbitral proceedings are being conducted in England and Wales or, as the case may be, Northern Ireland.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(4) A person shall not be compelled by virtue of this section to produce any document or other material evidence which he could not be compelled to produce in legal proceedings.

...

### § 44 Court powers exercisable in support of arbitral proceedings.

(1) Unless otherwise agreed by the parties, the court has for the purposes of and in relation to arbitral proceedings the same power of making orders about the matters listed below as it has for the purposes of and in relation to legal proceedings.

(2) Those matters are--

(a) the taking of the evidence of witnesses;

(b) the preservation of evidence;

(c) making orders relating to property which is the subject of the proceedings or as to which any question arises in the proceedings--

(i) for the inspection, photographing, preservation, custody or detention of the property, or

(ii) ordering that samples be taken from, or any observation be made of or experiment conducted upon, the property;

and for that purpose authorising any person to enter any premises in the possession or control of a party to the arbitration;

(d) the sale of any goods the subject of the proceedings;

(e) the granting of an interim injunction or the appointment of a receiver.

(3) If the case is one of urgency, the court may, on the application of a party or proposed party to the arbitral proceedings, make such orders as it thinks necessary for the purpose of preserving evidence or assets.

(4) If the case is not one of urgency, the court shall act only on the application of a party to the arbitral proceedings (upon notice to the other parties and to the tribunal) made with the permission of the tribunal or the agreement in writing of the other parties.

(5) In any case the court shall act only if or to the extent that the arbitral tribunal, and any arbitral or other institution or person vested by the parties with power in that regard, has no power or is unable for the time being to act effectively.

(6) If the court so orders, an order made by it under this section shall cease to have effect in whole or in part on the order of the tribunal or of any such arbitral or other institution or person having power to act in relation to the subject-matter of the order.

(7) The leave of the court is required for any appeal from a decision of the court under this section.

...

### § 45 Determination of preliminary point of law.

(1) Unless otherwise agreed by the parties, the court may on the application of a party to arbitral proceedings (upon notice to the other parties) determine any question of law arising in the course of the proceedings which the court is satisfied substantially affects the rights of one or more of the parties.

An agreement to dispense with reasons for the tribunal's award shall be considered an agreement to exclude the court's jurisdiction under this section.

11620/0002/619021.1

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(2) An application under this section shall not be considered unless--

(a) it is made with the agreement of all the other parties to the proceedings, or

(b) it is made with the permission of the tribunal and the court is satisfied--

(i) that the determination of the question is likely to produce substantial savings in costs, and

(ii) that the application was made without delay.

(3) The application shall identify the question of law to be determined and, unless made with the agreement of all the other parties to the proceedings, shall state the grounds on which it is said that the question should be decided by the court.

(4) Unless otherwise agreed by the parties, the arbitral tribunal may continue the arbitral proceedings and make an award while an application to the court under this section is pending.

(5) Unless the court gives leave, no appeal lies from a decision of the court whether the conditions specified in subsection (2) are met.

(6) The decision of the court on the question of law shall be treated as a judgment of the court for the purposes of an appeal.

But no appeal lies without the leave of the court which shall not be given unless the court considers that the question is one of general importance, or is one which for some other special reason should be considered by the Court of Appeal.

...

## § 66 Enforcement of the award.

(1) An award made by the tribunal pursuant to an arbitration agreement may, by leave of the court, be enforced in the same manner as a judgment or order of the court to the same effect.

(2) Where leave is so given, judgment may be entered in terms of the award.

(3) Leave to enforce an award shall not be given where, or to the extent that, the person against whom it is sought to be enforced shows that the tribunal lacked substantive jurisdiction to make the award.

The right to raise such an objection may have been lost (see section 73).

(4) Nothing in this section affects the recognition or enforcement of an award under any other enactment or rule of law, in particular under Part II of the Arbitration Act 1950 (enforcement of awards under Geneva Convention) or the provisions of Part III of this Act relating to the recognition and enforcement of awards under the New York Convention or by an action on the award.

...

## § 67 Challenging the award: substantive jurisdiction.

(1) A party to arbitral proceedings may (upon notice to the other parties and to the tribunal) apply to the court--

(a) challenging any award of the arbitral tribunal as to its substantive jurisdiction; or

(b) for an order declaring an award made by the tribunal on the merits to be of no effect, in whole or in part, because the tribunal did not have substantive jurisdiction.

A party may lose the right to object (see section 73) and the right to apply is subject to the restrictions in section
11620/0002/619021.1

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

70(2) and (3).

(2) The arbitral tribunal may continue the arbitral proceedings and make a further award while an application to the court under this section is pending in relation to an award as to jurisdiction.

(3) On an application under this section challenging an award of the arbitral tribunal as to its substantive jurisdiction, the court may by order--

(a) confirm the award,

(b) vary the award, or

(c) set aside the award in whole or in part.

(4) The leave of the court is required for any appeal from a decision of the court under this section.

...

## § 68 Challenging the award: serious irregularity.

(1) A party to arbitral proceedings may (upon notice to the other parties and to the tribunal) apply to the court challenging an award in the proceedings on the ground of serious irregularity affecting the tribunal, the proceedings or the award.

A party may lose the right to object (see section 73) and the right to apply is subject to the restrictions in section 70(2) and (3).

(2) Serious irregularity means an irregularity of one or more of the following kinds which the court considers has caused or will cause substantial injustice to the applicant--

(a) failure by the tribunal to comply with section 33 (general duty of tribunal);

(b) the tribunal exceeding its powers (otherwise than by exceeding its substantive jurisdiction: see section 67);

(c) failure by the tribunal to conduct the proceedings in accordance with the procedure agreed by the parties;

(d) failure by the tribunal to deal with all the issues that were put to it;

(e) any arbitral or other institution or person vested by the parties with powers in relation to the proceedings or the award exceeding its powers;

(f) uncertainty or ambiguity as to the effect of the award;

(g) the award being obtained by fraud or the award or the way in which it was procured being contrary to public policy;

(h) failure to comply with the requirements as to the form of the award; or

(i) any irregularity in the conduct of the proceedings or in the award which is admitted by the tribunal or by any arbitral or other institution or person vested by the parties with powers in relation to the proceedings or the award.

(3) If there is shown to be serious irregularity affecting the tribunal, the proceedings or the award, the court may--

(a) remit the award to the tribunal, in whole or in part, for reconsideration,

(b) set the award aside in whole or in part, or

11620/0002/619021.1

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(c) declare the award to be of no effect, in whole or in part.

The court shall not exercise its power to set aside or to declare an award to be of no effect, in whole or in part, unless it is satisfied that it would be inappropriate to remit the matters in question to the tribunal for reconsideration.

(4) The leave of the court is required for any appeal from a decision of the court under this section.

...

### § 69 Appeal on point of law.

(1) Unless otherwise agreed by the parties, a party to arbitral proceedings may (upon notice to the other parties and to the tribunal) appeal to the court on a question of law arising out of an award made in the proceedings.

An agreement to dispense with reasons for the tribunal's award shall be considered an agreement to exclude the court's jurisdiction under this section.

(2) An appeal shall not be brought under this section except--

(a) with the agreement of all the other parties to the proceedings, or

(b) with the leave of the court.

The right to appeal is also subject to the restrictions in section 70(2) and (3).

(3) Leave to appeal shall be given only if the court is satisfied--

(a) that the determination of the question will substantially affect the rights of one or more of the parties,

(b) that the question is one which the tribunal was asked to determine,

(c) that, on the basis of the findings of fact in the award--

(i) the decision of the tribunal on the question is obviously wrong, or

(ii) the question is one of general public importance and the decision of the tribunal is at least open to serious doubt, and

(d) that, despite the agreement of the parties to resolve the matter by arbitration, it is just and proper in all the circumstances for the court to determine the question.

(4) An application for leave to appeal under this section shall identify the question of law to be determined and state the grounds on which it is alleged that leave to appeal should be granted.

(5) The court shall determine an application for leave to appeal under this section without a hearing unless it appears to the court that a hearing is required.

