# Exhibit 15

Westlaw.UK

(1876-77) L.R. 2 App.Cas.                                    Page 1
1877 WL 16887 (HL), (1876-77) LR 2 App. Cas. 284
(Cite as: (1876-77) LR 2 App. Cas. 284)

*284 Alexander John Dudgeon v. E. Pembroke

House of Lords

HL

Lord O'Hagan, Lord Blackburn and Lord Gordon
Lord Penzance.

1877 Feb. 12, 13; March 23

Time Policy--Warranty of Seaworthiness--Perils
insured against.

A policy of insurance was effected on ship from
the 22nd of January, 1872, to the 23rd of January,
1873, both inclusive. These words were written in
on a printed form, which also contained, in print,
the words, at and from, and *for this present voyage*,
and other similar words which were commonly
found in the forms of a voyage policy, and which
had not been erased or struck through:--

Held, that the policy was really a time policy, and
its character was not affected by the printed words
thus negligently left in the form.

In a time policy the law, in the absence of special
stipulations in the contract, does not imply any
warranty that the vessel should be seaworthy.
Gibson v. Small [FN1] supplemented by Thompson
v. Hopper [FN2], and Fawcus v. Sarsfield [FN3],
declared to have set at rest all controversies on this
subject.

FN1 4 H. L. C. 353.

FN2 6 El. & Bl. 172.

FN3 6 El. & Bl. 192.

If a shipowner knowingly and wilfully sends his
ship to sea in an unseaworthy condition, the
knowledge and wilfulness are essential elements in
the consideration of his claim to recover.

A time policy was effected on an iron steamer, the
*Frances*, of 705 tons burden, then lying in the yard
of its owner, a shipwright. It had been put under
repair, and it was stated in evidence that there had
not been any stint placed upon the repairs, and that
the marine engineer who superintended the repairs,
and the workmen who executed them, believed
them to be completely satisfactory. It was expressly

found that if the ship was unseaworthy the assured
was ignorant of the fact. The ship went with
nothing but a deck cargo of iron machinery from
*London* to *Gothenburg*--made more water on the
voyage than could have been expected from the
state of the weather--ceased to do so on getting into
harbour--was examined, and its condition on the
voyage could not be accounted for; and in a few
days afterwards took on board a cargo of oats and
380 tons of iron, and a deck loading of timber;
started from *Gothenburg*, encountered in the open
sea very bad weather which put out the fires, ran
for the port of *Hull*, could not make the port, ran
ashore, and after some time was broken up and
became a total wreck:--

Held, that these facts shewed a loss by perils
insured against--the perils of the sea--and that the
assured was entitled to recover as for a total loss.

A loss caused immediately by perils of the sea is
within the policy though it might not have occurred
but for the concurrent action of some other cause
which is not within the policy.

IN this case an action had been brought upon a
policy of insurance on the iron steamer *Frances*.
The policy was effected for the *285 sum of £5800
on ship valued at £8000 and machinery at £4000.
The policy stated that the assured "caused
themselves to be insured, lost or not lost, *at and
from*-------, for and during the space of twelve
calendar months, commencing on the 24th of
January, 1872, and ending on the 23rd of January,
1873, both days inclusive, in port and at sea, in
dock and on way, at all times, in all places, and on
all occasions and services, ... upon any kind of
goods and merchandises, and also upon the body,
tackle, &c., of and in the good ship or vessel called
the *Frances* (S.) whereof is master for this present
voyage-------,or whosoever else shall go, &c.,
beginning the adventure upon the said goods and
merchandises from the loading thereof aboard the
said ship *as above*, &c., ... and further until the said
ship shall be *arrived at*------as above, until she hath
moored at anchor twenty-four hours in good safety,
and upon the goods and merchandises until the
same be there discharged. ... Touching the
adventures and perils which we, the assurers, are
contented to bear, and do take upon us in this
present voyage, they are *of the seas*, &c., and of all
other perils, losses, and misfortunes that shall come
to the hurt, &c., of the goods and merchandises and
ship, &c., or any part thereof" [FN4].

FN4 The words printed in italics were those

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

referred to in the Exchequer Chamber by Lord Coleridge, as shewing that the policy bore the character of a voyage policy.

The *Frances* was an iron screw steamer of 705 tons burden, which had been built at *Amsterdam*, in 1858, and launched in 1859, for Spanish owners (under the name of the *Paris*), and was stated to have been originally constructed of good iron. It was proved to have been lying in 1867-1868, in the harbour of *Cadiz*, unemployed, for about eighteen months. The Plaintiff was a shipwright at *Millwall*, and in 1871, the *Paris*, then lying at *Birkenhead* and being offered for sale, he contracted with the Spanish owners to build them a new vessel and to take their vessel in part payment. The vessel was, for the purpose of this arrangement, valued at £4000. It was then, as its boilers were not in good condition, towed round to *Millwall*. At the time when this transaction took place the Plaintiff was the owner of two steamers plying between *London* and *Gothenburg* for goods and passengers, but one of them broke down, and the Appellant *286 resolved to repair the *Paris*, and run it on the *Gothenburg* line. Its name was then changed to the *Frances*. He accordingly put the vessel into a dry dock at *Millwall*, where it underwent all the repairs that were deemed to be required; and in the evidence given at the trial, it was stated that there was no stint whatever as to the amount of the repairs, and that the workmen, and the marine surveyor and engineer, believed that the ship was made seaworthy. Before the *Frances* left *London*, a surveyor from the Board of Trade surveyed the outside of the ship, but for want of time did not survey the inside of it, and therefore it did not obtain a passenger certificate. It sailed for *Gothenburg* on the 3rd of February, 1872, without one passenger. It had then some machinery on deck, but no other cargo, and was stated to be, consequently, somewhat crank. On its voyage more water was observed in it than could be accounted for by the state of the weather, but it arrived safely at *Gothenburg* on the 7th of February, and on getting into harbour the leakage ceased. On examination there by carpenters, no cause for making so much water during the voyage could be discovered. On the 11th of February the *Frances*, having taken on board a cargo of oats and 180 tons of iron, together with a deck cargo of deals, left *Gothenburg* for *London*. On the morning of the 12th of February, the ship being then in the open sea, the wind became very strong with a heavy rolling sea, and the ship laboured much, and a sail was put over the stokehole to prevent the sea from getting into the fires. The precaution did not answer; and in sixteen hours the fires were put out. Some of the wood forming the deck cargo was used for relighting the fires, and some was thrown or

was washed overboard. After about twelve hours pumping, the pumps got choked with the oats, and all hands were employed in baling the ship. Evidence was given, which did not appear to be denied, to shew that the screw tunnel was not in proper order, and that if it had been, the pumps could not have got choked as they did. On the night of the 14th of February, endeavours were made to get the ship into *Hull*, but being waterlogged it did not readily answer the helm, and went ashore under *Didlington Heights*, upon the coast of *Yorkshire*, and finally went to pieces.

This action was then brought. The declaration contained a *287 count on the policy as for a total loss and the common money counts. To the first count the Defendant pleaded: 1. Denial of the insurance; 2. Denial of the Plaintiff's interest; 3. Denial of the loss by perils insured against. 4. Misrepresentation. 5. Concealment. 6. That after the making of the policy the Plaintiff, well knowing that the ship was unseaworthy, and without any justifiable cause, sent it to sea in such unseaworthy condition, and that the loss was occasioned thereby. 7. That the voyage was illegal by reason of the ship having sailed with passengers without a passengers' certificate, and that the policy was effected to cover the illegal voyage. As to the money counts, never indebted. Issue on all the pleas.

The cause was tried before Mr. Justice *Blackburn* and a special jury at the *London* sittings after Trinity Term, 1873, when the learned Judge left seven questions to the jury, which, and the answers, were the following: 1. Was the broker's representation at the time of making the insurance correct?--Yes. 2. Was it represented that the vessel was to carry passengers, and therefore that it had been surveyed by the Board of Trade?--No. 3. Was there concealment of any matter materially affecting the insurance?--No. 4. Was the fact that the ship had not been surveyed for carrying passengers material?--No. 5. Was the vessel seaworthy when it started?--The jurymen could not agree. 6. If not, was that known to the Plaintiff?-- No. 7. Was that unseaworthiness the cause of the loss?--The jurymen could not agree. The learned Judge directed the verdict to be entered for the Plaintiff, with leave to move. A rule was obtained to set aside the verdict on the 6th plea, on the ground that the findings of the jury did not warrant the entry of the verdict, and that as to the third plea there was no finding to warrant the entry of such verdict. The rule also called on the Plaintiff to shew cause why a verdict should not be entered for the Defendant, or a new trial be granted, on the ground that the findings were against the weight of evidence, and were inconsistent and incomplete. On the 6th of July, 1874, the Court of Queen's

Case 1:06-cv-00011    Document 116-2    Filed 03/13/2007    Page 3 of 31

Bench gave judgment discharging the rule [FN5]

FN5 Law Rep. 9 Q. B. 581.

This decision was, on appeal, reversed in the Exchequer Chamber, *288 the majority of the Judges there being of opinion that the answers given upon the third and sixth issues did not properly dispose of the case, and that therefore there ought to be a new trial [FN6] This appeal was then brought.

FN6 1 Q. B. D. 96.

Mr. *Milward*, Q.C., and Mr. *A. L. Smith*, for the Appellant:--

When the principle of law that ought to govern this case is properly considered, there can be no doubt that all the issues were disposed of, and that the verdict was rightly entered for the Plaintiff.

There is no warranty of seaworthiness in a time policy on ship. In a voyage policy it is otherwise. This was a time policy, and certain expressions used in it, though relied on in the judgment of Lord *Coleridge* in the Exchequer Chamber as altering its character, had no such effect.

The question has really been decided by the case of Thompson v. Hopper [FN7], which followed the decision of this House in Gibson v. Small [FN8] Fawcus v. Sarsfield [FN9], and Jenkins v. Heycock [FN10] proceeded on the same principle.

FN7 6 El. & Bl. 172.

FN8 4 H. L. C. 353.

FN9 6 El. & Bl. 192.

FN10 8 Moo. P. C. 351.

By these authorities the law may be considered as definitely settled. The only difficulty that could exist arose from the applicability to the particular findings here of the principle involved in those decisions. The jurors could not agree whether at the time of effecting the policy the ship was or was not seaworthy, nor could they agree whether unseaworthiness was the cause of the loss. But this was a time policy, and it became immaterial to consider these questions, for a time policy involved no warranty of seaworthiness. Going out of the policy, and referring only to the general question whether the Plaintiff had sent the ship to sea knowing that it was not seaworthy, so that he might be said to have occasioned his own loss, the jurymen answered distinctly that if the vessel was

unseaworthy, which they could not agree to find, at all events he did not know of its being so. The material facts were therefore found in favour of the Plaintiff, and consequently the verdict was properly entered in his favour.

*289 Even if, independently of the rule of law as to a time policy, the owner of a ship was bound to send it to sea in a state fit to encounter the ordinary dangers of a voyage, it was clear that he had done so here. The evidence shewed that proper repairs had been ordered and executed, and the vessel made the voyage to *Gothenburg* in safety, and there could be no doubt that it was stress of weather and the perils of the sea that made it run ashore on its return voyage.

The cases relied on by the other side in the Court below [FN11], where the obligation of sending a ship to sea in a seaworthy condition was insisted on, were those of voyage policies, which had nothing to do with the present case. Douglas v. Scougall [FN12] was the case of a voyage policy, and the observations there made by Lord *Eldon* [FN13] were strictly confined to the case which he was then considering. The facts here shewed that the loss was one which arose immediately from the perils of the sea, and would have keen sufficient to fix liability on the Defendant even if this had been a voyage policy: Walker v. Maitland [FN14]; Ionides v. Universal Marine Assurance [FN15]; Bondrett v. Hentigg [FN16]; Montoya v. The London Assurance Company [FN17]

FN11 1 Q. B. D. 96.

FN12 4 Dow. 269.

FN13 Ibid. at p. 276.

FN14 5 B. & Ald. 171.

FN15 14 C. B. (N.S.) 259; 32 L. J. (C.P.) 170.

FN16 Holt, N. P. 149.

FN17 6 Ex. 451.