(6) The leave of the court is required for any appeal from a decision of the court under this section to grant or refuse leave to appeal.

(7) On an appeal under this section the court may by order--

(a) confirm the award,

(b) vary the award,

(c) remit the award to the tribunal, in whole or in part, for reconsideration in the light of the court's determination, or

11620/0002/619021.1

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(d) set aside the award in whole or in part.

The court shall not exercise its power to set aside an award, in whole or in part, unless it is satisfied that it would be inappropriate to remit the matters in question to the tribunal for reconsideration.

(8) The decision of the court on an appeal under this section shall be treated as a judgment of the court for the purposes of a further appeal.

But no such appeal lies without the leave of the court which shall not be given unless the court considers that the question is one of general importance or is one which for some other special reason should be considered by the Court of Appeal.

...

### § 71 Challenge or appeal: effect of order of court.

(1) The following provisions have effect where the court makes an order under section 67, 68 or 69 with respect to an award.

(2) Where the award is varied, the variation has effect as part of the tribunal's award.

(3) Where the award is remitted to the tribunal, in whole or in part, for reconsideration, the tribunal shall make a fresh award in respect of the matters remitted within three months of the date of the order for remission or such longer or shorter period as the court may direct.

(4) Where the award is set aside or declared to be of no effect, in whole or in part, the court may also order that any provision that an award is a condition precedent to the bringing of legal proceedings in respect of a matter to which the arbitration agreement applies, is of no effect as regards the subject matter of the award or, as the case may be, the relevant part of the award.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit 12



West's Ann.Cal.Civ.Code § 3537

**C**

**Effective: [See Text Amendments]**

West's Annotated California Codes Currentness
  Civil Code (Refs & Annos)
    Division 4. General Provisions (Refs & Annos)
      Part 4. Maxims of Jurisprudence (Refs & Annos)

→ **§ 3537. Superfluity**

Superfluity does not vitiate.

CREDIT(S)

(Enacted 1872.)

West's Ann. Cal. Civ. Code § 3537, CA CIVIL § 3537

Current through Ch. 1 of 2007 Reg.Sess. urgency legislation

© 2007 Thomson/West

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit 13



812 N.E.2d 369                                                                      Page 1
351 Ill.App.3d 123, 812 N.E.2d 369, 285 Ill.Dec. 549
(Cite as: 351 Ill.App.3d 123, 812 N.E.2d 369, 285 Ill.Dec. 549)

**H**

Appellate Court of Illinois,
First District, Fourth Division.
ALBERTO-CULVER COMPANY, Associated
Aviation Underwriters, Inc., The American
Insurance Company, Centennial Casualty Company,
Federal Insurance Company,
Fireman's Fund Insurance Company, Greenwich
Insurance Company, Lumberman's
Mutual Casualty Company and Sun Insurance Office
of America, Plaintiffs-
Appellants,
v.
AON CORPORATION and Aon Aviation, Inc.,
Defendants-Appellees (Kalyn Alwin and
Devin Koppie, Co-Administrators of the Estate of
Martin Larry Koppie, Deceased,
and Jacqueline Quern, Independent Executor of the
Estate of Arthur F. Quern,
Deceased, Interveners; United States Aviation
Underwriters, Inc., Intervener-
Appellee).
No. 1-02-3815.

May 13, 2004.
Rehearing Denied July 22, 2004.

**Background:** Following liability litigation in which
chief pilot was found liable for airplane crash that
killed all those onboard, insurer of aircraft owner
sought declaration that aircraft operator that
employed pilot was not covered under policy it
issued to owner. Insurer of operator
intervened. The Circuit Court, Cook County, Stephen
A. Schiller, J., granted summary judgment to operator
insurer that owner's coverage was primary. Owner's
insurer appealed.

**Holdings:** The Appellate Court, Hartman, J., held
that:
(1) operator was excluded from coverage as matter
of law;
(2) parol evidence was insufficient to support
finding that operated was covered under owner's
liability policy;
(3) operators liability policy provided primary
coverage; and
(4) operation of aircraft under interchange
agreement was "commercial" activity excluded from
coverage under owner's liability policy.
Reversed.

West Headnotes

**[1] Indemnity** 🔑27
208k27 Most Cited Cases
Contracts for indemnification that are designed to
shift the ultimate cost of liability from one party to
another are enforceable where they are explicit and
do not run counter to public policy.

**[2] Indemnity** 🔑30(1)
208k30(1) Most Cited Cases
Indemnification contracts will not be construed as
indemnifying against a party's own negligence unless
such construction is required by clear and explicit
language of the contract, or such an intention is
expressed in unequivocal terms.

**[3] Insurance** 🔑1813
217k1813 Most Cited Cases
The primary objective in construing the language of
an insurance policy is to ascertain and give effect to
the intentions of the parties as expressed in their
agreement.

**[4] Insurance** 🔑1822
217k1822 Most Cited Cases
If the terms of the insurance policy are clear and
unambiguous, they must be given their plain and
ordinary meaning.

**[5] Insurance** 🔑1808
217k1808 Most Cited Cases

**[5] Insurance** 🔑1832(1)
217k1832(1) Most Cited Cases
If the insurance policy language is susceptible to
more than one meaning, it is considered ambiguous
and will be construed strictly against the insurer who
drafted the policy and in favor of the insured.

**[6] Insurance** 🔑1808
217k1808 Most Cited Cases
Courts will not strain to find ambiguity in an
insurance policy where none exists.

**[7] Insurance** 🔑1832(1)
217k1832(1) Most Cited Cases

**[7] Insurance** 🔑1836

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

812 N.E.2d 369
351 Ill.App.3d 123, 812 N.E.2d 369, 285 Ill.Dec. 549
(Cite as: 351 Ill.App.3d 123, 812 N.E.2d 369, 285 Ill.Dec. 549)

Page 2

217k1836 Most Cited Cases

The rationale for rule construing ambiguities in an insurance policy against the insurer is that (1) the intent of an insured in purchasing an insurance policy is to obtain coverage and, therefore, any ambiguity jeopardizing such coverage should be construed in a manner consistent with the insured's intent, (2) the insurer is the drafter of the policy and could have drafted the ambiguous provision clearly and specifically, and (3) public policy considerations dictate that a liberal construction in favor of coverage be applied since the recovery of an injured innocent third party is involved.

**[8] Insurance** 🔑1810

217k1810 Most Cited Cases

An insurance policy will be construed as a whole, taking into account the type of insurance purchased, the nature of the risks involved and the overall purpose of the contract.

**[9] Appeal and Error** 🔑893(1)

30k893(1) Most Cited Cases

The construction of an insurance policy is a question of law subject to de novo review.

**[10] Insurance** 🔑2331

217k2331 Most Cited Cases

**[10] Insurance** 🔑2332

217k2332 Most Cited Cases

Operator of aircraft that crashed, killing all persons onboard, was excluded from coverage under owner's liability insurance policy, as matter of law; provision in policy excluded coverage of any person or organization operating any flight service, or aircraft or piloting service, aircraft was being flown by operator under an interchange agreement, owner's insurer was not a party to the interchange agreement, insurer did not endorse the agreement and incorporate it as part of the policy, and insurer received no additional premiums to cover operator.

**[11] Insurance** 🔑1808

217k1808 Most Cited Cases

Mere absence of a definition of a term in an insurance policy does not necessarily render a policy term ambiguous, nor is an ambiguity created simply because the parties disagree about the meaning of the policy language.

**[12] Insurance** 🔑1822

217k1822 Most Cited Cases

**[12] Insurance** 🔑1855

217k1855 Most Cited Cases

An undefined term in an insurance policy is given its plain and ordinary meaning, which can be obtained from a dictionary.

**[13] Insurance** 🔑1807

217k1807 Most Cited Cases

**[13] Insurance** 🔑1808

217k1808 Most Cited Cases

Courts should neither exercise their inventive powers to create an ambiguity in an insurance policy where none exists, nor approve of the distortion of language to reach a desired result.

**[14] Contracts** 🔑143(1)

95k143(1) Most Cited Cases

"Four corners" doctrine of contract interpretation looks primarily to the language of the contract to determine whether it is susceptible to more than one meaning.