Mr. *C. P. Butt*, Q.C. (Mr. *Cohen*, Q.C., was with him), for the Respondent:--

Whatever difficulty exists in this case as to the entry of the verdict, has arisen from the answer of the jurors to the latter part of the sixth question. But that really was immaterial. The plea on which it was founded was quite sufficient to defeat the claim of the Plaintiff, without reference to that part of it which declared his knowledge of the unseaworthiness of the vessel. If the ship was

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

unseaworthy and the Plaintiff sent it to sea in that condition, and the loss was occasioned thereby, the plea was a good answer to the action; the averment of the *scienter* was unnecessary. If the ship went to sea without being fit to encounter the ordinary risks of going to sea, not the extra ordinary risks of storms, for the *290 consequences of which the insurer alone made himself answerable, the assured could not recover. A policy of insurance was only a contract of indemnity against risks which could not be foreseen, or by ordinary care be provided against. If a vessel could not sail over a smooth sea without making water at such a rate as to threaten danger, such a vessel was not fit to be sent to sea, and was not a proper subject of insurance. It was not necessary to aver that the vessel was wilfully sent to sea in such a condition. Such an averment might be necessary to bring a man within the penal provisions of the 11th section of the 34 & 35 Vict. c. 110, but it was not necessary for the purpose of answering a claim upon a policy of insurance. It was not, therefore, necessary to put to the jury the question of knowledge, and the finding that if the vessel was unseaworthy the Plaintiff was ignorant of it, did not affect the case. The real questions for the jury were--was the vessel unseaworthy, and, if so, was that unseaworthiness the cause of the loss? On those questions, which were fairly raised by the third and the sixth pleas, the jurymen had been unable to agree. No verdict, therefore, was given upon them, and consequently there was no verdict to justify the entry of judgment. The absence of any finding could not justify the entry of a judgment as on a finding for the Plaintiff. Upon this point the case of Thompson v. Hopper [FN18] was really a case in favour of the Defendant, for it shewed that the fact of sending a ship to sea in an improper state, in other words in a condition not fit to encounter ordinary sea risks, was a good answer to a claim by the assured, if it appeared that by reason of the premises the ship was wrecked. That was shewn here by the plea, and that plea was really made out by the evidence, and ought so to have been found by the jury, and the want of a finding on that matter was good ground for a new trial. And the case of Fawcus v. Sarsfield [FN19] established even more strongly the same proposition. That was a time policy, and it was there held that a ship sent to sea not fit to perform the particular voyage, and which was therefore, without encountering any but the ordinary risks of navigation, compelled to put into port for repair, was not to be treated as a vessel the repairs of which were to be thrown on the underwriter. And that was held though it was *291 found as a fact, by the arbitrator, that the owner did not know that such was the state of the vessel when he sent it to sea. The principle was adopted in Merchants' Trading Company v. Universal Marine Assurance

Company [FN20] The allegation of knowledge, therefore, in the sixth plea was immaterial, and ought not to have been left to the jury; but the other part of the plea was most material, and not having been answered in one way or the other by the jury, must be made the subject of another inquiry.

FN18 6 El. & Bl. 172.

FN19 6 El. & Bl. 192.

FN20 2 Mar. Cas. 431.

Then as to the supposed rule that there was not, in the case of a time policy, an implied warranty of seaworthiness. No case had yet laid down any such rule. The case of Gibson v. Small [FN21] did not decide the question one way or the other. It really only settled that, under such circumstances as existed there, no warranty of seaworthiness could be implied. But the vessel there was in a distant part of the world at the moment the policy was executed. Here, on the contrary, when the policy was entered into the ship was in the shipyard of the Plaintiff himself, and he had the amplest means of knowing whether the vessel was seaworthy or not. The exemption from warranty of seaworthiness in a time policy might well apply to a policy effected in *England* when the ship was in a distant port, but could not properly be applied when the vessel was in the port where the owner resided, nay more, in his own dockyard. And to hold that, under such circumstances, a warranty of seaworthiness was implied, would not entail the consequences adverted to in some of the judgments in the Court below, but would be of advantage in preventing negligence and even fraud in such cases; and such was the opinion of Lord *Eldon* in Douglas v. Scougall [FN22], and his observation in Wilkie v. Geddes [FN23], that in every contract of insurance there was an implied warranty of seaworthiness at the commencement of the voyage, though made in the case of a voyage policy, was not intended to be restricted to voyage policies alone. And Lord *Redesdale*, there, expressly adopted those observations. It is plain that Lord *St. Leonards* while admitting, in Gibson v. Small [FN24], that a warranty of seaworthiness was not implied in a time policy *292 effected while the vessel was at sea, thought that it ought to be implied while the vessel was in a place where its condition was known to the assured. And Lord *Compbell* himself in that very case [FN25] shewed an inclination towards the same opinion.

FN21 4 H. L. C. 353.

FN22 4 Dow. at p. 276.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN23 3 Dow. at p. 59.

FN24 4 H. L. C. at p. 417.

FN25 4 H. L. C. at 423.

The cases of Bondrett v. Hentigg [FN26], and Montoya v. The London Assurance Company [FN27], shewed no doubt that when the sea had utterly disabled the vessel, the injuries that afterwards happened to the goods, the subject of insurance, might be treated as losses occasioned by the perils of the sea, but here the question related to what was the cause by which the vessel had been so disabled. That question was, whether any injury would have occurred to the *Frances* from perils of the sea, if the vessel had been in a state fit to encounter ordinary sea risks.

FN26 Holt's N. P. 149.

FN27 6 Ex. 451.

The real substantive questions for the jury were whether the vessel was in a fit state to be sent to sea, and whether the loss had not arisen from its unfitness, and these questions not being answered, the Court below had done rightly in directing a new trial.

Mr. *A. L. Smith*, in reply:--

There was no warranty of seaworthiness in a time policy, and the question of unfitness to go to sea could only arise where there existed knowledge of unfitness or fraud was imputed. Here the existence of knowledge was distinctly negatived by the finding.

1877 March 23. LORD PENZANCE:--

In this case, my Lords, the action was brought by the Appellant upon a policy of insurance by which the steamship *Frances* was insured for a year for the sum of £5800, the ship being valued at £8000, and the machinery at £4000. Several pleas were pleaded by the underwriter, the present Respondent. The cause was tried, and several questions were eventually put to the jury by the learned judge, who, upon the answers of the jury, directed the verdict to be entered for the Plaintiff. A rule was obtained to set aside this verdict for a new trial, or to enter the verdict for the Defendant on the third plea. This rule was discharged *293 after argument by the Court of Queen's Bench, and an appeal was then had to the Court of Exchequer Chamber upon a special case stated by the parties. The result of this appeal was, that the judgment of the Queen's Bench was reversed and a new trial

granted. It is against this reversal that the Appellant has appealed to your Lordships' House; and the questions raised in the case, though not numerous, are of extreme importance in the administration of the law of marine insurance.

My Lords, the policy in this case is a time and not a voyage policy, and not only so, but an ordinary time policy. There can, I apprehend, be no doubt upon that point. It has been suggested that by reason of the policy having been drawn up on a printed form, the printed terms of which are applicable to a voyage and also to goods as well as to the ship, the policy is something less, or something more, than a time policy. But the practice of mercantile men of writing into their printed forms the particular terms by which they desire to describe and limit the risk intended to be insured against, without striking out the printed words which may be applicable to a larger or different contract, is 0too well known, and has been too constantly recognised in Courts of Law, to permit of any such conclusion.

The policy, then, being a time policy, the first question raised for your Lordships' determination is, whether the law implies in such a contract any warranty that the vessel should be seaworthy at any period of the risk, and if so, at what period or periods.

My Lords, this is no new question. It was raised in the case of Gibson v. Small [FN28], which was determined by your Lordships' House in the year 1854, and has been the subject of more than one subsequent decision. I do not propose to trouble your Lordships by reviewing the arguments on this question, because I consider that the case of Gibson v. Small [FN29], supplemented as it was by the two cases of Thompson v. Hopper [FN30], and Fawcus v. Sarsfield [FN31], must be considered to have set at rest the controversies on this subject, and to have finally decided that the law does not, in the absence of special stipulations in the contract, infer in the case of a time policy any warranty that the vessel at *294 any particular time shall have been seaworthy. In pronouncing the judgment of the majority of the Court in the latter case, Lord *Campbell* said, "For the reasons which I gave in the case of Gibson v. Small [FN32], and which I have given in the case of Thompson v. Hopper [FN33], I think there is no implied warranty of seaworthiness in any time policy."

FN28 4 H. L. C. 353.

FN29 4 H. L. C. 353.

FN30 6 El. & Bl. 172.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN31 6 El. & Bl. 192.

FN32 4 H. L. C. 353.

FN33 6 El. & Bl. 172.

From that time, upwards of twenty years ago, to the present, these decisions have been acted upon and submitted to, and thousands of time policies have been effected and millions in losses adjusted under them; and whatever may be argued as to the soundness of the conclusions then arrived at, or however desirable it may be, as a matter of public policy and concern, that some such obligation of keeping his vessel, as far as it is within his power, seaworthy, should be cast on a shipowner, the law must, I submit to your Lordships, be considered as settled by these decisions, and any change made in it must be by legislative authority alone.

It was next contended that the vessel in this case was not lost by "perils of the sea," and that some question ought to have been put to the jury by the learned Judge upon this subject. The circumstances of the vessel's loss are detailed in the special case. It is only necessary to quote a few sentences of it: "The *Frances* laboured heavily, and began to make water to such an extent that in sixteen hours the fires were extinguished. A portion of the deals which formed the deck cargo was used for relighting the fires, and the rest was thrown or washed overboard. After about twelve hours pumping the pumps got choked with the oats, and all hands had to be employed in baling the ship." There was evidence given by the Defendants that had the screw tunnel been in proper order, the pumps would not have got choked as they did. "On the night of the 14th of February those on board the *Frances* having sighted the *Spurn Lights*, endeavoured to get her into *Hull*; the ship at the time being waterlogged, did not readily answer her helm. Partly from this, and partly from the thickness of the weather, which at the time was very dense, on the following morning, at about 5 A.M., the ship having been in a state of distress since the morning of the 12th of February, went *295 ashore under *Didlington Heights*, upon the coast of *Yorkshire*. One of the boats was swamped, but the crew were all saved by a smack. Part of the cargo was afterwards saved, but the vessel could not be got off, and subsequently broke in two, and, finally, after some months, went completely to pieces."

These facts require no argument. If ever a vessel was "lost by perils of the sea," understanding those words in the sense which the Courts of this country have uniformly ascribed to them, this vessel

undoubtedly was so; and the real question intended to be raised, therefore, is, whether a vessel not strong enough to resist the perils of the sea (in another word, unseaworthy,) can be properly said to be "lost by perils of the sea," when it is clear that by the force of the winds and waves it went ashore, and finally "broke up and went to pieces." The question, therefore, is one of law, and not of fact, and the learned Judge was quite justified in entering the verdict as he did, without asking the jury any farther question as to the loss, about which there was no fact in dispute, subject to determination of the question of law so raised.

In discussing such a question it must be assumed (as it was admitted by the Appellant that it should be, for the sake of argument), that the vessel was not seaworthy, and that its want of seaworthiness caused it to be unable to encounter successfully the perils of the sea, and so to perish. The question, therefore, is in substance the same as that raised by the sixth plea, or rather so much of it as the jury found to be proved, namely, that the vessel "sailed from *London* in a wholly unseaworthy condition in the voyage on which she was lost," and that the ship "was lost, as alleged, by reason of such unseaworthiness." For this plea must be understood to mean, not that the vessel did not perish immediately by the action of the winds and waves (if it did it was certainly not sustained by the facts), but that the loss by these perils of the sea was brought about by the vessel's unseaworthiness.

It will at once occur to your Lordships, upon the raising of such a question, that it applies as much and as fully to a voyage policy as to a time policy. If a loss proximately caused by the sea, but more remotely and substantially brought about by the condition of the ship, is a loss for which the underwriters are not liable, *296 then, quite independently of the warranty of seaworthiness, which applies only to the commencement of the risk (in its several "gradations," as Mr. Justice *Erle* in Thompson v. Hopper [FN34] called them), the underwriters would be at liberty, in every case of a voyage policy to raise and litigate the question whether, at the time the loss happened, the vessel was, by reason of any insufficiency at the time of last leaving a port where it might have been repaired, unable to meet the perils of the sea, and was lost by reason of that inability.

FN34 6 El. & Bl. 172, at p. 181.

If such be the law, my Lords, the underwriters have been signally supine in availing themselves of it. For there is no case that I am aware of, except those to which I have referred, in which anything like such a defence as this has been set up. The

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

materials for such a defence must have existed in countless instances, and yet there is no trace of it in any case which has been brought to your Lordships' notice, still less any decision upholding such a doctrine.

The case of Fawcus v. Sarsfield [FN35] was relied upon at the Bar, but that was a case of partial loss, in which the question was whether the underwriters were liable for certain repairs, and the Court held that the arbitrator had found "that the necessity for repairs did not arise from any peril insured against, but from the vice of the subject of insurance."

FN35 6 El. & Bl. 192.

In the total absence, then, of all authority, and in the fact that this defence is a new one, I find sufficient reason for advising your Lordships not, now for the first time, to sanction a doctrine which would entirely alter the hitherto accepted obligations between underwriter and assured.

It was said by one of the learned Judges in the Exchequer Chamber that "the unseaworthiness of the ship at the commencement of the voyage, which really causes the loss, is a fact, the consequences of which are imputable to the assured, and were to be borne by him, and not the underwriters." But the question, as it seems to me, is not what losses ought in the abstract to be borne by the assured as being "imputable" to him or his agents on the one hand, or by the underwriters as being caused by the elements on the other hand, but what losses they have mutually agreed *297 should be borne by the underwriters in return for the premium they have received. These losses are in the contract of insurance, amongst others, declared to be all "losses by perils of the sea." A long course of decisions in the Courts of this country has established that "*causa proxima et non remota spectaturr*dquo; is the maxim by which these contracts of insurance are to be construed, and that any loss caused immediately by the perils of the sea is within the policy, though it would not have occurred but for the concurrent action of some other cause which is not within it.