**[15] Evidence** 🔑397(1)

157k397(1) Most Cited Cases

**[15] Evidence** 🔑448

157k448 Most Cited Cases

Parol evidence is generally inadmissible to vary the terms of a written instrument unless the language used is ambiguous or incomplete.

**[16] Insurance** 🔑2332

217k2332 Most Cited Cases

**[16] Insurance** 🔑2333

217k2333 Most Cited Cases

Parol evidence was insufficient to support finding that operator, under interchange agreement with owner, of aircraft that crashed, was covered under owner's liability policy; policy excluded coverage for any person or organization operating any flight service or aircraft or piloting service, and insurer provided affidavit testimony of executive who oversaw general aviation underwriting that exclusion language was modified to broaden definition to eliminate any potential inference that commercial activity was prerequisite to exclusion.

**[17] Insurance** 🔑2285(2)

217k2285(2) Most Cited Cases

Aircraft operator's liability insurance provided primary coverage for damages resulting from crash

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

812 N.E.2d 369
351 Ill.App.3d 123, 812 N.E.2d 369, 285 Ill.Dec. 549
(Cite as: 351 Ill.App.3d 123, 812 N.E.2d 369, 285 Ill.Dec. 549)

Page 3

that killed all persons onboard; operator's chief pilot was responsible for crash, and condition precedent for primary coverage that all other valid and collectible insurance was exhausted was satisfied, where aircraft owner's liability policy did not provide coverage to operator.

## [18] Insurance ☞2332

217k2332 Most Cited Cases

Operation of owner's aircraft by lessee company under interchange agreement was " commercial" activity, which was excluded from coverage under owner's liability insurance policy for damages resulting from crash of aircraft that killed all persons onboard, even though aircraft was being used for in-house flight services; exchange of aircraft services constituted "lease" under federal regulation defining interchange agreements. 14 C.F.R. § 91.501(c).

**\*372 \*125 \*\*\*552** Alder, Murphy & McQuillen, Chicago (Michael G. McQuillen, James F. Murphy, Mark S. Susina and Austin W. Bartlett, of counsel), for Appellants.

Richard J. Prendergast, Cozen O'Connor, Chicago (Matthew T. Walsh, of counsel), for Intervener-Appellee (USAU).

Merlo, Kanofsky & Brinkmeier, Ltd., Chicago (Alan J. Brinkmeier, of counsel), for Appellee.

Justice HARTMAN delivered the opinion of the court:

This appeal arises from an aircraft accident involving a Gulfstream G-IV aircraft (G-IV) privately owned by Alberto-Culver Company (Alberto), and being utilized by Aon Corporation and Aon Aviation, Inc., (sometimes collectively Aon). The plane crashed upon takeoff at Palwaukee Municipal Airport (Palwaukee) on October 30, 1996, and was consumed by fire. All four persons aboard perished, including Martin Larry Koppie, chief pilot and captain for Aon Aviation, a subsidiary of Aon Corporation; Robert Hampton Whitener, pilot and captain for Alberto; Arthur Quern, chief executive officer for Aon Risk Management Inc.; and Catherine Mio Anderson, a flight attendant employed by Executive Jet, whose services were secured by Aon Aviation. The operative facts of the accident itself are set forth in detail in an opinion filed in a previous appeal, *Anderson v. Alberto-Culver USA, Inc.,* 337 Ill.App.3d 643, 646-47, 273 Ill.Dec. 404, 789 N.E.2d 304 (2003) (*Anderson* ).

Following preceding liability litigation which found

Koppie at fault, the present dispute implicates insurance coverage involving the respective insurance companies. Associated Aviation Underwriters (AAU), Alberto's insurers, sought, *inter alia,* a judicial declaration that Aon Aviation and Aon Corporation were not insured under the aircraft insurance policy AAU issued to Alberto. United States Aviation Underwriters (USAU), insurers of Aon Aviation, intervened and successfully moved for cross-summary judgment against AAU and Alberto. The circuit court found that Aon Aviation and Aon Corporation were entitled to coverage under Alberto's policy with AAU, and that AAU has a duty to defend and indemnify Aon Aviation, because AAU's policy was deemed primary coverage, and USAU's coverage was found excess. Alberto appeals.

Aon Aviation and Alberto each maintained a flight department at Palwaukee, and each operated their own G-IV, a twin engine jet that requires a two-pilot crew. The instant flight was conducted pursuant to an Interchange Agreement entered into on June 7, 1995, by Alberto and Aon, which permitted Aon Corporation and Alberto Culver \*126 to utilize each other's G-IV upon occasion when needed. *Anderson,* 337 Ill.App.3d at 647-48, 273 Ill.Dec. 404, 789 N.E.2d 304. Aon Aviation is organized "to own, operate and lease aircraft (but not to offer transportation services to the general public)." As contained in Paragraph Six of the Interchange Agreement, Aon Aviation and Alberto agreed, *inter alia,* to (1) "hold harmless and indemnify the other from loss, expense, damages, claims, or suits which they might suffer as a result of any act or omission of the other party"; (2) maintain operational control of their own G-IV during use by the other party; and (3) "have, and keep in effect" an aircraft insurance policy with a minimum $150 million value to provide coverage when piloting each other's airplanes. *Anderson,* 337 Ill.App.3d at 648, 273 Ill.Dec. 404, 789 N.E.2d 304.

In compliance with the Interchange Agreement, Alberto and Aon separately held non-owned aircraft coverage through **\*\*373 \*\*\*553** their respective insurance policies, applicable to the use of borrowed aircraft. Aon Aviation purchased a $300 million liability policy from USAU covering Aon Aviation for any liability relating to its operation of its owned and non-owned aircraft (USAU policy). Alberto purchased aviation insurance from AAU and other interested insurers, [FN1] providing Alberto with liability and property damage coverage in connection with its own and non-owned aircraft (AAU policy).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

812 N.E.2d 369
351 Ill.App.3d 123, 812 N.E.2d 369, 285 Ill.Dec. 549
(Cite as: 351 Ill.App.3d 123, 812 N.E.2d 369, 285 Ill.Dec. 549)

Page 4

> FN1. Other interested insurers collectively refers to the American Insurance Company, Centennial Casualty Company, Federal Insurance Company, Fireman's Fund Insurance Company, Greenwich Insurance Company, Lumberman's Mutual Casualty Company and Sun Insurance Office of America.

Importantly, neither the USAU policy nor the AAU policy made reference to the Interchange Agreement between Alberto and Aon, nor was any evidence produced by Alberto or Aon requesting that their respective insurance companies make the Interchange Agreement a part of their respective policies of insurance by rider, endorsement or otherwise.

Under Paragraph Eight of the Interchange Agreement (Paragraph Eight), as required by Federal Aviation Regulations (FAR), both parties agreed to maintain "operational control" of their own aircraft during use by the other party. The Interchange Agreement does not define "operational control," however, Paragraph Eight refers to the Department of Transportation under the Federal Aviation Administration (FAA) for an explanation of this term. [FN2] "Operational control" is defined in the Code of Federal Regulations (CFR) as the "exercise of *127 authority over initiating, conducting or terminating a flight." 14 C.F.R. § 1.1 (2001). Koppie, listed as chief pilot for Aon Aviation, signed the agreement twice for "Operational Control" and acceptance purposes. *Anderson,* 337 Ill.App.3d at 648, 273 Ill.Dec. 404, 789 N.E.2d 304.

> FN2. Paragraph Eight provides, in part, that Alberto and Aon Aviation "certify that both G-IVs respectively are each operated under appropriate provisions of FAR 91, subpart D * * *."