It is, I conceive, far too late for your Lordships now to question this construction of the underwriters' obligations, if, indeed, you were disposed to do so.

The only exception which has hitherto been established to the underwriters' liability, thus construed, is to be found in the case of Thompson v. Hopper [FN36], where it was alleged that the shipowner himself knowingly and wilfully sent the ship to sea in an unseaworthy state, and that she was lost in consequence.

FN36 6 El. & Bl. 172.

It is only necessary to observe upon that case that the knowledge and wilful misconduct of the assured himself was an essential element in the decision arrived at--there is no case that warrants your Lordships in going farther--and on the other hand it is easy to see that the arguments employed in this case, if sanctioned by judicial decision, would result in relieving the underwriters from many other losses to which they have hitherto been held liable. For instance, the assured has hitherto always been held protected from loss through the perils insured against, though that loss was brought about through the negligence of his captain or crew. Now the captain has the entire control of the vessel in respect of repair in foreign ports, as of everything else, and if the 6th plea in this case were held to be sufficient without proof of the shipowner's knowledge and wilfulness, the result would be that whenever the captain failed in his duty in fitly repairing the vessel in a foreign port, and the loss, though caused by perils of the sea, could be traced to the ship's defective condition, the assured would lose the benefit of his policy. Such a doctrine, once established, would extend equally to the negligent conduct of the master in *298 the course sailed by the ship, or the careless management of the ship in an emergency, or the absence of reasonable and proper exertion on the part of the captain or crew.

For these reasons, my Lords, I submit to the House that the judgment of the Court of Exchequer Chamber ought to be reversed.

My Lords, I may state that my noble and learned friend the Lord Chancellor has been made acquainted with the judgment I was about to deliver in this case, and that he desires me to say that he entirely agrees with it, and does not wish to add anything to it.

LORD O'HAGAN:--

My Lords, having had the advantage of perusing the opinion delivered by my noble and learned friend who has just addressed your Lordships, and adopting it, after sufficient consideration, without any reserve, I do not propose to go again over the reasons on which it is grounded. I would only say a word with reference to one of the judgments we are reviewing, with which I am unable to concur.

Notwithstanding the suggestions in that judgment, I think that the policy in this case was a time policy, and nothing else; and I would urge upon

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

your Lordships the importance of abiding by the well-considered decision of this House in Gibson v. Small [FN37], followed by subsequent cases of high authority, and accepted as the rule of mercantile action for so many years, which determined that in such a policy, framed in the usual terms, there is no implied warranty of seaworthiness. That decision was wise, convenient, and safe. It was in accordance with the sound principle which forbids the importation into a written contract, save in exceptional cases which are familiar to us all, of material terms which the parties to it have not thought fit to insert. It was convenient as furnishing one of those "'plain rules,' without qualification or exception," which Lord *Campbell* has described in Gibson v. Small [FN38] as "most desirable in commercial transactions," avoiding extreme refinements or the superfluous raising of difficult *299 questions from special circumstances. And it was safe; because express stipulation can always be introduced when needful. The want of implied warranty does not protect the insured against the consequences of his own fraud, or wilful concealment, in nullifying the insurance, nor does it deprive the insurer of his protection against such malversation, or of the security he may derive from the inspection which he has the opportunity of making for himself, in the only case to which Lord *St. Leonards* referred (in Gibson v. Small [FN39]), as possibly justifying the implication of a warranty in a time policy, *i.e.*, when it is effected on a vessel about to sail on a particular voyage. In the case before the House the jurymen have expressly negatived all knowledge of the alleged unseaworthiness on the part of the insurers, and there is no evidence of fraud of any kind.

FN37 4 H. L. C. 353.

FN38 4 H. L. C. 353.

FN39 4 H. L. C. 417.

The principle so long established cannot be disturbed merely upon the suggestion of one of the learned Judges that it is desirable to put difficulties in the way of those who either criminally or negligently send unseaworthy ships on dangerous voyages. If the public interest, for that or any other reason, requires a change in a law so well established, it should be made by the authority of the Legislature.

As to the loss of the vessel by the perils of the sea, I can add nothing to the observations of my noble and learned friend.

LORD BLACKBURN:--

My Lords, I also have had an opportunity of perusing the opinion of the noble and learned Lord who moved the judgment of the House in this case, and I perfectly and thoroughly concur in it. I will say no more than that I agree both in the reasoning and in the conclusion.

LORD GORDON:--

My Lords, I am of the same opinion I think the case of Gibson v. Small [FN40] is decisive of the question in this case. There may, possibly, be questions as to the propriety of the principle thus affirmed, but if a change is desirable, it can only be made *300 by the will of the Legislature; and if any proposition to that effect were brought forward, it would probably give rise to considerable discussion.

FN40 4 H. L. C. 353.

**Representation**

Solicitors for the Appellant: Cattarns, Jehu, & Hughes.

Solicitors for the Respondent: Hollams, Son, & Coward.

Judgment of the Court of Exchequer Chamber reversed; the judgment of the Queen's Bench affirmed; and the Respondent to pay to the Appellant the costs of the appeal. Lords' Journals, 23rd March, 1877.

(c) Incorporated Council of Law Reporting For England & Wales

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit 16

Westlaw.UK

[1993] 1 Lloyd's Rep. 455                                                                     Page 1
1993 WL 965563 (CA (Civ Div)), [1993] Q.B. 701, [1993] 3 All E.R. 897, [1993] 1 Lloyd's Rep. 455, [1993] 3
W.L.R. 42, 3-01-1993 Times 965,563
(Cite as: [1993] 1 Lloyd's Rep. 455)

**\*455** Harbour Assurance Co. (UK) Ltd. v. Kansa
General International
Insurance Co. Ltd.

Court of Appeal

CA
Jan. 25, 26, 27 and 28, 1993; Jan. 28, 1993

Before Lord Justice Ralph Gibson Lord Justice
Leggatt and Lord Justice Hoffmann

Arbitration - Arbitrators - Jurisdiction - Doctrine
of separability - Dispute under reinsurance
contracts - Allegation that contracts illegal -
Whether arbitration clause wide enough to cover
illegality dispute - Whether arbitration agreement
severable - Whether defendants entitled to stay
action.

The six defendants were Finnish insurance and
reinsurance companies and four of them were
members of a pool formed in Finland for securing
reinsurance business. The fifth defendant
subsequently joined the pool. The pool wished to
extend their portfolio to reinsurance business
originating from the London market and such
business was duly underwritten. None of the
defendants were ever authorized by the Department
of Trade and Industry to carry on the business of
insurance or reinsurance in Great Britain.

The plaintiffs were an English insurance and
reinsurance company and by a quota share
obligatory retrocession agreement, the plaintiffs, as
retrocessionaires, agreed to reinsure the defendants
in respect of risks retroceded for the years 1980,
1981 and 1982. The agreement contained inter alia
an arbitration clause which provided:

12. All disputes or differences arising out of this
Agreement shall be submitted to the decision of
two Arbitrators one to be chosen by each party and
in the event of the Arbitrators failing to agree, to
the decision of an umpire to be chosen by the
Arbitrators before entering upon the reference. The
Arbitrators and Umpire shall be executive officials
of insurance or reinsurance companies, or Lloyd's
Underwriters. If either of the parties fails to appoint
an Arbitrator within one month after being required
by the other party in writing to do so or if the
Arbitrators fail to appoint an umpire within one
month of their nomination, such Arbitrators or

Umpire as the case may be shall at the request of
either party be appointed by the Chairman of the
Reinsurance Offices Association. The Arbitration
proceedings shall take place in London . . .

The plaintiffs contended that the defendants
carried on the business of insurance and
reinsurance in Great Britain in the years 1980, 1981
and 1982 in breach of s. 2(1) and s. 83 of the
Insurance Companies Act, 1974 and the equivalent
provisions of the Insurance Companies Act, 1981.
The plaintiffs **\*456** alleged that the underlying
insurance and reinsurance contracts were illegal
contracts and that the retrocession agreements were
irrevocably affected by the illegality of the
underlying contracts so that the retrocession
agreements were themselves illegal null and void.

By a writ issued on Nov. 2 1989 the plaintiffs
sought declarations to the effect they they were not
liable under the retrocessions.

By separate summonses dated Jan. 14, 1990 and
Feb. 2, 1990 the defendants applied for an order
that the action be stayed pursuant to s. 1 of the
Arbitration Act, 1975.

Arguing for a stay of the legal proceedings the
defendants submitted that the arbitration clause was
wide enough to cover a case of initial illegality or
invalidity to the retrocessions and that as a
collateral, severable and self-contained agreement
the arbitration clause survived the hypothetical
illegality of the retrocessions. In the alternative the
defendants contended that the illegality merely
rendered the retrocessions unenforceable and the
arbitration agreement was unaffected.

The plaintiffs argued that disputes as to initial
validity or illegality of a contract which contained
an arbitration clause were never arbitrable. In the
alternative they contended that issues of illegality
of the contract irrespective of the question whether
the illegality arose by common law, statute or
public policy, were never arbitrable; and that as a
matter of language the words "disputes" or
"differences" arising out of this agreement were
wide enough to cover the dispute.

Held, by Q.B. (Com. Ct.) (STEYN, J.), that
(1) the principle of the separability of an
arbitration agreement only arose if the arbitration
agreement formed part of a written agreement;
however where an ad hoc arbitration agreement
was concluded after a dispute as to the initial

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1993 WL 965563 (CA (Civ Div)), [1993] Q.B. 701, [1993] 3 All E.R. 897, [1993] 1 Lloyd's Rep. 455, [1993] 3 W.L.R. 42, 3-01-1993 Times 965,563
**(Cite as: [1993] 1 Lloyd's Rep. 455)**

validity of the contract had arisen or where an ad hoc arbitration agreement was made after the contract was concluded but before a dispute had arisen or where a written contract and a separate written arbitration agreement, contained in the separate documents were executed at the same time, an arbitrator appointed in each case would be entitled to decide issues relating to the initial invalidity or illegality of the contract provided that the arbitration agreement was widely enough drawn;

(2) the foundation of an arbitrator's authority was the arbitration agreement, and the scope of the principle of separability of the arbitration clause only arose where the challenge was directed at the contract which contained an arbitration clause;

(3) it was clearly established that the initial invalidity of an arbitration clause or its subsequent termination by repudiation did not affect the validity of the contract because the arbitration clause was a separate and severable agreement, and it was also clearly established that if a contract was terminated for breach by an acceptance of repudiation and by frustration the arbitrator was still entitled to deal with disputes flowing from the ending of the contract;

(4) disputes as to the avoidance of contracts for innocent or negligent misrepresentation, undue influence or duress could be referred to arbitration; in all such cases a widely drawn arbitration clause would survive the avoidance of the contract; and a question of voidability for fraudulent misrepresentation was just as much capable of being referred to arbitration as an issue of avoidance for innocent misrepresentation;

(5) in no English case had it ever been held and in no English textbook had it ever been suggested that an arbitration clause could survive the initial invalidity of the contract; provided that the arbitration agreement itself was not directly impeached, it was as a matter of legal theory capable of surviving the invalidity of the contract;

(6) the separability principle as applicable also to the case of initial invalidity of contract was sound in legal theory; it was also in the public interest that the arbitral process which was founded on party autonomy would be effective and there were strong policy reasons for holding that an arbitration clause was capable of surviving the initial invalidity of the contract;

(7) an issue of initial illegality of the contract was always beyond the jurisdiction of an arbitrator; the application for a stay would be dismissed;

(8) if the separability principle had extended to cases of ab initio illegality the arbitration clause would have been wide enough to cover such a dispute.

The defendants appealed.

Held, by C.A. (RALPH GIBSON, LEGGATT and HOFFMANN L.JJ.), that

(1) an arbitration clause, in ordinary terms, was usually and had been held to be a self-contained contract collateral to the containing contract and had to be construed according to its terms in and with regard to the relevant factual situation; and the learned Judge was right to hold that as a matter of construction of the contract the present clause covered the issue of illegality; the question whether all the promises contained in the contract were rendered invalid and void at the time when the parties signed the documents by the illegality of the agreement was a dispute arising out of the agreement (*see* p. 459, col. 2; p. 460, col. 2; p. 462, col. 2; p. 463, cols. 1 and 2; p. 470, cols. 1 and 2);

(2) the Court was not obliged by authority to prevent the arbitrators from determining the issue of initial illegality (*see* p. 459, col. 2; p. 465, col. 2; p. 470, col. 1);

-David Taylor & Sons Ltd. v. Barnett Trading Co. Ltd., [1953] 1 Lloyd's Rep. 181, distinguished.