The AAU insurance policy obtained by Alberto provides coverage to the "Insured" for "all sums for which the Insured shall become legally obligated to pay as damages because of bodily injury sustained by any person and property damage, caused by an occurrence and arising out of the ownership, maintenance or use of the scheduled aircraft." Alberto was the named insured on the AAU policy. The General Policy Definitions of the AAU policy define an "Insured" as "(a) any person while using the aircraft with the permission of the Named Insured provided the actual use is within the scope of such permission, and (b) any other person, or organization, but only with respect to his or its liability because of

acts or omissions of the Named Insured or of an Insured under (a) above, provided, however, that the insurance afforded under subsections 2(a) and (b) above does not apply to: (i) any person or organization or agent or employee thereof (other than employees of the Named Insured) engaged in * * * the operation of * * * any flying service, or aircraft or piloting service, with respect to any occurrence arising out of such activity" (Exclusion (i)). No definition of what is meant by "flying service, or aircraft or piloting service" is set forth in the AAU policy.

Lawrence Colton, the former executive vice president and head of general aviation underwriting at AAU, averred by affidavit [**374 ***554 FN3] that the policy language was modified from "charter service" to "flying service" to avoid any implication that a monetary charge or commercial activity was required to trigger the preclusion of coverage for certain permissive users under the AAU policy.

> FN3. The Colton affidavit was submitted in response to USAU's discovery demand, over AAU's objection, that USAU be provided with the reason for AAU's inclusion of such exclusionary language in its policy. No counter-affidavit was ever produced by USAU.

The AAU policy also set forth, in General Condition Four, a provision of "Other Insurance" which avers, "[e]xcept with respect to insurance specifically purchased by [Alberto] to apply in excess of this policy, if there is other insurance in [Alberto's] name or otherwise, against loss, liability or expense covered by this policy, [AAU] shall not be liable * * * for a greater portion of such loss * * * than the applicable limit of [AAU's] liability bears to the total applicable [l]imit of [l]iability of all valid and collectible insurance against such loss, liability or expense."

*128 The AAU policy additionally provided Alberto with liability coverage for its use of non-owned aircraft. That part of the policy contained its own condition of "Other Insurance," under which AAU's non-owned coverage was to be in excess of any other insurance available to Alberto, either as "an [i]nsured under a policy applicable to the non-owned aircraft or otherwise."

Similarly, Aon Aviation held non-owned aircraft coverage by obtaining an endorsement to its policy with USAU, which states: "[y]our business needs

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

812 N.E.2d 369
351 Ill.App.3d 123, 812 N.E.2d 369, 285 Ill.Dec. 549
(Cite as: 351 Ill.App.3d 123, 812 N.E.2d 369, 285 Ill.Dec. 549)

Page 5

may require you [to] rent, borrow, or use aircraft you don't own. For this reason, we've developed this endorsement to expand your liability coverage and your medical coverage to apply while you're using aircraft you don't own." The USAU policy's non-owned coverage endorsement also contains an "other insurance" clause that asserts: "[t]his endorsement provides you with excess insurance. This means that if you have other insurance covering a loss that's also covered by this endorsement, we'll pay claims only when all other valid and collectible insurance covering the loss has been exhausted. Of course, this restriction does not apply to any insurance you purchased in excess of this endorsement."

After the crash, Aon Aviation notified AAU of the accident, seeking coverage under the AAU policy issued to Alberto. Alberto and its insurers (collectively AAU/Alberto) filed a complaint for an insurance coverage declaration on January 17, 1997, seeking, *inter alia,* a judgment that Aon Aviation was not an insured under the AAU policy issued to Alberto. [FN4] On **375 ***555 May 2, 2001, USAU, moved to intervene in the action, which the circuit court allowed on July 5, 2001.

> FN4. AAU/Alberto filed its third amended complaint on December 9, 1997. In response, on January 9, 1998, Aon filed a combined motion to dismiss and motion for summary judgment.
>
> On June 17, 1998, Aon filed its answer, affirmative defenses, and counter-claim to AAU/Alberto's third amended complaint. AAU/Alberto filed an answer to the counter-claim alleging, *inter alia,* waiver. The circuit court struck down AAU/Alberto's affirmative defenses, but granted AAU/Alberto leave to file amended affirmative defenses, which it did on February 22, 2000. Meanwhile, on January 28, 2000, Aon filed its motion for judgment on the pleadings. On March 20, 2000, Aon moved to strike AAU/Alberto's amended affirmative defenses alleging Aon waived coverage under AAU's policy, and the court did so strike AAU/Alberto's defenses in its order entered on April 24, 2000.
>
> On May 15, 2000, the circuit court granted Aon's motion for summary judgment as to the fifth count of AAU/Alberto's third amended complaint alleging assumption of liability by virtue of the Interchange Agreement, and ruled that AAU had a duty to defend Aon. AAU/Alberto moved the

court to reconsider its order, which was denied on July 20, 2000.

On July 5, 2001, the circuit court granted Aon's renewed motion for judgment on the pleadings as to AAU/Alberto's third claim of its third amended complaint alleging Aon was not insured under the AAU policy.

On July 6, 2001, USAU filed an intervening petition containing *129 three claims, namely, that: (1) Aon Aviation is an insured under the AAU policy, (2) it is entitled to defense and indemnity from AAU, and (3) it is covered primarily by Alberto's AAU policy because USAU's policy is exclusively in excess of the AAU policy.

On November 1, 2001, AAU/Alberto filed its fourth amended complaint in which it sought (1) subrogation from Aon Aviation for reimbursement of funds AAU paid to Alberto for the destruction of its aircraft; and a declaratory judgment that (2) Aon Corporation was not a permissive user entitled to coverage, (3) Aon Aviation was engaged in the operation of a flight service thereby precluding coverage, and (4) Aon Aviation waived coverage under the AAU policy pursuant to the Interchange Agreement.

On March 25, 2002, USAU moved for summary judgment on all three claims against AAU/Alberto and on AAU/Alberto's claim regarding the operation of flight service. After a hearing on August 2, 2002, the circuit court ruled that the question of whether Aon Aviation was engaged in a flight service operation did not foreclose coverage under the AAU policy, that AAU has a duty to defend, and to indemnify Aon Aviation since AAU's policy was the primary coverage and USAU's policy was in excess. On August 6, 2002, the court entered its order in accordance with its findings; however, the order did not include a finding of appealability under Supreme Court Rule 304(a) (155 Ill.2d R. 304(a)). The court did not explicitly rule on AAU/Alberto's fifth count regarding Aon Aviation's waiver of coverage.

On August 21, 2002, AAU/Alberto moved the circuit court to reconsider its order, and moved for summary judgment on the fifth count of their complaint as to waiver. Aon Aviation filed a cross-motion for summary judgment on that count. Following a hearing on November 15, 2002, the court denied AAU/Alberto's motion to reconsider, finding that "much was made of newly discovered evidence, but it was discovered prior to the hearing * * * and nothing brought forward in the form of a [Supreme

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

812 N.E.2d 369
351 Ill.App.3d 123, 812 N.E.2d 369, 285 Ill.Dec. 549
(Cite as: 351 Ill.App.3d 123, 812 N.E.2d 369, 285 Ill.Dec. 549)

Page 6

Court] Rule 191(b) affidavit that would suggest that allowing additional time * * * would create an issue of fact." As to AAU/Alberto's motion for summary judgment on its waiver count, the court found in favor of Aon Aviation and granted its cross-motion for summary judgment, stating that the court's reasoning involved in the August 2, 2002 ruling, similarly dictated its ruling *130 on the waiver of coverage issue. [FN5] The final and appealable order was entered on November 21, 2002, wherein the court stayed enforcement of that order and the August 6, 2002 order during pendency of the appeal. AAU/Alberto timely appeals from the court's denial of its motion for summary judgment and the grant of summary judgment in favor of USAU and Aon Aviation (collectively USAU/Aon Aviation). [FN6]

> FN5. On appeal, AAU/Alberto seeks judgment in its favor (1) on the waiver count, (2) on the primary coverage shift count, and (3) on counts stating Aon Aviation was engaged in flight service, thereby excluding coverage for Aon Aviation. Alternatively, AAU/Alberto asks this court to remand the cause for trial.