(3) there was no intention by the parties not to treat a dispute as arising out of the retrocession agreement if one of the parties contended that the intention of the other had the effect of avoiding it retrospectively; the appeal would be allowed and the stay granted (*see* p. 463, col. 1; p. 466, col. 1; p. 470, col. 2).

**\*457** The following cases were referred to in the judgments:

Ashville Investment Ltd. v. Elmer Contractors Ltd., (C.A.) [1988] 2 Lloyd's Rep. 73; [1989] Q.B. 488;

Bremer Vulkan Schiffbau und Maschinenfabrik v. South India Shipping Corporation, (H.L.) [1981] 1 Lloyd's Rep. 253; [1981] A.C. 909;

Dalmia Dairy Industries Ltd. v. National Bank of Pakistan, (C.A.) [1978] 2 Lloyd's Rep. 223;

Fillite (Runcorn) Ltd. v. Aqua-Lift, [1989] 45 B.L.R. 27;

Hannah Blumenthal, The (H.L.) [1983] 1 Lloyd's Rep. 103; [1983] 1 A.C. 854;

Heyman v. Darwins Ltd., (H.L.) (1942) 72 Ll.L. Rep. 65; [1942] A.C. 356;

Hirji Mulji v. Cheong Yue Steamship Co. (P.C.) (1926) 24 Ll.L.Rep. 209; [1926] A.C. 497;

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Lee (Joe) Ltd. v. Lord Dalmeny, [1927] Ch. D.
300;

Mackender Hill and White v. Feldia A.G., (C.A.)
[1966] 2 Lloyd's Rep. 449; [1967] 2 Q.B. 590;

Mahmoud and Isphani, Re [1921] 2 K.B. 716;

Phoenix General Insurance Co. of Greece S.A. v.
Administratia Asigurarilor de Stat, (C.A.) [1986] 2
Lloyd's Rep. 552; [1988] Q.B. 216;

Prenn v. Simmonds (H.L.) [1971] 1 W.L.R. 1381;

Prima Paint Corporation v. Flood & Conklin,
(1967) 388 U.S. 395;

Prodexport State Company for Foreign Trade v.
E. D. & F. Man Ltd., [1972] 2 Lloyd's Rep. 375;
[1973] Q.B. 389;

Smith Coney & Barrett v. Becker Gray & Co.,
[1916] 2 Ch. 86;

Sojuznefteexport v. JOC Oil Ltd., Bermuda Court
of Appeal July 7, 1989;

Taylor (David) & Son Ltd. v. Barnett Trading Co.
Ltd., (C.A.) [1953] 1 Lloyd's Rep. 181; [1953] 1
W.L.R. 562;

Union of India v. E. B. Aaby's Rederi A/S (H.L.)
[1974] 2 Lloyd's Rep. 57; [1975] A.C. 797.

This was an appeal by the first, third, fourth and
fifth defendants Kansa General International
Insurance Co. Ltd., Keskinainen Vakuutusyhtio
Autoilijat, Tyovaen Keskinainen Vakuutusyhtio
Turva and Keskinainen Vakuutusyhtio Varma from
the decision of Mr. Justice Steyn ([1992] 1 Lloyd's
Rep. 81) refusing to stay the action brought by the
plaintiffs Harbour Assurance Co. (UK) Ltd., for a
declaration that they (the plaintiffs) were not liable
under the retrocession agreements between the
plaintiffs and defendants on the ground that such
agreements were illegal.

**Representation**

Mr. Sydney Kentridge, Q.C. and Mr. Stephen
Ruttle (instructed by Messrs. Lovell White
Durrant) for the first and third to fifth defendants;
Mr. Andrew Longmore, Q.C. and Mr. Timothy
Saloman (instructed by Messrs. Clifford Chance)
for the plaintiffs.

The further facts are stated in the judgment of
11620/0002/618855.1

Lord Justice Ralph Gibson.

Judgment was reserved.

Thursday Jan. 28, 1993

**JUDGMENT**

Lord Justice RALPH GIBSON:

This is an appeal, brought with the leave of Mr.
Justice Steyn (as he then was), by the first, third,
fourth and fifth defendants against his order of July
16, 1991 in an action brought by Harbour
Assurance Co. (UK) Ltd. By that order Mr. Justice
Steyn dismissed the application by the defendants
for a stay of the action under s. 1 of the Arbitration
Act, 1975. His judgment is reported at [1992] 1
Lloyd's Rep. 81.

This case raises the question whether in English
law, under the principle of the separability or
autonomy of the agreement expressed in an
arbitration clause, which clause is contained in a
written contract, the clause can give jurisdiction to
the arbitrators under that clause to determine a
dispute over the initial validity or invalidity of the
written contract, upon the assumptions that upon its
true construction the arbitration clause covers such
a dispute and that the nature of the invalidity
alleged does not attack the validity of the
agreement expressed in the arbitration clause itself.

The orthodox view in English law has always
been, it has been said for the plaintiffs, that if the
contract in which the arbitration clause is contained
is void ab initio, and therefore nothing, so also
must be the arbitration clause in the contract. That
is the proposition that nothing can come of nothing;
ex nihil nil fit. It has also been called in this case
the argument of logic.

In the action, commenced on Nov. 2, 1989, the
plaintiffs claimed inter alia, a declaration that
certain insurance policies made by way of
obligatory quota share retrocession, taking effect
for the years 1980 to 1984, and entered into by the
plaintiffs with the defendants, are void and that the
plaintiffs are not liable in **\*458** respect of them.
Allegations are made against the defendants or
non-disclosure of material facts and of
misrepresentation by reason of which the plaintiffs
say that they avoided the reinsurances by letter in
1989. With those allegations this Court is not
concerned. They will be for decision by the
arbitrator if the appeal succeeds and if the contract
was otherwise enforceable. In addition, however,
the plaintiffs assert that in respect of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[1993] 1 Lloyd's Rep. 455

Page 4

1993 WL 965563 (CA (Civ Div)), [1993] Q.B. 701, [1993] 3 All E.R. 897, [1993] 1 Lloyd's Rep. 455, [1993] 3
W.L.R. 42, 3-01-1993 Times 965,563
**(Cite as: [1993] 1 Lloyd's Rep. 455)**

reinsurances for 1980, 1981 and 1982, the defendant, retrocedants, were not registered or approved to effect or carry on insurance or reinsurance business in Great Britain by the Department of Trade under the Insurance Companies Acts, 1974 and 1982, and that, therefore, the reinsurances for 1980, 1981 and 1982 are void for illegality. All the allegations of illegality are denied by the defendants.

The relevant reinsurance agreements between the plaintiffs and the defendants contain an arbitration clause. The relevant terms of the clause are as follows:

All disputes or differences arising out of this Agreement shall be submitted to the decision of two Arbitrators one to be chosen by each party and in the event of the Arbitrators failing to agree, to the decision of an umpire to be chosen by the Arbitrators before entering upon the reference. The Arbitrators and Umpire shall be executive officials of insurance or reinsurance companies; or Lloyd's Underwriters. If either of the parties fails to appoint an Arbitrator within one month after being required by the other party in writing to do so or if the Arbitrators fail to appoint an umpire within one month of their nomination, such Arbitrators or Umpire as the case may be shall at the request of either party be appointed by the Chairman of the Reinsurance Offices Association.

The Arbitration proceedings shall take place in London.

The defendants applied for the action to be stayed under s. 1 of the 1975 Act. On Feb. 11, 1990 Mr. Justice Gatehouse ordered that, pursuant to the applications of the defendants under s. 1, a preliminary issue should be tried as follows:

Whether the Court is satisfied that, by reason of illegality, (i) the arbitration agreements contained in the retrocession agreements for the underwriting years 1980, 1981 and 1982 are null and void, inoperative or incapable of being performed; (ii) there is not in fact any dispute or difference between the parties within the meaning of the said arbitration agreements.

Pleadings were delivered in the preliminary issue. A procedural complication arose as described on p. 85 of his judgment by Mr. Justice Steyn. As a result of agreement between the parties the only issues considered by him were whether, as the defendants alleged, the arbitration clause was wide enough to cover the illegality issue, and whether there was no impediment in law to giving effect to the arbitration agreement.

For the reasons set out in his judgment, Mr.

Justice Steyn concluded that he was compelled by authority to hold that the principle of separability could not extend so as to enable the arbitrator to determine whether or not the contract, in which the arbitration clause is contained, is in fact void ab initio for illegality. He therefore dismissed the application for a stay of the proceedings in which the plaintiffs seek to establish that illegality.

The appeal by the defendants was directed only to the last passages of the judgment by the Judge, by which he held that he was required by authority to hold as he did. In all other respects the defendants adopted and supported the conclusions and reasoning of the learned Judge.

Before dealing with the main issues in the appeal reference must be made to the issues of illegality. The issues were described briefly by Mr. Justice Steyn in his judgment at p. 84. In opening the appeal, Mr. Kentridge pointed to the allegations of the plaintiffs in their pleadings and noted that the plaintiffs themselves were authorized under the Act; and that if the allegations of fact as to where the defendants carried on their business were made out, the underlying reinsurances written by the defendants would be invalid and any rights of the defendants under the retrocession agreements between the plaintiffs and the defendants would be unenforceable. One consequence would be that if the underlying reinsurance contracts were invalid, the defendants would have no insurable interest in respect of which they could claim against the plaintiffs. That contention, he said, would clearly be within the jurisdiction of the arbitrator, but, by making the allegation in the form that the retrocession agreements were rendered void, the plaintiffs were trying to remove from the arbitrators issues which the parties had agreed should be decided by them. That was relevant to one of the policy grounds considered by Mr. Justice Steyn. Lord Justice Hoffmann then raised the question whether the allegations of the plaintiffs did raise an issue as to the initial voidness of the retrocession agree- *459 ments as contrasted with an issue as to their enforceability by the defendants.

The points raised seemed to me to be of substantial weight. Mr. Kentridge, however, said that he had not raised the point before the Judge, and did not seek to raise it in this Court. We proceed therefore on the same basis as that accepted by Mr. Justice Steyn.

In brief summary, the learned Judge held as follows:

(i) The principle of the separability of the

11620/0002/618855.1

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[1993] 1 Lloyd's Rep. 455
1993 WL 965563 (CA (Civ Div)), [1993] Q.B. 701, [1993] 3 All E.R. 897, [1993] 1 Lloyd's Rep. 455, [1993] 3
W.L.R. 42, 3-01-1993 Times 965,563
(Cite as: [1993] 1 Lloyd's Rep. 455)

Page 5

arbitration clause or agreement from the contract in which it is contained exists in English law; and, provided that the arbitration clause itself is not directly impeached, the arbitration agreement is, as a matter of principled legal theory, capable of surviving the invalidity of the contract so that the arbitrators could have jurisdiction under the clause to determine the initial validity of the contract.

Further, it would be consistent to hold that an issue as to the initial illegality of the contract is also capable of being referred to arbitration, provided that any initial illegality does not directly impeach the arbitration clause.

(ii) The illegality alleged in this case does not impeach the arbitration clause.

(iii) The arbitration clause on its proper construction was wide enough to cover a dispute as to the initial illegality of the contract.

(iv) To his evident regret, however, Mr. Justice Steyn was driven to hold that the principle of separability could not apply when the alleged ground of invalidity of the contract was initial illegality. The decision of this Court in David Taylor & Sons Ltd. v. Barnett Trading Co. Ltd., [1953] 1 Lloyd's Rep. 181; [1953] 1 W.L.R. 562 (*Taylor*) compelled him to hold that the separability principle does not extend to initial illegality.

For the defendants Mr. Kentridge submitted, as already indicated, that Mr. Justice Steyn was right in holding, as he did, on points (i), (ii) and (iii) above for the reasons which he gave, but contended that the decision in *Taylor* did not bind the Judge to hold that the principle of separability cannot apply so as to permit an arbitrator to decide an issue of initial illegality.

The contentions of the plaintiffs, in their respondents' notice included:

(i) That the Judge was wrong not to hold that the non-arbitrability of an issue of initial illegality was established by the reasoning of the majority in Heyman v. Darwins Ltd., (1942) 72 Ll.L.Rep. 65; [1942] A.C. 356.

(ii) English law had adopted the principle of separability only so far as to leave disputes as to initial validity or legality outside the jurisdiction of arbitrators.

(iii) The logical ground for excluding the arbitrator's jurisdiction in cases of initial invalidity and initial illegality is ex nihil fit, and it would be

contrary to logic and principle to differentiate between cases of "direct" and "indirect" invalidity of the arbitration clause.

(iv) Disputes as to the legality of the contract do impeach the arbitration clause contained in the contract either directly or sufficiently directly to exclude the arbitrator's jurisdiction.

(v) Lastly, this arbitration clause is not wide enough to cover disputes as to the initial validity of the retrocession agreement, or disputes as to illegality.

For my part, for the reasons which follow, I would uphold the reasoning and conclusions of Mr. Justice Steyn on all aspects of his judgment, save for his final conclusion that he was bound by the decision in Taylor to hold as he did. I would hold that this Court can properly distinguish the decision in *Taylor*, and I would therefore allow this appeal.