> FN6. Aon Aviation claims AAU/Alberto has waived any objection on the circuit court's May 5, 2000 order, where the court ruled AAU had a duty to defend Aon Aviation. The only issue on appeal is whether AAU has a duty to indemnify. AAU/Alberto, however, argues that the notice of appeal pertains to the court's orders from August 6, 2000, and November 21, 2000. The August 6, 2000 order granted summary judgment to Aon Aviation, and ruled that AAU is required to defend and indemnify. Therefore, the duty to defend is part of the summary judgment from which this appeal is taken.

**376 ***556 I

Summary judgment is granted properly where the pleadings, depositions, admissions and affidavits, which are construed strictly against the moving party and liberally in favor of the opponent (*RLI Insurance Co. v. Illinois National Insurance Co.,* 335 Ill.App.3d 633, 643, 269 Ill.Dec. 524, 781 N.E.2d 321 (2002) (*RLI Insurance* )), show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2-1005 (West 2002). Summary judgment is a drastic means of disposing of litigation and should be allowed only when the right of the moving party is clear and free

from doubt. *Spirit of Excellence, Ltd. v. Intercargo Insurance Co.,* 334 Ill.App.3d 136, 144-45, 267 Ill.Dec. 857, 777 N.E.2d 660 (2002) (*Spirit of Excellence* ). Reversal of summary judgment is warranted if, on review, a material issue of fact or an inaccurate interpretation of the law exists. *Spirit of Excellence,* 334 Ill.App.3d at 145, 267 Ill.Dec. 857, 777 N.E.2d 660. Summary judgment orders are reviewed *de novo. Outboard Marine Corp. v. Liberty Mutual Insurance Co.,* 154 Ill.2d 90, 102, 180 Ill.Dec. 691, 607 N.E.2d 1204 (1992) (*Outboard Marine* ).

[1][2] In seeking to exclude Aon Aviation from coverage under the AAU policy, AAU/Alberto primarily contends that Aon Aviation waived its right to coverage by virtue of its assent to, and execution of the Interchange Agreement. Although the parties have argued extensively, before this court and the circuit court, in furtherance of their respective interpretations of the Interchange Agreement, that contract has *131 only tangential relevance to this appeal, as will be discussed in the following three paragraphs. Rather, this coverage dispute turns on the construction of the AAU policy, without regard to the Interchange Agreement. [FN7]

> FN7. Although beyond the purview of this appeal, contracts for indemnification that are designed to shift the ultimate cost of liability from one party to another are enforceable where they are explicit and do not run counter to public policy (*Allison v. Shell Oil Co.,* 113 Ill.2d 26, 27, 99 Ill.Dec. 115, 495 N.E.2d 496 (1986)); however, indemnification contracts will not be construed as indemnifying against a party's own negligence unless such construction is required by clear and explicit language of the contract, or such an intention is expressed in unequivocal terms. *McNiff v. Millard Maintenance Service Co.,* 303 Ill.App.3d 1074, 1077, 239 Ill.Dec. 802, 715 N.E.2d 247 (1999).

First, Aon Aviation did not waive its right to seek coverage under the AAU policy through its execution of the Interchange Agreement. Under General Condition Seven, the AAU policy disclaims:

"Notice * * * or knowledge possessed by any agent or by any other person shall not effect a waiver or a change in any part of this policy[,] * * * nor shall the terms of this policy be waived or changed, except by endorsement issued to form a part of this policy signed by [AAU]."

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

As previously noted, the Interchange Agreement was not made an endorsement to the AAU policy and, therefore, cannot operate to waive Aon Aviation's ability to seek coverage thereunder.

Second, beyond having no effect as to waiver, the Interchange Agreement is not determinative as to whether AAU is obligated to indemnify Aon Aviation. Exclusion (a) of Part I of the AAU policy provides **377 ***557 that the insurance "does not apply: (a) to liability assumed by the Insured except as provided by Coverage I." Turning to Coverage I, entitled "Liability Under Contractual Agreements," the AAU policy states:

"Exclusion (a) of Part I * * * does not apply to the assumption by the Named Insured of the liability of others for bodily injury or property damage in any written contract or agreement, provided that the Named Insured submits a copy of all such agreements to [AAU] within a reasonable time * * *; however, failure to do so through error or omission shall not prejudice the insurance afforded hereunder. [AAU] reserves the right to charge an additional premium for any such agreement so submitted."

Third, Alberto could not bind AAU to the terms of the Interchange Agreement unless it was endorsed by the AAU policy. [FN8] Alberto's failure to do so renders the Interchange Agreement non-controlling in *132 determining whether coverage for Aon Aviation exists under the AAU policy. The absence of the endorsement does not, however, preclude Aon Aviation from seeking coverage under the AAU policy as an unnamed insured, since any "error or omission shall not prejudice the insurance afforded" under the AAU policy.

> FN8. This reading is based on the aforementioned provisions, and is in accord with General Condition Eight of the AAU policy, which provides that "[a]ssignment of interest under this policy shall not bind [AAU] until its consent is endorsed thereon * * *."

[3][4][5][6] The question of whether coverage exists must be resolved by interpreting Exclusion (i) of the AAU policy. The primary objective in construing the language of an insurance policy is to ascertain and give effect to the intentions of the parties as expressed in their agreement. *Crum & Forster Managers Corp. v. Resolution Trust Corp.,* 156 Ill.2d 384, 391, 189 Ill.Dec. 756, 620 N.E.2d 1073 (1993) (*Crum & Forster* ). If the terms of the policy are

clear and unambiguous, they must be given their plain and ordinary meaning. *Outboard Marine,* 154 Ill.2d at 109, 180 Ill.Dec. 691, 607 N.E.2d 1204. Conversely, if the policy language is susceptible to more than one meaning, it is considered ambiguous and will be construed strictly against the insurer who drafted the policy and in favor of the insured, (*American States Insurance Co. v. Koloms,* 177 Ill.2d 473, 479, 227 Ill.Dec. 149, 687 N.E.2d 72 (1997)); however, courts will not strain to find ambiguity in a policy where none exists. *McKinney v. Allstate Insurance Co.,* 188 Ill.2d 493, 497, 243 Ill.Dec. 56, 722 N.E.2d 1125 (1999).

[7] The rationale for the anti-drafter, or "*contra preferendum* " rule of construction is that (1) the intent of an insured in purchasing an insurance policy is to obtain coverage and, therefore, any ambiguity jeopardizing such coverage should be construed in a manner consistent with the insured's intent; (2) the insurer is the drafter of the policy and could have drafted the ambiguous provision clearly and specifically (*Smith v. Allstate Insurance Co.,* 312 Ill.App.3d 246, 254, 244 Ill.Dec. 405, 726 N.E.2d 1 (2000)); and (3) public policy considerations dictate that a liberal construction in favor of coverage be applied since the recovery of an injured innocent third party is involved. *State Security Insurance Co. v. Burgos,* 145 Ill.2d 423, 438, 164 Ill.Dec. 631, 583 N.E.2d 547 (1991). The rule "is intended to aid a party whose bargaining power was less than that of a draftsperson," and may be "inappropriate if both parties are equally sophisticated in the use of the language." 5 Corbin on Contracts § 24.27, at 292 (rev.1998). It has been described as applicable ***558 **378 "only as a last resort, when other techniques of interpretation and construction have not resolved * * * which of two or more possible reasonable meanings the court should choose." 5 Corbin on Contracts § 24.27, at 297.

*133 Reviewing courts may be "reluctant to use the anti-drafter inference where the adversaries are two insurance companies." *United States Fire Insurance Co. v. Hartford Insurance Co.,* 312 Ill.App.3d 153, 157, 244 Ill.Dec. 530, 726 N.E.2d 126 (2000); *Thomas v. Aetna Casualty & Surety Co.,* 28 Ill.App.3d 363, 366, 328 N.E.2d 374 (1975) (in a dispute involving two insurers, where each are subject potentially to primary liability, "a judicial policy which finds ambiguity in the terms of the policy or directs a liberal construction of such terms is not a dominant principle"); *Associated Indemnity Co. v. Insurance Co. of North America,* 68 Ill.App.3d 807, 827, 25 Ill.Dec. 258, 386 N.E.2d 529 (1979) (the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

precept of construing in favor of coverage "is not as poignant in a suit where the issue to be resolved is which of two insurers affords primary coverage"); 2 Couch on Insurance § 22:14, at 37 (3d ed.1997) (the rule does not operate in deciding whether a certain person or entity belongs to insured class described in policy).