As to the contention based upon Heyman v. Darwins Ltd., the speeches in that case were examined again in this Court in detailed argument. Mr. Longmore submitted that the ratio of the decision was that a distinction was to be drawn between a contract which is alleged to have come to an end, and a contract which is alleged never to have been made and never to have been valid. Whereas an arbitration clause cannot apply to initial validity, that clause may apply to termination because it survives to deal with it.

The statement of that to which an arbitration clause does not apply was as much part of the decision of their Lordships as the statement of that to which it did. I do not accept this submission, and I can add nothing useful to the reasons given by Mr. Justice Steyn, with which I agree.

Mr. Longmore next relied upon the weight of opinion contained in the text book and in many dicta and decisions in support of the orthodox view, and from which he urged this Court not to depart. Examples from text books are passages in Mustill & Boyd on Commercial Arbitration, 2nd ed., p. 113; Halsburys Laws, 4th ed. vol. 2., par. 612; Chitty on Contracts, 26th ed. par. 1068.

The cases mentioned included Smith Coney & Barrett v. Becker Gray & Co., [1916] 2 Ch. 86; Joe Lee Ltd. v. Lord Dalmeny [1927] Ch.300 **\*460** , per Mr. Justice Eve; Mackender Hill and White v. Feldia A.G., [1966] 2 Lloyd's Rep. 449; [1967] 2 Q.B. 590 (C.A.); Prodexport State Company for Foreign Trade v. E.D. & F. Mann Ltd., [1972] 2 Lloyd's Rep. 375; [1973] Q.B. 389 per Mr. Justice

[1993] 1 Lloyd's Rep. 455

1993 WL 965563 (CA (Civ Div)), [1993] Q.B. 701, [1993] 3 All E.R. 897, [1993] 1 Lloyd's Rep. 455, [1993] 3 W.L.R. 42, 3-01-1993 Times 965,563

(Cite as: [1993] 1 Lloyd's Rep. 455)

Page 6

Mocatta and Dalmia Dairy Industries Ltd. v. National Bank of Pakistan, [1978] 2 Lloyd's Rep. 223.

Mr. Longmore also disputed the correctness of Mr. Justice Steyn's view that policy considerations were all clearly in favour of the incremental development of the principle of separability so as to extend it to initial illegality. It was acknowledged that parties generally do not want to face two sets of proceedings, and that the consideration was properly taken into account in Ashville Investment Ltd. v. Elmer Contractors Ltd., [1988] 2 Lloyd's Rep. 73; [1989] Q.B. 488, in upholding the jurisdiction of the arbitrator under that clause to determine a claim to rectification under that contract.

The risk of two sets of proceedings, however, cannot be excluded, it was said, because it is common ground that if the attack on the initial validity of the contract must be taken to include an attack upon the validity of the arbitration clause as well, then the issue of validity must be for the Court. Next it could not be assumed that parties to commercial or other contracts with arbitration clauses, would necessarily prefer or intend an issue as to original illegality to be decided by the arbitrator, particularly when the clause provides for the arbitrator to be from those engaged in a particular profession or branch of trade or commerce, as contrasted with a clause which permits the parties to appoint a lawyer, or person of other particular skills as so advised.

Further it was submitted there was little force in the reference by the Judge to the preservation of the perceived neutrality of the arbitral process by not directing that an issue of initial illegality be removed from the arbitrator to the national Court. In most cases, it was said the parties, by the terms of the contract including the arbitration agreement, will have determined the proper law of the contract and the national Court to which any issue will be referred. Contrary to the view of Mr. Justice Steyn, Mr. Longmore submitted that policy considerations should cause the Court to favour reserving issues as to the initial validity of the contract for decision by the Court.

The policy consideration which is of greatest weight, in my judgment is what the Judge called the imperative of giving effect to the wishes of the parties unless there are compelling reasons of principle why it is not possible to do so.

The first argument for the plaintiffs, that is, the orthodox view to which we are invited to adhere, is

based on the logic of the proposition that nothing can come from nothing. Mr. Longmore's adherence to that logical proposition was, I think, less than fully constant because he, on occasion, referred to the proposition as applying to the "ordinary" arbitration clause. An example of what we are, I think, to understand as an "extraordinary" arbitration clause in this context is provided by the rules of the International Chamber of Commerce Arbitration, art. 8.4, which expressly provide that the arbitrator shall not cease to have jurisdiction by reason of any claim that the contract is null, void or non-existent, provided that he upholds the validity of the agreement to arbitrate. The logical proposition, however, upon which the orthodox view is based, does not depend upon the terms or construction of the arbitration clause. It asserts that if the containing contract is void ab initio, an arbitration clause contained within it is also void. It follows that if the logical argument is applied according to its terms, the intention of the parties could be thwarted even if, on its true construction, the clause shows, not only that the dispute is within those agreed to be referred, but also that the clause was intended to survive the validity of the contract.

Such a rule of law should in my judgment be rejected if this Court can properly hold that it is not part of our law. Once that rule is removed, the parties remain free to exclude from the arbitrator's jurisdiction any issue which they prefer to leave to the Court. That freedom will, I think, sufficiently answer the arguments of policy advanced by Mr. Longmore.

The reference to an extraordinary arbitration clause as possibly outside the logical proposition is in effect an argument that, for the principle of separability to be applied so as to save the clause from voidness by reason of the voidness of the containing contract, special words are needed. I do not accept this argument. An arbitration clause, in ordinary terms - that is to say, without special words to ensure survival - is usually, and has been held to be, a self-contained contract collateral to the containing contract. As with any other contract, it must be construed according to its terms in and with regard to the relevant factual situation. I see no reason to establish a principle of this nature which would require special words to be inserted in order to secure that which the parties would probably suppose was covered by the ordinary words.

*461 For that reason, which is of course contained in Mr. Justice Steyn's judgment, it seems to me to be right for this Court to be willing to abandon the orthodox view, if we are free to do so,

11620/0002/618855.1

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[1993] 1 Lloyd's Rep. 455                                                                                                Page 7

1993 WL 965563 (CA (Civ Div)), [1993] Q.B. 701, [1993] 3 All E.R. 897, [1993] 1 Lloyd's Rep. 455, [1993] 3
W.L.R. 42, 3-01-1993 Times 965,563
**(Cite as: [1993] 1 Lloyd's Rep. 455)**

notwithstanding the endorsement of it by so many
authorities and Judges.

Mr. Justice Steyn if not prevented by authority,
would have held that an issue as to initial illegality
is capable of being within the jurisdiction of an
arbitrator under a clause contained within that
contract, provided that any initial illegality does not
directly impeach the arbitration clause itself. He
also held that the illegality alleged in this case does
not impeach the arbitration clause. The concept of
requiring direct impeachment was criticized in the
respondents' notice, and it was asserted that this
dispute as to the legality of the contract does
sufficiently impeach the arbitration clause so as to
require the issue to be decided by the Court. As
advanced in the notice it seems to me that these
contentions are part of and dependent upon the
argument of the logical proposition and fall with it.

Mr. Longmore however, as I understood him, also
argued that, even if the logical proposition
argument fails, problems remain as to when, and in
what circumstances, an attack upon the initial
validity of the contract must be taken to include an
attack upon the initial validity of the separate but
contained arbitration agreement. He criticized, for
example, Mr. Justice Steyn's approach to questions
of fraud. Mr. Justice Steyn held that the inexorable
logic of the decision in *Mackender* required him to
hold that a question of voidability for fraudulent
misrepresentation is just as much capable of being
referred to arbitration as an issue of avoidance for
innocent misrepresentation.

Mr. Longmore pointed out that a party to a
contract the making of which he says was induced
by fraud, would be surprised to be told that he is
bound to have the issue tried by an arbitrator
appointed under a clause in that contract. He also
pointed out that when such a party alleges that the
contract is void for illegality, he might well be
astonished to be told that the issue of that illegality
is to be determined by an arbitrator appointed
under it.

There is, I think, force in these comments, but I
add that in my view they are no more than forceful
comments. Mr. Justice Steyn said that the question
of fraud or initial illegality was *capable* of being
referred to arbitration. He did not qualify the
clearly stated principle that if the validity of the
arbitration clause itself is attacked the issue cannot
be decided by the arbitrator. His reference to direct
impeachment was, as I understood his judgment, to
distinguish an attack upon the clause otherwise
than by the logical proposition that the clause falls
within the containing contract. When it is said that

the contract was induced by fraud it may well be
clear that, if it was, the making of the independent
arbitration clause was also induced by the fraud.
There is, further, the power of the Court under s.
24(2) of the 1950 Act, considered by Mr. Justice
Steyn at p. 89 of his judgment.

Next, as to illegality, the question whether the
particular form of illegality will, if proved, render
void both the contract and the arbitration clause
must depend upon the nature of the illegality and,
as Lord Justice Hoffmann pointed out in the course
of argument, when it is said to consist of acts
prohibited by statute, upon the construction of the
relevant provisions of the statute.

For example, the decision of Mr. Justice Eve in
Joe Lee Ltd. v. Lord Dalmeny, in which he rejected
the argument that an arbitration clause in a contract
for betting was collateral to the betting transaction
and therefore valid, might well I think be decided
in the same way if the principle of separability is
upheld by this Court as far as Mr. Justice Steyn
thought it should extend.

I come now to the question of authority; to the
case of Taylor. In that case the contract for the sale
of canned meat was illegal under price control
legislation. The umpire awarded damages for non-
delivery to be paid by the sellers, although the
indisputable illegality of the contract was pointed
out to him. The motion by the sellers to set aside
the award on the ground that (i) the award was bad
on its face and (ii) that the umpire had
misconducted himself in law in failing to take into
account the illegality of the contract, was dismissed
by Lord Goddard, C.J.

On appeal to the Court of Appeal, the same two
grounds were before the Court. The first was
dismissed and is irrelevant. On the second ground
the appeal succeeded. Mr. Justice Steyn noted that
it was arguable that Taylor was decided on the
basis that the arbitrator committed misconduct
which warranted the setting aside of the award,
and, if that was right, the decision is not authority
for the proposition that an issue of illegality of the
contract cannot be decided under an arbitration
clause in that contract. On balance, however, he
concluded that the decision could not be so
distinguished at first instance. His comments upon
the judgments of Lords Justices Singleton, Denning
and Hodson are set out in his judgment at p. 94.

*462 I do not accept his view of the decision in
Taylor. It is clear that it was not argued, and the
Court did not address the proposition that, although
the contract was admittedly unlawful, the arbitrator

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1993 WL 965563 (CA (Civ Div)), [1993] Q.B. 701, [1993] 3 All E.R. 897, [1993] 1 Lloyd's Rep. 455, [1993] 3
W.L.R. 42, 3-01-1993 Times 965,563
**(Cite as: [1993] 1 Lloyd's Rep. 455)**

did or did not have jurisdiction under an
independent arbitration clause to determine
whether it was unlawful. There would have been no
point in such a contention. If he had jurisdiction to
decide it, he could only lawfully decide it one way,
and he had, in misconduct, chosen the other. The
decision was not, in my judgment, a decision upon
the point now before this Court.

I will add that Lord Justice Denning did not, as I
read his judgment, base his reasoning on a
jurisdictional ground in any relevant sense. He
rejected the argument (at p. 187, col. 1; p. 570) that
the arbitrator could award what he thought it was
fair to award, despite the illegality. He added:
    . . . If a contract is illegal, then arbitrators must
decline to award upon it just as the Cour

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit 17

Westlaw.UK

**\*161** Polpen Shipping Company, Limited v.
Commercial Union Assurance Company,
Limited.

King's Bench Division

KBD

Atkinson J.

1942 Dec. 7, 8.

Insurance (Marine)--Institute Time Clauses--Risk
of loss by collision between insured vessel and any
other ship or vessel--Collision between insured
vessel and flying boat.

A time policy of insurance on the plaintiffs' motor
vessel, *P.,* to which the Institute Time Clauses were
attached, covered a loss by collision between the *P.*
and "any other ship or vessel." During the life of
the policy the *P.* dragged her anchor and collided
with and damaged a flying boat belonging to His
Majesty which also was at anchor. The plaintiffs,
having paid for the damage to the flying boat,
claimed from underwriters their proportion of that
sum:-

Held, that a flying boat was not a "ship or vessel"
within the meaning of the policy and the plaintiffs'
claim must fail.

A "ship" or "vessel" is a hollow structure intended
to be used in navigation, that is, to do its real work
on the seas or other waters, and capable of free and
ordered movement thereon from one place to
another.

ACTION tried by Atkinson J., without a jury.