[8][9] To the extent that Aon Aviation is a sophisticated corporate entity familiar with aviation insurance, having paid no premium for the AAU policy (nor caused AAU to pay an additional premium) and maintained its own separate insurance coverage, application of the *contra preferendum* rule here is inappropriate. Rather, the policy will be construed as a whole, taking into account the type of insurance purchased, the nature of the risks involved and the overall purpose of the contract. *Crum & Forster*, 156 Ill.2d at 391, 189 Ill.Dec. 756, 620 N.E.2d 1073. The construction of an insurance policy is a question of law subject to *de novo* review. *Spirit of Excellence*, 334 Ill.App.3d at 151, 267 Ill.Dec. 857, 777 N.E.2d 660.

[10] The policy language at issue is located in Exclusion (i) of AAU's policy, which denies coverage to "any person or organization * * * engaged in * * * the operation of any * * * flight service, or aircraft or piloting service." AAU/Alberto concedes that Aon Aviation was using the aircraft with permission, but asserts that "permissive user status is not equivalent to insured status." It maintains that at the time of the accident, Aon Aviation was operating such a service, thus triggering the application of Exclusion (i).

USAU/Aon Aviation counters that "service" must be construed to exclude only those entities engaged in "commercial" aircraft operations, not in-house aircraft transportation. It claims this reading is buttressed by the juxtaposition of "flight service" amidst "other, purely commercial activities," including the "operation of any airport, hangar, [or] flying school," where no disjunctive language sets apart the activities. It argues further that the exclusion runs afoul of the stated purpose of the AAU policy, which covers Alberto's aircraft for "[a]ll operations of the Named Insured," one of which was to mutually exchange private aircraft with Aon Aviation. To exclude coverage **134 for the operations conducted under the Interchange Agreement, it urges, would render illusory the very permissive-user coverage anticipated by the parties and manifested in the Interchange Agreement.

In finding the exclusion inapplicable, the circuit court believed the construction of the AAU policy was contingent on the Interchange Agreement. It commented that the AAU "policy contemplated this interchange agreement that existed between the two plane owners," and "if they ***559 **379 [Aon Aviation] operated within that interchange agreement, my impression is this language would not exclude coverage." The court determined the exclusion would operate only if a service was being offered to a "portion of the public that was interested in piloting and aircraft services as opposed to two groups of owners accommodating each other * * *," and ultimately concluded that "if commercial is not something that gives color to the term flight service, then * * * there is no coverage [for] [permissive] usage of the aircraft." USAU/Aon Aviation adopts this position on appeal. [FN9]

> FN9. AAU/Alberto responds that several categories of permissive users would be "insured" under the AAU policy such as an Federal Aviation Administration Inspector conducting a regulatory inspection flight, a potential purchaser of Alberto's aircraft while conducting a test flight, or pilot applicants for Alberto performing test flights. In these circumstances, it maintains, permissive users would be exempt from the exclusion.

[11] The threshold inquiry is whether the language at issue is ambiguous. Although USAU/Aon Aviation notes that the terms are undefined within the AAU policy, the mere absence of a definition does not necessarily render a policy term ambiguous (*Milwaukee Guardian Insurance, Inc. v. Taraska*, 236 Ill.App.3d 973, 974, 176 Ill.Dec. 763, 602 N.E.2d 70 (1992)), nor is an ambiguity created simply because the parties disagree about the meaning of the policy language. *Installco Inc. v. Whiting Corp.*, 336 Ill.App.3d 776, 783, 271 Ill.Dec. 94, 784 N.E.2d 312 (2002).

[12] Affording the words their plain, ordinary and popular meaning, Exclusion (i) is clear and unambiguous in the context of USAU/Aon Aviation's specific challenge--that the activities described must be "commercial" to trigger the exclusion. The qualifying adjective "any," however, invokes the exclusion irrespective of whether the activities may or may not be commercial. Despite USAU/Aon Aviation's insistence that "service" "means commercial activity, *i.e.,* services to the public or others for hire," this reading is neither inherent nor

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

812 N.E.2d 369
351 Ill.App.3d 123, 812 N.E.2d 369, 285 Ill.Dec. 549
(Cite as: 351 Ill.App.3d 123, 812 N.E.2d 369, 285 Ill.Dec. 549)

Page 9

implicit in the language actually employed. "Service" need not connote monetary exchange, and is defined more aptly as "a duty or labor to be rendered by one person to another," or the "performance **135 of labor for benefit of another, or at another's command." Black's Law Dictionary 1368 (6th ed.1990). An undefined term in an insurance policy is given its plain and ordinary meaning, which can be obtained from a dictionary. *El Rincon Supportive Services Organization, Inc. v. First Nonprofit Mutual Insurance Co.,* 346 Ill.App.3d 96, 102-03, 281 Ill.Dec. 128, 803 N.E.2d 532 (2004).

[13] USAU/Aon Aviation's ability to locate other definitions more favorable to its position is not compelling. Courts should neither exercise their inventive powers to create an ambiguity where none exists, nor approve of the distortion of language to reach a desired result. *American Standard Insurance Co. v. Allstate Insurance Co.,* 210 Ill.App.3d 443, 447, 155 Ill.Dec. 162, 569 N.E.2d 162 (1991). By injecting "commercial" into the phrase, the written language supplied and the risks contemplated in writing the policy would be supplanted and distorted unnecessarily, creating an unintended class of insureds.

Were it to be surmised that AAU intended to deny coverage only to those engaged in "commercial" activities, it easily could have chosen the same language USAU did in its policy, where it denies coverage to those operating, *inter alia,* a "commercial flying service or flying school or any person engaged in commercial aviation." Unlike USAU, however, AAU excluded "any" flight service from permissive **380 ***560 user coverage, not solely " commercial" flights, which must be enforced as written (*RLI Insurance,* 335 Ill.App.3d at 648, 269 Ill.Dec. 524, 781 N.E.2d 321) without alteration by adding new terms. 2 Couch on Insurance § 22:16, at 36 (3d ed.1997).

The placement of "flight service" within the list of other activities does not justify reading "commercial" into the language. This argument presumes each of the activities mentioned are exclusively commercial; however, USAU/Aon Aviation could not argue, for example, that the operation of its own aircraft hangar is commercial where its overarching supposition is that in-house activities of a subsidiary do not constitute commercial activity. Notwithstanding this syllogistic inconsistency, each of the activities listed is modified by the introductory word "any."

Also without merit is USAU/Aon Aviation's reliance

on the AAU policy provision which covers "all operations of the Named Insured." Although flights related to the Interchange Agreement may be deemed operations of Alberto, this general policy provision is overridden by specific policy exclusions. Where an inconsistency arises between a clause that is general and one that is more specific, the latter prevails. Restatement of Contracts (Second) § 203(c) (1981); 11 Williston on Contracts § 32:15, at 507, 509-12 (4th ed.1990). The general **136 provision does not establish coverage when read in the context of the entire policy. [FN10]

> FN10. Permissive user coverage would not be rendered illusory if "commercial" were absent from the phrase. Although AAU/Alberto has set out various examples of when coverage would apply, even if the AAU policy creates a greater number of scenarios denying coverage than those affording coverage, the force of Exclusion (i) remains undiminished.

The circuit court was aware of the terms of the Interchange Agreement and the relevant insurance polices; however, it did not recognize that the AAU policy defeats primary coverage for those flights that were the subject of the Interchange Agreement. As noted above, however, AAU was not a party to the Interchange Agreement, the policy did not endorse the Interchange Agreement, and AAU received no additional premiums for Aon Aviation's coverage. AAU was entitled to implement its policy exclusions without regard to the Interchange Agreement.

The circuit court's grant of summary judgment was unwarranted and, where no material issue of fact remains, the circuit court's ruling is reversed. Aon Aviation is excluded from coverage under the AAU policy as a matter of law.