The plaintiffs, the Polpen Shipping Co., Ld., were
the holders of a time policy of insurance on their
motor vessel, *Polperro,* which was underwritten by
the defendants, the Commercial Union Assurance
Co., Ld. Attached to the policy were the Institute
Time Clauses, by cl. 1 of which it was agreed "that
**\*162** if the ship hereby insured shall come into
collision with any other ship or vessel and the
assured-shall in consequence thereof become liable
to pay, and shall pay, by way of damages .... any
sum or sums in respect of such collision, the
underwriters will pay the assured such proportion
of such sum or sums so paid as their respective
subscriptions hereto bear to the value of the ship

11620/0002/618880.1

hereby insured ...." On January 4, 1939, during the
life of the policy, the *Polperro,* which was at
anchor in harbour, dragged her anchor and came
into collision with one of His Majesty's flying
boats, described as the "X," which also was at
anchor. Two letters were treated at the trial as
evidence of the facts set out in them. A letter of
October 21, 1942, stated that the flying boat was a
London reconnaissance flying boat, fitted with two
engines which, but for the accident, would have
been engaged in fleet exercises. She was designed
to carry a crew of six, and had a normal range of
seven hundred miles and a maximum range of
eleven hundred miles. It stated that a seaplane did
not travel on the surface of the water, except when
taking off or alighting. Later, further information
was given: "The hull of the flying boat is
constructed on the usual boat lines, with bulkheads,
frames, stringers and shell-plating of light alloy. It
has a length of 52 ft. 8 ins." By a later letter, this
information was added: "The London flying boat is
not amphibious. It is designed to take off from and
alight on the water only. So far as can be
ascertained a crew of six is usually employed,
though the flying boat could be flown with less
than six." The plaintiffs admitted liability for the
collision and paid 2263l. to the Air Ministry for the
damage to the "X" and also a sum for interest and
costs. They sued the defendants for 2021. 9s. 10d.
as the defendants' proportion of a loss under the
policy. The defendants denied liability, on the
ground (inter alia) that a flying boat was not a "ship
or vessel" within the meaning of cl. 1.

*Sir Robert Aske K.C.* and *Devlin* for the plaintiffs.
The flying boat, "X," was a "ship or vessel" within
the meaning of the policy. If it had not been
furnished with wings there can be no doubt that it
would have been a vessel. The definition of "ship"
in s. 742 of the Merchant Shipping Act, 1894, is
that it "includes every description of vessel used in
navigation not propelled by oars." The evidence
shows that this boat was navigated about the
harbour, sometimes for **\*163** half-an-hour at a time.
Navigability is the deciding factor: Merchants'
Marine Insurance Co., Ld. v. North of England
Protecting and Indemnity Association [FN1]. A
hopper barge, though having no means of self-
propulsion, was held to be a "ship" within the
meaning of s. 458 of the Merchant Shipping Act,
1854: The Mac [FN2]. The "X" was a "ship or
vessel," and the mere fact that it was also able to
fly makes no difference.

FN1 (1926) 26 Ll. L. Rep. 201.

Case 1:06-cv-00011     Document 116-2     Filed 03/13/2007     Page 20 of 31

FN2 (1882) 7 P. D. 126.

*Pritt K.C.* and *A. J. Hodgson* for the defendants. The clause in the policy as to collision with another "ship or vessel" must be interpreted as another ship or vessel ejusdem generis as the *Polperro*, which this flying boat was not. No doubt, in determining whether something is a ship or vessel, adaptability for navigation is important, but that means navigation as part of its ordinary use. Normally, this boat does not travel on water. It was built to fly, and only incidentally to navigate the water. An army tank which can navigate a river is not a vessel. In Merchants' Marine Insurance Co., Ld. v. North of England Protecting and Indemnity Association [FN3], Roche J. agreed with the contention that a vessel was "an artificial structure made and used for the conveyance by water of persons or property." That was not the object of the construction of this boat. The meaning of "ship" or "vessel" in the Merchant Shipping Act has nothing to do with the meaning of the words in this policy. On the other hand, the statutory provisions relating to aircraft show very clearly that, in the view of the legislature, aircraft (including seaplanes and flying boats) and "ship" or "vessels" are two distinct things. Absurd results would follow from holding that a flying boat is a ship, and the Merchant Shipping Acts would require to be considerably amended before they could be applied to a flying boat. The Air Navigation Act, 1920, by s. 11 provides that "the law relating to wreck and to salvage of life or property, and to the duty of rendering assistance to vessels in distress (including the provisions of the Merchant Shipping Acts, 1894-1916, and any other Act relating to those subjects) shall apply to aircraft on or over the sea or tidal waters as it applies to vessels. " That provision would be quite unnecessary if a seaplane or flying boat was already a vessel. Further, by the Air Navigation Act, 1936, aircraft are for certain limited purposes to be "deemed to be" vessels: see s. 3, sub-ss. 1, 2. It is also important to notice that the last-named Act always *164 speaks of aircraft "manoeuvring" on the water and not "navigating": see s. 3, sub-s. 5 (c).

FN3 25 Ll. L. Rep. 446; 26 Ll. L. Rep. 201.

*Devlin* replied.

ATKINSON J.

I am told that I have to give the words "ship or vessel" their natural and ordinary meaning, but probably it would be more accurate to say that I must give them the meaning intended by the parties to this policy, One naturally begins by turning to the Merchant Shipping Act, 1894, to see what

definitions there are of these two words "vessel" and "ship." By s. 742 it is provided: "'Vessel' includes any ship or boat, or any other description of vessel used in navigation," and "'ship' includes every description of vessel "used in navigation not propelled by oars." It seems to me that the dominant idea is something which is "used in navigation," and not merely capable of navigating for the moment. The next guide which is presented to me is The Gas Float Whitton No. 2 [FN4], where the plaintiffs were claiming to be entitled to a salvage award for services rendered to a gas float adrift in the tidal waters of the Humber, The facts are stated by Lord Esher as follows: "The lower part bore the resemblance of a ship or boat; that part called by the county court judge 'the hull' had two ends, shaped like the bows of a vessel; it was fifty feet long and twenty feet broad; it had no mast, sternpost, forepost, or rudder; its interior was wholly occupied by a cylinder into which gas was pumped so as to fill it, and so that the gas went up to a light elevated on a pyramid of pieces of wood fifty feet high. The float could not, by reason of its structure, be used for any purpose of its being navigated. It could not be navigated. It could not carry any man or any goods from place to place. It could not hold any man in it except that he could by means of a man-hole and ladder ascend to the light at the top to clean or arrange it. The float was fixed by an anchor or anchors and otherwise at a particular spot in the River Humber, so as to remain always fixed at that spot," from where it had broken away. In the course of a very learned and long judgment Lord Esher said: "It seems impossible to say that within the ordinary English meaning among merchants or sailors or persons dealing with maritime affairs this thing could be called a ship, a vessel, or a boat. But now we have to deal with the argument that the general *165 law maritime acknowledged in the High Court of Admiralty included, and includes, subjects or objects as the subjects or objects of salvage which are beyond ship, apparel, and cargo, including flotsam, jetsam, and lagan, and wreck of ship or cargo. It was argued that everything found floating on the water, although it itself could not possibly be a navigable thing, might be the subject or object of salvage." Then he quotes with approval a passage from the case of Nicholson v. Chapman [FN5]: "They are not vehicles intended for the navigation of the sea, or the arms of the sea; they are not recognized as instruments of commerce or navigation by any Act of Congress. They are piles of lumber, and nothing more, fastened together and placed upon the water until suitable vehicles are ready to receive them and transport them to their destined port." I am satisfied that the dominant idea in Lord Esher's mind in considering the attributes of a ship was not merely its ability to be navigated,

11620/0002/618880.1

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

but whether it could fairly be said to navigate the seas. The Gas Float Whitton No. 2 [FN6] went to the House of Lords where Lord Herschell said [FN7]: "It was not constructed for the purpose of being navigated or of conveying cargo or passengers." He seems to me to put his judgment in a nutshell when he says "for the purpose of being navigated. " In Merchants' Marine Insurance Co., Ld. v. North of England Protecting and Indemnity Association [FN8], the question was whether a pontoon crane was a ship or vessel, and Roche J. held that it was not. He said [FN9]: "With regard to the decisions that have been cited to me, and the definitions derived from dictionaries which have been put before me very fully by Mr. Jowitt, I say that the adaption for navigation or to navigation is an ever-recurring element in the definitions in the dictionaries. It is indeed part of the definition adopted by Mr. Jowitt himself, which was that a vessel was an artificial structure made and used for the conveyance by water of persons or property." I think it is fair to say that again the dominating idea throughout his judgment was whether the structure which he was considering had been intended to be used for navigation. The same view was taken in the Court of Appeal. The court were singularly loth to lay down any principle or any definition. I doubt whether Scrutton L.J. was ever so hesitant about *166 stepping in with some clarifying remarks, but I think it is clear that all the members of the court thought that a floating crane could not be regarded as being built be "used in navigation." In the Scottish case of Watson v. R. C. A. Victor Co., Inc. [FN10] the question was whether a seaplane was a "ship or vessel" for the purposes of salvage. There is a passage in the Sheriff's judgment with which I agree, and I will read it: "On consideration of the question presented here for decision I am satisfied that the answer to it must be in the negative. It is common knowledge that a seaplane is in reality only a species of aircraft, and that although its construction permits of its floating on the sea, or even being navigated a short distance, its primary function - as illustrated in this case by the flight of the seaplane from New York to an island off the east coast of Greenland - is navigation in the air. Its construction for the purpose of floating or moving on the water is, I understand, mainly designed for purposes of safety should it be compelled through stress of weather or mechanical defect or for other reasons to descend from the air while flying above water." That, of course, is not true with regard to the flying boat with which I am concerned. Its construction is to enable it to land on water and to take off from water. The passage continues: "In short, in popular language, no one would I think describe a seaplane as a ship, or vessel, or boat. But further it is, I think, plain that a seaplane does not satisfy the definitions or descriptions of a ship or a

vessel given in either the Merchant Shipping Acts or in the decided cases." Then the learned Sheriff gives the definitions which I have already read and adds: "The essential element in these definitions is that ships or vessels must be structures 'used in navigation.' Plainly it cannot be predicated of a seaplane - which as pointed out is a species of aircraft - that it is 'used in navigation' in the sense in which a vessel or a ship is so used."

FN4 [1896] P. 42, 45, 58, 60.

FN5 (1793) 2 H. Bl. 254.

FN6 [1896] P. 42, 45, 58, 60.

FN7 [1897] A. C. 337, 343.

FN8 25 Ll. L. Rep. 446; 26 Ll. L. Rep. 201.

FN9 25 Ll. L. Rep. 447.

FN10 (1934) 50 Ll. L. Rep. 77, 78.

My attention has been drawn to certain statutes. Mr. Pritt referred me to the Air Navigation Act, 1920, and urged on me the confusion which, in view of the provisions of that Act, would arise if a flying boat or a seaplane were to be deemed a "ship or vessel." Section 11 of the Act deals with the law relating to wrecks and the salvaging of life or property in connexion with aircraft. If aircraft are "ships" or "vessels" are two sets of rules applicable to them? Section 12 provides for an *167 investigation into accidents arising out of air navigation. Are there to be two inquiries? The Air Navigation Act, 1936, contains provisions for the limitation of claims in respect of damage caused by aircraft which set up a standard altogether different from the limitation of liability under the Merchant Shipping Acts. Mr. Pritt points out that the two cannot work together. The Act of 1936 has one or two other sections which are of interest. By s. 3, sub-s. 2, it is provided: "For the purpose of the Dockyard Ports Regulation Act, 1865, seaplanes when on the surface of the water shall be deemed to be vessels." They are, therefore, only to be deemed to be vessels for a very limited purpose. Sect. 3, sub-s. 3, of the Act of 1936 is: "Any enactment which confers or imposes on a conservancy or harbour authority any power or duty to make bylaws for the regulation of ships or vessels shall be construed as if the power or duty so conferred or imposed included a power or duty to make bylaws for the regulation of seaplanes when on the surface of the water." But for provisions of that sort harbour authorities would not have any power to make regulations governing seaplanes and flying boats on the basis of their being ships or vessels.

11620/0002/618880.1

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The conclusion at which I have arrived is that it is impossible to hold that the words "ship or vessel" in this policy include this flying boat. I do not want to attempt a definition, but if I had to define "ship or vessel" I should say that it was any hollow structure intended to be used in navigation, i.e., intended to do its real work on the seas or other waters, and capable of free and ordered movement thereon from one place to another. A flying boat's real work is to fly. It is constructed for that purpose, and its ability to float and navigate short distances is merely incidental to that work. To my mind, that is where the difference lies. There will be judgment for the defendants, with costs.

## Representation

Solicitors for plaintiffs: Holman, Fenwick & Willan. Solicitors for defendants: Parker, Garrett & Co.

Judgment for defendants. (A. W. G. )

(c) Incorporated Council of Law Reporting For England & Wales

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit 18

**\*376** Western Assurance Company of Toronto v. Poole

King's Bench Division

KBD

Bigham J.

1902 Dec. 12, 15; 1903 Jan. 12

Marine    Insurance--Reinsurance--Constructive Total Loss--"To pay as may be paid thereon"-- Suing and Labouring--Salvage Charges.