II

[14][15] The parties presented extrinsic evidence before the circuit court. Illinois courts follow the "four corners" doctrine when interpreting contracts, looking primarily to the language of the contract to determine whether it is susceptible to more than one meaning. *Nebel, Inc. v. Mid-City National Bank,* 329 Ill.App.3d 957, 967-68, 263 Ill.Dec. 843, 769 N.E.2d 45 (2002). Generally, parol evidence is inadmissible to vary the terms of a written instrument unless the language used is ambiguous or incomplete. *Zimmerman v. Illinois Farmers Insurance Co.,* 317 Ill.App.3d 360, 369, 251 Ill.Dec. 57, 739 N.E.2d 990 (2000).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

812 N.E.2d 369
351 Ill.App.3d 123, 812 N.E.2d 369, 285 Ill.Dec. 549
(Cite as: 351 Ill.App.3d 123, 812 N.E.2d 369, 285 Ill.Dec. 549)

Page 10

[16] Assuming *arguendo,* that the language is ambiguous, the collateral evidence overwhelmingly supports the same conclusion. During discovery, USAU/Aon Aviation requested documents pertaining to the drafting history of Exclusion (i). As previously explicated in his affidavit, Lawrence Colton, the former Executive Vice-President and overseer of general aviation underwriting **381 ***561 at AAU, described the history of Exclusion (i). He attested that the AAU policy language was modified from "charter service" to "flying service," in response to an accident involving Twining Aviation, an aircraft charter and rental company. There, the pilot, although insured by another insurer, sought and obtained coverage under the AAU policy, arguing that at the time of the accident, he was flying alone and could not have been operating a "charter" flight. Thereafter, AAU issued an endorsement,

*137 "modifying the policy language to make it clear that no flying or piloting service conducted by [those] other than the Named Insured, (not just charter or commercial services * * *), was entitled to coverage * * *. The change was deliberately made and intended to encompass all persons or entities engaged in the operation of a flight service regardless of whether the operation was commercial in nature, regardless whether a charge was made for the operation, and regardless of whether the operation was intended to result in a profit to the operator. The rationale supporting this construction is that persons or entities that operate flying or piloting services should have their own coverage which is specifically designed and placed to appropriately protect their interests. Had [Alberto], through Aon as its broker, made a request for a modification of the basic policy terms, AAU would have considered the broker's request and made a decision on whether or not to make the modification and at what additional cost." Colton Affidavit, pp. 1-3.

In 1973, AAU introduced its "Golden Wing" policy, which incorporated the definition of an insured as it currently appears in the AAU policy. Colton stated that "[t]he phrase 'aircraft or piloting' was added to more fully describe the types of entities that were precluded from claiming insured status under the policy." The definition of an insured used in the "Golden Wing" policy since has remained unchanged.

A fair and accurate reading of Colton's affidavit undermines USAU/Aon Aviation's contention that it demonstrates "only a broadening of an exclusion that had been limited to certain kinds of commercial activity, so as to include all commercial activity, not an extension to non-commercial activity." If AAU sought to include additional commercial activities, as USAU/Aon Aviation posits, AAU would not have altered the language with the deliberate intention of eliminating any potential inference that commercial activity was a prerequisite to exclusion. The Colton affidavit affirmatively establishes the intent behind Exclusion (i), further compelling a finding of no coverage for USAU/Aon Aviation. [FN11]

> FN11. USAU/Aon Aviation presents as parol evidence certain inquiry and advisory letters between Alberto and AAU regarding a potential aircraft mutual-use arrangement involving Duchossois Industries and Alberto. The letters reveal only preliminary discussions toward a possible, yet un-manifested written arrangement, one distinct in character from the Interchange Agreement. Although the evidence has been considered duly, it is too general, speculative and indeterminate to shed light on the present coverage dispute.

## III

[17] As a corollary issue, it must be determined whether the USAU *138 non-owned aircraft coverage is excess or primary. Pursuant to the USAU policy endorsement for non-owned aircraft, primary coverage is subject to a condition precedent-- "all other valid and collectible insurance covering the loss [must be] exhausted." Under the foregoing analyses, the condition has **382 ***562 been satisfied and USAU is the primary insurer.

## IV

[18] Were this court to read "commercial" into the existing language, the exclusion would apply nonetheless. USAU/Alberto's position rests on the flawed premise that aircraft used for private, in-house corporate purposes are not "commercial" in nature. This criteria does not embrace the full scope of "commercial" in the aviation context or elsewhere.

In *Airmanship v. U.S. Aviation Underwriters, Inc.,* 559 So.2d 89 (1990), USAU argued that a copilot pilot fell within its "commercial aviation" exclusion since he had been paid for his services. The policy did not define the term, but in construing "commercial aviation," the Florida District Court of Appeal stated, "[r]easonable people could differ as to the definition of 'commercial aviation.' Although the term may be understood to encompass the furnishing

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

812 N.E.2d 369
351 Ill.App.3d 123, 812 N.E.2d 369, 285 Ill.Dec. 549
(Cite as: 351 Ill.App.3d 123, 812 N.E.2d 369, 285 Ill.Dec. 549)

Page 11

of compensation for assisting in piloting an aircraft, it could just as easily apply to leasing the aircraft or employing it to carry passengers or freight." *Airmanship,* 559 So.2d at 91. The lease of an aircraft under these circumstances is "commercial." [FN12]

> FN12. Article 2A of the Uniform Commercial Code governs the lease of goods. See UCC § 2A *et seq.* (2000).

As USAU/Aon Aviation acknowledges, an interchange agreement is defined in the Code of Federal Regulations to mean "an arrangement whereby a person leases his airplane to another person in exchange for equal time, when needed, on the other person's airplane, and no charge, assessment, or fee is made, except that a charge may be made not to exceed the difference between the cost of owning, operating, and maintaining the two airplanes." [FN13] 14 C.F.R. § 91.501(c)(2) (2000).

> FN13. The Interchange Agreement provides that both Aon and Alberto "agree [ ] to make the G[-]IV available * * * under the privileges and provisions of FAR 91.501(c)(2)," and that "Alberto may lease their G[-]IV to Aon in exchange for time, when it is needed on Aon's aircraft and no charge, assessment or fee is made. Aon may likewise lease their aircraft to Alberto with the same stipulations."

Since Quern's flight was conducted under the Interchange Agreement, which is by definition a lease, Aon Aviation necessarily engaged *139 the operation of a "commercial" activity at the time of the accident, placing it squarely within the scope of Exclusion (i).

Accordingly, for the reasons set forth above, the judgment of the circuit court of Cook County is reversed.

Reversed.

GREIMAN, J., and THEIS, J. concur.

351 Ill.App.3d 123, 812 N.E.2d 369, 285 Ill.Dec. 549

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit 14

**\*511** Cunard Steamship Company, Limited v. Marten

In the Court of Appeal

CA

Vaughan Williams L.J., Romer L.J. and Stirling L.J.

1903 July 21

Insurance (Marine)--Insurance of Shipowner's Liability to Cargo Owner--Suing and Labouring Clause--Applicability.

A number of mules exceeding 20,000l. in value having been shipped on the plaintiffs' steamship for carriage, under a contract which contained no clause exempting the plaintiffs from liability for loss of the mules through the negligence of the plaintiffs' servants, the plaintiffs effected an insurance with the defendant and other underwriters at Lloyd's, to protect the plaintiffs against "liability of any kind to the owners of the mules up to 20,000l. owing to the omission of the negligence clause" from the contract. The policy was in the printed form of an ordinary Lloyd's policy, containing the usual suing and labouring clause. During the voyage the vessel was stranded through the negligence of the plaintiffs' servants, and expenses were incurred by the plaintiffs in saving some of the mules, and in attempting to save others which were lost. The plaintiffs sought to recover these expenses, not as a direct loss under the policy, but under the suing and labouring clause as expenses incurred to avert or reduce the amount of the loss:--

Held, that the suing and labouring clause was inapplicable to and formed no part of the contract of insurance, and that the plaintiffs were not entitled to recover in the action.