Shipowners insured their ship with the plaintiffs for a voyage against partial as well as total loss, the sound value of the ship being expressed in the policy to be agreed at a specified sum. The plaintiffs reinsured with the defendant against the risk of total or constructive total loss only, the ship being valued as per original policy. The policy of reinsurance was in the form of an ordinary Lloyd's policy, containing in print the usual undertaking by the assurers to contribute to suing and labouring charges. It also contained in writing the following clauses: "Being a reinsurance subject to the same clauses and conditions as the original policy and to pay as may be paid thereon"; and, "No claim to attach to this policy for salvage charges." During the course of the insured voyage the ship stranded and suffered damage. The probable cost of getting her afloat, taking her to a port of repair, and repairing her exceeded the agreed value of the ship as expressed in the policy, but as it was in fact less than her real repaired value the owners elected not to give notice of abandonment. The ship was floated and placed in a condition of safety, and subsequently taken to a port of repair and repaired. The owners recovered from the plaintiffs upon their policy 107l. per cent. of their proportion of the agreed value of the ship, that sum being made up partly of the expense of repairs and partly of the expense of floating her. The plaintiffs then sued the defendant for the full amount underwritten by him as in respect of a constructive total loss, or in the alternative for his proportion of the suing and labouring charges:--

Held,

(1.) that, there being, in the absence of a notice of abandonment by the owners, no original liability upon the plaintiffs to pay as for a constructive total loss, the mere fact that they had paid, in respect of

11620/0002/618879.1

a partial loss and suing and labouring charges combined, upwards of 100l. per cent. did not entitle the plaintiffs to recover that sum from the**\*377** defendant as for a constructive total loss under the words "to pay as may be paid thereon"; and

(2.) that the clause providing that no claim was to attach for "salvage charges" excluded the defendant's obligation to contribute to the suing and labouring charges, notwithstanding the omission to delete the printed clause imposing that obligation.Uzielli v. Boston Marine Insurance Co., (1884) 15 Q. B. D. 11, discussed.

TRIAL before Bigham J. without a jury.

The owners of the ship Edmund by a policy dated November 21, 1900, insured her with the plaintiffs for a voyage from Santa Rosalia to Portland (Oregon). By the terms of the policy, which was against partial as well as total loss, the sound value of the ship was agreed at 19,000l. By a policy of reinsurance dated December 11, 1900, the plaintiffs reinsured themselves with the defendant (amongst other underwriters) "against the risk of total and/or constructive total loss only," the ship being expressed therein to be "valued as per original policy." The policy, which was in the ordinary Lloyd's form, contained in print the usual suing and labouring clause. The policy also contained in writing the following clauses: "Including valuation clause if in original policy"; "Being a reinsurance subject to the same clauses and conditions as the original policy and to pay as may be paid thereon"; and, "No claim to attach to this policy for salvage charges." The *Edmund* sailed from Santa Rosalia in ballast on November 28 for Portland, and within a few hours after sailing she stranded. The owners did not then nor at any time give notice of abandonment. The London Salvage Association, acting in the interests of the plaintiffs and other underwriters on original policies, succeeded, after the ship had been insured for some weeks, in floating her on January 16, 1901, and bringing her back to Santa Rosalia. Temporary repairs were done, and she started in tow for San Francisco as the nearest port where permanent repairs could be done. On her way she met with rough weather and had to put into San Diego, where further repairs were done, and on February 20 she arrived at San Francisco, where she was permanently repaired. The total cost of floating the ship and taking her to San Francisco and repairing her amounted to 20,207l. But the real repaired**\*378** value of the ship in fact exceeded that sum, although it was agreed in the policies at the lower figure of 19,000l. The plaintiffs paid to the owners 107l. per cent.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

upon the original policy, which included the cost of floating the ship as well as that of the repairs. The present action was brought to recover from the defendant as in respect of a constructive total loss the sum of 100l., which was the amount for which the policy of reinsurance was subscribed by him, or in the alternative the sum of 39l. 5s., as being his proportion of the cost of floating the ship.

Evidence was given by underwriters called on behalf of the defendant to the effect that for many years past the words "no salvage charges" in a policy of reinsurance were understood to include suing and labouring charges as well as volunteer salvage services. Evidence was also given that in another policy, made out by other underwriters from the very same slip as that from which the policy sued on was made out, the suing and labouring clause was struck out of the printed form.

*Hamilton, K.C.* , and *Loehnis,* for the plaintiffs. The ship here was in fact a total loss, and if the owners had given notice of abandonment there is no question but that the plaintiffs would have been liable to pay as for a total loss, and could have similarly recovered over against the defendant. But, having regard to the fact that the plaintiffs were liable to pay upwards of 100 per cent. of the agreed value of the ship, and paid that amount, the absence of a notice of abandonment cannot affect their right to recover from the defendant, the contract of reinsurance having provided that the defendant is "to pay as may be paid thereon." So long as there is a liability to pay 100 per cent. under the original policy, and the money is paid, that is enough to support a claim for a total loss under the reinsurance policy. It matters not under what head of claim the reinsurers were liable to pay the 100 per cent. The important point is the percentage. To hold otherwise would be to introduce a wagering element into the policy of reinsurance; for whereas the reinsurers would have to pay the same amount whether the owners chose to claim as for a*379 partial or as for a total loss, the reinsurers' right to recover over would depend upon whether the owners elected to claim under the one head or under the other. In Chippendale v. Holt [FN1] underwriters, having insured a ship, reinsured themselves with the plaintiffs, who reinsured themselves with the defendants. The ship stranded, and the owner claimed for a constructive total loss, which the underwriters paid, and were paid in their turn by the plaintiffs. The defendants, however, refused to admit that the ship was in fact a constructive total loss, and it was held by Mathew J. that the words in the defendants' policy of reinsurance "to pay as may be paid thereon" did not relieve the plaintiffs from the necessity of proving that they were liable to pay as well as that they had

in fact paid, for that otherwise the contract would be a wager. That case is in the plaintiffs' favour. The question is practically covered by the decision in Uzielli v. Boston Marine Insurance Co. [FN2] There the owners of a ship insured her with underwriters, who reinsured themselves with the plaintiffs, who in turn reinsured themselves with the defendants. The defendants' policy bound them to pay as might be paid thereon, was to cover risk of total loss only, and contained a suing and labouring clause. The ship went ashore, and the owners gave notice of abandonment to their underwriters, who settled the owners' claim for a constructive total loss at 88 per cent. The underwriters spent a large sum in floating the ship, which sum, after deducting the price for which the ship was ultimately sold, amounted to 24 per cent. It was held by the Court of Appeal that the plaintiffs could not recover the 24 per cent. under the suing and labouring clause on the ground that the original underwriters were not the factors, servants, or assigns of the plaintiffs within the meaning of the suing and labouring clause; but the plaintiffs were held entitled to recover 100 per cent., or 12 per cent. more than the amount at which the total loss had been settled, and this 12 per cent. they were allowed to recover under the words "to pay as may be paid thereon." Lindley L.J. said:

FN1 (1895) 1 Com. Cas. 197; 65 L. J. (Q.B.) 104.

FN2 15 Q. B. D. 11.

"If it were not for the clause whereby the defendants were rendered subject to the same*380 terms, clauses, and conditions as were contained in the original policy, and were to pay as might be paid thereon, the plaintiffs, in my opinion, if indeed they could recover at all, would be entitled to recover only 88 per cent."

Secondly, the plaintiffs are in the alternative entitled to recover in respect of the suing and labouring charges. Their right to do so is not excluded by the clause providing that no claim is to attach for "salvage charges." In this policy the two terms are meant to cover different things. Here salvage charges should be read as applying only to volunteer salvage charges, for the Court is bound if possible to give effect to every part of the contract. If the parties intended to delete the suing and labouring clause they ought to have struck it out.

*Scrutton, K.C.* , and *Mackinnon,* for the defendant. The plaintiffs cannot sue as for a constructive total loss, for they were never liable to pay such a loss. Their only interest in the ship is their liability under their policy. They cannot recover under the words

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

"to pay as may be paid thereon," for that means properly pay--pay under a liability to pay: Chippendale v. Holt [FN3]; Marten v. Steamship Owners' Underwriting Association. [FN4]The true explanation of Uzielli v. Boston Marine Insurance Co. [FN5] is that given in the 7th edition of Arnould's Marine Insurance, s. 866, that the 12 per cent. allowed for salvage expenses was recoverable only as losses due to perils of the sea.

FN3 1 Com. Cas. 197; 65 L. J. (Q.B.) 104.

FN4 (1902) 7 Com. Cas. 195.

FN5 15 Q. B. D. 11.

Secondly, the plaintiffs' claim for 39l. 5s. under the suing and labouring clause is negatived by the clause as to no salvage charges. Charges incurred in saving a vessel from peril are properly described as salvage charges. The evidence of the underwriters called to support the defendant's contention that salvage charges in this contract include suing and labouring expenses was uncontradicted. The objection that that construction gives no effect to the suing and labouring clause is immaterial. Policies of marine insurance cannot be read with the same strictness as other written contracts: see*381 per Walton J. in Cunard Steamship Co. v. Marten [FN6], where he observes, with reference to marine policies, that in practice it is most unusual to find that the superfluous or inapplicable words have been struck out of the printed form. In this case the suing and labouring clause was inapplicable, for this is a reinsurance policy, and what is insured in a reinsurance policy is the liability under the original policy, and to a contract of indemnity against a liability to a limited amount the suing and labouring clause can have no application: Cunard Steamship Co. v. Marten. [FN7] If the term "salvage charges" means what the plaintiffs contend, then on this policy it was superfluous to exclude it, for in Aitchison v. Lohre. [FN8]Lord Blackburn, speaking of volunteer salvage claims, said: "The amount of such salvage occasioned by a peril has always been recovered, without dispute, under an averment that there was a loss by that peril." That would here be a partial loss, and could not be recovered under a policy against total loss only.

FN6 [1902] 2 K. B. 624.

FN7 [1902] 2 K. B. 624.

FN8 (1879) 4 App. Cas. 755.

*Hamilton, K.C.* , in reply.

11620/0002/618879.1

*Cur. adv. vult.*

Jan. 12. BIGHAM J.

This is an action brought on a policy of reinsurance dated December 11, 1900, and expressed to be for 1800l. upon the ship *Edmund*, valued as per original policy, from Santa Rosalia to Portland (Oregon) and thence to the United Kingdom. It is subscribed by the defendant for 100l. The policy is in the ordinary Lloyd's form; but written on its face are four special clauses, which are in the following terms: 1. "Including valuation clause if in original policy"; 2. "Being a reinsurance subject to the same clauses and conditions as the original policy and to pay as may be paid thereon"; 3. "Being against the risk of total and/or constructive total loss only"; and 4. "No claims to attach to this policy for salvage charges."

The original policy dated November 21, 1900, was issued by the plaintiffs to the shipowners, the ship being valued therein at 19,000l. This policy was also in the usual Lloyd's form; but it covered partial loss as well as total loss. Attached to and*382 incorporated with it was a clause to the effect that general average and salvage charges should be payable according to foreign statement if so claimed, and a further clause that the value of 19,000l. should be mutually admitted and taken to be the sound value of the ship for all purposes of constructive total loss under the policy.

The plaintiffs' claim on the reinsurance policy is for 100l. as for a constructive total loss consequent upon a stranding, or in the alternative for 39l. 5s. under the suing and labouring clause. The defendant, while admitting the interest of the plaintiffs and the stranding of the ship, denies that there was any total loss, or that the plaintiffs ever became liable to pay such a loss; and he denies that the plaintiffs ever incurred any suing or labouring expenses, and says that if they did their right to recover such expenses from him is barred by the clause in the reinsurance policy excluding claims for salvage charges. Thus the question is whether any, and if so what, loss has happened which can be brought within the meaning of the reinsurance policy.

The material facts are very simple: On November 28, 1900, the *Edmund*, while on the insured voyage, stranded shortly after leaving Santa Rosalia, which is on the coast of Mexico. On December 11 a tug was employed by the London Salvage Association for the purpose of getting her afloat again. She floated on January 16, 1901, and was then in safety. Temporary repairs were done to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

her at a neighbouring port called San Diego, and she was then towed to San Francisco, where she arrived on February 20. There she was dry-docked and permanently repaired. The cost of getting her to San Francisco under temporary repairs was 9000l., and the cost of the permanent repairs was 11,207l.--total 20,207l. The defendant admits that the shipowners might in the circumstances have treated the vessel when on the bank near Santa Rosalia as a constructive total loss; in other words, that the probable cost of getting her to a repairing port and there making good the damage she had sustained would have exceeded the repaired value of 19,000l. as fixed by the original policy. But the shipowners did not take this course; they gave no notice of abandonment, but\*383 elected to keep the vessel and claim for a partial loss; and on this footing the plaintiffs have paid. They have paid in all 107 per cent. on the original policy, the amount being made up of a large partial loss and a heavy claim for suing and labouring. A demand seems to have been made upon the plaintiffs for even more than 107 per cent.; but by some compromise the claim was settled at the smaller sum.