Decision of Walton J., [1902] 2 K. B. 624, affirmed.

APPEAL from the decision of Walton J. [FN1]

FN1 [1902] 2 K. B. 624.

The action was brought upon a Lloyd's policy, which the **\*512** defendant had underwritten for 1000l., to recover the defendant's proportion of

11620/0002/618878.1

expenses alleged to be recoverable under the suing and labouring clause in the policy.

The plaintiffs were the owners of the steamship Carinthia, and in April, 1900, they contracted with the British Government to carry on the ship 1500 mules from New Orleans to Cape Town. The contract contained no clause exempting the plaintiffs from liability for loss arising from the negligence of their servants.

The policy, dated May 9, 1900, was effected to protect the plaintiffs as owners of the ship against "liability of any kind to owners of mules and/or cargo up to 20,000l., owing to the omission of the negligence clause in contract and/or charterparty and/or bill of lading."

The policy was in the ordinary Lloyd's printed form, the above clause being inserted in writing.

The printed part contained the ordinary suing and labouring clause in the following terms:

"And in case of any loss or misfortune it shall be lawful to the assured, their factors, servants, and assigns, to sue, labour, and travel for, in, and about the defence, safeguard, and recovery of the said goods and merchandises and ship, &c., or any part thereof, without prejudice to this insurance; to the charges whereof we, the assurers, will contribute each one according to the rate and quantity of his sum herein assured."

The ship sailed from New Orleans on May 11, 1900, with 1500 mules on board, their value being about 40,000l. On May 15, 1900, she was stranded off Hayti, owing to the negligence of the plaintiffs' servants.

Efforts were made to save the mules, and in the result more than 900 were rescued and were sent to Cape Town in another ship. The remainder were lost.

The plaintiffs in saving the 900 mules and in endeavouring to save the others incurred (as they alleged) expenses amounting to 7744l. 0s. 8d., and by this action they claimed under the suing and labouring clause to recover 387l. 4s. 2d., the defendant's proportion of the expenses.

Walton J. gave judgment for the defendant on the ground **\*513** that the suing and labouring clause was inapplicable to the insurance actually effected, and was no part of the contract. The learned judge recognised that a suing and labouring clauses might

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

be framed which would be appropriate to such an insurance as was effected. But any attempt to apply to that insurance a clause which was framed and intended to apply to an insurance of a different kind would work injustice, unless, in order to make the clause applicable to the insurance in question, it was so modified as to make it in fact a different clause altogether.

The plaintiffs appealed.

*Pickford, K.C.*, and *Loehnis*, for the plaintiffs. It is submitted that the suing and labouring clause applies. The liability to the owners arises out of the loss of the mules, and that liability was diminished by the salving of the mules. That is for the benefit of the shipowners, but it is also for the benefit of the underwriters. There may be some difficulty in applying the suing and labouring clause, but that is not a reason for excluding it altogether. No doubt words in a contract may be rejected when they are absolutely inconsistent with the rest of the document, but there is no such inconsistency here. Walton J. based his judgment on two grounds--(1.) that the policy was not upon goods; (2.) that there might be a case in which the expenses incurred would be for the benefit of the assured, and not for the benefit of the underwriters. It is submitted that neither of those grounds affords a sufficient reason for excluding the suing and labouring clause. As a matter of fact, in the present case the underwriters have the whole benefit of the expenditure. The parties have agreed that the policy shall have in it a suing and labouring clause if it can be applied to the case, and there being no absurdity or inconsistency it can be applied. Xenos v. Fox [FN2] is distinguishable. There the "running down" clause was not a part of the policy; it was an additional contract. If the suing and labouring clause does not apply, the shipowners might*514 incur heavy expenses which would benefit the underwriters and they would be under no liability. That could not have been the intention. If expenses are incurred which in fact benefit the underwriters, it must have been intended that they should recoup the shipowners. A contract of marine insurance ought not to be construed in a different way from other contracts. The whole of the policy must be looked at: Cory v. Burr [FN3]In Kidston v. Empire Marine Insurance Co. [FN4] Willes J. said that expenses incurred in averting a loss for which underwriters would have been liable are within the suing and labouring clause. That applies to the present case. The plaintiffs have taken steps to diminish the liability which would be incurred by the underwriters under the policy.

FN2 (1868) L. R. 3 C. P. 630; (1869) L. R. 4 C. P. 665.

l 1620/0002/618878.1

FN3 (1881) 8 Q. B. D. 313, 315.

FN4 (1866) L. R. 1 C. P. 535, at p. 552.

[VAUGHAN WILLIAMS L.J. referred to Paterson v. Harris. [FN5]]

FN5 (1861) 1 B. & S. 336; (1862) 2 B. & S. 814.

*Carver, K.C.*, and *F. D. MacKinnon*, for the defendant, were not called upon.

VAUGHAN WILLIAMS L.J.

In my opinion this appeal must fail and the judgment of Walton J. be affirmed.

Every one is agreed that, whatever is the subject-matter of this policy, it is plain the mules are not. Both sides agree in that. The subject-matter of the policy is--
"To cover shipowner's liability of any kind to owners of mules and/or cargo up to 20,000l., owing to the omission of the negligence clause in contract and/or charterparty and/or bill of lading."

I do not understand the plaintiffs to say that they could recover the whole expenses which were incurred in salving the mules as a direct loss under this policy; it is because they feel the impossibility of doing that that they are obliged to have recourse to the suing and labouring clause. That being so, how does the matter stand? [The Lord Justice read the suing and labouring clause, and continued:--]

Now prima facie, as was pointed out by Walton J., the words "said goods and merchandises" have no application to the*515 subject-matter of this policy. But it is said, although these words do not directly apply and the mules are not the subject-matter of the policy, yet by salving the mules you are really averting a liability to the owner of the mules, and therefore the suing and labouring clause applies. I do not think that one ought thus to strain the words of the policy to make them apply to this subject-matter. In my view the parties never could have intended it. The value of the mules was 40,000l., and the amount insured to cover the liability to the cargo owners was 20,000l. In case the salvage expenses had amounted to the whole 20,000l. the assured would, if this argument is right, have been entitled to recover the whole of that loss, although the insurance was for only half the value of the mules. In fact, although both sides are agreed that this is not an insurance on the mules, we are invited to apply the suing and labouring clause just as if it was. I adopt in full the reasoning of Walton J., and I feel that it is

Case 1:06-cv-00011    Document 116    Filed 03/13/2007    Page 28 of 29

impossible for me to improve upon what he said.

ROMER L.J.

I also do not see my way to differ from Walton J. The point involved is a very short one. It is admitted on behalf of the appellants that this policy of insurance is not upon the mules or goods or ship at all; it is what it purports to be, solely an insurance to cover the shipowner's liability of any kind to the owners of mules or cargo up to 20,000l., owing to the omission of the negligence clause in the contract of affreightment. That is the only subject-matter of the insurance, and it is inserted in a policy the printed part of which applies to an insurance on ship and goods and cargo. Naturally enough, you find that most (if not all) of the printed matter has little or no application to the precise risk insured. But it is said that one of the printed clauses can be singled out from the others and made applicable--namely, that which is commonly called the suing and labouring clause. How does it run? [The Lord Justice read the clause, and continued:--]

That clause refers to "the said goods and merchandises and ship," because, as I have said, the printed form of this policy is for an insurance on the ship and goods. Therefore the suing*516 and labouring clause refers to "the said goods and merchandises and ship," and admittedly this insurance is not on any goods or merchandises or ship at all. Of course I would, if I could do so reasonably, apply that clause to the present case, but it appears to me that it cannot reasonably be applied to such a case. In my opinion the clause was never intended to apply to such a subject of insurance; it was on the very face of it intended to apply only to an insurance on "goods, merchandises, and ship."

STIRLING L.J.

I agree, and I cannot usefully add anything.

**Representation**

Solicitors: Rowcliffes, Rawle & Co., for Hill, Dickinson & Co., Liverpool; Parker, Garrett & Co.

Appeal dismissed. (W. L. C.)

(c) Incorporated Council of Law Reporting For England & Wales

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.