The first question is whether there has been any constructive total loss within the meaning of the contract sued on. It is quite a common practice for an insurer against total and partial loss to reinsure the risk of total loss while keeping himself uncovered as to partial loss. Of course he does this at a premium much lower than that which he himself receives for the double risk, and in the event of the insured vessel sustaining damage by the perils insured against it is very much to his interest that the damage should be sufficiently serious to constitute a constructive total loss, for in that event only can he get his loss recouped by his reinsurer, and secure his profit, namely, the difference between the two premiums. So, in the present case, the plaintiffs are anxious to make that which the shipowners treated as a partial loss under the original policy a total loss under the reinsurance policy. But can they? I think not. What the defendant promised by his contract was to indemnify the plaintiffs if they were called upon to pay a constructive total loss. What, then, constitutes a constructive total loss? I think that to constitute a constructive total loss there must be, not only such a damage to the vessel as to make her not worth repairing, but there must also be a notice of abandonment. "A constructive total loss in insurance law is that which entitles the insured to claim the whole amount of the insurance, *on giving due notice of abandonment*": Arnould, 7th ed. s. 1091. The notice of abandonment is a necessary preliminary to a claim for a constructive total loss; and this is so, not only according to insurance law, but also according to the universal practice of

merchants and underwriters. The notice of abandonment is an offer made by the shipowner to the underwriter to vest the property in the ship in the underwriter, so that he may deal with it as his own. Without such\*384 an offer the underwriter cannot deal with the ship as his own; it remains the shipowner's property; and such a position is inconsistent with the existence of a claim for a constructive total loss. Of course the owner is not compellable to give any notice of abandonment; there is nothing in his policy which obliges him to divest himself of his property in the ship; and this is true whatever the extent of the damage may be. He can always, keep his ship and claim for a partial loss, even though the cost of repairs may amount to 100 per cent. of the insured value. But if he elects to take this course, his claim is a claim for a partial loss only.

But it is said that the case is concluded in the plaintiffs' favour by the judgment in Uzielli v. Boston Marine Insurance Co. [FN9] That was an action by reinsurers against second reinsurers. The original insurers had received and had ultimately accepted a notice of abandonment from the shipowners, and had settled on the basis of a constructive total loss. They did not, however, pay 100 per cent. There appears to have been some dispute between themselves and the shipowners as to whether the facts justified the abandonment and the claim for a constructive total loss, and this dispute was settled by the shipowners agreeing to take 88 per cent. and giving up the ship to their underwriters. These underwriters had spent a large sum in suing and labouring, which, after deducting the price at which they sold the ship, amounted to 24 per cent. of the insured value. Thus the original underwriters were out of pocket 88 per cent. and 24 per cent., or in all 112 per cent. The plaintiffs, who were the reinsurers of the original underwriters, paid the whole 112 per cent., and brought their action against their re-reinsurers to recover the amount. No notice of abandonment was served on the defendants. The case was tried before Mathew J., when it was contended on behalf of the defendants that there was no constructive total loss. The learned judge rejected this contention. The case went to appeal, and upon this point the decision of Mathew J. was affirmed. The reason submitted in support of the contention (see the argument as reported) appears to have been that the\*385 compromise of 88 per cent. shewed that the parties had elected to treat the loss as a partial and not a total loss. This reasoning was treated with scant courtesy by the members of the Court of Appeal. The then Master of the Rolls said, "As to the first point, whether there was a constructive total loss, it is perfectly obvious that there was," and there he left the matter. Cotton and Lindley

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

L.JJ. dismissed the argument equally curtly. The point, however, received as much respect as it deserved. There had been a notice of abandonment, which the underwriters had accepted and acted on by taking the ship and selling it on their own account. That stamped the claim as a constructive total loss; and the mere fact that the amount of the claim was abated could not alter its character. The next point taken in the case on behalf of the defendants was that, whether or not there was a total loss as between the shipowners and the original underwriters, there certainly was none as between the plaintiffs and the defendants; and this upon the ground that the defendants had not been served in their turn with any notice of abandonment. With reference to this point the Master of the Rolls said: "It appears that notice of abandonment was given to the first insurers, and that according to insurance law was sufficient." And Lindley L.J. said: "The point has not perhaps been decided in this country, but it appears to have been considered in America that no notice of abandonment is necessary; at least it has been so laid down by Phillips on Marine Insurance, s. 1506 .... It seems plain upon principle that no notice of abandonment is necessary in the case of a reinsurance." The soundness of this part of the judgment in Uzielli's Case [FN10] is questioned in a note to s. 1191 in the last edition of Arnould, where it is suggested that when the original insurer has accepted a notice of abandonment from the shipowner he has become entitled to something which he in his turn ought to abandon to his reinsurer. I am not going to criticise the judgment of the Court of Appeal. It is my duty to accept it, and I do so with all the more alacrity because I think it is absolutely right. What is the contract which a*386 reinsurer enters into when he underwrites a policy such as existed in Uzielli's Case [FN11], and such as exists here? It consists of a promise to indemnify the reassured against any liability that he may come under to the shipowner in respect of the risk reinsured, and "to pay as may be paid thereon." What is the effect of such a promise? What is the position as between reassured and reinsurer? It is, in my opinion, this. The reinsurer, when called upon to perform his promise, is entitled to require the reassured first to shew that a loss of the kind reinsured has in fact happened; and, secondly, that the reassured has taken all proper and businesslike steps to have the amount of it fairly and carefully ascertained. That is all. He must then pay. There is nothing in his contract either express or implied which entitles him to have the ship or to deal with it in any way: though he is, no doubt, entitled to require that the original underwriter should realize it in such a way as to reduce the loss as much as may be reasonably possible. Nor is he entitled to rip up the settlement

between the shipowner and the original underwriter, except upon the ground that it is dishonest or has been arrived at carelessly. So long as liability exists, the mere fact of some honest mistake having occurred in fixing the exact amount of it will afford no excuse for not paying. He has promised "to pay as may be paid thereon." Such is in my opinion the meaning and effect of these reinsurance policies, and it follows that a notice of abandonment is inapplicable to them. The third point decided in Uzielli's Case [FN12] was that in the circumstances of that case the plaintiffs could recover nothing under the suing and labouring clause. It was held that the original underwriters who incurred the suing and labouring expenses were not the factors or servants or assigns of the plaintiffs within the meaning of the policy sued on, and that, therefore, the claim did not come within the clause. Mathew J. had held differently at the trial. He regarded the original underwriters as the "factors" of every one concerned in averting a loss, including the ultimate re-reinsurer, and had accordingly given judgment for 112 per cent.--88 per cent. for the total loss and 24 per cent. for the*387 suing and labouring charges. If it was open to me and necessary to choose between these conflicting judgments, I should prefer that of the judge at the trial. It seems to me that, where there is a chain of reinsurance policies and nothing in any of them to qualify the operation of the suing and labouring clause, the intention of all parties is that the clause shall operate to bind each successive underwriter to make good the expenses which may have been incurred for his benefit. But it is not necessary to discuss this question. For the purpose in hand--to see whether Uzielli's Case [FN13] assists the present plaintiffs--it is sufficient to say that, in conclusion, the Court of Appeal awarded the plaintiffs 100 per cent. It is on this circumstance that the present plaintiffs rely. Mr. Hamilton asks, Why should the Court give the 12 per cent. beyond the 88 per cent.? And he answers the question by saying, because of the clause "to pay as may be paid thereon," and refers to the last sentence in the judgment of Lindley L.J. He says that the 12 per cent. was no part of the total loss, for that had been compromised at 88 per cent.; then he says it was not recoverable under the suing and labouring clause, because the Court had already declared that no cause of action existed on that clause; and he therefore concludes that it was payable only because of the promise to pay as may be paid thereon. From this he argues, as I understand, that it is sufficient in the present case to say that the plaintiffs have paid 100 per cent., and that it matters not whether the payment was accepted in satisfaction of a total loss or a partial loss claim; it was as much and no more than could have been asked for on the basis of a total loss, and,

11620/0002/618879.1

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

having been paid, is recoverable in this action by virtue of the promise to pay as may be paid on the original policy. On the other hand, Mr. Scrutton, on behalf of the defendant in the present case, says that the reason why the Court of Appeal allowed the plaintiffs in Uzielli's Case [FN14] to recover the 12 per cent. was (as suggested in s. 866 of Arnould, 7th ed.) that it could be claimed as a loss due to perils of the seas, and, therefore, as within the re-reinsurance policy. Neither of these explanations appears to me to be very*388 satisfactory, for I think that either the whole 24 per cent. ought to have been allowed as recoverable under the suing and labouring clause, or none of it if that clause was not operative. But, whatever the explanation may be, I am quite satisfied that the Court never meant to say that, where there had been in fact no original liability for a constructive total loss, the reassured could recover from the reinsurer on the mere ground that he had paid a sum of money which amounted to what might, perhaps, have been claimed from him as the amount of such a loss if such a loss had happened. The essential difference between the present case and Uzielli's Case [FN15] is that in the one there was and in the other there was not a constructive total loss. I think the one case has no application to the other, and that the plaintiffs' claim for a total loss fails.

FN9 15 Q. B. D. 11.

FN10 15 Q. B. D. 11.

FN11 15 Q. B. D. 11.

FN12 15 Q. B. D. 11.

FN13 15 Q. B. D. 11.

FN14 15 Q. B. D. 11.

FN15 15 Q. B. D. 11.

The other question in this case is whether the plaintiffs can recover on the suing and labouring clause. I think the answer to that question depends upon the meaning to be put on the written words "no claim to attach to this policy for salvage charges," and in my opinion those words are intended to exclude any claim under the printed words in the body of the policy. Mr. Hamilton says that if it had been intended that the printed clause should not form part of the contract, it would have been deleted; and he argues that it is possible to give effect to both the print and the writing if the writing be read as referring to salvage charges proper--that is, to a salvage claim arising out of volunteer services. Of course, if I am right in

supposing as I do that "salvage charges" is an equivalent for suing and labouring expenses (and it will be observed that the word "charges" occurs in the print), then the printed clause and the written clause are inconsistent, and the latter must prevail. But, even if I am wrong, I must still consider whether the printed words were intended to stand part of the contract, or were by carelessness omitted to be deleted. If the latter, I ought to read the policy without the words, for, although carelessness should be discouraged, it is not to be punished by injustice. It is quite well known that in policies of marine insurance clauses are frequently left*389 standing which are not intended to constitute any part of the contract. "It is," as was said by Walton J. in Cunard Steamship Co. v. Marten [FN16], "obviously necessary in every case to consider carefully the description of the risk or special kind of indemnity expressed in the written words of the policy in order to ascertain whether any particular clause of the printed form applies to the insurance effected by the policy. It is most unusual to find that the superfluous or inapplicable words have been struck out of the printed form." I do not forget Mr. Hamilton's argument that the words in the present case are neither superfluous nor inapplicable. I am only drawing attention to the fact that in the hurry of business parties frequently omit to alter the printed words so as to make them exactly conform to the contract which they intend to make. Now the contract which I have to interpret was first reduced into writing in the form of what is called a "slip"--a memorandum of the heads of agreement initialled by the different underwriters who were subsequently to subscribe policies. On this slip appear the letters "No s/c," which it is agreed mean "No salvage charges." In pursuance of this slip the policy now sued on was issued, in which the printed words of the suing and labouring clause were not struck out. But it was proved before me that other underwriters on the same slip had issued a policy in which the words were struck out. The plaintiffs apparently accepted both policies without objection. Was one policy right and the other wrong? I think not; for in my opinion both parties knew quite well that the words were inapplicable to the contract they were making, and thought that it was of no importance whether they were left in or struck out. Salvage charges may, no doubt, in some connection mean claims for volunteer salvage services. But it is quite common to use the words for the purpose of describing those expenses which come within the scope of suing and labouring expenditure; and several witnesses of great experience were called before me to say, and they did say very plainly, that used in a policy such as this they were always understood to bear that meaning. Before the action was tried, express*390 notice was given to the plaintiffs that evidence of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

this kind would be called, and yet the plaintiffs called no one to refute it. I am quite satisfied that if I were to allow the plaintiffs to recover under the suing and labouring clause I should be inventing and giving effect to a contract which the parties never intended to make. Further, I think, on the authority of Aitchison v. Lohre [FN17] and Dixon v. Sea Insurance Co. [FN18], that volunteer salvage would not be recoverable at all under this policy. Such a claim would be a claim for a partial loss arising from perils of the sea, and could not be recovered under a policy limited to total loss only. And if this be so, it was a useless form to insert the words "no claim for salvage charges," unless they were intended to exclude claims under the suing and labouring clause. The fact is that this policy is an indemnity against total or constructive total loss only, and against nothing else; and such a loss has not happened. The plaintiffs' claim, therefore, wholly fails.

FN16 [1902] 2 K. B. 624.

FN17 4 App. Cas. 755.

FN18 (1880) 4 Asp. M. L. C. 327.

**Representation**

Solicitors for plaintiffs: Walters, Johnson, Bubb & Whatton.

Solicitors for defendant: Cooper & Co.

Judgment for defendant. (J. F. C. )

(c) Incorporated Council of Law Reporting For England & Wales

END OF DOCUMENT

.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.